UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | § | |
|---|---|---|
| UNITED STATES OF AMERICA, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CRIMINAL NO. 3:17-CR-0169-B |
| | § | |
| SAID AZZAM MOHAMAD RAHIM, | § | |
| | § | |
| Defendant. | § | |

### MEMORANDUM OPINION AND ORDER

Before the Court is Defendant's Motion to Suppress Statements Made to Law Enforcement Agents on March 5 and 6, 2017 (Doc. 79). For the following reasons, the Court **DENIES** the motion.

### I.

### BACKGROUND

At issue in this motion to suppress are two interviews that Federal Bureau of Investigation agents conducted of Defendant Said Azzam Mohamad Rahim. This case stems from the FBI's investigation of the mobile application "Zello." Doc. 80, Br. Mot. to Suppress, 1. The FBI began surveilling communications on Zello in the spring of 2016, after suspicions that the application was being used in connection with support for terrorists organizations. *Id.* (citing Doc. 80, Ex. A). This surveillance led the FBI to believe that Rahim was using Zello to support and promote the Islamic State of Iraq and Levant ("ISIL"). *Id.* The FBI continued to surveil Rahim, eventually discovering that he was planning to travel to Amman, Jordan on March 5, 2017. *Id.* at 2 (citing Ex. C). Rahim

argues that he was traveling to Jordan to see his daughter, who lives there with her mother; the Government, however, suspected he was traveling there to join a terrorist organization. *Id.* Relevant to this motion, the FBI conducted two interviews of Rahim before his arraignment on the charges he now faces.

A.   *Pre-*Miranda *Interview at DFW International Airport.*

On Sunday, March 5, 2017, Rahim went to the Dallas–Fort Worth International Airport to travel to Jordan. Agents with the FBI and the Department of State Diplomatic Security Services (State Department) were stationed at the airport and planned to interview Rahim after he cleared the security check point. Doc. 83, Gov't's Resp., 2. At that time, the agents had already obtained search warrants to seize and search Rahim's luggage. Doc. 80, Rahim's App'x, Ex. C. Before he went through security, Rahim attempted to obtain a boarding pass with an airline agent, but the airline refused to issue him a boarding pass at that time and instead instructed him to proceed to the departure gate to obtain one. Doc. 83, Gov't's Resp., 2.

After passing through security, Rahim claims he was immediately detained by law-enforcement agents, identifying themselves as members of the Joint Terrorism Task Force, and escorted to a private room near his departure gate. Doc. 80, Br. Mot. to Suppress, 2. According to the Government, FBI Special Agent Dan Glick of the State Department approached Rahim at the security checkpoint and discovered from him that he had not received a boarding pass. Doc. 83, Gov't's Resp., 2. FBI Special Agent Dwayne Golomb approached the two once Glick had helped Rahim collect his belongings. *Id.* The agents were wearing plain, unmarked jackets, and their firearms were not visible. *Id.* Special Agent Glick then asked Rahim if he would be willing to speak with him in order to clear up any issues with the airline. *Id.* at 2. Rahim agreed to voluntarily speak to the

agents, stating he had no reason not to answer. Doc. 80, Rahim's App'x, 153. The two agents accompanied Rahim to his gate. Doc. 83, Gov't's Resp., 2. During this walk, Rahim "maintained control of his passport, keys, wallet, and bag." *Id.*[1] At the gate, the agents led Rahim to a small room off of his gate's jet bridge. *Id.* Special Agent Golomb directed Rahim to sit in a chair near the door to the room, and he and Special Agent Glick sat across from Rahim. *Id.* at 2–3. The agents began the interview.[2]

The interview began sometime around 3:00 p.m. Doc. 80, Br. Mot. to Suppress, 2. Rahim's flight was scheduled to depart at 4:10 p.m. *Id.* The agents started by asking Rahim basic questions about his contact information (full name, telephone numbers, email address, place of business). Doc. 80, Rahim's App'x, Ex. F (DFW Interview Tr.), 1–4. The agents then told Rahim: "we've got this questionnaire, you know, that we'd like you to answer voluntarily." *Id.* at 4:25–5:2. The agents then officially introduced themselves and the respective agencies they work for. *Id.* at 5. Special Agent Golomb then informed Rahim that he should be truthful and honest in answering their questions and that "lying to us technically is a Federal crime." *Id.* at 5–6. They then proceeded to ask Rahim questions from the questionnaire. The agents' questions covered the reasons for his travel to Jordan, what family he had in Jordan, and questions about his knowledge of or association with certain terrorist organizations. Doc. 80, Br. Mot. to Suppress, 3. In total, the interview process lasted

---

[1] The only account Rahim provides of this preinterview encounter is that "[i]mmediately upon Rahim passing through security, he was detained by law enforcement agents identifying themselves as members of the Joint Terrorism Task Force and escorted to a private room a few hundred feet from his departing gate." Doc. 80, Br. Mot. to Suppress, 2. Thus, Rahim's version of these facts does not appear to conflict with the Government's.

