THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

UNITED STATES OF AMERICA, )
                          )
          Plaintiff,      )
                          )
vs.                       )  3:17-CR-00169-B
                          )
SAID AZZAM MOHAMAD RAHIM, )
                          )
          Defendant.      )

TRANSCRIPT OF PROCEEDINGS
PRETRIAL CONFERENCE
BEFORE THE HONORABLE JANE J. BOYLE
UNITED STATES DISTRICT JUDGE
APRIL 26, 2019

A P P E A R A N C E S

For the Government:

    UNITED STATES ATTORNEY'S OFFICE
    1100 Commerce Street - 3rd Floor
    Dallas, TX  75242
    214/659-8600
    BY:  ERRIN MARTIN
and
    U.S. DEPARTMENT OF JUSTICE
    Counterterrorism Section, National Security
    Division
    950 Pennsylvania Avenue, NW
    Washington, DC  20530
    202/532-4162
    BY:  TARYN MEEKS

For the Defendant:

    WHALEN LAW OFFICE
    9300 John Hickman Parkway - Suite 501
    Frisco, TX  75035
    214/368-2560
    BY:  JAMES P. WHALEN
         RYNE T. SANDEL

```
COURT REPORTER:   SHAWNIE ARCHULETA, TX CCR No. 7533
                  1100 Commerce Street
                  Dallas, Texas 75242

proceedings reported by mechanical stenography,
transcript produced by computer.
```

```
 1              (In open court at 9:55 a.m.)
 2              THE COURT:  Good morning.  Let me just get
 3    this stuff out here.
 4              This is Case Number 3:17-CR-169, United
 5    States v. Rahim.  We are here for the pretrial
 6    conference.  The trial is going on Monday.
 7              For the government, who do I have?
 8              MS. MARTIN:  Yes, Your Honor.  Errin
 9    Martin, Taryn Meeks and Brian Portugal for the
10    government.
11              MR. WHALEN:  James Whalen and Ryne Sandel
12    for the defendant, Your Honor.
13              THE COURT:  Are you going to speak
14    first Ms. --
15              MS. MARTIN:  Yes, Errin Martin.
16              THE COURT:  Yes.  Ms. Martin, come up
17    here.
18              Do you have anything you want to say
19    about -- we will go through each of the motions, but
20    I wanted to see if you had anything up front to say?
21              MS. MARTIN:  I don't know if the Court
22    wanted to start with some of the housekeeping
23    questions or wait until the end.
24              THE COURT:  Just ask some of them, and I
25    will tell you if we will wait until the end.
```

```
 1            MS. MARTIN:  Your Honor, one of the things
 2   we anticipate happening at trial is there -- I mean
 3   the Court has probably seen that most of the
 4   evidence are audio recordings and transcripts of
 5   those.  Those audio recordings are in Arabic.
 6            THE COURT:  Are in Arabic?  All right.
 7            MS. MARTIN:  Yes, ma'am.
 8            The government plans to play several of
 9   those audio recordings in order to do voice
10   identification with the linguist; however, we would
11   propose not to play every single Arabic audio
12   recording because, in fact, the transcripts are the
13   evidence when it's in a foreign language.  So we
14   wanted to flag that for the Court.
15            THE COURT:  Okay.  Mr. Whalen, anything
16   you wanted to say about that?  Any particular
17   objections you make to that?  Do you agree with her
18   that the transcripts are the evidence because it's
19   in a foreign language?
20            MR. WHALEN:  Yeah, I should probably --
21   yes, I would probably be okay with that as long as
22   the linguist can lay all the predicate, that they
23   have read them and that's the accurate translation.
24   I would probably be okay with that from that
25   standpoint.
```

```
 1              THE COURT:  Okay.  What else?
 2              MS. MARTIN:  Your Honor, along this --
 3              THE COURT:  And I'm not sure if I'm okay
 4   with it, but just go ahead.
 5              MS. MARTIN:  Your Honor, along those
 6   lines, the government in this case has the audio and
 7   then transcript books or binders for the jury.  But
 8   when the linguist is testifying, the government
 9   intends to play five or six that have the transcript
10   synced with the audio just so the linguist can walk
11   through how she has listened to all of them and
12   matched them up with the voice of the defendant.
13              Additionally, intent -- you know, we
14   anticipate one of the defenses is going to be, "I
15   said it, but I didn't mean anything."  So I think
16   hearing the voice with the words when it's in a
17   foreign language will be important.  So the
18   government would ask permission for just those six
19   to run the synced transcript with the audio.
20              THE COURT:  Okay.  Mr. Whalen?  You can
21   think about this for a while.  But do you have
22   anything to say up front?
23              MR. WHALEN:  No, not up front.  The only
24   thing that I will say that I'm just thinking -- so
25   I'll say it because I'll forget -- is the statement
```

```
 1   about the linguist identifying Mr. Rahim, that she

 2   identified his voice.  I guess the question would

 3   become -- you know, as long as the predicate is

 4   laid, how she identified his voice and is familiar

 5   with his voice, then I think that probably would be

 6   okay.  But I will let the Court --

 7             THE COURT:  Yeah, but I mean, she's got to

 8   say it's him somehow.  And you know that,

 9   Ms. Martin, right?

10             MS. MARTIN:  Yes, Your Honor.

11             THE COURT:  All right.  What else?

12             MS. MARTIN:  And then just timing on -- we

13   were going to ask the Court about amount of time for

14   voir dire, amount of time for opening statements.

15             THE COURT:  Okay.  I'll talk about that

16   later.

17             What else?

18             MS. MARTIN:  I think that's it for now,

19   Your Honor.

20             THE COURT:  Mr. Whalen, come on up.

21             MR. WHALEN:  The only thing I would have

22   preliminarily as far as Mr. Rahim goes today is,

23   he's in leg irons and handcuffs.  Is that going to

24   be the protocol for the trial and at least for the

25   purposes of this hearing, that he not be handcuffed
```

```
 1   so he can take notes and participate in his trial?
 2   But as far as the leg irons, I need to know what the
 3   protocol is going to be for that.
 4            THE COURT:  Okay.  Okay.  The Marshals --
 5   can you tell us what you think the protocol should
 6   be?
 7            THE MARSHAL:  Yes, ma'am.  As far as
 8   however you want it to be.  If you want to put leg
 9   irons or not, I will defer to the Court.
10            THE COURT:  I don't think I want the leg
11   irons, and I don't think I want the handcuffs.  But
12   if anything goes wrong, then, you know, he's going
13   to be hooked up again.  Again, you know, we have to
14   do whatever we can to make sure the jury doesn't
15   know that he's in custody.  So he's going to have
16   clothes up there?
17            MR. WHALEN:  Yes, we will have clothes on
18   Monday morning.
19            THE COURT:  All right.  Let me just think
20   about the leg irons.  The hands will be free.  All
21   right.  The leg irons may be on.  All right.  I just
22   have to think about that.  All right.
23            MR. WHALEN:  And then, if you decide about
24   the leg irons, I know in the past in the previous
25   trial, they used more of a seatbelt material so you
```

```
 1  didn't hear the sound and the noise of the chains if
 2  he was moving around.  So we want to make sure
 3  there's an accommodation for that as well, so. . .
 4          THE COURT:  Okay.  I'm asking the Marshals
 5  about this.  I realize we're catching the Marshal
 6  somewhat offguard.  But, you know, can you fix the
 7  leg irons so they are like Mr. Whalen said and you
 8  can't hear them?
 9          THE MARSHAL:  Yes, ma'am.
10          THE COURT:  We will make sure it's okay
11  before the jury comes out.  All right?
12          MR. WHALEN:  Okay.  I don't think I have
13  anything else off the top of my head other than what
14  we will talk about throughout the day.
15          THE COURT:  All right.  Let's go through
16  the motions.  I'm going to start with the
17  government's motions, and let me just pull those.
18          All right.  Government's motions in
19  limine.  That's Document 111.
20          Does everyone have that?  Ms. Martin?
21          MS. MARTIN:  Yes, Your Honor.
22          THE COURT:  Mr. Whalen?
23          MR. WHALEN:  Your Honor, I'm seeing 96.1.
24  But is the subsequent filing --
25          THE COURT:  Government's Motion in Limine
```

```
 1   111.  I have an extra one.
 2              MR. WHALEN:  Okay.  If you do -- I think
 3   it's the same.
 4              MS. MARTIN:  Your Honor, I think the one
 5   you are talking about is the motion to seal that had
 6   it behind it.
 7              THE COURT:  Oh, do you have it behind it?
 8              MR. WHALEN:  Right, I have 96.1, which is
 9   behind their motion --
10              THE COURT:  Yes.  Okay.  Okay.  You have
11   it.
12              All right.  Let's start.  Ms. Martin, come
13   on up.
14              MS. MEEKS:  Hi.  Good morning, Your Honor.
15              THE COURT:  I'm sorry you are Ms.?
16              MS. MEEKS:  Ms. Meeks, Your Honor.
17              THE COURT:  Meeks.  All right.
18              MS. MEEKS:  If it pleases the Court, I
19   will be handling the first two portions of the
20   government's motion in limine.
21              With regard to the first motion in limine,
22   as far as the interview technique of deception, the
23   government primarily rests on its motion; however,
24   just notes to the Court that it is a common tactic
25   for law enforcement to use what is commonly called
```

