THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

UNITED STATES OF AMERICA, )
                          )
          Plaintiff,      )
                          )
vs.                       )   3:17-CR-00169-B
                          )
SAID AZZAM MOHAMAD RAHIM, )
                          )
          Defendant.      )

TRANSCRIPT OF PROCEEDINGS
PRETRIAL CONFERENCE
BEFORE THE HONORABLE JANE J. BOYLE
UNITED STATES DISTRICT JUDGE
APRIL 29, 2019


A P P E A R A N C E S

For the Government:

     UNITED STATES ATTORNEY'S OFFICE
     1100 Commerce Street - 3rd Floor
     Dallas, TX  75242
     214/659-8600
     BY:  ERRIN MARTIN
and
     U.S. DEPARTMENT OF JUSTICE
     Counterterrorism Section, National Security
     Division
     950 Pennsylvania Avenue, NW
     Washington, DC  20530
     202/532-4162
     BY:  TARYN MEEKS


For the Defendant:

     WHALEN LAW OFFICE
     9300 John Hickman Parkway - Suite 501
     Frisco, TX  75035
     214/368-2560
     BY:  JAMES P. WHALEN
          RYNE T. SANDEL

```
COURT REPORTER:    SHAWNIE ARCHULETA, TX CCR No. 7533
                   1100 Commerce Street
                   Dallas, Texas 75242
```

proceedings reported by mechanical stenography,
transcript produced by computer.

LORENZO VIDINO, Ph.D.

| | |
|---|---|
| Direct Examination by Ms. Meeks | 10 |
| Cross-Examination by Mr. Whalen | 26 |
| | |
| Argument By Ms. Meeks | 31 |
| Argument By Mr. Whalen | 32 |
| Response By Ms. Meeks | 33 |
| Ruling | 34 |
| | |
| Record Sealed (filed separately) | 38 |
| | |
| Reporter's Certificate | 42 |

GOVERNMENT'S EXHIBITS ADMITTED:

| | | | |
|---|---|---|---|
| GX NO: | 1 - 4 | Cricket Wireless Records | 5 |
| GX NO: | 5 | Time Warner Cable Records | 5 |
| GX NO: | 31 | Google Records (Ibn Dawla) | 5 |
| GX NO: | 32 | FB Records (Salah Deen) | 5 |
| GX NO: | 33 | FB Records (El Aoual) | 5 |
| GX NO: | 35 | IP Log | 5 |
| GX NO: | 36 | Zello Chart | 5 |
| GX NO: | 41 | Photographs | 5 |
| GX NO: | 46 | iPhone seized | 5 |
| GX NO: | 48 | Image from iPhone | 5 |
| GX NO: | 49 | US currency seized | 5 |

```
GX NO:  50  Lufthansa Records            5

GX NO:  52  Maps                         5

GX NO:  53  Code of Federal Regulations  5

GX NO:  54  Passport                     5

GX NO:  56  DHS/INS Records              5

GX NO:  57  Driver's License             5

GX NO:  58  Photo of store               5

GX NO:  60  Phone                        5

GX NO:  63  Pole Cam Footage             5

GX NO:  68 Lufthansa Gate Pass           5

GX NO:  69  Birth Certificate            5

GX NO:  70  Hard drive (record purposes) 5
```

```
 1              (In open court at 9:00 a.m.)
 2              THE COURT:  Good morning.  Let's -- this
 3    is Case Number 3:17-CR-169, United States v. Azzam
 4    Mohamad Rahim.  We are here this morning for the
 5    final pretrial conference.  I would like to have the
 6    parties introduce themselves, who they are and who
 7    they represent, starting with the government.
 8              MS. MARTIN:  Yes, Your Honor.  Errin
 9    Martin and Taryn Meeks for the government.
10              THE COURT:  All right.  And who is your
11    third person?
12              MS. MARTIN:  This is our case agent,
13    Special Agent Dwayne Golomb with the FBI.
14              THE COURT:  I recognize you now.  I saw
15    you in the tapes.
16              AGENT GOLOMB:  Yes, ma'am.
17              MR. WHALEN:  Good morning, Your Honor.
18    James Whalen and Ryne Sandel for Mr. Rahim.
19              THE COURT:  Okay.  The first thing I would
20    like to ask you about is the preadmitted exhibits.
21              Come up, Ms. Martin, and tell me which of
22    their exhibits you agree to preadmit.
23              MS. MARTIN:  Your Honor, I believe their
24    exhibit list incorporated ours, so I think we will
25    just go through the ones they agreed to of ours.
```

```
 1              THE COURT:  Okay.  I just need to know
 2    which are government's exhibits and defense
 3    exhibits.
 4              MS. MARTIN:  The defendants do not
 5    currently have exhibits, so it would be government's
 6    exhibits.
 7              THE COURT:  Okay.  All right.  Mr. Whalen,
 8    are you okay with that?
 9              MR. WHALEN:  Yes, Your Honor.
10              THE COURT:  All right.  Go ahead.
11              MS. MARTIN:  1, 2, 3, 4, 5, 6, 31, 32, 33,
12    35, 36, 41, 46, 48, 49, 50, 52, 53, 54, 56, 57, 58,
13    60, 63, 68, 69; 70 for record purposes only.
14              THE COURT:  Okay.
15              MS. MARTIN:  One moment.  And that's all
16    Your Honor.
17              THE COURT:  Okay.  The following
18    government's exhibits are preadmitted.  1, 2, 3, 4,
19    5, 6, 31, 32, 33, 35, 36, 41, 46, 48, 49, 50, 52,
20    53, 54, 56, 57, 58, 60, 63, 68, 69, and 78 for
21    record purposes only.
22              What else did you have, Ms. Martin?
23              MS. MARTIN:  One more thing about the
24    government's exhibit list.
25              THE COURT:  Will you come up here to the
```

1   lecturn?