[2] An audio and video recording of the interview was made. The Government provided a copy to the Court. Doc. 84. The transcript and recording were received into evidence at the Court's hearing on April 15, 2019. The Court has reviewed both the recording and the transcript of the interview.

over an hour and twenty minutes, and by the time it was over, Rahim's flight had departed without him. *Id.* At various points in the interview, Rahim asked about the status of his flight and whether he was going to be able to board the plane. *See, e.g*, Doc. 80, Rahim's App'x, Ex. F (DFW Interview Tr.), 32. The agents assured him at multiple points that his flight had not departed yet and that they were working to find out why he had not received a boarding pass. *Id.*; *id.* at 79–80. The agents told Rahim that the problem appeared to be that the German-based airline did not clear him to fly and that, by answering the questions, the agents would potentially be able to help him obtain a boarding pass. *Id.* at 72, 93; *see also* Doc. 80, Rahim's App'x, 153–54 (agents informing Rahim of the problem with the airline before the interview).[3] Also, towards the end of the interview, the agents requested, and Rahim consented to, another search of his luggage and a search of his cellphone. Doc. 83, Gov't's Resp., 3. While these items were being searched, the agents "chatted" with Rahim about soccer and also confirmed some of his biographical information. *Id.* The Government claims any "meaningful questioning" had concluded at this point. *Id.* The Government also points out that during the interview, airport and airline personnel passed by the room where the interview was taking place on a number of occasions (the Government counts twenty-two, exactly). *Id.* After the agents finished searching Rahim's things, they informed him that his flight had already departed and that he could try to fly again the following day. *Id.* at 4.

It is undisputed that Rahim was never read his *Miranda* rights at this interview. Rahim also points out that at no time during the interview did the agents inform him that he was free to leave

---

[3] Based on the Government's representations at the hearing on this motion, the agents were lying to Rahim about the possibility of him boarding the flight to Jordan. Rahim was marked on the "no-fly" list, and the agents were aware of this. The Government was never under the impression that Rahim would be able to get on his flight that day.

or that he had the option to not answer the agents' questions. Doc. 80, Br. Mot. to Suppress, 2–3. Rahim claims that the agents' representations that they were attempting to help him obtain a boarding pass were a "guise" and that they never intended to let him travel. *Id.* at 3. Indeed, after he left the interview room, Rahim was arrested while he was still at the airport in the drop-off area of the terminal. *Id.* at 4. Rahim was arrested for allegedly making false statements to the agents during the course of that interview. Doc. 83, Gov't's Resp., 4. He was then transported to the Dallas County Jail and held there overnight. *Id.*

Rahim argues that his statements from this interview should be suppressed because the statements were made while he was in law-enforcement custody and subject to interrogation, requiring the law-enforcement agents to provide Rahim with *Miranda* warnings before the statements could be admissible in court. Doc. 80, Br. Mot. to Suppress, 4. The Government responds that there was no *Miranda* violation because Rahim was not in custody when he made the statements. Doc. 83, Gov't's Resp., 5.

B.   *Post-*Miranda *Interview at Dallas FBI Headquarters.*

Rahim was arrested at approximately 4:50 p.m. on Sunday, March 5, 2017. *Id.* at 4. He was accepted into custody at Dallas County Jail around 6:40 p.m. *Id.* Around 9:00 a.m. the next morning, federal agents transported him from the county jail to the FBI Dallas field office. *Id.* He arrived there at around 10:00 a.m. *Id.* After he arrived, the agents started a second interview of Rahim. Two agents proceeded to question Rahim until around 10:56 a.m. One of the agents from the first interview was present at this one as well. The second agent had not been present at the previous interview.