1    deception techniques or techniques that are in --
2    some questions that are in some way misleading and
3    that the analysis really should be on whether the
4    questions overwore the will of the defendant.
5              At this point, the Court has already ruled
6    on the admissibility of the statements.  Therefore,
7    the government's motion in limine would preclude or
8    request to preclude the defense from making
9    arguments in closing or statements in opening or
10   cross-examining on the validity of the deception
11   technique.
12             THE COURT:  Right.  But what is to stop
13   them from asking about it?
14             MS. MEEKS:  Your Honor, I think that it
15   would be fair for the defense to ask whether or not
16   those questions were truthful, but I don't think,
17   Your Honor, it would be fair for defense then to act
18   in a manner or suggest with questionings or argument
19   that it was --
20             THE COURT:  I agree.
21             MS. MEEKS:  Okay.
22             THE COURT:  Let me hear from Mr. Whalen,
23   though.
24             MR. WHALEN:  Your Honor, we're not going
25   to suggest that his statements are involuntary or

 1  inadmissible or anything like that, because you have

 2  ruled on that.  But I do think it's fair game to be

 3  able to talk about their investigative techniques

 4  and however the jury wants to weigh that.

 5          THE COURT:  I think so, too.  I think the

 6  investigative techniques are fair game.  To the

 7  extent you try to argue that it's unfair and

 8  voluntary, I'll stop you.  But the motion in limine

 9  is granted in part and denied in part.

10          All right.  Ms. Meeks, what's the next

11  one?

12          MS. MEEKS:  Thank you, Your Honor.

13          The government also has reason to believe

14  that the defense will try to explore the use of FISA

15  at trial.  The Court has likewise ruled on the

16  constitutionality and the legality of the

17  collection.  So the government's requesting in this

18  case that the Court preclude the defense counsel

19  from further exploration of the use of FISA in this

20  case.

21          THE COURT:  In any sense, any sense at

22  all.

23          MS. MARTIN:  Your Honor, I think that it

24  would be permissible for the defense -- because

25  there is a public filing that there has been

```
 1   affirmative use of FISA collection -- to note that.
 2          However, what the government is concerned
 3   with is twofold:  The inadvertent disclosure or
 4   exploration of what is still classified information,
 5   which would be impermissible pursuant to CIPA 5, and
 6   then there is a CIPA 8 objection as well, but also
 7   about making this sort of a public referendum on the
 8   fairness of FISA.  And the government is cautious
 9   and hopes the Court will also be cautious of
10   allowing this to become a sort of sideshow where we
11   are asking the jury to make determinations on
12   whether the government should, when this is a legal
13   technique.
14          THE COURT:  Okay.  Thank you.
15          Come on up, Mr. Whalen.
16          MR. WHALEN:  Your Honor, I think as far as
17   getting into it to disclose any type of classified
18   information, I wouldn't know what to ask, because I
19   don't know what it is.  So I don't think we get down
20   that road.
21          I do think -- I don't think it's going to
22   become a referendum on investigative techniques, but
23   I do think it could be a potential fair argument.
24   Because the government would get to argue in closing
25   argument about a plea to law enforcement and safety
```

1   and security, and I think I get to be able to

2   respond to that in some way, shape or form.

3            THE COURT:  In what way?  Give me an idea.

4            MR. WHALEN:  Well, I think I get to

5   comment on what weight they should give all that.  I

6   think it kind of goes to the nature of the

7   investigation, the amount of the investigation that

8   got done, and what weight they should put into that.

9   I don't necessarily think I'm going to be critical

10   of what FISA is, because that is an argument for a

11   different day.  But I do think I get to comment on

12   the different techniques they used and to what

13   extent the jury can weigh that.

14            THE COURT:  Ms. Meeks, what do you say?

15            MS. MEEKS:  Thank you, Your Honor.

16            With regard to the techniques that are

17   used, that borders very closely to how FISA is

18   collected, and that information is still classified.

19   So while the government concedes that the defense

20   could very generally refer to the fact that there

21   was FISA in this case, I think that it would be

22   inappropriate and embordering into classified

23   territory to go any further.

24            THE COURT:  I'm going to grant the motion

25   in limine except for very narrowly mentioning FISA.

14

1    And if you think you need to get more into the

2    techniques, we can do that at the time, but I'm

3    going to grant the motion in limine right now.