2          MS. MARTIN:  One more thing about the

3   government's exhibits list.

4          Mr. Whalen alerted me to an arithmetic

5   error that I committed on the exhibit list.  It says

6   $7,000 in U.S. Currency, it should be 6,000.  And

7   because it was last minute, I wanted to seek leave

8   to amend the exhibit just to change that number.

9   That would be it.

10          THE COURT:  Where are you going to change

11   it?  What exhibit is it on?

12          MS. MARTIN:  It's one of the preadmitted,

13   Your Honor.

14          THE COURT REPORTER:  Is it 70 or 78 for

15   record purposes?

16          THE COURT:  Is it 70 or 78 for record

17   purposes only?

18          MS. MARTIN:  Seven zero.

19          THE COURT:  70, all right.

20          And what exhibit is it?

21          MS. MARTIN:  That I'm speaking about, Your

22   Honor?

23          THE COURT:  Yes.

24          MS. MARTIN:  Exhibit 49.  It should be

25   6,000 and not 7,000.

```
 1              THE COURT:  All right.  Mr. Whalen, you
 2   agree with that?
 3              MR. WHALEN:  Yes, I have no objection.
 4              THE COURT:  We will let you reform that
 5   exhibit.  What else did you have?  Anything else?
 6   Anything on -- just anything, motions in limine,
 7   other anticipated evidentiary issues, all sorts of
 8   things, you know, that you think we need to talk
 9   about today.
10              MS. MARTIN:  Your Honor, I believe we're
11   prepared to address the expert Daubert hearing.
12   Mr. Whalen and Mr. Sandel met with myself and
13   Ms. Meeks on Friday.  And we have one exhibit that
14   has a business records authentication, but we have
15   the witness here live.
16              Mr. Whalen indicated that he might be
17   willing to accept the record if he could put some
18   questions, you know, before it was -- before the
19   jury was here.  And I don't know if that's something
20   we could resolve right now.
21              THE COURT:  Yes.  What about the expert?
22   I thought he wasn't coming until Sunday night.
23              MS. MARTIN:  He did come --
24              THE COURT:  Oh, this last Sunday night.
25              MS. MARTIN:  Yes, Your Honor.
```

```
 1              THE COURT:  You have him here?
 2              MS. MARTIN:  He is here in the courtroom.
 3              THE COURT:  Let's do that in a minute.
 4              The other thing is what?
 5              MS. MARTIN:  Your Honor, Government's
 6    Exhibit 110, I believe --
 7              THE COURT:  Okay.  Okay.  Okay.
 8              Mr. Whalen, do you want to ask some
 9    questions about that or something?
10              MR. WHALEN:  Yes, Your Honor.  It comes in
11    relation to an affidavit signed by Agent Fine.  And
12    it relates to -- I think what he would testify to is
13    that he compared the phone calls or certain calls to
14    their hash values and authenticated them.
15              However, the questions I would want to ask
16    him is:  How were these calls collected?  What
17    method were they used to be collected?  And I think
18    that may go into FISA territory on the collection
19    methods.  So I wanted to be able to get into that,
20    you know, for authentication purposes.  But I think
21    the government has a different opinion, so we have
22    to figure out what I'm going to be able to ask him
23    or not.
24              And the reason why I didn't agree to the
25    affidavit in and of itself was because I still want
```

```
 1   to be able to preserve that error if the Court rules
 2   that's FISA, that's classified, you can't get into
 3   that collection technique.  I still want to be able
 4   to put on the record the questions I would have
 5   asked him that he's not allowed to answer and
 6   therefore preserve that objection.
 7            THE COURT:  Okay.  I want to hear what
 8   those are.  Do you want to ask them now?
 9            MR. WHALEN:  I can ask them whenever.  We
10   just have to see how they want to do it.
11            THE COURT:  Ms. Martin.  Ms. Meeks.
12            MS. MEEKS:  Yes.  Thank you, Your Honor.
13            Your Honor, we're retrieving the witness
14   right now if the Court would like to pursue those
15   lines of questions at this time.
16            Mr. Whalen is correct that the government
17   would object to certain inquiries that would go into
18   specifics.
19            THE COURT:  Okay.  So we're going to have
20   two witnesses this morning?
21            MS. MEEKS:  Yes, Your Honor.  We have our
22   expert here, as well.
23            THE COURT:  Okay.  Who do you have first?
24            MS. MEEKS:  Our expert is here, Your
25   Honor.
```

1                THE COURT:  All right.  Call the expert.

2                MS. MEEKS:  We call Dr. Vidino.

3                COURT SECURITY OFFICER:  Raise your right

4     hand, please.

5                (Witness sworn.)

6                THE WITNESS:  I do.

7                COURT SECURITY OFFICER:  Have a seat, and

8     state and spell your name.

9                THE WITNESS:  Lorenzo Vidino, V-I-D-I-N-O.

10               MS. MEEKS:  Thank you, Dr. Vidino.

11               Your Honor, I'm not sure how much the

12    Court would like us to go into the --

13               THE COURT:  Not a lot in to background;

14    just certain amounts, yeah.

15                    LORENZO VIDINO, Ph.D.

16    **having been first duly sworn, testified as follows:**

17                        **DIRECT EXAMINATION**

18    **BY MS. MEEKS:**

19    Q.   Thank you, Dr. Vidino.

20         Can you please give the Court an idea of your

21    current employment and educational and professional

22    background?