The interview started at approximately 10:13 a.m. *Id.* This time, before the interview started,

the agents read Rahim his *Miranda* rights and Rahim stated he understood his rights. Gov't's Ex. 2, Custodial Interview. Rahim also signed a waiver stating he was read and he understood his rights. *Id.* The agents explained to Rahim that he had been arrested for making false statements to federal agents in his prior interview. Doc. 80, Br. Mot. to Suppress, 3. This interview covered similar topics as the previous interview, but went into more depth on Rahim's use of the mobile app Zello and his association with terrorists organizations made through the app. Gov't's Ex. 2, Custodial Interview. After approximately forty-five minutes of questioning, Rahim appeared to ask for a lawyer; the agents asked him if this was the case and Rahim confirmed that he would like to speak to a lawyer. *Id.*; Doc. 80, Br. Mot. to Suppress, 3. The agents immediately stopped the interview. *Id.*

After the interview, Rahim was processed out of the FBI field office and transported to this courthouse. He arrived at approximately 12:00 p.m. and made his initial appearance in front of Magistrate Judge Toliver at 2:00 p.m.—the standard time that Judge Toliver conducted initial appearances. Doc. 83, Gov't's Resp., 5.

Rahim argues two grounds exist to suppress the post-*Miranda* statements he made in the second interview: (1) there was an unreasonable delay between his detention and presentment to a magistrate, violating *Corley v. United States*, 556 U.S. 303 (2009); and (2) the statements made in the second interview were the fruits of the illegally obtained pre-*Miranda* statements and thus inadmissible under *Missouri v. Seibert*, 542 U.S. 600 (2004). Doc. 80, Br. Mot. to Suppress, 4. As for the first argument, the Government responds that while the post-*Miranda* interview occurred after a six-hour delay in presentment—past the statutory safe harbor in 18 U.S.C. § 3501(c)—the delay was not unnecessary or unreasonable. Doc. 83, Gov't's Resp., 15–19. And with respect to Rahim's second argument, the Government counters that even assuming the first interview violated *Miranda*,

Rahim's statements in the second interview were in fact voluntary under the circumstances and no deliberate two-step strategy was used to coerce the statements. *Id.* at 19–24.

The Court has received the parties' briefing and the relevant exhibits to decide this motion. The Court also held an evidentiary hearing on Monday, April 15, 2019. Based on the parties' arguments and evidence presented at the hearing, the Court denied Rahim's motion to suppress his statements made to law-enforcement agents. *See* Doc. 100, Apr. 15, 2019 Order. This memorandum opinion provides the reasoning for that Order.

## II.

## LEGAL STANDARD

*A.    Miranda's "In Custody" Requirement.*

*Miranda* warnings must be administered prior to "custodial interrogation." *United States v. Bengivenga*, 845 F.2d 593, 595 (5th Cir. 1988) (en banc) (citing *Miranda v. Arizona*, 384 U.S. 436, 479 (1966)). A suspect is "in custody" for the purposes of *Miranda* "when placed under formal arrest or when a reasonable person in the suspect's position would have understood the situation to constitute a restraint on freedom of movement of the degree which the law associates with formal arrest." *Id.* at 596. "Two discrete inquires are essential to the determination: first, what were the circumstances surrounding the interrogation; and second, given those circumstances, would a reasonable person have felt he or she was at liberty to terminate the interrogation and leave." *United States v. Cavazos*, 668 F.3d 190, 193 (5th Cir. 2012) (quoting *J.D.B. v. North Carolina*, 564 U.S. 261, 270 (2011)). "The requisite restraint on freedom is greater than that required in the Fourth Amendment seizure context." *United States v. Wright*, 777 F.3d 769, 774 (5th Cir. 2015) (citing *Bengivenga*, 845 F.2d at 598). "The critical difference between the two concepts . . . is that custody

arises only if the restraint on freedom is a certain degree—the degree associated with formal arrest." *Id.* (quoting *Bengivenga*, 845 F.2d at 598).

"Whether a suspect is 'in custody' is an objective inquiry that depends on the 'totality of the circumstances.'" *United States v. Ortiz*, 781 F.3d 221, 229 (5th Cir. 2015) (quoting *Wright*, 777 F.3d at 774–75). "The subjective views harbored by either the interrogating officers or the person being questioned are irrelevant." *Id.* The Fifth Circuit has identified the following factors relevant to the custody inquiry:

> (1) the length of the questioning; (2) the location of the questioning; (3) the accusatory, or non-accusatory nature of the questioning; (4) the amount of restraint on the individual's physical movement; (5) and statements made by officers regarding the individual's freedom to move or leave.