4              Okay.  What else is there?

5              MS. MARTIN:  Your Honor.

6              THE COURT:  Come on up, Ms. Martin.

7              MS. MARTIN:  Your Honor, with respect to

8    Government's Motion in Limine Number 3, the

9    invocation of the First Amendment and freedom of

10   speech.  While we believe it's appropriate to -- for

11   the defendant to argue speech with respect to

12   intent, "I was just talking, this isn't a criminal

13   act," we believe that's appropriate.  But any kind

14   of invocation of wrapping themselves in the First

15   Amendment or -- you know, "If they're going to do

16   this to him, you're next."  Or any kind of argument

17   or inference that they infringed on his First

18   Amendment rights or that the government has

19   infringed on his First Amendment rights is

20   inappropriate.  The Supreme Court has held that

21   2339B does not infringe on a defendant's First

22   Amendment rights, so any argument --

23             THE COURT:  It can.  It actually can.  So

24   there are times when it can, right?  I mean, I read

25   that in the cases.

```
 1            MS. MARTIN:  Well, Your Honor, I believe
 2    that it could.  But any call to the jury that the
 3    government's overreach, you know, like, "They're
 4    next," you know, "What you're saying on line now,
 5    you're fair game," when actually he's charged with
 6    material support to terrorism.  He can't recruit, he
 7    can't use his words to recruit, and that's what he's
 8    charged with.
 9            THE COURT:  Right.  So that's not First
10    Amendment.
11            MS. MARTIN:  Correct.  So any argument
12    that this is the government's overreach and that the
13    First Amendment is what's really the issue would be
14    distracting for the jury because it's not truly the
15    issues in this trial.  It is whether what he said
16    was recruitment.
17            THE COURT:  Mr. Whalen.
18            MR. WHALEN:  The way I read the cases that
19    have addressed the issue, the cases, if I recall
20    them correctly, dealt with a motion to find the
21    statute unconstitutional.  And I think what the
22    cases said, is, no, this is a reasonable imposition
23    on a restriction based on the statute.  However, I
24    do think it's important, because in the statute
25    in --
```

1          THE COURT:  It specifically says.

2          MR. WHALEN:  It specifically says it's not

3     going to abridge the exercise of rights guaranteed

4     under the First Amendment.  So I think it is fair

5     game for a jury to decide, hey, we don't think these

6     statements gave rise to material support, it was him

7     exercising his right to free speech.  I think that's

8     a fact issue the jury gets to decide.

9          THE COURT:  I think it is, too.  And I

10    will not let you go too far with it, but I think the

11    free speech issue is fair game to a certain extent.

12    I don't know how far it is, but I think I will allow

13    you to do that to a certain extent.  So I'm denying

14    the motion on that.

15         What's the next motion?

16         MS. MARTIN:  Your Honor, Government's

17    Motion in Limine Number 4 is agreed to by the

18    defendant, and it deals with any comments on

19    punishment or the length of time in prison the

20    defendant would be facing if convicted in this case.

21         THE COURT:  Okay.  Agree to.  Thank you.

22         And that -- let's see.  Do I have any

23    other motions in limine from you?

24         MS. MARTIN:  No, Your Honor.

25         THE COURT:  Okay.  Let me go through the

```
 1   defense motions in limine, then.
 2              Mr. Whalen, come on up.
 3              I have -- we have to talk about the prayer
 4   thing, but let's do your motion and supplemental
 5   motion in limine.
 6              MR. WHALEN:  Okay.
 7              THE COURT:  What's your first motion?
 8              MR. WHALEN:  Sure.  Your Honor, just for
 9   the record, I'm referring to Document 87.
10              The first one is regarding 404(b), motion
11   in limine as it relates to any 404(b) evidence.  The
12   government has filed a notice of 404(b), and we
13   would simply request that there be a hearing on
14   those issues prior to any reference to them or
15   admissibility in front of the jury.
16              THE COURT:  Okay.  That's a pretty broad
17   request, because there are all sorts of things that
18   can be considered 404(b) in this case.
19              Let me hear from Ms. Martin.
20              MS. MARTIN:  Yes, Your Honor.  With
21   respect to the notice 404(b), on the first intent,
22   the -- or the first portion, which discusses the
23   defendant making statements that he was a member of
24   Hamas.  And those happened -- there is an error in
25   the notice.  It should be 2015, December 30th, 2015.
```

```
 1   Those are recorded.  That's audio recordings where
 2   he's stating it.  It's during the course of the
 3   conspiracy and relevant to the charges.
 4            These statements are probative of his
 5   knowledge -- one of the things the government has to
 6   prove is the defendant knew that it was a designated
 7   foreign terrorist organization or that ISIS engaged
 8   in terrorism.  His statement that he used to be
 9   Hamas go directly to the element of the defense.
10            Additionally, he has a leadership role in
11   this channel with thousands and thousands of members
12   across the nation.  And this is his bona fides to
13   the other coconspirators and to the individuals he's
14   trying to recruit to join ISIS and to commit jihad
15   for ISIS.
16            THE COURT:  It's a 2015 recording?
17            MS. MARTIN:  Yes, Your Honor.
18            THE COURT:  Okay.  Okay.  Mr. Whalen.
19            MR. WHALEN:  Your Honor, as it relates to
20   him, whether or not he was a member of Hamas or
21   supporting Hamas, I think that is more prejudicial
22   than it is probative.  I don't think it is intrinsic
23   to the conspiracy.  That's a separate issue, and so
24   I don't think it is part and parcel.  And I also
25   think that the necessity of it is not -- based on
```

1    the recordings that they intend to present, there is

2    no necessity for them to provide that.

3            THE COURT:  Okay.  I'm going to deny the

4    motion as to this one and the 2015 recordings.  I

5    think they are relevant, because they are intrinsic

6    evidence of his intent and knowledge and everything

7    he was going after.  And also that goes -- 404(b),

8    they go to motivation and intent.  I deny the

9    request as to that.

10           Ms. Martin are there others?

11           MS. MARTIN:  Yes, Your Honor, we believe

12   the remainder of the motion is truly 404(b) and not

13   intrinsic.  But we believe that any suggestion that

14   it was just talk, he didn't really mean it when he

15   tells people to run over individuals in trucks, he

16   made a statement in 2007 to a border patrol official

17   that he had run over someone on a bicycle and that

18   his family paid $30,000 to get him out of it.  He

19   also made statements about getting caught with an

20   illegal weapon in Chicago.  And we believe this also

21   goes to whether or not he could -- had the means and

22   the intent to commit the crimes that he's charged

23   with, recruiting to commit.