23    A.   Sure.  I'm currently the director of a research

24    center called Program in Extremism, which is based

25    out of George Washington University,

1   Washington, D.C.; I have a law degree from the

2   University of Milan in Italy; I have a Master's in

3   Security Studies in Middle East affairs in Fletcher

4   School of Diplomacy; and I have Doctorate of Studies

5   in the Middle East from Fletcher School.

6   Q.   How many years have you been involved in the

7   study of extremism?

8   A.   Nineteen.

9   Q.   And can you tell us a little bit about what the

10   program is out of George Washington that you run?

11   A.   Basically what we specialize on is the

12   ISIS-related mobilization, mostly in the United

13   States.  Not only we cover other parts of the world,

14   but the main focus is on radicalization and

15   mobilization patterns related to ISIS in the United

16   States.

17            THE COURT:  We're talking about ISIL here,

18   aren't we?

19            MS. MEEKS:  Your Honor, it's one and the

20   same.  ISIS/ISIL are the same.

21            THE COURT:  ISIS/ISIL, they're the same.

22   I didn't know that.

23            THE WITNESS:  Yes, yes, yes.  I can use

24   ISIL if you prefer; it's the same.

25   A.   What we do basically is we -- we research

```
 1    trends.  We try to investigate all the cases
 2    studied, all the cases that hit the court system.
 3    That means getting all the court documents, trying
 4    to -- from several of them, not all of them, of
 5    course, we can't for all of them, try to talk to as
 6    many people as possible who have knowledge in the
 7    case.  That means in some cases even the defendant,
 8    himself or herself, you know, prosecutors, FBI
 9    agents, defense attorneys, family members,
10    journalists, whoever can potentially have knowledge
11    on the case.
12              We try to extract trends which are a
13    quantitative and qualitative analysis of the
14    information.  And what we do is we compare it with
15    the academic literature.  Most of what we do is peer
16    reviewed.  That means it's subjected to the
17    assessment of the scholarly community.
18    Q.    (By Ms. Meeks)  Okay.  So let's talk about
19    that.  Speaking of peer-reviewed, your work has been
20    published?
21    A.    Yes.
22    Q.    Can you give us a synopsis of some of the work
23    that you have had published?  And has that been in
24    journals or books or have you co-authored?  Can you
25    expand on that?
```

13

1  A.   Sure.  I published six books, several of which

2  are peer-reviewed.  My latest one is from Columbia

3  University Press.  I have published, I believe,

4  around 20 journal articles.  All journal articles

5  are peer-reviewed.  That means that it goes to an

6  editing process.  There's an editor that makes the

7  first decision on whether it's a scholarly-sound

8  product.  And then it will go to at least peer

9  reviewers who will review the paper.  And only ones

10 that get past those steps they publish the article.

11      I have contributed, I would say, probably

12 around 15 chapters to edited books.  And then I have

13 probably more than 100 articles in terms of op-eds

14 or analysis and around probably 15, 20 reports.

15 Reports are generally something that falls a bit

16 short of a book, 50, 70 pages.  What we do is we

17 make that information public.  We publish as pdf on

18 our website.  But all of it is also peer-reviewed,

19 because we run a lot of our products by other

20 experts just to make sure that it's a correct

21 analysis.

22 Q.   Okay.  Have you also testified in other cases,

23 other criminal cases with regard to terrorism?

24 A.   Yes, I have.

25 Q.   Are those federal cases?

1  A.   Yes.

2  Q.   Federal trials?

3  A.   Yes.

4  Q.   How many?

5  A.   In court I believe seven, six or seven.

6  Q.   Okay.  And have you testified -- and that was

7  as an expert?

8  A.   As an expert, correct.

9  Q.   Have you also testified before Congress?

10  A.   I have on five occasions.

11  Q.   In what capacity?

12  A.   As an expert in front of -- from both Senate

13  and House, talking about different aspects of

14  terrorism, radicalization.

15  Q.   Do you also participate in international

16  forums?

17  A.   Very frequently.  I'm invited to conferences

18  which are organized by universities, think tanks,

19  government agencies, other parliaments in other

20  parts of the world, but I do that very frequently.

21  Q.   Do you appear on television or radio?

22  A.   That's also part of the job; I do it very

23  frequently.

24  Q.   And in what capacity?

25  A.   As one of those talking heads.  We go on TV and

1    talk about terrorism.  Sometimes it's a very short

2    commentary, those kind of 30-second soundbites.

3    Other times is what I prefer, just longer analysis,

4    just kind of panels or the commentaries.  But, yeah,

5    I work a lot with the media.

6    Q.   Let's go a little bit more into the Center, the

7    way in which you and the Center conduct research.

8    So can you give us an idea if it's field research,

9    academia and what's involved in those?

10   A.   A little bit of both.  What we try to do is try

11   to get information from as many sources as possible,

12   and that's probably the best way to corroborate all

13   that information.  So as I said, we focus very much

14   on the cases that hit the court system.  Those are

15   public.