*United States v. Romero–Medrano*, 207 F. Supp. 3d 708, 711–12 (S.D. Tex. 2016) (citing *Wright*, 777 F.3d at 775). No one factor is determinative. *Wright*, 777 F.3d at 775. In a motion to suppress, the defendant has the burden of proving he or she was under arrest or in custody. *United States v. Webb*, 755 F.2d 382, 390 (5th Cir. 1985) (citing *United States v. Charles*, 738 F.2d 686, 692 (5th Cir. 1984) (overruled on other grounds)).

B.  *Prompt-Presentment Rule.*

Rule 5 of the Federal Rules of Criminal Procedure requires that "[a] person making an arrest within the United States must take the defendant without unnecessary delay before a magistrate judge." *United States v. Boche–Perez*, 755 F.3d 327, 333 (5th Cir. 2014) (quoting Fed. R. Crim. P. 5(a)(1)(A)). "Rule 5 codifies the common-law rule of 'prompt presentment,' which required that an officer take an arrested person before a magistrate 'as soon as he reasonably could.'" *Id.* (quoting *Corley*, 556 U.S. at 306). The Supreme Court established that the remedy for violating the prompt-

presentment requirement is suppression of any confession obtained during a period of unreasonable delay. *Corley*, 556 U.S. at 306–07 (discussing *McNabb*, 318 U.S. 332 (1943) and *Mallory*, 354 U.S. 449 (1957)).

"In 1968, Congress modified the *McNabb–Mallory* framework by enacting 18 U.S.C. § 3501." *Boche–Perez*, 755 F.3d at 333. "Section 3501(c) provides that a court may not suppress a confession made during a six-hour safe-harbor period solely due to a delay in presentment if the confession was made voluntarily." *Id.* at 333–34 (citing *Corley*, 556 U.S. at 322). "Section 3501(c) also permits for an extension of the six-hour safe harbor in any case in which the delay in bringing such a person before a magistrate is found by the trial judge to be reasonable considering the means of transportation and the distance to be traveled to the nearest magistrate." *Id.* But "[c]onfessions provided outside of § 3501(c)'s safe-harbor, however, remain subject to the *McNabb–Mallory* exclusionary rule." *Id.*

Thus, a district court follows a two-step inquiry in a *McNabb–Mallory* challenge: (1) the court must determine length of the delay; and if that delay falls outside of the § 3501(c) safe harbor, then (2) the court determines whether the causes of the delay were justifiable under the *McNabb–Mallory* cases. *United States v. Mero*, 2017 WL 4931704, at *2 (E.D. Tex. Sept. 27, 2017) (citing, *inter alia*, *Boche–Perez*, 755 F.3d at 336). "*McNabb–Mallory* case law rejects delays when those delays have either (1) a non-existent or (2) an unacceptable justification." *Boche–Perez*, 755 F.3d at 336. "A non-existent explanation (i.e., delay for delay's sake) is unacceptable under *McNabb–Mallory* because a delay for delay's sake is, by definition, unnecessary to any legitimate law enforcement purpose." *Id.* (citing *United States v. Yong Bing–Gong*, 594 F. Supp. 248, 254 (S.D.N.Y. 1984), *aff'd sub nom.*, *United States v. Bing–Nam*, 788 F.2d 4 (2d Cir. 1986)). "Similarly, a delay for the purpose of

interrogation "is the epitome of [an] unnecessary delay." *Id.* (citing *Corley*, 556 U.S. at 308). "But beyond either unexplained delays or purposeful delays for criminal interrogations, courts have been 'careful not to overextend *McNabb–Mallory*'s prophylactic rule in cases where there was a reasonable delay unrelated to any prolonged interrogation of the arrestee.'" *Id.* at 336–37 (quoting *United States v. Garcia–Hernandez*, 569 F.3d 1100, 1106 (9th Cir. 2009)). When applying these rules, "a district court should not resort to a 'semanticisim that obscures the facts.'" *Id.* at 338 (quoting *United States v. Leviton*, 193 F.2d 848, 854 (2d Cir. 1951)). "The overall reasonableness of a delay will vary city-to-city, case-to-case, justification-to-justification." *Id.* Finally, it is the defendant that bears the burden of demonstrating a *McNabb–Mallory* violation. *Id.* at 336 (citing *United States v. Brown*, 459 F.2d 319, 324 (5th Cir. 1971)).