24           THE COURT:  I don't need to hear from you

25   on that.  I'm going to grant the motion as to those

```
 1   two.  Those are extraneous.  And not only that, they
 2   have nothing to do with terrorism.  You may argue
 3   that they do, but they really don't.  You can say
 4   that they do, but I don't see them.  And I am going
 5   to deny that request, grant the motion as to those
 6   and just see where we go with that.
 7             What else did you have, Ms. Martin?
 8             MS. MARTIN:  Those are the only matters
 9   that we filed a 404(b) notice on.
10             THE COURT:  Okay.  Let's see.
11             Mr. Whalen, come on up.
12             What else did you have?
13             MR. WHALEN:  Your Honor, in Document 87,
14   Number 2, there has been a notice of expert
15   witnesses.  And basically what we are asking in that
16   motion in limine is that the witnesses be confined
17   to what is -- what was listed in the notice and that
18   they not be allowed to go past anything else than
19   what's been listed in the notice and that's
20   intricate.
21             THE COURT:  Okay.  Ms. Martin.
22             MS. MARTIN:  Your Honor, Ms. Meeks is
23   going to address this one.
24             THE COURT:  Okay.  Ms. Meeks.
25             MS. MEEKS:  Your Honor, the government did
```

1   file an initial notice to comply with the notice of

2   experts.  The government also filed an amended

3   government notice as well.  And attached to that was

4   a lengthy summary of what the expert witnesses,

5   particularly Dr. Vidino, would be talking about.  It

6   goes something along five pages of all the subject

7   matter that Dr. Vidino would likely enter into.  We

8   feel that that complies.  It was filed on

9   April 15th as the amended notice, and we feel that

10  that complies with the notice requested by the

11  defense in this case and should satisfy their

12  request.

13          THE COURT:  And they are not going --

14  Mr. Whalen, if they don't go beyond what they have

15  filed notice, an extended notice on, do you have any

16  objections, besides your typical objections?

17          MR. WHALEN:  No objection.  And I don't

18  know if we want to address this now, but I do think

19  we are requesting there be a 702 hearing as to

20  Dr. Vidino to see whether or not he is qualified to

21  give these opinions and have that done outside the

22  presence of the jury.

23          THE COURT:  Ms. Meeks.

24          MS. MEEKS:  Well, the government would

25  cite that it's not necessary.  Dr. Vidino has

```
1   testified in numerous district courts around the
2   country on this exact subject matter on terrorism
3   and how it relates to ISIS specifically.  He runs
4   two international programs, one from George
5   Washington and one out of Italy.  He has an
6   extensive CV and education and experience.  So
7   having already qualified as an expert witness in --
8   I want to say, Your Honor, in five different trials,
9   it seems unnecessary to qualify him here.
10            THE COURT:  You know, I don't see any harm
11   in it because this is new to me and really new to
12   all of us, except maybe you.  But I would like to
13   hear summarily what he's going to say ahead of time
14   just to get the idea that it is okay for the jury to
15   hear that.  I'm not used to having experts testify
16   in criminal cases.  I know they do quite a bit in
17   terrorism cases.
18            So I'm going to grant that request that
19   there be a hearing, a short hearing.  And otherwise
20   Ms.  -- what Ms. Meeks has said about your
21   disclosure, Mr. Whalen is okay with that, so I will
22   deny the request to the extent they have given the
23   full disclosures.  But I will grant the request to
24   the extent that we're going to have a hearing.
25            MS. MEEKS:  Yes, Your Honor.
```

```
 1              THE COURT:  Number 3.

 2              MR. WHALEN:  Your Honor, Number 3 relates

 3    to there's some -- in the discovery, some offense

 4    reports from Dallas PD that we saw that dealt with

 5    or some suggestion that Mr. Rahim possessed or sold

 6    firearms or ammunition or other type of illegal

 7    weapons of some kind, and so we are objecting there

 8    not be any reference to that.

 9              THE COURT:  Ms. Meeks.

10              MS. MEEKS:  Your Honor, the government has

11    no intention to go into the disposition of whether

12    the firearms were lawful or unlawful.  However, the

13    government does have video from a pole camera

14    footage of the defendant holding a handgun outside

15    of his place of business and walking around with

16    that in plain sight.

17              And due to the nature of the charges in

18    which the defendant has repeatedly called for

19    various violent actions on behalf of ISIS, to

20    include shootings and to include specifically how

21    easy it is to get a weapon in America, how everyone

22    is armed and that's why it's easy to commit attacks

23    here, the government finds that it's relevant.

24              THE COURT:  When was that?

25              MS. MEEKS:  That exact statement?
```

```
1              I don't have the exact date, but it was
2    within the scope of the conspiracy and the
3    investigation.
4              THE COURT:  Mr. Whalen.
5              MR. WHALEN:  Your Honor, my view of that
6    would be that it's 404(b).  And I think it's
7    somewhat of a stretch to say that because you can
8    legally possess firearms in the United States, that
9    that therefore leads to some propensity to commit a
10   terrorist act.
11             THE COURT:  I grant the motion on that.
12   Okay.  That doesn't mean it doesn't come in, but it
13   doesn't come in without approaching the bench and
14   all of that.
15             Four.
16             MR. WHALEN:  Number 4.  There's some
17   suggestion that he drove a vehicle that was
18   previously owned by law enforcement, and he got
19   pulled over and they made some suggestion that he
20   might have been impersonating a law enforcement
21   officer.  It still had the equipment on it but none
22   of it worked, and it came back as he bought it at an
23   auction or something like that.
24             THE COURT:  Ms. Martin.
25             MS. MARTIN:  No objection, Your Honor.
```

```
 1              THE COURT:  Okay.  Grant on that.
 2              Let's see.  Number 5.  I think this is
 3   important.
 4              MR. WHALEN:  Yes.  Number 5, as it relates
 5   to referring to other type of terrorist attacks, I
 6   will agree that in the course of the alleged
 7   conspiracy, there is the Nice attack and it's in the
 8   questionnaire, as well as the Pulse Nightclub attack
 9   that's referenced as well as the nightclub attack in
10   Turkey.  But I think to then refer to other types of
11   terrorist attacks not within the scope --
12              THE COURT:  Like the recent one.
13              MR. WHALEN:  Like the recent one,
14   nine-eleven, those things, I think those terrorist
15   attacks would not be relevant to the scope of the
16   indictment, Your Honor.
17              THE COURT:  Ms. Meeks.
18              MS. MEEKS:  Your Honor, the government
19   will go ahead and concede that we do not intend to
20   go into the Sri Lanka attack, just to make that
21   clear before the Court.  But with regard to other
22   terror attacks or other foreign terrorist
23   organizations, they are very relevant; they are
24   intrinsic to the charges before the Court.
25              THE COURT:  You have Nice.  You have the
```

```
 1   Pulse Nightclub.  You have Turkey.  What else do you
 2   have?
 3            MS. MEEKS:  Well, the defendant speaks at
 4   length as part of his recruitment effort and as part
 5   of the charges about the Istanbul attack, the Reina
 6   Nightclub attack.  In Nice, the Nice attack.  The
 7   Orlando attack.  About an attack in Minneapolis.  He
 8   also talks about the assassination of a Russian
 9   diplomat.  And he talks about other foreign
10   terrorist organizations, and how he arrived to be a
11   member of ISIS was part and parcel with how he
12   rejected the other tenets of the other
13   organizations.
14            THE COURT:  It's fine, and he talked about
15   it.  But besides him talking about it, are you
16   going -- you know, are we going to have all sorts of
17   explosion testimony about various terrorist attacks
18   that he's not tied to at all is what I am asking.
19            MS. MEEKS:  Your Honor, so our expert will
20   talk about those attacks and --
21            THE COURT:  Which attacks will he talk
22   about?
23            MS. MEEKS:  Again, about the Istanbul
24   Reina Nightclub attack, the Nice Promenade attack
25   and the Orlando attack and the Minneapolis Mall
```