16        And what we do is, we get all the documents

17   available.  We spend a lot of money on PACER, and we

18   get basically all the documents.  Then, of course,

19   we try to talk to as many people as possible.  Now,

20   obviously, maybe around 140 cases related to ISIL in

21   the U.S., we cannot investigate all of those to the

22   same depth.  But for some we will try to talk to FBI

23   agents, prosecutors, defense attorneys, family

24   members, whoever might have knowledge on the case

25   that might help us understand better the dynamics of

```
 1   the case.
 2        We also have a team of three or four younger
 3   analysts that spend a lot of time online, basically
 4   sort of surveying what is being talked about in what
 5   I would call the ISIL bubble on certain social media
 6   platforms, FaceBook, Twitter, Telegram, and try to
 7   get a sense of what this community of ISIL
 8   sympathizers talks about, and we bring all this
 9   information together.
10           A big part of that, of course, is
11   understanding what our colleagues, our peers, are
12   doing, what the publications out there are, what
13   government agencies are assessing the dynamics to
14   be, and, again, trying to bring all that information
15   together.
16   Q.   So you work with other government agencies or
17   you collaborate with government agencies or
18   think tanks or non-profits or NGOs, is that also
19   correct?
20   A.   Yes.  We are independent.  We don't receive any
21   funding from the government.  But we do work very
22   closely with a variety of agencies, whether that
23   means just informal conversations or at times we
24   provide workshops, training for the Department of
25   Defense, State Department, FBI, a variety of
```

1   agencies in the U.S.  We also receive and do a lot

2   of work in Europe.  I was three weeks ago in

3   Singapore working with the Singaporean government.

4   So it's fairly common.

5        And also we are part of a community of

6   academics, of universities, of research centers, of

7   think tanks that study terrorism, that research

8   terrorism.  And that cooperation is important for

9   us.  It's the way you bounce off ideas and you

10  compare trends.  That exchange is very common.  So

11  we have partnerships with different universities in

12  the U.K., the Netherlands, Italy and Austria, and we

13  work with them.

14  Q.   How does the Center find particular cases that

15  it wants to explore in more detail?  How do you make

16  that decision?

17  A.   Well, it depends on what topic, what aspect

18  we're specifically interested in.  I would say it's

19  a combination of factors that lead us to choose

20  which cases to focus on rather than others.  Part of

21  it is how interesting the case is.  For example, we

22  are currently working on a report on terrorism

23  financing and looking at how individuals link to

24  ISIS funded themselves or provided funding to ISIS.

25  So of course some cases will be more interesting

18

1    than others, because there's more money involved or

2    there's passages of money from overseas to the U.S.

3    or vice versa.  So those cases might be more

4    interesting, and we will try to focus more on those.

5              Another factor, of course, is how

6    accessible the information is.  Is it possible for

7    us to obtain more information.  At times it's really

8    logistics.  We know more people in a certain

9    location rather than another place.  Obviously

10   nobody can cover everything, and we -- we make

11   choices.

12   Q.   Okay.  This is a field of study.  Would you

13   call it a social science or humanities field of

14   study?

15   A.   Yeah, it's part of social science.  I would

16   call it terrorism studies, which is part of the

17   humanities.

18   Q.   All right.  So is this an exact science?

19   A.   It's not a hard science; like all humanities,

20   it's not an exact science.

21   Q.   So tell us how you come to your conclusions

22   then.

23   A.   You get as much information as possible.  You

24   try to come up with all possible alternative

25   explanations.  You provide all caveats possible.

19

```
 1    We're very careful in our methodology section.  So
 2    whatever we do, we explain that the information we
 3    have is only partial; that, particularly when it
 4    comes to radicalization, no two cases are alike, but
 5    the dynamics are very complex.
 6         What we can extract are trends.  We do sort of
 7    a both, as I said, a quantitative and qualitative
 8    analysis, which is based inevitably on partial
 9    information but still allows us to see trends.  It's
10    an analysis that is still very valid.  The products
11    that I put out or my center puts out is relied upon
12    by a variety of bodies in the U.S. Government or in
13    other places.  But that's basically how it works in
14    the humanities.
15              THE COURT:  What's an example of something
16    you found that turned into a trend?
17              THE WITNESS:  We looked quite a bit at the
18    online aspect of it, the shift from open platforms,
19    like FaceBook and Twitter, to more encrypted
20    applications, like Telegram and basically how the
21    sort of ISIS sympathizers online were directing
22    people to go to those platforms.
23              We do a lot of work.  We published three
24    reports on those online dynamics.  And that's
25    something that we also worked with some of the
```

1  giants in Silicon Valley on, tried to make them
2  understand how their platforms were being used and
3  abused by ISIS sympathizers.
4           THE COURT:  Okay.  Thank you.
5  Q.   (By Ms. Meeks)  And you had talked about the
6  professional community encompassing universities and
7  think tanks.  Can you give us some examples of the
8  sort of think tanks that you were discussing or that
9  you were mentioning?
10 A.   Yeah.  We have different sort of working
11 partnerships with institutions that range from some
12 of the big Washington think tanks, from Brookings,
13 Heritage, CSIS, those sort of places.
14      Last week we did a big event of the 9/11
15 Memorial Museum in New York, which is also a
16 research component.  We have a partnership with the
17 New York Times to archive and analyze ISIS files.
18 The New York Times reporters obtained in Iraq a
19 massive amount of documents, 15,000 documents.  We
20 are also academic partners with the New York Times
21 in that project.
22      We work a lot with the European think tanks.
23 Just to give you an idea, next week I will be in
24 Europe.  I will be doing an event with an Italian
25 think tank.  Then I will be in London the second

21

1  part of the weekend, and I will be doing an event

2  with King's College in London.  And that's sort of

3  the dynamics we have.  And at times it means

4  co-publishing a report, exchanging information.

5  Q.   So would you consider that your opinion and

6  that of your center is generally accepted or

7  widespread -- is accepted widespread?

8  A.   I would say so.

9  Q.   Okay.

10            MS. MEEKS:  One moment, Your Honor.

11            THE COURT:  Okay.

12            MS. MEEKS:  Your Honor, would you like us

13  to summarize some of what his testimony would cover?

14            THE COURT:  I would like to hear a little

15  bit more about why it would be helpful in this case

16  and relevant in this case and just along those

17  lines.  You know, I know what he knows now.  How is

18  he going to use it in this case?