C.   *The Admissibility of Post-*Miranda *Statements Under* Missouri v. Seibert and Oregon v. Elstad.

The admissibility of post-*Miranda* confessions that come after pre-*Miranda* confessions is governed by *Missouri v. Seibert*, 542 U.S. 600 (2004) and *Oregon v. Elstad*, 470 U.S. 298 (1985). *See United States v. Delgado–Arroyo*, 358 F. App'x 530, 532 (5th Cir. 2009). "*Seibert* requires the suppression of a postwarning statement only where a deliberate two-step strategy is used and no curative measures are taken; where that strategy is not used, the admissibility of postwarning statements continues to be governed by the principles of *Elstad*." *United States v. Nunez–Sanchez*, 478 F.3d 663, 668 (5th Cir. 2007) (quoting *United States v. Courtney*, 463 F.3d 333, 338 (5th Cir. 2006)) (cleaned up). "*Elstad* allows a postwarning confession even where the police had previously obtained a pre-warning confession, so long as the prewarning confession was voluntary." *United States v. Lim*, 897 F.3d 673, 692 (5th Cir. 2018) (quoting *Nunez–Sanchez*, 478 F.3d at 668) (cleaned up).

Thus, the Court first determines if a two-step strategy was used by law enforcement. The

-10-

"deliberate two-step strategy involves an interrogator relying on the defendant's prewarning statement to obtain the postwarning statement used against her at trial, by confronting the defendant with her inadmissible prewarning statements and pushing her to acknowledge them." *Delgado–Arroyo*, 358 F. App'x at 532 (quoting *Seibert*, 542 U.S. at 621 (Kennedy, J., concurring in judgment)) (cleaned up). For *Seibert* to apply, law-enforcement officers must have used the two-step strategy "in a calculated way to undermine the *Miranda* warning." *Lim*, 897 F.3d at 692 (quoting *Seibert*, 542 U.S. at 622 (Kennedy, J., concurring in judgment)). If the evidence suggests that a deliberate two-step strategy was not used, the Courts turns to the *Elstad* inquiry, under which it examines "the surrounding circumstances and the entire course of police conduct" to determine if the second statement was voluntary. *Id.* (quoting *Nunez–Sanchez*, 478 F.3d at 669). "A statement is involuntary if the tactics employed by law enforcement officials constitute a Fifth Amendment due process violation and are so offensive to a civilized system of justice that they must be condemned." *Id.* (quoting *United States v. Hernandez*, 200 F. App'x 283, 287 (5th Cir. 2006) (quoting *Bengivenga*, 845 F.2d at 601)) (cleaned up). "In cases such as this, a subsequent administration of *Miranda* warnings to a suspect who has given a voluntary but unwarned statement ordinarily should suffice to remove the conditions that precluded admission of the earlier statement." *Id.* (quoting *Nunez–Sanchez*, 478 F.3d at 669).

## III.

## ANALYSIS

The Court starts by determining whether Rahim was "in custody" for the purposes of *Miranda* during his first interview. The Court next decides whether Rahim has shown that law enforcement violated the prompt-presentment requirement. Finally, the Court looks to whether Rahim's

statements in his second interview are admissible under *Seibert* and *Elstad*.

A.      *Rahim Was Not "In Custody" When He Gave His Initial Statements to Law Enforcement at DFW.*

To start, the Court notes it is undisputed that Rahim was neither formally arrested nor given *Miranda* warnings before his first interview at DFW. Thus, the only issue is whether he was otherwise "in custody" as required to trigger *Miranda*'s protections.

The Court must determine whether the circumstances surrounding the first interview would lead a reasonable person to believe the situation constituted a restraint on freedom to the degree the law associates with formal arrest. *Chavira*, 614 F.3d at 133. The Court applies the following five factors to Rahim's case to make this decision:

> (1) the length of the questioning; (2) the location of the questioning; (3) the accusatory, or non-accusatory nature of the questioning; (4) the amount of restraint on the individual's physical movement; (5) and statements made by officers regarding the individual's freedom to move or leave.

*Romero–Medrano*, 207 F. Supp. 3d at 711–12 (citing *Wright*, 777 F.3d at 775).

*Length of Time*—The parties seem to agree that the total duration of the detention at DFW was approximately one hour and twenty minutes. Doc. 80, Mot. to Suppress, 3; Doc. 83, Gov't's Resp., 7. But the Government pushes back on this, arguing that "meaningful" questioning lasted only 48 minutes. Doc. 83, Gov't's Resp., 7. The remaining time, the Government asserts, was taken up with casual conversation, while the Government conducted a consent search of Rahim's luggage and phone. *Id.*

There is no constitutional time limit that definitively triggers *Miranda*. *Romero–Medrano*, 207 F. Supp. 3d at 712. But, "*detention* of a defendant for 'approximately an hour raises considerable suspicion." *Id.* (citing *United States v. Harrell*, 894 F.2d 120, 124 n.1 (5th Cir. 1990) (emphasis

added)). The fact that the Government *detained* Rahim for over an hour—even if the substantive questioning only lasted 48 minutes—raises considerable suspicion and weighs in favor of finding a custodial interrogation occurred.