1    attack, for which reasons are specific in that the

2    defendant not only praised these attacks, and it

3    goes to also --

4             THE COURT:  All four of them he praised?

5             MS. MEEKS:  Yes, Your Honor.  And that

6    also goes to the 1001 false statement charges that

7    we have where he denied making any kind of praise or

8    promotion of terrorist attacks; not only to the

9    2339B's, but also the 1001s.

10            THE COURT:  Yes, he did talk about all

11   those, and I'm going to let you get that in.  But

12   are you going after other things that are not

13   something he talked about?

14            MS. MEEKS:  No, Your Honor.  And only just

15   to respond to the nine-eleven.  So there will be --

16   in the history of the creation of ISIS, it has gone

17   through a metamorphosis to date back to nine-eleven.

18   So I do think it would be appropriate for the expert

19   in this case to give a very brief overview of how it

20   came to be in this --

21            THE COURT:  But it's not like he's going

22   to say that Mr. Rahim was somehow responsible for

23   nine-eleven.

24            MS. MEEKS:  No, Your Honor.

25            THE COURT:  Okay.  Mr. Whalen.

 1          MR. WHALEN:  I think that's reasonable.  I
 2  mean, if he mentioned it or talked about and it does
 3  go to the 1001, so I do think that is fair game, my
 4  biggest concern is what the Court had, that we're
 5  going to talk about a whole bunch of things that
 6  would be more prejudicial.
 7          THE COURT:  And they don't sound like they
 8  are going to.
 9          MR. WHALEN:  Right.  And I think based on
10  that representation that would satisfy our concern.
11          THE COURT:  You've got referring to other
12  terrorist organizations other than ISIS.
13          Tell me about that.
14          MR. WHALEN:  Your Honor, this relates to
15  his support of ISIS.  I think to then discuss any
16  other type of terrorist organizations, whether it's
17  Al Qaeda and Hamas and other types of terrorist
18  organizations that he's not charged with supporting
19  or advocating for, then I think it would be improper
20  to do that, because then I think it's simply to
21  prejudice the jury.  So it's more prejudicial than
22  it is probative, Your Honor.
23          THE COURT:  Okay.  Ms. Meeks.
24          MS. MEEKS:  Your Honor, some of the
25  discussion of other foreign terrorist organizations

1   goes directly to how the creation of ISIS exists.
2   So that would be background information only.
3              THE COURT:  But again, you are not tying
4   him to those.
5              MS. MEEKS:  Correct.  However, Your Honor,
6   the defendant does mention them.  I think it is
7   intrinsic to the charge here about how he has viewed
8   and rejected other FTOs.
9              THE COURT:  If he's talked about it, it's
10  fine.  It comes in.  I mean to a certain extent.
11             MS. MEEKS:  Yes, Your Honor.
12             THE COURT:  But you're not going to talk
13  about, well, the FTO Hamas and this other FTO were
14  blowing things up and that type of stuff.  I mean,
15  you're not going to go into that, are you?
16             MS. MEEKS:  No.  Only in the sense that he
17  had seen the way that that existed, the way that it
18  was run as an organization and rejected it for
19  something else, and that would be ISIS.
20             THE COURT:  Okay.  So give me an idea of
21  what are you going to put on in this regard.
22             MS. MEEKS:  Well, I think, Your Honor --
23  so the expert can talk a little bit about Hamas, not
24  in depth, but just enough to do the wave caps about
25  how it is both -- it tries to act as a legitimate

1    organization and as a terrorist organization and how
2    that kind of operation was not radical enough for
3    the defendant.
4            THE COURT:  Okay.  Anything else?  Any
5    other foreign terrorist organizations?
6            MS. MEEKS:  One moment.
7            Your Honor, I would also refer to the
8    Court what is going to be Government's Exhibit 53,
9    which is the CFR establishing ISIS as a foreign
10   terrorist organization.  And in that it lists quite
11   a lot of foreign terrorist organizations that was
12   formerly known as.
13           THE COURT:  Mr. Whalen.
14           MR. WHALEN:  I don't have any objection to
15   the CFR.  I know it went through a bunch of
16   different iterations and it was called different
17   things, but we all know it to be ISIS.
18           THE COURT:  Okay.  From what I have just
19   heard, I'm going to deny the motion in limine,
20   because it sounds like you are not going to get into
21   a bunch of stuff that he didn't either say or the
22   expert is going to give his background.
23           MS. MEEKS:  Correct, Your Honor.
24           THE COURT:  Okay.  7 is any and all
25   coconspirator statements, 7.

```
 1              MR. WHALEN:  Your Honor, obviously one of
 2    the counts is conspiracy to provide material support
 3    unless and until -- we're not asking for a separate
 4    James hearing.  I know the case law says you can
 5    make that determination during the course of the
 6    trial.  But I do think there has to be some finding
 7    at some point for the Court to make that I do find
 8    that there was a conspiracy and that these
 9    statements now become admissible as coconspirator
10    statements or offered conditionally until the Court
11    makes that finding; something of that nature, that
12    they not be allowed to discuss what other alleged
13    coconspirators said until you make the finding that
14    there was, in fact, a conspiracy.
15              THE COURT:  Okay.  Ms. Martin.
16              MS. MARTIN:  Yes, Your Honor.
17              In this case, the circumstances of the
18    defendant's recruitment is some evidence of a
19    conspiracy.  It was a global social media platform
20    that he was one of the leaders of with 10,000
21    members, the name of which was the State of the
22    Islamic Caliphate.  But most of the evidence of the
23    conspiracy are the defendant's acts and statements
24    that are in conjunction with him.  His own
25    statements will establish the conspiracy, I believe,
```

32

```
 1    but we intend to offer coconspirator statements.
 2    But I think the Court will be satisfied before those
 3    are offered from the defendant's own statements and
 4    the fact that he's running a channel of 10,000
 5    members calling for jihad.
 6              THE COURT:  Okay.  Assuming we're talking
 7    about everybody agrees that you can offer it
 8    conditionally and then connect it up and I will make
 9    a finding of a conspiracy, I'm going to -- Number 7,
10    I will grant.
11              All right.  Number 8.
12              MR. WHALEN:  Number 8 is simply there
13    obviously not be on either side any reference to
14    that there was pretrial motions and rulings thereof.
15    So that's all Number 8 is.
16              THE COURT:  Granted.
17              Okay.  You have a supplemental motion in
18    limine.  Go ahead.
19              MR. WHALEN:  Your Honor, just for the
20    record, that's Document 106.  There's really just
21    two issues in that one as it relates to any
22    reference to the Sri Lanka incident that occurred on
23    April 20th.
24              THE COURT:  And they agreed to that.
25              MR. WHALEN:  They agreed to that.
```

1              And the last thing is there are

2      discussions about people being tortured, beheaded,

3      burned, I know.  And the reason why I mention this,

4      I think in Dr. Vidino's previously testimony he

5      talked about this, I believe that's where I read it.