19            MS. MEEKS:  Yes, Your Honor.

20  Q.   (By Ms. Meeks)  Dr. Vidino, have you had an

21  opportunity to review the transcripts from the Zello

22  application in this case?

23  A.   Yes, I have.

24  Q.   And are you familiar with the details involving

25  the defendant, Said Rahim?

1    A.    Yes.

2    Q.    What areas generally are you able to talk about

3    that would give you specialized knowledge that would

4    help the jury to process this information in a

5    certain context?

6    A.    Sure.  I would say that many of the dynamics

7    fit very much into what I have been studying for the

8    last -- at least since the ISIS mobilization started

9    the last five or six years; how the online community

10   functions; how the individuals of ISIS sympathizers

11   communicate with one another; what kinds of things

12   they discuss; what the dynamics and hierarchies in

13   those channels are; a lot of the jargon that is used

14   in those conversations; a lot of the terminology

15   that is common to ISIS supporters; I guess the

16   dynamics of radicalization and mobilization; how

17   people talk about certain things; progress that's

18   called the radicalization trajectory and then

19   eventually the site to mobilize, which means

20   traveling to join ISIS or plan to carry out attacks

21   in some other parts of the world.

22   Q.    Are these complex issues in and of themselves?

23   A.    I would say so, yes.

24   Q.    And do they change through time?

25   A.    Very much so.

1  Q.    So you've had the opportunity to study an

2  evolution, would you say?

3  A.    Yeah, absolutely.

4  Q.    Okay.  And does that evolution consist of

5  religious or social or geopolitical aspects?

6  A.    It's a combination of all of the above.

7  Q.    You will also be talking about the use of

8  social media; is that correct?

9  A.    Yes.

10  Q.    Can you give us an idea of how your studies in

11  social media can assist the fact-finder in this case

12  in processing the information from Zello?

13  A.    Zello, like other more common platforms, has

14  been used by ISIS sympathizers as a way to

15  communicate, to react with like-minded individuals.

16  On these platforms, what normally happens is that

17  you have more experience in charismatic individuals

18  that sort of coach and guide less experienced but

19  equally interested and enthusiastic ISIS supporters.

20            Basically what happens on these platforms

21  is you have a formation of a community of

22  individuals.  People get their sense of belonging,

23  of being part of something bigger than themselves

24  wherever they are in the world.  They have a sense

25  of belonging.  And in many cases, from simply being

1  part of an online community and just interacting

2  online, people take the next step, which is

3  mobilizing.  Those dynamics are very common.  That's

4  how ISIS uses social media.

5  Q.  Okay.  And in some of the communications you've

6  had a chance to review, are there specific -- you

7  had mentioned jargon -- certain terms of art that

8  are used?

9  A.  Yes.  They draw from Arabic language and from

10  mainstream Islamic theology or specifically what is

11  called jihadist jargon.

12  Q.  Are you familiar with that type of -- those

13  terms of art?

14  A.  Yes, very much so.

15  Q.  And do you have the ability to communicate that

16  in a meaning just beyond the word but to the context

17  to the fact-finder?

18  A.  Yes.  Because in many of these cases, there's a

19  specific meaning that is used by people in the

20  jihadist world, which is different from the most

21  common meaning that the word would have in Arabic.

22  Q.  Okay.  And what about individuals that would be

23  considered -- or could be considered ISIS

24  leadership?  Are you familiar with certain names

25  that have been used in the transcripts?

25

1    A.    Yes.

2    Q.    What are you able to tell the jury and the

3    fact-finder with regard to those names?  What kind

4    of background can you provide?

5    A.    I study ISIS leadership, especially some of the

6    individuals mentioned on the platform are some of

7    the top leaders of ISIS.  And I can explain to the

8    jury their origin, their position within the group,

9    the importance of their standing and some of the

10   messages they send out to their supporters.

11   Q.    Are you also familiar with certain -- are you

12   familiar with the transcripts that the defendant had

13   referenced certain terrorist attacks?

14   A.    Yes.

15   Q.    Particularly one that occurred in Nice, France?

16   A.    Yes.

17   Q.    And one that occurred in Istanbul, Turkey and

18   Orlando, Florida?

19   A.    Yes.

20   Q.    Are you familiar with those attacks?

21   A.    Yes.

22   Q.    And are you able to discuss how that -- the way

23   that those incidents has related to ISIS and how

24   ISIS has been interwoven with them?

25   A.    Yes.

```
 1              MS. MEEKS:  One moment, Your Honor.
 2              Unless the Court has more questions,
 3    that's all I have.
 4              THE COURT:  No.
 5              Mr. Whalen.
 6                   CROSS-EXAMINATION
 7    BY MR. WHALEN:
 8    Q.   Dr. Vidino, good morning.
 9    A.   Good morning.
10    Q.   Just kind of cut to the chase.  What exactly is
11    the opinion that you intend to render to this jury,
12    if allowed to?  What is your opinion?
13    A.   On what topic?
14    Q.   Well, you were called as it relates to
15    Mr. Rahim.  Do you have a specific opinion that you
16    intend to render to this jury about his actions or
17    behavior?
18    A.   I think in general, I think my opinion is that
19    in the conversations that we -- that we see, we
20    conceive as somebody who clearly has very good
21    knowledge of what ISIS is, the jargon, the language,
22    very deep knowledge of that by American standards,
23    very deep knowledge, and clearly somebody that is
24    charismatic and sort of takes for himself a position
25    of leadership, if you will, in their community.  And
```

1   the fact that other people in the -- in that channel

2   refer to him with the title of Sheikh, which is

3   obviously a title that comes from a certain stature,

4   indicates that people look up to him.  That tells me

5   that this is somebody who is very important in their

6   community.  Yeah, that's the general gist of it.