*Location of Questioning*—The interview took place in a backroom off a jet bridge in DFW. Doc. 83, Gov't's Resp., 9. The FBI agents initially approached Rahim at the DFW security checkpoint and escorted him to this room. *Id.* at 8–9. The backroom had no door and Rahim was seated close to the opening of the room. *Id.* at 9. At various times during the interview, airline personnel passed by the room (the Government counted 22 occasions where this occurred). *Id.* The Government argues these circumstances show that the interview was subject to public scrutiny and in a place—a designated security checkpoint—where Rahim was less likely to be taken by surprise. *Id.* at 8–9. Rahim argues this was a private room in a secured area from which he had no means of exiting. Doc. 80, Br. Mot. to Suppress, 10–11.

This factor is neutral in this case. In analyzing this factor, courts in the Fifth Circuit focus on the element of surprise to the accused. *Romero–Medrano*, 207 F. Supp. 3d at 712 (citing *Bengivenga*, 845 F.2d at 599). Specifically, "[c]ourts have found a reasonable person less likely to perceive restraint when he arrives at an anticipated law enforcement checkpoint." *Id.* (citing *Harrell*, 894 F.2d at 123–24). In *Harrell*, the Fifth Circuit held that an interrogation that occurred at an immigration checkpoint was noncustodial. *Harrell*, 894 F.2d at 124–25. The defendant in that case flew into Dallas on a flight from Mexico City. *Id.* at 122. INS agents stopped him at the immigration checkpoint and escorted him to an INS office separated from the public by glass walls and interior conferences areas. *Id.* The agents interrogated him there for 60 to 75 minutes. *Id.* In analyzing whether the location of the questioning weighed towards finding that the defendant was in custody,

the Fifth Circuit applied case law holding that "law enforcement presence at a fixed checkpoint actually assuages the reasonable person's perception of restraint." *Id.* at 124 (quoting *Bengivenga*, 845 F.2d at 599). Applicable to this case, the *Harrell* court noted that "advance notice obtains and visible signs of authority mitigate rather than enhance the perceived degree of restraint." *Id.* In other words, because the suspect reasonably anticipates that he or she will be subject to some law-enforcement restraint and scrutiny when traveling, it takes some of the surprise out of the situation and weighs against a custodial finding.

But the circumstances here are no exactly like those in *Harrell*. Here, the actual interrogation here occurred in a backroom, out of the eyes of the traveling public. Although the video recording of the interview shows airport personnel and other government officials passing by the interview room during the interrogation, this is not as public as the location of questioning in *Harrell*, where the defendant was in plain view of the public through glass walls of the interrogation room. It seems reasonable that a person would feel a greater degree of restraint when he or she is taken away from a public security checkpoint to a private room that is accessible and visible only to airport staff. However, the Court doesn't believe these circumstances rise to the level of other cases where courts found interrogations were custodial based on the location of the questioning; for example, in *Romero–Medrano*, the district court found a defendant to be in custody when officers woke him up early from his own home, removed him from his home (while still in pajamas), and escorted him to a police vehicle where he was interrogated. 207 F. Supp. 3d at 712. In that case, the court found a reasonable person would not feel free to leave the interrogation under those circumstances in part because the degree of surprise associated with the officer's tactics was greater than one would perceive at a security checkpoint. *Id.* (comparing *Harrell*, 894 F.2d at 123–24 with *Cavazos*, 668 F.3d

at 194). The facts here lie somewhere in between those presented in *Harrell* and *Romero–Medrano*. The Court thus finds that this factor does not weigh substantially in favor of either party.

*Nature of Questioning*—"The *awareness* of the person being questioned by an officer that he has become the 'focal point' of the investigation, or that the police already have ample cause to arrest him, may well lead him *to conclude, as a reasonable person*, that he is not free to leave." *Bengivenga*, 845 F.2d at 597 n.16 (emphasis in original). In analyzing this factor, courts look to whether the officers indicated to the defendant that he or she was the "focal point of their investigation," or that he or she was the suspect of a crime. *See Romero–Medrano*, 207 F. Supp. 3d at 712. For example, in *Romero–Medrano*, the district court found this factor weighed in favor of custody where the agents involved told the defendant that "they knew a crime had been committed, and they advised him to tell the truth about his involvement." *Id.* at 713. On the other hand, when the defendant is not told that he is the suspect of a crime, courts are less likely to find a custodial interrogation. *See, e.g.*, *Harrell*, 894 F.2d at 125.