6      So unless there's something tying Mr. Rahim to any

7      type of torture or beheadings or those types of

8      issues, there not be discussion or any evidence

9      supporting that.

10              THE COURT:  Ms. Martin.  Ms. Meeks.

11              MS. MEEKS:  Thank you, Your Honor.

12              The government would note that the

13      defendant, himself, directly refers to some of these

14      acts and that they are very -- they are very closely

15      held to what makes a terrorist organization a

16      terrorist organization.  The government doesn't

17      intend to get into graphic and gruesome details of

18      any on particular act, but I think it is certainly

19      fair in the description of how a terrorist

20      organization operates, especially one such as ISIS,

21      which operates through fear in part, that these are

22      legitimate methods of control and implementation of

23      Shari'a law.

24              THE COURT:  But the question is, are you

25      going to offer this unrelated to him and what he's

```
 1    had to say, or is it going to be directly related to
 2    what he's had to say?
 3              MS. MEEKS:  I think, Your Honor, it will
 4    be directly related.  But also I think that the
 5    government is looking for a little latitude for
 6    allowing the expert to talk about how ISIS executes
 7    its mission, both universally and globally, and also
 8    on the ground in its so-called Caliphate.
 9              THE COURT:  All right.  That motion is
10    granted to the extent we're talking about things
11    unrelated to this defendant and denied with respect
12    to things related to this defendant.  But I will
13    allow the expert some latitude on explaining ISIS.
14    Okay?  Okay.
15              Does that take care of the motions in
16    limine?
17              MR. WHALEN:  Yes, Your Honor.
18              THE COURT:  Okay.  Let's talk about the
19    prayer.
20              MR. WHALEN:  Yes.
21              THE COURT:  And that is Document 86.
22              MR. WHALEN:  Your Honor, as relates to
23    that, I don't have anything additional to add.  I
24    did try --
25              THE COURT:  Do you have any authority?
```

35

```
 1   What I was looking for was some authority that I
 2   have to do this.
 3              MR. WHALEN:  No.  And I was trying to find
 4   some cases.  And what I -- most of them dealt with
 5   accommodations in the prison system and a test that
 6   you have to do to determine that.  I do think based
 7   on the timing of when prayer must be conducted, I
 8   think it will fit.  So I guess what I would suggest
 9   is, let's see how it goes and if it becomes an
10   issue, then I will readdress it.  But I think based
11   on what I've learned and based on the time schedule,
12   I think the normal afternoon break will accommodate
13   it in some way, shape or form.
14              THE COURT:  I am granting it in part and
15   denying it in part.  Because if it interferes with
16   our trial schedule, he's not going to get to do it
17   unless you can bring me some authority that he's
18   allowed to do it.  But it's granted to the extent
19   he's allowed to do it if it doesn't interfere.
20              MR. WHALEN:  Fair enough.
21              THE COURT:  And we talked about this, the
22   702 hearing, really briefly, Document 108.
23              MR. WHALEN:  Yes, Your Honor.  We do
24   believe a 702 hearing is necessary, which you said
25   you would grant.  And I also think part of that 702
```

1   hearing is not only to qualify him as an expert, but

2   whether or not the opinion he's -- exactly what

3   opinion is he going to render, if any; and two,

4   whether that opinion is based in some type of

5   science or it's been tested in some way, shape or

6   form under Daubert and whether or not it's

7   reasonably acceptable and whether or not that would

8   invade the province of the jury as far as the

9   ultimate fact issue, Your Honor.

10          THE COURT:  Okay.  Anything else on this

11  Ms. Meeks or Ms. Martin?

12          MS. MEEKS:  Your Honor, nothing to add.

13  Just I think the government would request if we're

14  going to have that hearing -- the expert doesn't

15  arrive until Sunday, so we would hold it potentially

16  Monday morning while the jury --

17          THE COURT:  Yeah, it will be outside the

18  presence of the jury and it will be off hour.  So

19  just remember that everything that you want to talk

20  to me about or anything is always during off hours.

21  It's before 9 and after 5 or like at the lunch hour,

22  between 1 and 1:30.  I don't know when I'm going to

23  break for lunch, so don't count on it, but it will

24  be an hour and 15 minutes.  Normally we will be

25  dealing with out-of-presence stuff after trial and

```
 1   before trial.

 2             MS. MEEKS:  Yes, Your Honor.

 3             THE COURT:  Okay.  I think we've covered

 4   this, but the United States 404(b) notice and the

 5   defendant's objections.  So let me hear about the

 6   404(b), just so we are clear.  That's Document 101.

 7             MS. MARTIN:  Yes, Your Honor.

 8             The government's 404(b), again, was with

 9   respect to his statements that he was formerly

10   Hamas, and we believe that is intrinsic and goes to

11   an element of the crime.  And I believe the Court

12   ruled on it, and we don't have anything additional.

13   And then the government also understands that the

14   latter part of that motion the Court has granted the

15   motion, and we will not go into it.

16             THE COURT:  Mr. Whalen, anything else to

17   say about that?

18             MR. WHALEN:  No, Your Honor.

19             THE COURT:  Okay.  Okay.  Let me just

20   recap.

21             On the government's motion in limine, the

22   deception is denied.  To the extent it doesn't go

23   overboard, it's allowed, the fact that the agents

24   deceived them.

25             Motion in Limine 2, preclude defense from
```