7   Q.   In your previous times you that testified --

8   let me strike that.

9        When was the first time that you heard of a

10  social platform called Zello?

11  A.   I can't recall a specific date.  I would say

12  probably around a year and a half ago, two years

13  ago.

14  Q.   Was it a year and a half ago in relation to

15  this case, or had you heard of it in relation to

16  another case?

17  A.   It was in relation to this case, I believe.

18  Q.   And you agree with me, in your prior testimony

19  you never referred to Zello or were familiar with

20  Zello, correct?

21  A.   Correct.

22  Q.   Okay.  So what knowledge do you have as it

23  relates to how Zello is structured or used as it

24  relates to FaceBook, Twitter or Telegram?

25  A.   On Zello specifically, none.  I have knowledge

1   in other platforms.

2   Q.   Okay.  And part of your -- you're not going

3   to -- strike that.

4        Since you have been studying this for the last

5   five years, how do you -- are you just relating what

6   you have learned in the last five years and looking

7   at it and saying this looks similar to the other

8   things that you studied, and therefore that's what

9   Mr. Rahim may have been doing?  Is that pretty much

10  it?

11  A.   To some degree, I guess.

12  Q.   Okay.  What did you actually listen to in

13  preparation for your testimony today in forming your

14  opinions?  So what exactly did you review?

15  A.   I have access to the evidence.  I have access

16  to the online conversations.

17  Q.   Okay.  How many online conversations did you

18  listen to?

19  A.   I had the transcripts, I believe, of all of

20  them.  Most of them I had the transcript and

21  listened to.

22  Q.   As far as the transcripts, those are the ones

23  given to you by the government, correct?

24  A.   Correct.

25  Q.   You did not listen to all of the recordings on

29

```
 1   Zello yourself or had somebody else in your office
 2   listen to them and translate them from Arabic to
 3   English?
 4   A.   Did not.
 5   Q.   Just so I understand it clearly, it was
 6   indicated that your testimony was going to be
 7   somewhat -- state that Mr. Rahim's behavior was a
 8   direct effort to recruit people on behalf of ISIS.
 9   You're not going to testify to that.  That's not
10   your opinion, is it?
11   A.   It depends on what you mean by "on behalf of
12   ISIS"; that Mr. Rahim has a leadership position on
13   that platform and pushes people to embrace ISIS'
14   world view and then clearly has connections within
15   ISIS that he can connect his interlocutors with ISIS
16   leadership, then yes.
17   Q.   Okay.  So tell me how you determined -- well,
18   let me back up.
19        This chat room was not, for lack of a better
20   word, an official ISIS platform, correct?
21   A.   Not an official one, yes.
22   Q.   So what do you rely on to form the opinion that
23   he was connected with actual leadership of ISIS?
24   A.   He makes a case repeatedly himself.  He
25   repeatedly says that he has facilitated the
```

1   mobilization of certain individuals, but thanks to

2   conversations with him and connections he had, they

3   joined ISIS.

4   Q.   And do you know specifically who "they" were?

5   A.   I don't.

6   Q.   Okay.  Can you -- are you going to give an

7   opinion that you can point to specific examples of

8   people that listen to Mr. Rahim and mobilized?

9   A.   I don't.

10  Q.   And will you be able to opine that anything he

11  said is directly linked to any specific terrorist

12  attack or activity?

13  A.   Linked in an operational point of view, no;

14  linked in a sense that he discusses terrorist

15  attacks at length, yes.  In one specific case he

16  praises brothers who a few weeks after he had

17  incited attacks, they carried out the attacks.  From

18  that point of view, yes; from an operational point

19  of view, no.

20           MR. WHALEN:  I'll pass the witness.

21           THE COURT:  Ms. Meeks?

22           MS. MEEKS:  Nothing further, Your Honor.

23           THE COURT:  You may step down.

24           THE WITNESS:  Thank you.

25           THE COURT:  Any argument?  Come up here.

31

```
1                Any argument, Ms. Meeks?
2                MS. MEEKS:  From the government, Your
3      Honor?
4                THE COURT:  Yeah.  And do you want him to
5      stay in here?
6                MS. MEEKS:  We would ask for an exception
7      to the Rule for the expert.
8                MR. WHALEN:  I have no objection.
9                THE COURT:  All right.
10               MS. MEEKS:  Your Honor, in terms of
11     requirements under Daubert, the gatekeeping
12     requirement is to ensure the reliability and the
13     relevancy of the expert testimony.
14               In this case, what we have seen is that
15     the reliability of Dr. Vidino's testimony is quite
16     extensive.  Not only does he provide information and
17     participate domestically in educating and commenting
18     and researching on ISIS and terrorism, but he also
19     does so in the international community quite
20     extensively.
21               As far as the ability to communicate with
22     the jury these very complex ideas, these
23     geopolitical, religious and social aspects to a
24     terrorist organization I think is something that's
25     highly important and relevant to the fact-finder and
```

```
 1   would help them process context that otherwise might

 2   not be available.

 3              He has extensive experience and background

 4   not only in sort of terms of art used by the

 5   extremist community, but also the leaders and how

 6   any reference of those in what would be -- could be

 7   a complicated matter to distill that information

 8   down to a way the fact-finder can process.

 9              Your Honor, the proposed testimony is

10   supported by good grounds as required under Daubert.

11   And then it is a reliable basis and knowledge and

12   experience as required under Kumho Tire.

13              So we think that this expert should be, as

14   allowed under Daubert, a wide latitude to offer the

15   opinions showing that it has the same intellectual

16   rigor through his studies and through his vast

17   amount of experience would be sufficient.

18              Thank you.

19              THE COURT:  Thank you, Ms. Meeks.  Okay.

20              Mr. Whalen.

21              MR. WHALEN:  Your Honor, we don't disagree

22   that he's qualified -- you know, he's qualified.

23   This is what he does for a living.  Our main concern

24   is when it comes to expert opinions, that it invades

25   the province of the jury's ability to make their own
```