Here, like in *Harrell*, Rahim was never told that he was suspected of a crime, nor did the agents accuse him of lying during the interview. Doc. 83, Gov't's Resp., 11. Much like *Wright*, "the transcript of the interview, and the cooperative tone throughout, highlights that the conversation was as much an opportunity taken by [Rahim] to tell his story to the officers as it was an opportunity taken by the officers to get information from [Rahim]." 777 F.3d at 777. At many points in the interview, the tone was casual—for example, the conversation turned to soccer and neighborhoods in Dallas. Doc. 83, Gov't's Resp., 11; *see, e.g.*, Doc. 80, Rahim's App'x (DFW Interview Tr.), 15–16, 18. The fact the agents warned Rahim that being untruthful or dishonest in answering their questions is not accusatory; this was a warning about his statements going forward, not an

-15-

insinuation that he was already suspected of committing some crime. The Court does not find that warnings about lying, before questioning even begins, color the questioning with an accusatory air. Rather, besides the casual asides, the agents did not appear to substantially deviate from the questionnaire form and did not once suggest Rahim was lying or the target of a criminal investigation. The Court finds this factor weighs against finding that Rahim was in custody.

*Amount of Restraint on Individual's Physical Movement*—There is no evidence here that Rahim was physically restrained before or during the interrogation. Rahim was also in possession of his passport, wallet, and luggage during the interview (the agents did examine his passport at various times). Doc. 83, Gov't's Resp., 2. The agents did not brandish or display weapons at Rahim. Thus, like other cases where defendants weren't handcuffed or restrained in someway, *see, e.g., Wright*, 777 F.3d at 776, the Court has no trouble concluding that this factor weighs against a finding of custodial interrogation.

*Statements Made Regarding Individual's Freedom to Leave*—"The Fifth Circuit has found that defendants were not in custody when they were told they were not under arrest and were free to leave." *Romero–Medrano*, 207 F. Supp. 3d at 714 (citing *United States v. Collins*, 972 F.2d 1385, 1405 (5th Cir. 1992)). Here, Special Agent Glick asked Rahim at the security checkpoint if he would be willing to speak with him. Doc. 83, Gov't's Resp., 14. Both agents say they told Rahim on the walk to his gate that his cooperation in sitting down with them was voluntary. *Id.* Further, in the jet-bridge room right before the interview, the agents told Rahim: "we've got this questionnaire, you know, that we'd like you to answer voluntarily." Doc. 80, Rahim's App'x, Ex. F (DFW Interview Transcript), 1–4. The Government argues that a reasonable person would have understood, in these circumstances, that he or she was free to stop answering questions and leave. Doc. 83, Gov't's Resp.,

14. Rahim argues that he was never told that refusing to answer was an option and that the agents wrongfully led him to believe that he had to answer their questions to obtain a boarding pass to make his flight. Doc. 80, Mot. to Suppress, 11. At the hearing, the Government admitted that the agents lied to Rahim and that they never believed Rahim would be able to fly. However, the Government asserted that even if this was a lie, it was not improper and does not affect the noncustodial nature of this interview. The Court finds that the law is on the Government's side. *See Oregon v. Mathiason*, 429 U.S. 492, 495 (1977) (holding that officer's lies to the defendant that his fingerprints were found at crime scene had "nothing to do with whether [the defendant] was in custody for purposes of *Miranda* rule"); *see also J.D.B. v. North Carolina*, 564 U.S. 261, 271 (2011) ("[T]he subjective views harbored by either the interrogating officers or the person being questioned are irrelevant.") (internal quotations removed).

Thus, the fact that the agents' representations to Rahim about his possibility of making his flight were false does not bear on the custodial analysis. The Court finds that the agents' statements would not make a reasonable person feel restrained or required to answer their questions. The agents never told Rahim he was under arrest or that he was required to accompany them. Nor did they tell him he was required to answer their questions to travel or to leave. To the contrary, the Government presented evidence that shows the agents told Rahim multiple times that his participation in the interview was voluntary. Doc. 80, Rahim's App'x, 153; Doc. 80, Rahim's App'x, Ex. F (DFW Interview Tr.), 4–5. The Court thus finds this factor weighs slightly against finding Rahim was in custody.