38

```
 1    using FISA.  I granted that, but, again, it's all
 2    shaded because it depends on how far you go.  I
 3    mean, I've granted that to an extent and denied it
 4    to an extent.  You can get into some parts of FISA,
 5    but not into the details of it and all of that such
 6    that you are trying to argue that it's unfair that
 7    we use FISA.  So I will grant that and deny that.
 8              Free speech is denied as long as you don't
 9    get into -- you know, beyond what you -- what you
10    can under the statute, that is denied.  And the
11    punishment is agreed to.
12              Document 87 is Rahim's motion.  And I --
13    okay.  Evidence of prior bad acts, criminal offenses
14    and other arrests of misconduct, which defendant has
15    not been charged.  I grant that to a certain extent
16    and deny it to a certain extent.  Ms. Martin says
17    she has audio recordings that have him talking about
18    a lot of stuff, and that's okay.  But other 404(b)
19    evidence is off limits other than the recording.
20    Right?
21              MS. MARTIN:  Yes, Your Honor.
22              THE COURT:  Okay.  Rule 16 -- yeah, that
23    is granted, because we're talking about expert
24    testimony and the -- we're going to have an
25    out-of-presence hearing, and we're going to see what
```

```
 1    the expert is going to talk about.  So I granted
 2    that request but -- yeah.  We're going to have an
 3    out-of-presence hearing, but I granted the request
 4    and denied it.  It depends on what he's going to
 5    say.
 6              Number 3, expert witness.  Possessed or
 7    sold firearms, ammunition.  I think I granted that,
 8    right?
 9              MS. MARTIN:  Yes.
10              MR. WHALEN:  Yes, Your Honor.
11              THE COURT:  Operated or owned a vehicle,
12    granted.
13              Referring to terrorist organizations,
14    granted in part and denied in part.  And that is you
15    can talk about Nice, Pulse, Turkey, Minnesota,
16    because he talked about them.  But anything outside
17    of what he talked about we can approach the bench,
18    and nine-eleven can be brought in with the expert
19    with background.
20              Six, I think ISIS and Hamas are okay.  Do
21    we have to grant it for anything else?
22              MS. MEEKS:  Yes, Your Honor.  Just to
23    clarify that we are also allowed to go into the fact
24    that Al Qaeda is the -- Al Qaeda and Iraq and all of
25    the other FTOs as it developed into ISIS through the
```

```
 1  expert testimony to give background, Your Honor.
 2            THE COURT:  Mr. Whalen?
 3            MR. WHALEN:  That was your ruling, Your
 4  Honor.
 5            THE COURT:  Okay.
 6            MS. MEEKS:  Thank you, Your Honor.
 7            THE COURT:  Granted, except for Hamas and
 8  ISIS and a certain amount of nine-eleven and Al
 9  Qaeda.
10            Coconspirator statements is granted, and 8
11  is granted.  And then we have the supplemental,
12  which is granted to the extent I have granted those.
13  Granted Number 2.  And Number 3 granted.  Right?
14            MS. MARTIN:  Yes, Your Honor.  But I
15  believe the Court said that it would allow the
16  expert latitude in explaining how ISIS operates.
17            THE COURT:  Okay.
18            MR. WHALEN:  I agree with that, Your
19  Honor.
20            THE COURT:  All right.  And then the
21  prayer is granted in part, denied in part.  We will
22  take that up as we see it.  And the -- yeah, that's
23  all the motions in limine.  Motion for prayer that I
24  have and the 404(b) motion we've talked about.
25            Is there anything else by way of motion
```

1   that we have to take up?

2             Ms. Martin?

3             MS. MARTIN:  No, Your Honor.

4             MR. WHALEN:  No, Your Honor.

5             THE COURT:  Okay.  Then let's talk about

6   housekeeping.  I have your witness list, your

7   exhibit lists, right?

8             I have your jury instructions.  We will be

9   working hard on those.  Jury questionnaire.  Here's

10  what we're going to do.  I would like to have you

11  all here at 9:00 on Monday with the defendant here,

12  and I want to talk just about pretrial stuff.  Make

13  sure you have -- we will talk about this in a

14  minute, but preadmitted exhibits and that type of

15  thing.  And then you can go until you get your

16  questionnaires, and then you can do whatever you

17  want with them except you've got to give them back

18  to us at the end of the trial.

19            I want to have an extra copy of the

20  questionnaire, because I want the juror to have the

21  questionnaire when you ask them about it.  It's no

22  good if they don't.

23            So Jenelle, will we have an extra copy for

24  the jurors?

25            THE CLERK:  Yes.

1              THE COURT:  How long do you want for jury

2     selection?

3              MS. MARTIN:  We would request 30 minutes.

4              THE COURT:  Just come up here.

5              MS. MARTIN:  The government requests 30

6     minutes for voir dire.

7              THE COURT:  Mr. Whalen?

8              MR. WHALEN:  Your Honor, I know you're

9     going to raise your eyebrows.  We would like an

10    hour, because I do think this is not the typical

11    case.  This is not a drug conspiracy or anything

12    like that.  I do think this is a very different type

13    of case that I think it needs the effort and time to

14    explore everybody's thoughts and feelings about this

15    topic.  And I don't think we can adequately -- I

16    don't think I can adequately do that in 30 minutes.

17             THE COURT:  How about 45 minutes.  45

18    minutes.  That's as long as I've ever given lawyers

19    to do any case, plus you will have the

20    questionnaires.

21             And remember, you will be bringing certain

22    people up front.  You know, I'll do my voir dire,

23    then you do your 45 minutes.  And then we bring them

24    up, those that have problems, one by one, and you

25    can ask them more questions.  And if you have anyone

```
 1   in particular you want to ask a question that didn't
 2   raise one, I will let you do that in this case
 3   because you will have the questionnaires.  All
 4   right?
 5              MR. WHALEN:  Thank you, Your Honor.
 6              THE COURT:  How long for opening?
 7              MS. MARTIN:  30 minutes for opening, Your
 8   Honor.
 9              MR. WHALEN:  That's fine, Your Honor.  I
10   don't think I would use 30, but 30 is fine.
11              THE COURT:  Okay.  How long is it going to
12   take to try this case?
13              Ms. Martin, if you will come up here,
14   please.
15              MS. MARTIN:  Your Honor, the government
16   believes it could put on its case in a week, but I
17   think -- it depends on how long jury selection
18   takes.  But I think four to five days the
19   government -- if we have that many full trial days,
20   I think the government could put that on.
21              THE COURT:  I plan to have the jury seated
22   by Tuesday, no later than Tuesday.
23              MS. MARTIN:  Yes, Your Honor.  So I
24   believe unless there are hangups or delays that the
25   government could have it by the end of the day
```

```
 1   Monday.
 2              THE COURT:  If we start the jury selection
 3   Tuesday at 9:00, we should be able to have opening
 4   statements at least Tuesday afternoon, if not the
 5   first witness.  So have your witnesses ready.
 6              MS. MARTIN:  Yes, Your Honor.
 7              THE COURT:  Mr. Whalen.
 8              MR. WHALEN:  I think that's reasonable of
 9   how long the trial is going to take.  And just so I
10   understand it, on Monday we'll give them the
11   questionnaires; we will wait until they complete
12   them; and then we will have Monday afternoon to
13   digest them; and then we will come back Tuesday
14   morning for voir dire.
15              THE COURT:  9:00.  We want to take care of
16   all our pretrial matters Monday morning at nine.
17              MR. WHALEN:  And the other question I do
18   have as far as jury selection, once we get the
19   questionnaires on Monday, whenever we get them,
20   where can we work so that Mr. Rahim can participate
21   in that process of being able to distill that
22   information?
23              THE COURT:  Okay.  Let's see.  You can
24   work in our jury room.  Is that all right with the
25   Marshals?
```

```
1              THE MARSHAL:  That's fine, ma'am.

2              THE COURT:  He will be bound and shackled

3    and all that.

4              MR. WHALEN:  Okay.  Thank you, Your Honor.

5              THE COURT:  All right.  Then we will have

6    the jury questionnaires Monday, and we will have the

7    jury selection Tuesday morning I hope.  And by

8    Tuesday afternoon I hope we get openings and the

9    first witness on and then we proceed through the

10   trial.

11             We will go nine to five every day; 15

12   minutes in the morning, 15 minutes in the afternoon,

13   and an hour and 15 minutes for lunch.  And there may

14   be days when I try to go a little bit later than

15   5:00.  Okay?

16             You know I run a formal show in here, so I

17   want everybody to approach the witness.  Have your

18   exhibits ready to go, have your witnesses ready to

19   go, and have your -- you know, everybody ready with

20   cross-examination, exhibits, direct examination

21   exhibits ready to go.

22             And to the extent you have anything in

23   particular that you think requires authority to get

24   in or keep out, have it with you.  I mean, I know

25   there are a certain amount of exhibits, and I want
```