1    findings.  My concern with his testimony will be

2    that if he opines in his opinion that this was a

3    direct effort on Mr. Rahim's part to recruit people,

4    that goes to the ultimate issue in the case, and I

5    think that's for the jury to decide.  I think he

6    could testify this is what those words mean, but he

7    can't get into Mr. Rahim's head and make some

8    statement that, based on my experience, I think

9    that's what he was doing.  I think that's just his

10   thought.  But it's not -- if you cloud it in the --

11   shroud it in it's an expert opinion, I think that

12   does invade the province of the jury.  And he

13   shouldn't be allowed to testify as it relates to his

14   opinion that this was a direct effort to recruit

15   people.  I think that is a jury decision, Your

16   Honor.

17             THE COURT:  Ms. Meeks, anything else on

18   that?

19             MS. MEEKS:  Your Honor, just to clarify

20   the government does believe the expert, Dr. Vidino,

21   would be in a position to talk about how the

22   defendant's actions are consistent with ISIS

23   recruitment efforts and the effect that that would

24   have on other people.

25             THE COURT:  I wanted to make sure that's

1    what you were going to do.  Okay.  Thank you.

2              MS. MEEKS:  Thank you.

3              THE COURT:  Federal Rule of Evidence 702

4    permits an expert to offer testimony in the form of

5    an opinion if his or her scientific, technical or

6    other specialized knowledge will assist the trier of

7    fact to understand the evidence or to determine a

8    fact in issue.  Provided:  One, the testimony is

9    based on sufficient facts or data; two, the

10   testimony is a product of reliable principles and

11   method; and three, the witness has applied the

12   principles and methods reliably to the facts of the

13   case.

14             In this particular case, there's no

15   question that some testimony about how the workings

16   of ISIS operate is going to be important.  The

17   Second Circuit in particular has repeatedly approved

18   the admission of expert testimony for organized

19   crime.  And then there are all sorts of circuits

20   that have approved Al Qaeda expert testimony

21   on Al Qaeda methods and that type of thing.  I could

22   cite a bunch of them, but I will just cite to United

23   States v. Kassir, 2009 Westlaw 910707, Southern

24   District of New York 2009.  And it cites a whole

25   bunch of cases, including -- I'll let you look at

1   them.  Starts with Damrah, 412 F.3d 618, 625,

2   6th Circuit 2005, and it goes on.

3            So the expert testimony would certainly be

4   helpful.  And what I heard is it doesn't go too far

5   in method or in scope, so I think it's okay.  You

6   know, the information is -- although there's lots of

7   testimony -- lots of stuff out there about ISIS and

8   Al Qaeda on the internet, it's really not the same

9   as hearing from an expert, because some of that

10  national news can be misleading.  The jury will

11  likely be unfamiliar with some of the lesser known

12  terrorist organizations if he's going to testify

13  about those.  Reliability is -- is set.  I mean,

14  he's got all sorts of degrees and repeated

15  peer-reviewed studies and things like that.

16           So I think without going into all of that,

17  yes, it's reliable testimony.  Although his

18  methodology is not subject to testing and permits a

19  no ready calculation of concrete error rate, it is

20  more reliable than a simple cherry-picking of

21  information from websites and other sources.  The

22  testimony and evidence at the Daubert hearing

23  demonstrated that his opinions and conclusions are

24  subject to various forms of peer review and that the

25  opinions he proposes to offer here regarding

```
 1   Al Qaeda's origins -- I mean ISIS origins, leaders
 2   and certain tradecraft are generally accepted within
 3   the relevant community.  And his methodology, as he
 4   describes it, is similar to that employed by experts
 5   who have been permitted to testify in other federal
 6   cases.
 7            Again, this is all -- I'm reading from the
 8   Kassir case at -- I don't know what page -- page 6.
 9            And then, as far as the relevance and
10   reliability, as long as it doesn't go too far -- and
11   I think he can testify that he believed his --
12   Mr. Rahim was recruiting, I think so, that his
13   testimony is relevant and reliable to the issues in
14   the case.
15            So for all those reasons -- and I've
16   also -- I just found one case that he was involved
17   in, United States v. Chaffey, Case Number 2018
18   Westlaw 3159769; that's 2018 Westlaw 3159769 out of
19   the Central District of California -- no, no,
20   Northern District of California, 6-28-18.  And he
21   testified in that case, very similar testimony about
22   ISIS and was allowed to do it.  So I find all those
23   reasons supported and supportable for allowing his
24   testimony and I will allow it.
25            Okay.  What else do we have?
```

37

 1          Do we have something about the experts on

 2   the exhibits?

 3          MS. MEEKS:  Oh, Your Honor, I just had one

 4   further question with regard to Dr. Vidino's

 5   testimony, if I may.

 6          With regard to the motion in limine that

 7   the Court had issued last week, Dr. Vidino uses a

 8   couple of examples, including the San Bernardino

 9   terrorist attack and the Garland, Texas, terrorist

10   attack in discussing the types of attacks that are

11   committed by ISIS and the ways that they are

12   committed.  It's narrow testimony, and it's not very

13   extensive, but those are the ones he typically uses.