*Totality of the Circumstance*—to conclude this analysis, the Court looks at the above circumstances in an objective light. *J.D.G.*, 564 U.S. at 270. The only factor that clearly weighs in

Rahim's favor is that the length of the interrogation and detention lasted more than an hour. But this alone is not dispositive. *See Wright*, 777 F.3d at 777 (noting that *Harrell*, 894 F.2d at 124 n.1, "reject[ed] the broad proposition that an hour-long delay constitutes a *per se* custodial interrogation") (cleaned up). And the other factors, all together, tend to support the Government's claim that this was a noncustodial affair—the interview occurred in a semi-public area; the questioning was nonaccusatory (and even casual at times); Rahim was not in anyway physically restrained; and the agents made no statements that would cause a reasonable person to believe he or she was not free to leave. The Court finds that Rahim was not in custody during this first interview for the purposes of *Miranda*, and Rahim's motion to suppress the first interview is denied.

B.   *Law Enforcement Did Not Violate the Prompt-Presentment Rule.*

Rahim argues that his statements in the second interview—made after he was *Mirandized*—should be suppressed because law enforcement unreasonably delayed in bringing him before a magistrate. Doc. 80, Mot. to Suppress, 13–14. Because the Government concedes that the delay here was outside § 3501(c)'s six-hour safe-harbor window, the only issue is whether the delay was justifiable under the *McNabb–Mallory* line of cases. *Boche–Perez*, 755 F.3d at 336. The Court reiterates that Rahim has the burden of demonstrating a violation. *Id.*

The case law is clear that delays for the sake of delay, or delays for the purpose of interrogation run afoul of the *McNabb–Mallory* doctrine. *Id.* But, as explained above, reasonable delays unrelated to prolonged interrogation of the arrestee do not violate *McNabb–Mallory*. *Id.* at 336–37. Thus, delays related to legitimate law-enforcement procedures are acceptable. *Id.* at 337. And, important here, delays "arising from a shortage of governmental personnel necessary for the initial appearance and transportation thereto . . . also remain acceptable." *Id.* (citing *United States*

*v. Garcia–Hernandez*, 569 F.3d 1100, 1106 (9th Cir. 2009)). Specifically, courts "also accept delays when the delays arise out of the unavailability of the magistrate." *Id.* at 338. "A magistrate can be considered unavailable due to a host of reasons including: a busy docket; a closed court; or other factors, such as distance and weather[.]" *Id.* (citing, *inter alia*, *United States v. Carter*, 484 F. App'x 449, 457–58 (11th Cir. 2012)). "The prompt-presentment requirement does not require a magistrate to be available twenty-four hours a days[.]" *Id.*

The Court finds the arresting agents' actions in this case to be reasonable. Rahim was arrested on a Sunday afternoon, around 4:50 p.m.; the agents brought him to this Court at around 12:00 p.m. the next day. Doc. 83, Gov't's Resp., 5. Magistrate judges in this Court typically conduct initial appearances from 1:00–2:00 p.m. on weekdays. At the time of Rahim's arrest, Magistrate Judge Toliver, who was assigned the case, held her initial appearances Monday to Friday at 2:00 p.m. Thus, the agent's here acted reasonably in bringing in Rahim when they did. Any delay that occurred because this Court was closed on Sunday or because of Judge Toliver's afternoon scheduling was not unreasonable. The Court finds that Rahim has not met his burden of showing law enforcement unreasonably delayed in bringing him before a magistrate in violation of *McNabb–Mallory*.

C.  *The Court Refuses to Suppress Statements Made in the Second Interview Because There Was No* Miranda *Violation in the First Interview.*

Rahim argues statements made in his second interview should be suppressed because they are the fruit of the poisonous tree—i.e., the product of his un-*Mirandized* first statements. Doc. 80, Mot. to Suppress, 14. But the Court has already found, *supra* Section III.A, that there was no *Miranda* violation regarding Rahim's first statements because that interview was noncustodial. Thus, the Court holds that Rahim's statements in the second interview are admissible, and Rahim's motion

to suppress these statements is denied.

## IV.

## CONCLUSION

For these reasons, the Court **DENIES** Defendant Said Azzam Mohamad Rahim's Motion to Suppress (Doc. 79).

**SO ORDERED.**

**SIGNED: April 19, 2019.**

_____
JANE J. BOYLE
UNITED STATES DISTRICT JUDGE