1   you to get together this weekend and try to agree on

2   preadmitted exhibits.  There's no reason to have

3   those 902-1 exhibits because of predicate and all

4   that.  I really think as far as business records and

5   those kinds of things I hope you can admit those.

6   It's up to you.  I understand that, but at least

7   70 percent of the exhibits ought to be preadmitted.

8   But I will ask you Monday morning for your list of

9   their preadmitted exhibits and your list of their

10  preadmitted exhibits.  So have those ready to go at

11  9:00 on Monday.

12          I've changed this over the years.  I used

13  to just allow a direct, cross and a redirect, but I

14  do allow a little bit more back and forth now, but

15  not too much.

16          So how many witnesses do you have,

17  Ms. Martin?

18          MS. MARTIN:  Your Honor, I believe we have

19  14, perhaps, on the list, but we don't anticipate

20  calling them all.

21          THE COURT:  That's fine.

22          And Mr. Whalen?

23          MR. WHALEN:  I don't anticipate much, Your

24  Honor.

25          THE COURT:  Okay.  All right.  Let's see.

```
 1   Closing, we will get the jury charge done.  I would
 2   really appreciate everybody's help on the jury
 3   charge.  Not on the 1001 so much, but on the 2339B
 4   charge.
 5           And let me see if there's anything else.
 6   I don't have anything else.
 7           What else do you have, Ms. Martin?
 8           MS. MARTIN:  Yes, Your Honor.
 9           May I approach?
10           THE COURT:  Yes.
11           MS. MARTIN:  One thing I should have
12   mentioned earlier but I just wanted to make the
13   Court aware, we do have one Italian witness.  So we
14   will have a live interpreter that we will provide
15   and that is certified for the witness.  And then we
16   would ask permission to exclude the case agent from
17   the Rule.
18           THE COURT:  Yes, you may -- Mr.--
19           MR. WHALEN:  That's normal, Your Honor.
20           THE COURT:  Yes.
21           MS. MARTIN:  And to call the case agent
22   twice for the presentation of evidence.  There are
23   some things that we don't anticipate will be agreed
24   to that he will help lay the foundation.
25           THE COURT:  That's fine.
```

```
 1              MS. MARTIN:  And then the final one, Your
 2    Honor, is the government anticipates using a
 3    PowerPoint for its opening statements.  And in
 4    telling the jury what the evidence will show, we
 5    will show quotes from the defendant that we intend
 6    to introduce at trial.  And we wanted to raise that
 7    for the Court at the pretrial hearing.
 8              THE COURT:  Say that one more time.
 9              MS. MARTIN:  The government intends to use
10    a PowerPoint for its opening statement.
11              THE COURT:  Have you showed it to them?
12              MS. MARTIN:  We haven't shown it to them
13    yet.
14              THE COURT:  Show it to them and see if
15    they have any objections.
16              Mr. Whalen, anything?
17              MR. WHALEN:  Not that I can think of, Your
18    Honor.
19              THE COURT:  Let me just look back through
20    my notes.  Yes -- let's see.  I have a 404(b) notice
21    that the government -- we talked about all that.
22    But the second thing in the 404(b) notice is the
23    government sought to introduce Rahim's statements in
24    a 2007 customs interview unrelated to the case.  He
25    had been jailed in the West Bank twice for fighting
```

1  and for being in a car wreck where a person on a
2  bike was killed.  I think we have talked about this.
3  I want to make sure that is not coming in.
4          Ms. Martin, you know that's off limits.
5          MS. MARTIN:  Yes, Your Honor.
6          THE COURT:  Mr. Whalen, anything else?
7          MR. WHALEN:  Just one thing that came to
8  mind.  As it relates to the Government's Exhibits,
9  the ones that we don't agree to, if we have
10 objections to them, do you want us to handle it as
11 it comes up.
12         THE COURT:  Yeah, to the extent you have
13 made your objections right up front, we will deal
14 with those Monday morning, you know, if you want to
15 object to those right there.  Otherwise, if it's
16 just typical objections, we will deal with those at
17 the time.  So I really would prefer, though, the
18 bigger objections, that we take care of those up
19 front, and I say, Well, okay, if they prove the
20 predicate, they can get it in or not.
21         MR. WHALEN:  Okay.
22         THE COURT:  So please have your case law
23 ready for your exhibits that you don't think -- that
24 you don't want the other side to get in and you want
25 to get in.  All right?

1               MR. WHALEN:  Okay.

2               THE COURT:  All right.  Anything else?

3               MR. WHALEN:  No, Your Honor.

4               MS. MARTIN:  Nothing from the government.

5               THE COURT:  We will see you at nine on

6     Monday.

7               (Court in recess at 10:51 a.m.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                     C E R T I F I C A T E

2               I, Shawnie Archuleta, CCR/CRR, certify

3     that the foregoing is a transcript from the record

4     of the proceedings in the foregoing entitled matter.

5               I further certify that the transcript fees

6     format comply with those prescribed by the Court and

7     the Judicial Conference of the United States.

8               This 21st day of March 2020.

9

10

11                         s/Shawnie Archuleta
                           Shawnie Archuleta CCR No. 7533
12                         Official Court Reporter
                           The Northern District of Texas
13                         Dallas Division

14

15

16    My CSR license expires:  December 31, 2020

17    Business address:  1100 Commerce Street
                         Dallas, TX  75242
18    Telephone Number:  214.753.2747

19

20

21

22

23

24

25