14          THE COURT:  I think I said -- I allowed

15   that.  I mean, Rahim moved to preclude any evidence

16   or reference related to terrorist attacks not

17   directly at issue in the case.  I granted in part

18   and denied in part that the government may refer to

19   terrorist attacks related to the case; for example,

20   attacks they can tie in some way to Rahim, somehow

21   talking about them, and I think that's fine.  And

22   you can also talk about 9/11 to the extent it's

23   background information.

24          MS. MEEKS:  Yes, Your Honor.

25          THE COURT:  Does that help you?  I mean,

1   is that all you had?

2          MS. MEEKS:  So the defendant -- the

3   defendant may not mention the specific

4   San Bernardino and Garland attacks, but they are

5   part of Dr. Vidino's typical expert testimony in the

6   way he uses them to describe.  So I just wanted --

7          THE COURT:  Well, you know, I think he

8   should stick to what he was talking about, you know,

9   San Bernardino -- you know, if he's just talking

10  about that in general and not tying Rahim to it, I

11  think that's okay just generally.

12          MS. MEEKS:  Yes, Your Honor.  Thank you.

13          THE COURT:  What else did you have?  Do we

14  have the expert on the exhibits or the witness on

15  the exhibits?

16          MS. MEEKS:  Yes, Your Honor.  We also have

17  Special Agent Fine here to talk about the 902 issue

18  and the affidavit we were discussing earlier, if the

19  Court would like that.

20          THE COURT:  Yes, that's what I'm talking

21  about, yes.

22          (Record sealed; filed separately.)

23          * * * * * * * * * * * * * * * * * * * * * * * * *

24              (Record resumes.)

25          THE COURT:  Let me just go through

39

```
 1  everything.
 2             I've got your jury questions.  I'm
 3  probably not going to ask all of them because you
 4  have that huge questionnaire now.  Come back around
 5  1:00, and I think we will have those copied for you
 6  and ready to go.  And the defense is going to stay
 7  in here and the government can go back to your
 8  office or in the jury room.
 9             MR. WHALEN:  Your Honor, we don't mind
10  staying in the courtroom, but can we request that
11  the audio recording be turned off?
12             THE COURT:  Yes.  I don't listen to it
13  anyway, but I will make sure it's turned off.
14             Any more motions in limine?
15             MS. MARTIN:  No, Your Honor.
16             MR. WHALEN:  One last.
17             THE COURT:  Yeah.
18             MR. WHALEN:  As relates to if we're going
19  to work in here that -- we would make the request
20  that the courtroom be limited to not public people
21  during that time.
22             THE COURT:  Oh, yeah.  No one is in here
23  except you; no one, except maybe the bailiff
24  occasionally, but that's it.
25             MR. WHALEN:  Okay.  I wanted to make sure.
```

1    Thank you.

2              THE COURT:  Yeah.  No objections to

3    witnesses?  Specific objections to witnesses?

4              MS. MARTIN:  None from the government,

5    Your Honor.

6              THE COURT:  Mr. Whalen?

7              MR. WHALEN:  None that I can think of,

8    Your Honor.

9              THE COURT:  Uh-huh.  How about summaries?

10   Do you have 1006 summaries?

11             MS. MARTIN:  Yes, Your Honor, we do

12   have -- I believe the government does have two

13   summary exhibits.

14             THE COURT:  And they are not on the

15   preadmitted exhibit list.

16             MS. MARTIN:  Let me make sure.  That's a

17   good question.  They may have been preadmitted.

18             Yes, they were preadmitted.

19             THE COURT:  Pedagogical summaries, other

20   summaries that are not evidence but demonstrative.

21             MS. MARTIN:  Your Honor, we anticipate

22   there may be some demonstratives with the witness

23   from Zello, just so the jury understands how it

24   operates, pictures, so the jury will understand what

25   it is and how it operates.

1          THE COURT:  Mr. Whalen, any comments?

2          MR. WHALEN:  No.

3          MS. MARTIN:  Your Honor, we will provide

4   those to Mr. Whalen before he testifies.

5          THE COURT:  Be sure to provide him your

6   next day's testimony.  And I think you will have

7   some witnesses tomorrow, so be sure to give him

8   those.  Time for opening statement, I have given you

9   a half an hour.

10          I don't really like speaking objections,

11   so please avoid those unless you can, but I really

12   appreciate if you can.  I don't have anything else.

13   I would like to start with the jury selection first

14   thing tomorrow morning at 9:00.  I'll see you later

15   today because you will be here to get the

16   questionnaires.

17          Nothing else, Ms. Martin?

18          MS. MARTIN:  No, Your Honor.

19          THE COURT:  Mr. Whalen?

20          MR. WHALEN:  No, Your Honor.

21          THE COURT:  We will be in recess.

22          (Court in recess at 10:01 a.m.)

23

24

25

```
 1                    C E R T I F I C A T E

 2          I, Shawnie Archuleta, CCR/CRR, certify

 3  that the foregoing is a transcript from the record

 4  of the proceedings in the foregoing entitled matter.

 5          I further certify that the transcript fees

 6  format comply with those prescribed by the Court and

 7  the Judicial Conference of the United States.

 8          This 21st day of March 2020.

 9

10

11                         s/Shawnie Archuleta
                           Shawnie Archuleta CCR No. 7533
12                         Official Court Reporter
                           The Northern District of Texas
13                         Dallas Division

14

15

16  My CSR license expires:  December 31, 2020

17  Business address:  1100 Commerce Street
                       Dallas, TX  75242
18  Telephone Number:  214.753.2747

19

20

21

22

23

24

25
```

**SHAWNIE ARCHULETA, CSR/CRR**
**FEDERAL COURT REPORTER - 214.753.2747**