```
              THE UNITED STATES DISTRICT COURT
            FOR THE NORTHERN DISTRICT OF TEXAS
                     DALLAS DIVISION

UNITED STATES OF AMERICA, )
                          )
          Plaintiff,      )
                          )
vs.                       )  3:17-CR-00169-B
                          )
SAID AZZAM MOHAMAD RAHIM, )
                          )
          Defendant.      )
```

```
                TRANSCRIPT OF PROCEEDINGS
                  JURY TRIAL - VOLUME 1
             BEFORE THE HONORABLE JANE J. BOYLE
                UNITED STATES DISTRICT JUDGE
                     APRIL 30, 2019


                  A P P E A R A N C E S

For the Government:

     UNITED STATES ATTORNEY'S OFFICE
     1100 Commerce Street - 3rd Floor
     Dallas, TX  75242
     214/659-8600
     BY:  ERRIN MARTIN
and
     U.S. DEPARTMENT OF JUSTICE
     Counterterrorism Section, National Security
     Division
     950 Pennsylvania Avenue, NW
     Washington, DC  20530
     202/532-4162
     BY:  TARYN MEEKS


For the Defendant:

     WHALEN LAW OFFICE
     9300 John Hickman Parkway - Suite 501
     Frisco, TX  75035
     214/368-2560
     BY:  JAMES P. WHALEN
          RYNE T. SANDEL
```

```
                SHAWNIE ARCHULETA, CSR/CRR
            FEDERAL COURT REPORTER - 214.753.2747
```

COURT REPORTER:   SHAWNIE ARCHULETA, TX CCR No. 7533
                  1100 Commerce Street
                  Dallas, Texas 75242

proceedings reported by mechanical stenography,
transcript produced by computer.

### TRANSCRIPT OF PROCEEDINGS - VOLUME 1

Pretrial Matters                                        3

Voir Dire By The Court                                  5
Voir Dire Examination By Ms. Martin                    52
Voir Dire Examination By Mr. Whalen                    78
Individual Voir Dire                                  113

Indictment Read By Ms. Martin                         154

Opening Statement by Ms. Meeks                        163
Opening Statement By Mr. Whalen                       179

SPECIAL AGENT DWAYNE GOLOMB
Direct Examination By Ms. Martin                      183
Cross-Examination by Mr. Whalen                       196

ALEXEY GAVRILOV
Direct Examination By Ms. Meeks                       204
Cross-Examination by Mr. Whalen                       239
Redirect Examination By Ms. Meeks                     245

AYDA HUSSEIN
Direct Examination By Ms. Martin                      248

Ex Parte and Sealed Record (filed separately)   267

Reporter's Certificate                                268

GOVERNMENT'S EXHIBITS ADMITTED:

GX 305 - Screenshot of WhatsApp            192

GX 306 - Screenshot of Twitter            194

GX 7   - Zello Records                    223

GX 109 - CD 1                             226

GX 110 - CD 1                             227

```
1              (In open court at 8:54 a.m.)

2              THE COURT:  Ms. Martin, come on up.

3              MS. MARTIN:  Yes, Your Honor.  I spoke

4   with Mr. Whalen this morning, and there are five

5   veneer members -- is that the correct term?

6              THE COURT:  Yes.

7              MS. MARTIN:  -- that we agree should be

8   struck for cause based on the answers in their

9   questionnaires.

10             THE COURT:  Okay:  What numbers are they?

11             MS. MARTIN:  Number 34.

12             THE COURT:  We aren't going to get to 34

13  yet, but go ahead.  34.

14             MS. MARTIN:  Number 43.  74.

15             THE COURT:  74.  Okay.

16             MS. MARTIN:  83.

17             THE COURT:  83.  Okay.

18             MS. MARTIN:  And 84.

19             THE COURT:  83 and 84.  Okay.  All right.

20  That's great.

21             We will, as soon as I can find out where

22  the jury is --

23             COURT SECURITY OFFICER:  The jury is here.

24  The jurors are lined up outside.

25             THE COURT:  All right.  We just need to
```

```
 1   have the defendant in here.
 2             COURT SECURITY OFFICER:  They are bringing
 3   him now, Your Honor.
 4             THE COURT:  As soon as they bring him in,
 5   I will go out, because it will take time to come in
 6   here.  I will do it different this time.  I will
 7   have you bring the panel in and then I will come in.
 8             COURT SECURITY OFFICER:  Okay.
 9             THE COURT:  We just have to wait for him
10   to come down here, and then we can start.  I'm going
11   to come in after, since it will take so long to
12   bring them in, I will come in after they bring the
13   jury in.
14             Mr. Whalen?
15             MR. WHALEN:  Just for the record, we agree
16   with what Ms. Martin represented on the record.
17             THE COURT:  Okay.
18             COURT SECURITY OFFICER:  When I bring them
19   in, we will have them seated.
20             THE COURT:  Yes.  And then I will come in,
21   and we will all rise, and they will stand and have
22   Jenelle swear them in.
23             (Recess taken.)
24
25
```

 1          THE COURT:  You all remain standing.  If
 2  you will raise your right hand, you will be sworn in
 3  as the panel.
 4          (Jury panel sworn.)
 5          THE COURT:  Good morning, Ladies and
 6  Gentlemen.  Welcome to Federal Court on Tuesday
 7  morning.  You know, it's -- you probably all
 8  wondered where you were going to end up yesterday or
 9  the day before, last week, and how long was it going
10  to be.  I will tell you right up front, I expect
11  this will be -- this is a criminal trial, a criminal
12  trial.  It involves terrorism financing and false
13  statements to the FBI.  And I think it will last two
14  weeks, no longer than.  So that's just up front.
15          I would like to introduce the participants
16  to you.  I'm going to start with Errin Martin.  She
17  represents the government.  And Errin, if you would
18  introduce your trial team, please.
19          MS. MARTIN:  Yes, Your Honor.
20          Again, my name is Errin Martin.  I'm an
21  Assistant United States Attorney here in Dallas.
22          This is Taryn Meeks, who is a prosecutor
23  with the Department of Justice in Washington.
24          This is Brian Portugal.  He's also an
25  Assistant United States Attorney here in Dallas.

1          This is Dwayne Golomb with the FBI.  He's
2    the case agent in the case.

3          Also we have Lara Burns, FBI.

4          Michael Hargrove, FBI.

5          And this Cora Drozd.  She's a paralegal in
6    our office.

7          THE COURT:  Okay.  Do any of you know any
8    of these people?  Do any of you know any of these
9    people?  You can look at them, and if they look
10   familiar after a while, you can say yes if you
11   didn't say yes right away.  But I don't see anybody
12   raising their hand.

13         Okay.  I would like to introduce the
14   defense team to you.  Mr. Whalen, if you would
15   introduce you and your team, please.

16         MR. WHALEN:  Good morning, Ladies and
17   Gentlemen.  My name is James Whalen.  I have an
18   office in Frisco.  This is my associate, Ryne
19   Sandel, and we have the pleasure of representing
20   Mr. Said Rahim.

21         THE COURT:  Do any of you individuals out
22   there know any of these people, Mr. Whalen,
23   Mr. Sandel, Mr. Rahim, any of them?  I take it by
24   your silence that you don't.

25         Well, we're going to embark on an

1    interesting case.  I think it will be an interesting

2    case.  But, you know, everybody sitting out there

3    and they're thinking terrorism, I hate terrorism,

4    you know, it comes as no surprise that everybody

5    hates terrorism, I hate terrorism, but that's really

6    not what this is about.  This is about, can you put

7    aside your personal feelings and judge the evidence

8    fairly, impartially, presume the defendant innocent,

9    give the burden of proof to the government and not

10   count it against him if he doesn't testify, all of

11   that stuff.

12          It all goes to fairness.  That's what

13   we're looking for.  Number one goal in this trial is

14   to be fair.  So that's what we are looking for.  And

15   so I want you to remember as we go through all of

16   these many questions that we ask you, we're asking

17   if you can set -- it's not how you feel about

18   terrorism, everybody hates it, but how do you think

19   you can, in this case, judge the evidence fairly and

20   impartially and give a fair verdict.  Okay?

21          The purpose of voir dire is to speak to

22   us.  It's to tell the truth.  It's the only time you

23   can talk to us and we can talk to you.  So it's the

24   time to speak up if you feel certain ways about

25   certain things.  Because once you get seated in this

1  box over here, then you can't talk to us anymore, we

2  can't talk to you.  It's all a matter of formal

3  procedures.

4          So be sure to remember, if you are sitting

5  out there and you're thinking, some of you, I will

6  just be stealth and no one will know I'm here and I

7  will get to go home.  And just as soon as you are

8  like that, you will get picked, because it's really

9  a process of elimination, it's not a process of

10 picking.  So remember that.

11         The -- I'm going to go over a few

12 constitutional principles that apply in all criminal

13 cases.  I think you-all know these, but I think it's

14 important to talk about it again.

15         The defendant is presumed innocent.

16 That's all there is to it.  By law, we presume the

17 defendant innocent in our country until he's proven

18 guilty by the government beyond a reasonable doubt.

19 The government willingly accepts that burden.  They

20 know they have a high burden they've got to prove

21 beyond a reasonable doubt, and the defendant is

22 presumed innocent until that time.

23         Is there anyone out there who cannot

24 presume the defendant innocent and put the

25 government to their full burden of proving the case

```
1   beyond a reasonable doubt?  No?  Okay.  Thank you.
2            The -- as I said, the burden of proof is
3   on the government.  The Fifth Amendment privilege is
4   really important, and I will talk to you about that
5   in just a minute.  If the defendant doesn't
6   testify -- see, the government has the full burden
7   of proof.  The defendant has no burden whatsoever.
8   He doesn't have to put any evidence on.  He can if
9   he wants, but he doesn't have to, and you can't hold
10  it against him if he does not.  I mean, if he
11  doesn't testify or get up there and give his side of
12  the story, you can't hold that against him in
13  deciding whether or not he's guilty.  You decide
14  whether or not he's guilty without considering that
15  he didn't testify.  Can all of you do that?  Can all
16  of you promise to do that and not hold it against
17  him if he doesn't testify?  Everybody agree?  Looks
18  like everybody agrees.  Any disagreements?
19            Okay.  Yes, sir.  And you are who?
20            PROSPECTIVE JUROR 83:  Edward Taylor.
21            THE COURT:  We have a microphone.
22            You're Edward Taylor.  What number are
23  you?
24            PROSPECTIVE JUROR 83:  83.
25            THE COURT:  83.  Why?
```

1          PROSPECTIVE JUROR 83:  I'm probably going

2    to have -- I pretty much already find him guilty, so

3    I don't know.

4          THE COURT:  I tell you what, we will talk

5    about that with you afterwards.  Thank you very

6    much.

7          Is there anyone else?  All right.  What

8    number are you?

9          THE COURT:  31.  Okay.  Hold on a second.

10   All right.

11         Yes, sir, Mr. Marsh.

12         PROSPECTIVE JUROR 31:  Yes.

13         THE COURT:  What are you thinking?  Do you

14   think he's guilty, or can you presume him innocent

15   or what?

16         PROSPECTIVE JUROR 31:  Either way it has

17   to be -- to me, it has to be proven innocent or

18   guilt on his part, you know.  Without that, I'm

19   undecided, so. . .

20         THE COURT:  Well, if the government proves

21   the case beyond a reasonable doubt, will you

22   convict?

23         PROSPECTIVE JUROR 31:  No.

24         THE COURT:  If the defense proves that

25   they are innocent or -- the defense doesn't prove

```
1   anything, but the government hasn't met their burden
2   of proof, you will find him innocent?
3            PROSPECTIVE JUROR 31:  Yes.
4            THE COURT:  Okay.  We will talk to you
5   later.
6            PROSPECTIVE JUROR 31:  Okay.
7            THE COURT:  Anybody else?  All right.  I
8   appreciate you speaking up.  I really do appreciate
9   you speaking up, because there are really no right
10  or wrong answers at this phase of the trial.  It's
11  just how you feel.  And fortunately, we don't all
12  feel the same, we feel differently about different
13  things.  And we just have to know for this trial how
14  you feel about certain things so that we can pick
15  our jury.
16           Yes, over there.  You are Number 61.
17  Stand up, please.  Yes, sir.  61.
18           PROSPECTIVE JUROR 61:  I just feel an
19  innocent man would want to prove his own case.  So
20  someone who pleads the Fifth, to me, has something
21  to hide.
22           THE COURT:  Well, could you presume him
23  innocent until the government proved their case
24  beyond a reasonable doubt?
25           PROSPECTIVE JUROR 61:  No.
```

```
 1              THE COURT:  Okay.  We will talk to you.
 2              Anybody else?  Okay.  Thank you very much.
 3   Appreciate that very much.  Appreciate your standing
 4   up.
 5              Okay.  Let's talk about the evidence in
 6   the case.  The evidence is the testimony of
 7   witnesses, it's documents, it's overheads, it's that
 8   type of thing.  And -- but it's important, it's
 9   critically important that nothing else be considered
10   except for the evidence in trial, whatever that is.
11              So I say that -- this is important, really
12   important what I'm about to say:  You cannot talk
13   about this case until it's over.  All of you out
14   there, I know that you aren't the 12 or 13 that will
15   sit on this jury, but all of you out there must
16   remember not to talk about the case.  If we take a
17   break or anything like that, talk about anything but
18   the case.  Because, you see, if you start talking
19   about it, you can form opinions without even
20   realizing it, and you start to presume the defendant
21   guilty or find that the government has not made
22   their case, that kind of thing up front, and you
23   haven't kept an open mind and listened to the
24   evidence.  So we prohibit any kind of talking about
25   the case at all from here forward.  So just, when
```

```
1    you go out there or whatever you do -- you know, you
2    will talk to your family members today and other
3    people that you work with.  You can't tell them
4    about the case.  You can tell them you're on a jury
5    trial, and that's it.  You will be out in two weeks,
6    and that's it.  Okay?  Is that all right with all of
7    you not to talk about the case?  All of you not to
8    talk about the case?  Yes, I think I have a hand
9    over here.  What number are you?
10               PROSPECTIVE JUROR 27:  27.
11               THE COURT:  27.  All right.
12               PROSPECTIVE JUROR 27:  I'm confused.  I
13   just want to find out, because you said he can
14   choose to or not to testify.
15               THE COURT:  Right.
16               PROSPECTIVE JUROR 27:  And the government
17   is going to prove everything.
18               THE COURT:  Yes.
19               PROSPECTIVE JUROR 27:  So if we don't hear
20   from him, how do we know -- I mean, how do we just
21   go by what is presented?  I don't understand.
22               THE COURT:  You just go by what the
23   government -- the government has the burden of
24   proving the case beyond a reasonable doubt.  He is
25   defending himself.  He can do that however he wants.
```

```
 1   He can bring evidence or he doesn't have to.  The
 2   government has the full burden of proof.  So you
 3   don't have to hear from him in order to find him
 4   innocent.  And you have to make sure that you --
 5   that you can find him innocent without him
 6   testifying.  So how do you feel about that?  You're
 7   Number 21?
 8               PROSPECTIVE JUROR 27:  27.
 9               THE COURT:  27.  Okay.  Yeah.  Do you
10   think you can find him innocent if he doesn't
11   testify?
12               PROSPECTIVE JUROR 27:  I think it depends
13   on -- I mean --
14               THE COURT:  On what?
15               PROSPECTIVE JUROR 27:  I don't know.  I
16   think it depends on what the situation, I mean, how
17   he goes.  Because I don't really know on his own
18   side what he's going on.  So yes, I can find him
19   unless and until I get proved that something went
20   wrong, yes.
21               THE COURT:  We will talk to you
22   Ms. Erwerike.
23               Anybody else?  All right.  Thank you.
24               And on the evidence, since I'm talking
25   about that, there are also all sorts of social
```

1    media.  We didn't used to have social media in court

2    or anyplace else, and now we do.  We have so much of

3    it.  There's Twitter, there's Instagram, there's

4    FaceBook and all that stuff.  Well, you can't talk

5    about the case on any social media at all.  You can

6    talk about anything else but this case until the

7    case is over.  And even then, I would advise you not

8    to talk about the case on social media.  No matter

9    what the situation is, do not talk about the case.

10           Is everyone okay with not using social

11   media to talk about the case to your friends, to

12   your relatives, to other jurors?  Everyone okay with

13   that?  Everyone okay with that?  Yes.  Yes.  Yes.

14   Yes.  Okay.  I take it by your silence that you are

15   okay with it.

16           All right.  You don't need to know the law

17   on terrorism.  You don't need to know the law on

18   lying to the FBI.  It will be set out for you in the

19   jury instructions at the end of the case.  I will

20   instruct you on what the law of terrorism financing

21   is and what the elements are.  And you -- you decide

22   what happened, you decide what the evidence showed.

23           See, I'm like a referee in the case.  I

24   call the balls and strikes and that type of thing.

25   The government has the burden of proving their case

```
 1   beyond a reasonable doubt.  They have the
 2   evidentiary burden.  The defense doesn't have any
 3   burden, but they can put a case on if they want to;
 4   they don't have to.
 5             But you have the most important role in
 6   this case, and that is to decide what happened.  You
 7   decide what happened.  That's all I can tell you to
 8   do.  And, you know, it's -- it really is such a
 9   beautiful thing to watch a jury come to a decision.
10   We don't have as many jury trials down here as we
11   used to.  And we all love to have jury trials,
12   because it's an opportunity to see the community
13   come down here and participate in a trial and make a
14   decision, make the main decision; that is, whether
15   or not they are guilty or not guilty or culpable or
16   not culpable.  So remember that.
17             So the -- I will give you instructions on
18   the law, and you decide the facts.  That is the most
19   important thing, you decide the facts.  Your verdict
20   has to be unanimous.
21             I'm going to ask each side to stand and
22   give their witness list to the jury and see if you
23   know any of these people.
24             Ms. Martin, would you please read your
25   witness list?
```

```
 1              MS. MARTIN:  Yes, Your Honor.  Lorenzo
 2   Vidino, Washington, D.C.;
 3              Mike Gober, Dallas FBI;
 4              Detective Jay Darst, Dallas Police
 5   Department;
 6              Ayda Hussein, Linguist, FBI;
 7              Marasciallo Maggiore, Cristiano
 8   Napoletano, Rome, Italy;
 9              Special Agent Daniel Glick, Department of
10   State;
11              Bill Moore, Zello, Austin, Texas;
12              Jake Hauske, Support Operation Specialist,
13   FBI-Dallas;
14              Special Agent Thomas Carignan, FBI Dallas;
15              Gwen Dove, Examiner, FBI Dallas;
16              Officer Barry Street, U.S. Customs and
17   Border Patrol;
18              Special Agent Nolan Blanchette, Department
19   of State;
20              Special Agent Paul Amacker, FBI Dallas;
21              Alexey Gavrilov, Austin, Texas.
22              And that's the conclusion.
23              THE COURT:  Okay.  Do any of you know any
24   of those people or do you think you might know some
25   of those people?  Any of you?
```

1          First row?  Third row?  Fourth row?  Fifth
2   row?  Sixth row?
3          I take it by your silence that you don't.
4          Mr. Whalen, do you have a witness list?
5          MR. WHALEN:  Yes.  Sahid Mohamed of
6   Mesquite, Texas and Asid Mohamed in Forney, Texas.
7          THE COURT:  Do you know either of those
8   witnesses?  Any of you know either of those
9   witnesses?  Okay.  Good.  Good.
10         We talked about the general principles
11  applying in all jury trials -- that's the
12  presumption of innocence, the burden of proof, the
13  Fifth Amendment privilege -- that you cannot hold it
14  against him if he doesn't testify.  The procedural
15  principles of evidence, you know, the Rules of
16  Evidence govern.
17         See, this is all about fairness.  All
18  these rules and all this thing is about one goal,
19  and it's fairness or justice.  So the reason we have
20  these Rules of Evidence, the reason we can't talk
21  about the case when you go outside, the reason you
22  can't talk about it on social media, it all has to
23  do with fairness.  It all has to do with not forming
24  opinions and all that type of thing.  It all goes to
25  the issue of fairness, so we are trying to keep the

```
 1    trial as fair as we can.
 2            You know that the evidence is in the
 3    courtroom.  You are the judges of the facts, of the
 4    credibility of the witnesses, and the jury charge
 5    will tell you every bit of law that you need to
 6    know.  Okay?  Any questions so far?  Okay.
 7            I have some questions I'm going to ask
 8    you.  And bear with me.  I promised the parties I
 9    would ask some of their questions, and they are
10    going to ask you a lot of the questions, so I'm not
11    going to ask too many.
12            Have any of you been employed by or
13    associated with the Federal Bureau of Investigation,
14    the United States Department of Diplomatic -- United
15    States Department of State Diplomatic Security
16    Services, the North Texas Joint Terrorism Task Force
17    or the Dallas Police Department?  Any of you -- and
18    I know there's somebody out there from the Dallas
19    Police Department.  Are there any of you that are
20    employed by or a close friend that is employed by or
21    associated with the Dallas Police Department, the
22    FBI, the State Department or the North Texas Joint
23    Terrorism Task Force?
24            Let's go row by row.  First row.  Anybody
25    who has been employed by the -- any of these
```

1   organizations?

2           Let me get my notes.  Yes, ma'am, you are

3   what number?

4           PROSPECTIVE JUROR 6:  Number 6.  My sister

5   works for the FBI.

6           THE COURT:  What does she do for the FBI?

7           PROSPECTIVE JUROR 6:  She's an analyst.

8           THE COURT:  How long has she worked there

9           PROSPECTIVE JUROR 6:  Probably over ten

10  years.

11          THE COURT:  Over two years?

12          PROSPECTIVE JUROR 6:  Ten years.

13          THE COURT:  Is there anything about that

14  that will affect you in this case?

15          PROSPECTIVE JUROR 6:  No.

16          THE COURT:  Thank you very much.

17          Anybody else on the first row?  Second

18  row?  Second row?  There we go.  That's Number 18.

19          PROSPECTIVE JUROR 18:  Yes, ma'am.  One of

20  my close friends from church, he's a police officer

21  for Dallas.

22          THE COURT:  Okay.  And is there anything

23  about that association that would affect you in this

24  case?

25          PROSPECTIVE JUROR 18:  No, ma'am.

```
 1              THE COURT:  Okay.  Thank you.  Anybody
 2   else on the second row?  Yes, sir.  And that's
 3   number -- what number are you?  16.
 4              PROSPECTIVE JUROR 16:  I don't know if
 5   this is a problem, but I previously worked as a
 6   locksmith and used to assist on FBI warrants and
 7   things.  I don't know the agents that I dealt with
 8   by name, but there may be somebody I worked with
 9   before.
10              THE COURT:  That's exactly what we needed
11   to know.  So you worked with the FBI in things like
12   unlocking things and stuff like that?
13              PROSPECTIVE JUROR 16:  Yes, for search
14   warrants and things like that; yes.
15              THE COURT:  How long did you do that?
16              PROSPECTIVE JUROR 16:  Off and on for
17   about eight years, but it's been about three years
18   ago that I stopped doing that.
19              THE COURT:  Is there anything about that
20   experience that's going to affect you here?
21              PROSPECTIVE JUROR 16:  I don't think so.
22              THE COURT:  We will talk to you.  Thank
23   you very much.
24              Anyone else on the second row?
25              Third row?  Yes, ma'am.  That's Number 25.
```

```
 1   Number 25.  All right.
 2             PROSPECTIVE JUROR 25:  I have a family
 3   member that was formerly with the FBI and the ATF
 4   and now the DEA.
 5             THE COURT:  All right.  I saw that on the
 6   questionnaire, FBI -- FBI, DEA.  Wow, he's made it
 7   around all the agencies; ATF, too.
 8             PROSPECTIVE JUROR 25:  Almost 50 years,
 9   yes.
10             THE COURT:  Is there anything about that
11   experience that would affect you in this case?
12             PROSPECTIVE JUROR 25:  Perhaps.
13             THE COURT:  Okay.  We'll talk to you.
14             Next who do we have?  Third row, over
15   there.  Number 35.
16             PROSPECTIVE JUROR 35:  My uncle is part of
17   the Dallas Police Department.
18             THE COURT:  Your uncle.  And what does he
19   do for them?
20             PROSPECTIVE JUROR 35:  I just believe he's
21   a police department -- I don't know.
22             THE COURT:  Dallas Police Officer?
23             PROSPECTIVE JUROR 35:  Yes.
24             THE COURT:  Okay.  Is there anything about
25   that that would affect you in this case?
```

```
 1              PROSPECTIVE JUROR 35:  No.
 2              THE COURT:  Okay.  Thank you.  Fourth row?
 3    39?
 4              COURT SECURITY OFFICER:  38.
 5              THE COURT:  38.  All right.
 6              PROSPECTIVE JUROR 38:  I just had a friend
 7    that did clearances, I think it was called, for the
 8    FBI.
 9              THE COURT:  How long did he do that?
10              PROSPECTIVE JUROR 38:  She did it for
11    several years.  She's not doing it right this
12    minute, but she did it for several years.  She's a
13    client of mine.
14              THE COURT:  Is there anything about that
15    that's going to affect you in this case?
16              PROSPECTIVE JUROR 38:  No, I don't think
17    so.  I do have a high regard for people as they do
18    that and as they are cleared, like in this case, you
19    know, the FBI are cleared.  I put high value in what
20    they are saying.  And you know, if they say it's
21    true, I'm pretty much going to believe that.
22              THE COURT:  We will talk to you.  Thank
23    you very much.
24              Who else do we have?
25              COURT SECURITY OFFICER:  39.
```

```
 1              PROSPECTIVE JUROR 39:  Yes, Your Honor.  I
 2   have a friend who I think he might be a director of
 3   the Philadelphia Field Office for the FBI.  He's
 4   high up there.  I'm not sure if he's the main guy.
 5              THE COURT:  Is there anything about that
 6   experience that will affect you in this case?
 7              PROSPECTIVE JUROR 39:  No, Your Honor.
 8              THE COURT:  Okay.  Thank you.  Anybody
 9   else on the third or fourth row?  40, over there --
10   that's Number 46.
11              PROSPECTIVE JUROR 46:  I have a cousin
12   that did work for the FBI in Washington, D.C., and
13   was doing border patrol.  But she no longer does
14   work for the FBI; she is in a different field now.
15              THE COURT:  Will that affect your opinion
16   in this case?
17              PROSPECTIVE JUROR 46:  No, not at this
18   time.
19              THE COURT:  Thank you very much.
20              Next we have Number 49.
21              PROSPECTIVE JUROR 49:  My dad works for
22   the Dallas Sheriff's Department.
23              THE COURT:  He works for what?
24              PROSPECTIVE JUROR 49:  The Dallas
25   Sheriff's Department.
```

```
 1              THE COURT:  Sheriff's Department, okay.
 2   And is there anything about that experience that's
 3   going to affect you here?
 4              PROSPECTIVE JUROR 49:  No, ma'am.
 5              THE COURT:  Thank you very much.  Anybody
 6   else?  Anybody else?
 7              Yes.  And that is Number 50.
 8              PROSPECTIVE JUROR 50:  I did not put this
 9   on my questionnaire because I didn't think it
10   mattered, but my very closest friend is a retired
11   FBI agent.
12              THE COURT:  Okay.  And how long did ago
13   did they retire.
14              PROSPECTIVE JUROR 50:  Two years.
15              THE COURT:  Anything -- is that Kelly
16   Casebere by any chance?
17              PROSPECTIVE JUROR 50:  No.
18              THE COURT:  I just wondered that.
19              Okay.  Is there anything about that
20   experience that's going to affect you in this case.
21              PROSPECTIVE JUROR 50:  Well, I don't think
22   so.
23              THE COURT:  All right.  We'll talk to you.
24   Okay.  Anybody else?  No?  No?
25              Do we have somebody else?
```

26

```
 1              COURT SECURITY OFFICER:  On the next row.
 2              THE COURT:  Okay.  Number -- what number
 3    is that?  52.
 4              PROSPECTIVE JUROR 52:  I don't know if
 5    this matters, but I do have a couple of friends that
 6    are in the Dallas Police Department.
 7              THE COURT:  Okay.  Is there anything about
 8    that experience with Dallas Police Department that's
 9    going to affect you in this case?
10              PROSPECTIVE JUROR 52:  No.
11              THE COURT:  Okay.  Anybody else?
12              Yes.  72.
13              PROSPECTIVE JUROR 72:  My husband is a
14    Dallas Police officer.
15              THE COURT:  Okay.  That's right.  You
16    are -- I can't remember your name, but I remember
17    you in the questionnaire.
18              Is there anything about that that's going
19    to affect you in this case?
20              PROSPECTIVE JUROR 72:  He's currently
21    working a federal case with the DEA, so that
22    might . . .
23              THE COURT:  It wouldn't be this one.
24              PROSPECTIVE JUROR 72:  No, not this case,
25    but just conversations we have had.
```

```
 1              THE COURT:  Okay.  We will talk to you
 2     about that.
 3              Anybody else?  Yes, Number 77.
 4              What number is that?
 5              PROSPECTIVE JUROR 75:  75.
 6              THE COURT:  75.  All right.
 7              PROSPECTIVE JUROR 75:  Yes, I have a close
 8     friend that previously worked for the FBI in
 9     Chicago.
10              THE COURT:  All right.  Is there anything
11     about that experience that's going to affect you in
12     this case?
13              PROSPECTIVE JUROR 75:  No, ma'am.
14              THE COURT:  Okay.  Thank you.  And then we
15     have 77.
16              PROSPECTIVE JUROR 77:  My sister-in-law
17     retired from the federal prison system;
18     brother-in-law is a Collin County Sheriff's
19     detective.  And back in the '80s, I attended the
20     Dallas County Sheriff's drug intervention class.
21              THE COURT:  Is there anything about any of
22     those experiences that's going to affect you in this
23     case?
24              PROSPECTIVE JUROR 77:  No, ma'am.
25              THE COURT:  Is that it?  Okay.  Okay.
```

 1          Next question:  Does anyone have any
 2    negative feelings towards the FBI, the police
 3    department or the Department of State?  Does anyone
 4    have any negative feelings towards the FBI, the
 5    Dallas Police Department or the Department of State?
 6              Row number 1?  Row number 2?  It's okay if
 7    you do.  It's okay if you do, but we need to know
 8    it.  Row Number 2?  Row Number 3?  Row Number 4?
 9    Row Number 5?  Row Number 6?  Nobody has any
10    negative feelings about the FBI, State Department,
11    Dallas Police Department, anything like that?  Okay.
12              Does anybody believe that too many
13    manhours, too much money or too much effort, too
14    much government resources are spent in the
15    investigation or enforcement of federal laws
16    involving terrorism?  Does anyone think too much
17    money is being spent on terrorism efforts?
18              Row Number 1?  Row Number 2?  Row
19    Number 3?  Row Number 4?  Row Number 5?  And 6?
20    Okay.
21              How many of -- this is switching gears a
22    little bit -- your relatives or close friends have
23    been a party to any legal action involving
24    government -- the government, its officers, its
25    agents or its employees?  How many of you, your

```
 1   relatives or your close friends, have ever been a

 2   party -- that means a witness, a plaintiff, a

 3   defendant -- to a legal action or proceeding

 4   involving the government, its officers, its agents

 5   or its employees?

 6           Anybody on the first row?  Anybody on the

 7   second row?  Third row?

 8           Third row, over here.  And you are Number?

 9           PROSPECTIVE JUROR 37:  37.

10           THE COURT:  Okay.

11           PROSPECTIVE JUROR 37:  One of my father's

12   work colleagues was accused -- and I believe found

13   guilty of -- fraud and embezzlement of a Council of

14   Governments.

15           THE COURT:  Okay.  This is a friend of

16   your father?

17           PROSPECTIVE JUROR 37:  Not necessarily a

18   friend, but a work associate.  They worked together

19   for many years.

20           THE COURT:  Okay.  Anything about that

21   experience that would affect you in this case?

22           PROSPECTIVE JUROR 37:  No, Your Honor.

23           THE COURT:  That's exactly what we need to

24   know.  Thank you.  Okay.

25           Next row?  Third row?  Anybody?  Fourth
```

1  row?  Over there.  What number are you?  51.  All

2  right.

3           PROSPECTIVE JUROR 51:  I put this on my

4  questionnaire.  I'm not sure if this is the right

5  question you are asking.  But I have a nephew that

6  was in a lot of drug problems and ended up

7  incarcerated in --

8           THE COURT:  TDCJ?

9           PROSPECTIVE JUROR 51:  No, ma'am, the

10  penitentiary in Huntsville.

11           THE COURT:  Oh, yeah, we call that TDCJ.

12  That's just one of the names.  Is there anything

13  about that experience that will affect you in this

14  case?

15           PROSPECTIVE JUROR 51:  I don't -- I don't

16  think so, but I'm not 100 percent sure at this

17  point.

18           THE COURT:  We will ask you a question

19  later.

20           Anybody else on the fourth row?  Yes.  56.

21           PROSPECTIVE JUROR 56:  My son is

22  currently --

23           THE COURT:  Is it 56?

24           PROSPECTIVE JUROR 56:  Yes.  My son is

25  currently incarcerated in Texas Department of

```
 1  Correctional --
 2              THE COURT:  Okay.  Anything about that
 3  experience that will affect you in this case?
 4              PROSPECTIVE JUROR 56:  No, ma'am.
 5              THE COURT:  What's he incarcerated for?
 6              PROSPECTIVE JUROR 56:  Family violence.
 7              THE COURT:  Okay.  Okay.  Thank you.
 8              Anybody else?  Yes, we have two.
 9              COURT SECURITY OFFICER:  76.
10              PROSPECTIVE JUROR 76:  My husband was
11  in -- we did federal court with the DEA in Plano.
12              THE COURT:  Your husband was what?
13              PROSPECTIVE JUROR 76:  Incarcerated with
14  the federal government.  We had a drug case in
15  Plano.
16              THE COURT:  Okay.  Okay.  And he's been in
17  jail for it?
18              PROSPECTIVE JUROR 76:  Yes, ma'am.  He's
19  on federal parole now.
20              THE COURT:  Okay.  Anything about that
21  experience that will affect you in this case?
22              PROSPECTIVE JUROR 76:  Probably, yes.
23              THE COURT:  We will talk to you.  Thank
24  you very much for telling us that.  Thank you very
25  much.
```

```
1                   And next.  Yeah, 77.
2                   PROSPECTIVE JUROR 77:  My son is in
3    Kaufman County jail right now, drug possession.
4                   THE COURT:  Is that 77?
5                   PROSPECTIVE JUROR 77:  Yes.
6                   THE COURT:  He's in Kaufman County jail,
7    right?
8                   PROSPECTIVE JUROR 77:  Yes.
9                   THE COURT:  Okay.  What for?
10                  PROSPECTIVE JUROR 77:  Drug possession.
11                  THE COURT:  And what about that experience
12   that's going to affect you in this case?
13                  PROSPECTIVE JUROR 77:  None.
14                  THE COURT:  Okay.  Thank you.  Anybody
15   else?  Okay.
16                  Have any of you, your relatives or close
17   friends, been involved as a witness, complainant or
18   accused in a court proceeding of any kind?
19                  This kind of covers what the last one did,
20   but I will ask you again:  Have any of you, your
21   friends or relatives, been involved as a witness or
22   complainant or accused in a criminal proceeding of
23   any kind?  Is there anything in that situation that
24   would affect your fairness?  Have any of you, your
25   friends or relatives, ever been involved as a
```

```
 1   witness, complainant or accused in a criminal court
 2   proceeding?
 3              Anyone on the first row?
 4              Yes.  Second row -- first row, and
 5   that's --
 6              COURT SECURITY OFFICER:  8.
 7              THE COURT:  Number 8.
 8              PROSPECTIVE JUROR 8:  My son-in-law --
 9   well he wasn't my son-in-law just then, but shortly
10   thereafter he was, he was involved in -- he was
11   accused of a sexual assault with a minor.
12              THE COURT:  And did -- did he get
13   convicted?
14              PROSPECTIVE JUROR 8:  No.
15              THE COURT:  Okay.  And is there anything
16   about that experience that will affect you in this
17   case?
18              PROSPECTIVE JUROR 8:  No.
19              THE COURT:  Okay.  Thank you.  Next we
20   have witnessed, accused, complainant in a criminal
21   proceeding.
22              COURT SECURITY OFFICER:  Number 20.
23              THE COURT:  Okay, Number 20.
24              PROSPECTIVE JUROR 20:  Yes.  My grandson
25   was convicted for theft and had a two-year
```

```
 1   probation.
 2              THE COURT:  Okay.  Anything about that
 3   experience that's going to affect you in this case?
 4              PROSPECTIVE JUROR 20:  No, ma'am.
 5              THE COURT:  Okay.  Thank you.  And we
 6   have -- yes.
 7              COURT SECURITY OFFICER:  Number 22.
 8              THE COURT:  22.
 9              PROSPECTIVE JUROR 22:  I had a cousin that
10   went to prison for 15 years in Carolina.
11              THE COURT:  What for?
12              PROSPECTIVE JUROR 22:  Don't have a clue;
13   don't care.
14              THE COURT:  Okay.  I guess it won't affect
15   you.
16              PROSPECTIVE JUROR 22:  No.
17              THE COURT:  Okay.  Thank you.  Anybody
18   else?
19              Yes, Number 15.
20              PROSPECTIVE JUROR 15:  I had a niece that
21   went to prison for drug charges.
22              THE COURT:  Prison.  Anything about that
23   experience that will affect you in this case?
24              PROSPECTIVE JUROR 15:  No, Your Honor.
25              THE COURT:  Okay.  Thank you.
```

```
 1                COURT SECURITY OFFICER:  26.
 2                PROSPECTIVE JUROR 26:  I had a second
 3    cousin who was molested by her stepfather and had to
 4    witness in that trial.
 5                THE COURT:  You were a witness?
 6                PROSPECTIVE JUROR 26:  No, she was.  I was
 7    there at the court trial because she was a minor.  I
 8    took her out of court when she was done testifying
 9    because I wanted them gone, but she had to witness.
10                THE COURT:  Anything about that experience
11    that will affect you in this case?
12                PROSPECTIVE JUROR 26:  No.
13                THE COURT:  Okay.  Thank you.
14                COURT SECURITY OFFICER:  Back to Number 8.
15                THE COURT:  Number 8.
16                PROSPECTIVE JUROR 8:  I guess I better say
17    I have a brother who served five years at
18    Huntsville.  He was convicted of sexual assault.
19                THE COURT:  And anything about that
20    experience that will affect you in this case?
21                PROSPECTIVE JUROR 8:  No.  And I've also
22    had a couple of cousins who were in jail, too.
23                THE COURT:  Okay.  Thank you very much.
24                Number 37.
25                PROSPECTIVE JUROR 37:  Yes.
```

```
 1            COURT SECURITY OFFICER:  37.
 2            PROSPECTIVE JUROR 37:  I had a cousin be
 3    convicted of drug charges.
 4            THE COURT:  Anything about that experience
 5    that will affect you in this case?
 6            PROSPECTIVE JUROR 37:  No, ma'am.
 7            THE COURT:  Okay.  Thank you.
 8            COURT SECURITY OFFICER:  38.
 9            PROSPECTIVE JUROR 38:  Your Honor, I'm not
10    sure if this is the same, but I had a brother that
11    was murdered.  And so we were having to be within
12    the courtroom during the time that the person that
13    murdered him was on trial, for two other people as
14    well.
15            THE COURT:  Yeah, that definitely counts.
16    Your brother was murdered.  How long ago was that?
17            PROSPECTIVE JUROR 38:  Seems like
18    yesterday, but it's been about 30 years ago.
19            THE COURT:  30 years ago.  Okay.  Is there
20    anything about that experience that will affect you
21    in this case?
22            PROSPECTIVE JUROR 38:  I would try not to
23    have it, but I think it's upsetting to be in a
24    courtroom.
25            THE COURT:  We will talk to you later.
```

```
1    Okay.  Who else do we have?

2              COURT SECURITY OFFICER:  42.

3              THE COURT:  42.

4              PROSPECTIVE JUROR 42:  I have a brother

5    who was convicted of drug charges.

6              THE COURT:  Brother, drug charges.

7    Anything about that experience that will affect you

8    in this case?

9              PROSPECTIVE JUROR 42:  No.

10             THE COURT:  Thank you.

11             COURT SECURITY OFFICER:  43.

12             PROSPECTIVE JUROR 43:  I was a witness in

13   an embezzlement trial.

14             THE COURT:  Were you involved in it in any

15   way?  You were a witness?

16             PROSPECTIVE JUROR 43:  I was a coworker,

17   and I had to testify.

18             THE COURT:  Okay.  How was that?

19             PROSPECTIVE JUROR 43:  Not fun.

20             THE COURT:  Okay.  And did they convict

21   the person?

22             PROSPECTIVE JUROR 43:  Yes.

23             THE COURT:  Is that going to affect you in

24   this case?

25             PROSPECTIVE JUROR 43:  No, ma'am.
```

```
 1              THE COURT:  Thank you.  Let's see.  We
 2   have Number 44.
 3              PROSPECTIVE JUROR 44:  Hi.  My brother was
 4   charged with a sexual case.  He died before the case
 5   actually went to court.  It's been over 20 years.
 6   But I could be biased, because it was just an
 7   accusation and it really kind of ruined his life.
 8              THE COURT:  Okay.  We will talk to you
 9   about that.
10              Anybody else?  Nobody else?
11              Yes.  73 and 74 and . . .
12              What number is that?
13              PROSPECTIVE JUROR 73:  73.
14              THE COURT:  Okay.
15              PROSPECTIVE JUROR 73:  Yes.  I had a
16   half-brother who was convicted of murder in Indiana.
17   He is now deceased.  And no, it won't affect my
18   opinion.
19              THE COURT:  Okay.  It won't affect your --
20              PROSPECTIVE JUROR 73:  No, he got what he
21   deserved.
22              THE COURT:  Okay.  Thank you.
23              PROSPECTIVE JUROR 73:  Sorry.
24              PROSPECTIVE JUROR 74:  74, Your Honor.  I
25   have a brother-in-law and half-brother who were both
```

39

```
1    convicted on drug charges.  And my wife is also a
2    former Hunt County sheriff's deputy and Hunt County
3    Police officer and has witnessed several crimes.
4              THE COURT:  Anything about that experience
5    that will affect you.
6              PROSPECTIVE JUROR 74:  No, Your Honor.
7              THE COURT:  Thank you.
8              Anybody else?  Yes.
9              COURT SECURITY OFFICER:  Number 79.
10             THE COURT:  79.
11             PROSPECTIVE JUROR 79:  .  I have three
12   children that have been incarcerated.
13             THE COURT:  Okay.  What for?
14             PROSPECTIVE JUROR 79:  My baby boy for
15   drugs; my other boy was for assault, I think; and
16   then my daughter, I don't know what she did.
17             THE COURT:  Is there anything about that
18   that's going to affect you in this case?
19             PROSPECTIVE JUROR 79:  No.
20             THE COURT:  Okay.  Thank you.  Anybody
21   else?
22             COURT SECURITY OFFICER:  Number 80.
23             THE COURT:  Number 80.
24             PROSPECTIVE JUROR 80:  I have an uncle who
25   was convicted of murder twice.
```

```
 1              THE COURT:  Wow, twice, two different
 2   times.
 3              PROSPECTIVE JUROR 80:  Yes.
 4              THE COURT:  For the same crime or two
 5   different crimes?
 6              PROSPECTIVE JUROR 80:  Two different.
 7              THE COURT:  Anything about that that will
 8   affect you in this case?
 9              PROSPECTIVE JUROR 80:  No.
10              THE COURT:  This is very helpful.
11              Anybody else?
12              COURT SECURITY OFFICER:  84.
13              THE COURT:  84.
14              PROSPECTIVE JUROR 84:  I have a nephew
15   convicted for manslaughter.  He served two years and
16   is on probation.
17              THE COURT:  Anything about that that will
18   affect you in this case.
19              PROSPECTIVE JUROR 84:  No, ma'am.
20              THE COURT:  Anybody else?  We've got
21   Number 37.
22              PROSPECTIVE JUROR 37:  I apologize.  My
23   godfather was the Sheriff of Bell County for many,
24   many years and would have been witness and party to
25   a number of court cases.
```

```
 1              THE COURT:  He was a sheriff of what
 2    county?
 3              PROSPECTIVE JUROR 37:  Bell County.
 4              THE COURT:  Okay, yes, Bell County.  Is
 5    that going to affect you in this case?
 6              PROSPECTIVE JUROR 37:  I don't think it
 7    should.
 8              THE COURT:  We will talk to you.  Thank
 9    you.
10              And 30.
11              PROSPECTIVE JUROR 30:  Yes.  I had a
12    brother that served some time in the Fed, and it
13    won't affect my opinion.
14              THE COURT:  Okay.  Thank you very much.
15              Anybody else?  Okay.  Okay.  Do any of
16    you -- I think I've already asked you this.  But do
17    any of you know Erin Nealy Cox, the U.S. Attorney,
18    or anybody that works for her office?  Erin Nealy
19    Cox, the U.S. Attorney, who anybody who works for
20    her office, the U.S. Attorney's Office in Dallas?
21              Anybody?  No.  Okay.
22              Give me a minute.  Do any of you know any
23    other members of the jury panel today?  There's a
24    lot of you.  Do any of you know any members of the
25    jury panel?  I will start with you, Number --
```

```
 1              PROSPECTIVE JUROR 24:  I know Juror Number
 2    19.
 3              THE COURT:  Okay.  Thank you.  How do you
 4    know him?
 5              PROSPECTIVE JUROR 24:  We go to church
 6    together.
 7              THE COURT:  Thank you.  Who else?
 8              Anybody else?
 9              COURT SECURITY OFFICER:  74 and 47.
10              PROSPECTIVE JUROR 74:  That is my
11    sister-in-law.
12              THE COURT:  Okay.  Well, that's great.
13    You know, we have so many people, it's not
14    surprising that you-all know each other.  Anyone
15    else know each other?  Okay.  Okay.  I take it that
16    wouldn't affect you.
17              Let's see.  Are there any members of the
18    panel who would believe the testimony of a
19    government agent or employee over the testimony of a
20    private citizen solely because he's a government
21    agent?  Any members of the panel that would believe
22    the testimony of a government agent or employee over
23    the testimony of a private citizen solely because
24    they are a government agent or employee?
25              First row?  Second row?  Third row?
```

1   Fourth row?  Fifth row?  Sixth row?

2           You raised your hand over there, and we

3   will talk to you about a lot of things, so I will

4   make that note.

5           Anybody else?  Okay.  I want to make sure

6   you understand that the indictment, even though

7   there are two charges of terrorism financing and six

8   charges of lying to a government agent is not any

9   kind of evidence against the defendant; no evidence

10  against the defendant.  It's just a piece of paper,

11  and that's all there is to it.  So I want you to

12  understand the indictment, itself, is no evidence at

13  all.  The defendant sits here.  As he sits here

14  right now, he is completely innocent, completely

15  innocent.  The indictment does not constitute any

16  evidence.  Anybody have any questions about that?

17  Okay.

18          You know, I hate to ask this question, but

19  I'm going to ask it so the defense won't ask it and

20  the government won't ask it.  Is there anyone on the

21  jury panel that thinks the defendant has done

22  something wrong or wouldn't be in court present

23  today?  That's a trick question, because you see the

24  government's lawyers and you see the defense lawyers

25  and you see the defendant, and you're supposed to

```
 1   think, well, of course, what did he do?  That's
 2   okay.  You just can't hold that against him.
 3              Do any of you think he must have done
 4   something wrong or he wouldn't be present in court
 5   today?
 6              First row?  Second row?  Third row?
 7   Fourth row?
 8              I think fourth row had a hand.  Yes, sir,
 9   what number are you?
10              PROSPECTIVE JUROR 29:  29.
11              THE COURT:  All right.  Go ahead.
12              PROSPECTIVE JUROR 29:  I just -- I'm
13   biased towards a defendant that --
14              THE COURT:  You're biased against the
15   defendant.
16              PROSPECTIVE JUROR 29:  Yes, ma'am.  I lost
17   a friend in a terrorist act.  We are going to talk
18   to you.  Thank you.
19              Anybody else?  Over here.  Two people.
20              PROSPECTIVE JUROR 37:  I might be a little
21   biased --
22              THE COURT:  What number are you?
23              PROSPECTIVE JUROR 37:  I'm sorry, 37 --
24   with my godfather that was -- he was a sheriff
25   during the Fort Hood attack, so I'm pretty familiar
```

```
 1   with terrorism and . . .
 2            THE COURT:  Okay.  We'll talk to you.
 3   Thank you.
 4            Anybody else?  Yes, Number 46.
 5            PROSPECTIVE JUROR 46:  Yes, I'm skeptical.
 6   I experienced nine-one-one -- nine-eleven, excuse
 7   me, and also military, and feel there must be
 8   something.
 9            THE COURT:  Is it 46?
10            PROSPECTIVE JUROR 46:  46.
11            THE COURT:  Okay.  Thank you.  We will
12   talk to you.  Anybody else?
13            61.  Remember you have to presume the
14   defendant innocent.  That's it.
15            COURT SECURITY OFFICER:  61.
16            PROSPECTIVE JUROR 61:  And not a lady,
17   Your Honor.
18            THE COURT:  Pardon?
19            PROSPECTIVE JUROR 61:  Not a lady.
20   Someone over there.
21            I just don't feel like we would all be
22   here if he hadn't done something.  So there's got to
23   be something to have us all here.
24            THE COURT:  Well, yes.  But, you know,
25   yes, it's all about the proof, proof beyond a
```

```
1    reasonable doubt.  Can you hold the government to

2    that proof beyond a reasonable doubt?

3              PROSPECTIVE JUROR 61:  Yes, I can hold the

4    government to that proof, but I would also hold him

5    to that proof.

6              THE COURT:  He has no burden of proof.

7              PROSPECTIVE JUROR 61:  That goes to my

8    Fifth Amendment answer earlier.  If he can't defend

9    himself . . .

10             THE COURT:  We will talk to you.  61.

11             All right.  Who else?

12             COURT SECURITY OFFICER:  73.

13             THE COURT:  73.

14             PROSPECTIVE JUROR 73:  I hate to admit

15   this, but I am biased.

16             THE COURT:  All right.  Why?

17             PROSPECTIVE JUROR 73:  Well, because I'm a

18   Christian, and I'm not supposed to be that way.

19             THE COURT:  I know.  But everyone is a

20   little biased, but you have to put the bias aside.

21   I mean, everybody comes in here with biases and

22   prejudices; me, too.  But you have to be able to put

23   it aside and judge the evidence fairly.  Can you do

24   that?

25             PROSPECTIVE JUROR 73:  I would pray to do
```

47

```
 1    that, but I'm not sure that I could.
 2              THE COURT:  Okay.  We will talk to you.
 3    Thank you.
 4              Anybody else?  And you are number?
 5              PROSPECTIVER JUROR 83:  83.
 6              THE COURT:  83.
 7              PROSPECTIVE JUROR 83:  Just from prior
 8    experiences in the military as -- same reason why I
 9    stood up initially.  I don't know if you want to
10    talk to me about it later.
11              THE COURT:  Is it 83?
12              PROSPECTIVE JUROR 83:  Yes, ma'am.
13              THE COURT:  Okay.  We will talk to you.
14    We will talk to you.  Thank you.
15              31.
16              PROSPECTIVE JUROR 31:  Yes.  I'll have to
17    say I have a big bias in this, as well, because I'm
18    a believer, too.  So -- and I understand as to
19    the -- to the proven burden, and I accept that.  But
20    other than that I would be biased.
21              THE COURT:  Okay.  Biased for whom?
22              PROSPECTIVE JUROR 31:  Just as -- well,
23    there has to be a motive behind the situation, you
24    know.  We all have a motive behind something.  So
25    without that, I don't know to say it.  I would just
```

1   be biased in it.

2           THE COURT:  Okay.  Thank you very much.

3           PROSPECTIVE JUROR 31:  Okay.

4           THE COURT:  Anybody else?

5           Yes, ma'am.  You are Number 64.

6           PROSPECTIVE JUROR 64:  I don't have a

7   bias.  I was sitting here thinking, and I realize I

8   know two people who work for the district attorney.

9           THE COURT:  Okay.  Anything about them

10  that might affect you?

11          PROSPECTIVE JUROR 64:  No, ma'am.

12          THE COURT:  Okay.  Thank you.

13          Anybody else?  Okay.

14          All right.  Does anyone have any -- and

15  believe me, I think we all have something like this.

16  But does anyone have any physical infirmities,

17  either diabetes or bad back or hearing that would

18  affect their ability to sit in this case for two

19  weeks?  Anybody have any problems, physical

20  problems, mental problems, that would affect you to

21  sit in this case for two weeks?

22          Anybody on the first row?  Second row?

23          Yes.  That's number -- what number is

24  that?

25          PROSPECTIVE JUROR 22:  22.  Right now I

```
 1   don't know if I have a tore rotator cuff or not, but
 2   I get pretty antsy.
 3           THE COURT:  Okay.  Do you think we could
 4   accommodate you by standing our you could use your
 5   arm or something like that for two weeks.
 6           PROSPECTIVE JUROR 22:  I don't know.  I
 7   was supposed to have an MRI yesterday, of course,
 8   but I had to be here.  I've been taking pain pills
 9   and everything else.
10           THE COURT:  All right.  We will talk about
11   it?
12           Who else?
13           COURT SECURITY OFFICER:  33.
14           PROSPECTIVE JUROR 33:  I'm supposed to
15   have knee surgery on the 15th of May.
16           THE COURT:  Oh, we will be finished by
17   then.  If you --
18           PROSPECTIVE JUROR 33:  It's bone on bone,
19   but I can stretch it.
20           THE COURT:  We will make sure you get to
21   stretch it.
22           COURT SECURITY OFFICER:  37.
23           PROSPECTIVE JUROR 37:  I have a clotting
24   disorder, so I have to get up and walk around, from
25   a previous deep vein thrombosis and pulmonary
```

```
 1    embolism.  So as long as I can get up and move every
 2    hour to two hours.
 3              THE COURT:  That's fine.
 4              PROSPECTIVE JUROR 37:  Yep.
 5              THE COURT:  Anybody else?  All right.
 6              COURT SECURITY OFFICER:  Number 70.
 7              THE COURT:  70.
 8              PROSPECTIVE JUROR 70:  Hi.  I'm 28 weeks
 9    pregnant.  I can sit fine, but I may need to use the
10    restroom on a regular basis.
11              THE COURT:  Okay.  That's a nice thing to
12    hear.  You are Number 70?
13              PROSPECTIVE JUROR 70:  Yes.
14              THE COURT:  28 weeks pregnant.  Well, we
15    will get you to no more than 30 weeks pregnant, I
16    promise.
17              Next?
18              COURT SECURITY OFFICER:  71.
19              PROSPECTIVE JUROR 71:  Yes.  I have
20    asthma, and sometimes I go through coughing fits.
21    Some days I'm okay; some days it's not so great.
22              THE COURT:  Okay.  But we can accommodate
23    that somehow?
24              PROSPECTIVE JUROR 71:  I may have to be
25    excused to take some medicine.
```

```
 1              THE COURT:  That's fine.  All right.

 2         Anybody else?

 3         COURT SECURITY OFFICER:  Number 80.

 4         PROSPECTIVE JUROR 80:  I wear hearing

 5  aids, and most of the time I can hear, but a lot of

 6  time I can't hear what's going on.

 7              THE COURT:  Okay.  Okay.  Thank you.

 8         Anybody else?  Yes, ma'am.  Number?

 9         PROSPECTIVE JUROR 15:  15.  I'm seven

10  weeks pregnant --

11              THE COURT:  I'm sorry, we can't hear you.

12         PROSPECTIVE JUROR 15:  I'm seven weeks

13  pregnant, too, so I might have to go to the bathroom

14  a lot.

15              THE COURT:  How much pregnant are you?

16         PROSPECTIVE JUROR 15:  Seven weeks.

17              THE COURT:  Seven weeks, all right.  But

18  you are okay besides that.

19              PROSPECTIVE JUROR 15:  Yes.

20              THE COURT:  Anybody else?

21         Is there anyone who for any reason doesn't

22  want to sit in judgment of another person?

23  Religious reasons, whatever, will not sit in

24  judgment of another person, will not judge them

25  guilty or not guilty?
```

1            Anyone on the first row?  Second row?

2    Will not sit in judgment on another person?  Third

3    row?  Fourth row?  Fifth row?  Sixth row?  No.

4    Okay.

5            How about reading and writing the English

6    language?  Does everybody out there read and write

7    the English language and speak the English language

8    just fine?

9            Row Number 1?  Row Number 2?  3?  4?  5?

10   6?  Okay.

11           All right.  Ladies and Gentlemen, I'm

12   going to turn this over to the lawyers for 45

13   minutes each to talk to you.  I don't know if they

14   will use that much time, but they've got that much

15   time.

16           Ms. Martin, go ahead.

17           MS. MARTIN:  Thank you, Your Honor.  Good

18   morning again.

19           As Judge Boyle told you, this case

20   involves some terrorism charges.  One of those is

21   conspiracy to provide material support in the form

22   of personnel and resources, and that is running a

23   social media platform and recruitment services.

24           And the law of conspiracy is going to be

25   important in this case.  A conspiracy is just an

1   agreement with an overt act.  It means more than
2   one -- the defendant or two people, at least two
3   people, reach an agreement to do something illegal.
4   And then at least one overt act is committed in
5   furtherance of that agreement.
6           So let me give you an example:  Let's say
7   we have a bank robbery.  The criminal act is a bank
8   robbery.  Ms. Meeks is the leader.  She is going to
9   put the crew together to commit the bank robbery.
10  Mr. Portugal is the driver.  He's going to drive the
11  getaway car.  Agent Golomb is going to be the
12  lookout, and Agent Burns is going to be the actual
13  bank robber.  They get together.  They talk about
14  their roles.  Ms. Meeks tells them what they are
15  going to do.  And on the day of the planned bank
16  robbery, everybody does their role, and Ms. Burns
17  robs the bank.  While she's in the bank, she pulls a
18  gun and she shoots someone.
19          Now, Mr. Portugal just agreed to be the
20  driver.  He had no idea that Ms. Burns is even going
21  to take a gun to the robbery, but that doesn't
22  matter.  He's part of the criminal conspiracy, so
23  he's responsible for every act of every
24  coconspirator in the conspiracy.
25          Special Agent Golomb, he's just the

```
 1    lookout.  That's all he did.  But he's responsible

 2    for every single act.

 3            Is there anyone on the jury that thinks

 4    that's not fair?  If someone didn't know what the

 5    other conspirators were going to do, you could hold

 6    them responsible for the acts of Agent Burns.

 7            Anyone on the first row?  Second row?

 8    Third row?  Fourth row?  Fifth?  Sixth?  Seventh?

 9            Okay.  Let me change the facts a little

10    bit.  What if -- same facts from the beginning,

11    Ms. Meeks puts together her crew.  She recruits

12    them, she gets Mr. Portugal and Agent Golomb and

13    Agent Burns, but the police are on to them.  And

14    before Agent Burns even makes it to the bank, they

15    stop the conspiracy.  Bank robbery never happens.

16    Nobody gets hurt.  No money is taken.

17            The law says that that's still a

18    conspiracy.  They still made an agreement.  They've

19    recruited the crew.  They've got in the car.

20    They've taken at least one overt act in furtherance

21    of the conspiracy, and they are all responsible

22    under the law for that.

23            With that change in facts, if something

24    doesn't ever happen, nothing bad ever happens, does

25    anybody here think I could not find, you know, Agent
```

1    Golomb is just the lookout and nothing ever really
2    happened, couldn't do that.  Does anybody think I
3    could not find somebody guilty of the conspiracy if
4    the act never actually happened?
5                   Row 1?  2?  How about Row 3?
6                   I think we have someone.
7                   THE COURT:  76.
8                   PROSPECTIVE JUROR 76:  At that point, to
9    me, it's just hearsay.  Like you can talk about
10   doing something and never do it.  So at that point,
11   I don't think I could convict somebody.
12                  MS. MARTIN:  So if it's just talk, if it's
13   just an agreement --
14                  PROSPECTIVE JUROR 76:  Yeah.
15                  MS. MARTIN:  What about an overt act?
16   What if they get the car they are going to drive for
17   the getaway?
18                  PROSPECTIVE JUROR 76:  Okay.  But suppose
19   they chickened out right when they got there and it
20   didn't happen anyway.
21                  MS. MARTIN:  So you think if it doesn't
22   ever happen, then it would hard for you to find
23   somebody guilty of the conspiracy.
24                  PROSPECTIVE JUROR 61:  I agree with her.
25                  THE COURT:  Who said that?  Stand up.

1    You're number --

2              PROSPECTIVE JUROR 61:  61.  I agree with

3    everything she just said.  If they obtained the car

4    legally, they are just a bunch of kids sitting

5    around having a party, hey, what if we rob a bank?

6    In my book, that's not a crime, and I couldn't

7    convict somebody on that.

8              MS. MARTIN:  Okay.  Thank you, sir.

9              Does anyone agree with Mr. Smith, that if

10   nothing happened, then no crime, couldn't convict

11   them?

12             I will start on the rows again.  I'm

13   sorry.  Row 1?  2?  3?  4?  5?  6?

14             COURT SECURITY OFFICER:  70.

15             PROSPECTIVE JUROR 70:  What does the law

16   state?  What did you say the law states just in

17   regards to a conspiracy, talking about it?

18             MS. MARTIN:  Yes.

19             PROSPECTIVE JUROR 70:  I don't know what

20   the law is, sorry.

21             MS. MARTIN:  If two or more people reach

22   an agreement to do something illegal and at least

23   one person commits an act in furtherance of that

24   agreement, then everyone in the conspiracy, everyone

25   that reaches the agreement is responsible.

1          PROSPECTIVE JUROR 70:  I agree with that

2   lady, because you said an act.  And if they are just

3   talking about it but they don't actually do an act,

4   I don't know if I could find guilty.

5          MS. MARTIN:  Okay.  Does anyone agree with

6   Number 70?  Anyone else agree, besides those who

7   have spoken, that if -- if it's just an agreement

8   and maybe they just go get the car for the getaway.

9   What if it's a gun?  What if they go get a gun to

10  commit the bank robbery?  What if Agent Burns gets a

11  gun?  Does that change your mind or do you think --

12          SPEAKER:

13          PROSPECTIVE JUROR 70:  Done legally?

14          THE COURT:  You have to speak up and stand

15  up.

16          PROSPECTIVE JUROR 70:  Did they get the

17  gun legally?  Was it a legal process to get the gun?

18          MS. MARTIN:  Does that matter?  Would it

19  matter to you?

20          PROSPECTIVE JUROR 70:  I don't think that

21  would change my mind.  If they didn't do an act, I

22  would have a hard time finding guilty.

23          MS. MARTIN:  Okay.  Thank you.  Let me

24  change the facts again.  This time we have two

25  individuals, and they agree that they are going to

58

1    put some explosives in a vehicle and they are going

2    to drive it down to a federal building downtown;

3    they are going to get as close as they can to the

4    federal building, and then they're going to leave

5    and detonate it.  And they're going to do it during

6    business hours, so the most people will be in the

7    area.  So they reach an agreement.  The day of that

8    act comes that morning, all of the people that work

9    in the federal building take their kids to school,

10   they take their kids to day care, they go to work,

11   they are in the federal building.  And when the time

12   comes for the bomb to go off, nothing happens.  They

13   got the car, they got maybe some of the materials

14   that go in the car, but when the time comes, nothing

15   happens.  No property is destroyed, nobody is hurt.

16   They planned to do it, they wanted to do it, but law

17   enforcement intercepted their plan, stopped them, so

18   nothing happened.

19           Number 70, would that change your mind in

20   that scenario?

21           PROSPECTIVE JUROR 70:  Possibly.  I mean,

22   I would need to know what was intercepted.  There's

23   a lot that goes into that question.  So I don't have

24   a specific answer for you right now.

25           MS. MARTIN:  Would it be difficult for

```
 1    anyone else, if law enforcement stopped the plot to
 2    set off a car bomb in downtown, is there anybody who
 3    would say, you know, they were stopped, so it would
 4    be hard for us to find those two conspirators guilty
 5    of the agreement to do something illegal?
 6                Number 15?
 7                PROSPECTIVE JUROR 15:  The intent is
 8    there.
 9                MS. MARTIN:  So you could find them guilty
10    of the conspiracy if they intended to do it.
11                PROSPECTIVE JUROR 15:  Yes.
12                MS. MARTIN:  Okay.  Thank you.
13                THE COURT:  31.
14                COURT SECURITY OFFICER:  31.
15                PROSPECTIVE JUROR 31:  Yes.  The same is
16    the intention of it, even though it didn't go
17    through or not, I would find him guilty.
18                MS. MARTIN:  Okay.  Thank you, sir.
19                COURT SECURITY OFFICER:  Juror Number 71.
20                PROSPECTIVE JUROR 71:  I mean, it's
21    attempted murder.  I would find them guilty.
22                MS. MARTIN:  Okay.  Thank you.
23                PROSPECTIVE JUROR 79:  Well, I'm a
24    Christian, too, and God says "Thou shalt not kill."
25                THE COURT:  What number are you?
```

```
 1            PROSPECTIVE JUROR 79:  79.  So I believe
 2   that an act that somebody plots, that's not right,
 3   because they could destroy a whole city.
 4            MS. MARTIN:  So you believe that if they
 5   reach an agreement and at least one person takes one
 6   overt act in furtherance of that agreement, you
 7   could find them guilty.
 8            PROSPECTIVE JUROR 79:  I could find them
 9   guilty.
10            MS. MARTIN:  Okay.  Thank you.
11            Is there anyone else?  And you guys are
12   helping me move along, Number 31, because I'm next
13   going to talk about intent.  The law also says if
14   you have the intent to commit a crime and you take a
15   substantial step toward committing that crime,
16   you're guilty even if it never happens, even if you
17   never go into the bank and commit the robbery, even
18   if the vehicle never explodes.  If you have the
19   intent to do it and you take an act that is a
20   substantial step in furtherance of it, you are
21   guilty.  So let's go back to the second scenario,
22   but let's say that there's only one person.  There's
23   no -- there are not two, there's just one, one
24   person that wants to commit the act, that wants to
25   plant a car bomb.
```

```
 1              THE COURT:  I'm sorry.  Wait, wait, wait.
 2   Who is that?
 3              MS. MARTIN:  Ma'am?  This is --
 4              THE COURT:  You can't be in here, I'm
 5   sorry.  Okay.
 6              MS. MARTIN:  I'm sorry.  I'll start over.
 7              You have only one person in this scenario.
 8   It isn't planning with anyone, it's just one person.
 9   He wants to set off a car bomb at a federal
10   building.  But based on what he's doing to prepare
11   for that, law enforcement finds out about it and
12   stops him from doing it.  He has the intent, he gets
13   the car.  He maybe gets some of the materials to put
14   in the car, but it never happens.  That's an intent.
15   He had the intent to do it, and he took a
16   substantial step.  Is there anyone here who thinks,
17   huh-uh, not enough?  If you don't actually do
18   anything, you shouldn't be found guilty.  Anyone?
19              THE COURT:  Over there.
20              PROSPECTIVE JUROR 37:  Number 37.  My only
21   concern would be to what threshold.  So, you know,
22   if you just buy a car, that's not inherently a
23   crime.  But obviously, if you are buying materials
24   that you would have to have, you know, to make a
25   bomb, I would just be concerned if they Googled "car
```

1    bomb" and bought a car, I would want to make sure
2    there was enough evidence to be very clear that they
3    were actually going to do that crime with those
4    materials in that way.
5                MS. MARTIN:  Okay.  Thank you.
6                Number 70.
7                PROSPECTIVE JUROR 70:  I agree with what
8    she said.
9                MS. MARTIN:  Thank you.  Some of you --
10   well, all of you -- most of you answered questions
11   about that on your questionnaire about the law of
12   intent.
13               And Juror Number 14.
14               PROSPECTIVE JUROR 14:  Yes, ma'am.
15               MS. MARTIN:  Based on the way that's been
16   explained this morning, would you have difficulty
17   finding somebody guilty if they had the intent and
18   they took a substantial step finding them guilty?
19               PROSPECTIVE JUROR 14:  I don't recall how
20   I answered the question.  I would not have any
21   difficulty, no.  Sorry.
22               THE COURT:  Errin, do you want him to look
23   at his questionnaire?
24               MS. MARTIN:  Yes.  Would that be helpful?
25               PROSPECTIVE JUROR 14:  Sure.

1          THE COURT:  Thank you.

2          PROSPECTIVE JUROR 14:  You said

3     question --

4          MS. MARTIN:  I believe it is -- one

5     moment, please.

6          It's Number 48.

7          (Juror reading his answer.)

8          PROSPECTIVE JUROR 14:  No, I do not have a

9     law with anything that penalizes it.

10         MS. MARTIN:  I'm sorry?

11         PROSPECTIVE JUROR 14:  It says, "Do you

12    have concerns with the law that penalizes attempting

13    to commit certain crimes?"  Question 48, correct?

14         MS. MARTIN:  Yes.  If you are instructed

15    that the crime here is unlawful to attempt to commit

16    the crime, would you have difficulty following the

17    law?

18         PROSPECTIVE JUROR 14:  No, not at all.

19         THE COURT:  Okay.  Thank you.

20         MS. MARTIN:  Is there anyone else that,

21    based on that explanation of attempt, would have

22    some difficulty?

23         PROSPECTIVE JUROR 61:  I'm sorry, you're

24    confusing me.  You are going back and forth before

25    "attempt" and "intent."  Is there a distinction

1   between the two?  Because in my mind, there is.  If

2   I have the intent to do something, so what?  If I

3   try to do it, that's a crime.

4          MS. MARTIN:  Okay.  I apologize for being

5   confusing.  In order to be found guilty of attempt,

6   in order for somebody to be found guilty of attempt,

7   they have to have the intent to commit the crime and

8   then take a substantial step towards committing it.

9   So attempt includes an intent to do something

10  illegal.  Does that make sense?

11         PROSPECTIVE JUROR 61:  Yes, ma'am.

12         MS. MARTIN:  Is anyone else confused by

13  the way I explained that?  Was that helpful?  Okay.

14         Judge Boyle also told you, this trial is

15  going to have quite a bit of evidence that relates

16  to social media, social media platforms.  How many

17  in the courtroom this morning use social media?

18         How many of you gave it up for lent

19  because you are worried you use social media too

20  much?  Anyone?  So it's part of our life every day.

21         Is anyone unfamiliar with social media,

22  not sure they know too much about it?  Have you --

23  has everyone heard of FaceBook?  Does everyone know

24  how FaceBook works?  Okay.  You connect with your

25  friends or maybe people you just went to high school

65

1   with and you are able to see what they post, what

2   they say about their days or their vacations.  Is

3   anyone not familiar with FaceBook?

4            And there are a great number or great deal

5   of other social media applications out there.  Most

6   of us that are over the age of probably 21 or 22

7   don't even know the half of it.  But if you have

8   kids and grandkids, you watch them on their social

9   media accounts all the time?  Okay.

10           I'm going to talk now about cyberbullying.

11  Cyberbullying is when someone gets on the internet

12  and harasses another individual.  Okay?  Sometimes

13  it's just annoying and mean, and sometimes it

14  reaches a higher limit.  It goes further.  It goes

15  towards threats.

16           I'm going to make two statements, and

17  everyone has to vote, so pick which one you most

18  closely align with.  Okay:  Cyberbullying is bad and

19  dangerous and law enforcement should prosecute it;

20  or, if you are on the internet and someone says

21  something to you, you could just get off the

22  internet so we really don't think cyberbullying is

23  that big of a deal.

24           Okay.  Think about which one and vote.  So

25  the first statement is bad and it could be dangerous

1   and it should be investigated and prosecuted.  Who

2   thinks that?  Okay.  Now, who agrees with the second

3   statement, if you don't like what's on the internet,

4   get off the internet.  Okay.  All right.

5              Row 1.  Juror Number 1.

6              PROSPECTIVE JUROR 1:  I don't use social

7   media.  If you're not listening to it and not

8   responding to it, I'm not bullied.

9              MS. MARTIN:  Okay.  Thank you.

10             Juror Number 2, do you agree with that?

11             PROSPECTIVE JUROR 2:  Yes.  I don't use

12  it.  Well, I just use it for one utility.  I know my

13  kids use it, but I just tell them to get off.  I

14  mean, they don't need to be on it anyway; neither do

15  I.

16             MS. MARTIN:  Does it make you nervous that

17  they are on it?

18             PROSPECTIVE JUROR 2:  No, it's just stupid

19  stuff, you know, that's posted and read.  But we

20  keep it in check.  But I just -- for me, I just

21  think it's a waste of time and I just don't use it.

22  I think you've got to watch it.  But if you don't

23  know how to use it or don't want to use it like I

24  don't, then you just need to be off.

25             MS. MARTIN:  Okay.  Thank you.

```
 1              PROSPECTIVE JUROR 2:  Yes.
 2              MS. MARTIN:  Anyone else on Row 1?
 3              How about Row 2?
 4              Yes, sir.
 5              PROSPECTIVE JUROR 13:  I'm kind of on the
 6    fence, in the middle, because I think that
 7    personally I would just get off it.  But I think
 8    some people are more inclined and more groups of
 9    people can be influenced by cyberbullying.  So I'm
10    kind of in the middle.
11              MS. MARTIN:  Okay.  Thank you.
12              PROSPECTIVE JUROR 13:  Thank you.
13              MS. MARTIN:  Anyone else on the same row,
14    Row 2?
15              Yes, sir.  You are Juror Number 17.
16              PROSPECTIVE JUROR 17:  I mean, not to say
17    I think cyberbullying can be dangerous, I just don't
18    really know if law enforcement should be
19    investigating it, because people have the right to
20    say things even if they are cruel.
21              MS. MARTIN:  I want to follow up on that.
22    Do you think that it could go too far?  Or do you
23    think that there couldn't be a limit of something
24    you could say on the internet?
25              PROSPECTIVE JUROR 17:  I think it could
```

68

```
 1    and has gone too far, especially for young adults
 2    and children.  But, there again, people should know
 3    if something is bothering you that bad, step away
 4    from -- the internet is the perfect place to step
 5    away from something.
 6                MS. MARTIN:  Okay.  Thank you.
 7                PROSPECTIVE JUROR 17:  Yes, ma'am.
 8                MS. MARTIN:  Anyone else on Row 2?
 9                Row 3?  You think it's your responsibility
10    to get off the internet if you don't like it.
11                Row 4?  Wait, we have someone on Row 3.
12                THE COURT:  What number is that?  27.  All
13    right.
14                PROSPECTIVE JUROR 27:  It should be
15    monitored, because you can say, "Get off the
16    internet," but like the kids don't have the capacity
17    to make that judgment of get off the internet, and
18    it's damaging a lot of children.  It should be
19    seriously monitored.
20                MS. MARTIN:  Thank you.  Anyone else on
21    that row?  Okay.  How about Row 4?
22                COURT SECURITY OFFICER:  42.
23                PROSPECTIVE JUROR 42:  Just get off.
24                THE COURT:  Yeah.
25                PROSPECTIVE JUROR 42:  You can't be
```

1   bullied if you're not looking at it.

2        MS. MARTIN:  Okay.  Thank you.  Anyone

3   else?  Okay.  You are?

4        THE COURT:  45.

5        PROSPECTIVE JUROR 45:  So the question --

6   or the statement was, if cyberbullying occurred,

7   just get off the internet.  I don't know that those

8   two have to go together.  I think you can free

9   speech -- the first question had to do with free

10  speech in the regulations, how much -- when

11  should -- when should the government step in and

12  prosecute?  Free speech is free speech, and it's

13  been litigated and decided when it steps over into

14  inciting illegal activity.

15        On the other hand, if you are the

16  recipient of bullying, you have the choice of how to

17  respond to it.  You can ignore it; you can get off

18  the internet; you can stay on the internet and just

19  ignore it.  That's why I believe those two

20  statements don't go together.

21        MS. MARTIN:  You believe you could go with

22  both of them.  You could say the government maybe

23  should step in at some point or law enforcement

24  should step in at some point if it goes too far --

25        PROSPECTIVE JUROR 45:  I would agree with

1    that.

2              MS. MARTIN:  -- but you could also ignore

3    it.

4              PROSPECTIVE JUROR 45:  Yes.

5              MS. MARTIN:  46.

6              PROSPECTIVE JUROR 46:  46 also agrees with

7    45.

8              MS. MARTIN:  Thank you.

9              This is 31?

10             PROSPECTIVE JUROR 31:  Yes.  Here the

11   same, because I believe that it may not be the

12   social media all the time.  It could be a verbal.

13   You have to take it serious.  You know, if I want to

14   kill somebody, and I say it verbally, you have to

15   take that real serious.  You never know what's in

16   the mind of that person or what the motive of that

17   person's heart is, so. . .

18             MS. MARTIN:  Okay.  Thank you.  Does that

19   affect anyone else on the first three rows?  Anyone

20   have a comment?

21             PROSPECTIVE JUROR 6:  I do.

22             THE COURT:  What number are you?

23             COURT SECURITY OFFICER:  Number 6.

24             PROSPECTIVE JUROR 6:  I have a hard time

25   saying that it's a black and white issue, it's

```
 1   either a yes or no.  I think it really does affect
 2   different things.  If children are involved, I think
 3   that's one thing.  If it's adults, I feel adults
 4   have more ability to shut it down and just walk
 5   away.  I think it affects children more than
 6   anything else.
 7            MS. MARTIN:  Okay.  Thank you.
 8            COURT SECURITY OFFICER:  37.
 9            PROSPECTIVE JUROR 37:  I would agree with
10   Jurors 45 and 46, that they are not mutual
11   exclusive.
12            MS. MARTIN:  You agree with both.  Which
13   one would you pick if you had to pick?
14            PROSPECTIVE JUROR 37:  I would want to
15   know where the line was when the government stepped
16   in, because you wouldn't want to say something using
17   your First Amendment right and get prosecuted when
18   it's taken out of context or something.  It would
19   depend on the line.
20            MS. MARTIN:  Okay.  Thank you.
21            Anyone else on Row 4 that we missed?
22   Okay.  Row 5?  And you are?
23            PROSPECTIVE JUROR 58:  Number 58.  I feel
24   like sometimes -- I'm a teacher, so I definitely
25   want children to be protected and everyone to be
```

```
 1   protected online.  But there are people who
 2   sometimes don't know they are breaking the law
 3   online.  So I think you do have to know the person
 4   or their intent with it.  Because, yes, people will
 5   make threats and this, but I know, as a teacher in a
 6   high school, that a lot of kids don't know that what
 7   they are doing is breaking the law.
 8                MS. MARTIN:  Thank you.
 9                Anyone else on that row?  Now we are on
10   six.  Row 6.
11                COURT SECURITY OFFICER:  Number 70.
12                PROSPECTIVE JUROR 70:  I believe in free
13   speech.  I think there could be laws and regulations
14   around cyberbullying of adolescents and children.
15   Adults, I think, can make decisions rationally or
16   ignore and continue moving forward.
17                MS. MARTIN:  Okay.  Anyone else on that
18   row?  Last row?  Anyone?
19                Okay.  A number of you answered
20   Judge Boyle's question with respect to having either
21   close family members or friends or even distant
22   family members that have either been prosecuted and
23   convicted or have spent time in either federal or
24   state custody.  Is there anyone who answered that
25   question that doesn't believe that the criminal
```

```
 1   justice system treated their loved one or their

 2   family member fairly?  Anyone that thinks the

 3   justice system just was not fair to my family member

 4   or friend?

 5             THE COURT:  30.

 6             COURT SECURITY OFFICER:  30.

 7             THE COURT:  Can you stand up, please?  30.

 8             PROSPECTIVE JUROR 30:  I believe that

 9   it's -- I'm not a racist, but I do believe -- and I

10   have seen, you know, sentences passed down, you

11   know -- you know, to a different ethnic group that

12   is more harsher than another group of people.

13             MS. MARTIN:  So you believe there's some

14   disparity in the length of punishment that's unfair.

15             PROSPECTIVE JUROR 30:  I believe something

16   needs to be worked out there.

17             MS. MARTIN:  Okay.  Thank you.

18             What about with respect to guilt or

19   innocence or guilty or not guilty?  Did you think

20   that your family member was treated fairly with

21   respect to that?

22             PROSPECTIVE JUROR 30:  Yes.  Yes.  It

23   was -- yeah, I agreed to that, yes.

24             MS. MARTIN:  So it was more just the

25   sentence may have not been evenly handed out?
```

```
 1              PROSPECTIVE JUROR 30:  Yes.

 2              MS. MARTIN:  Okay.  Thank you.  Is there

 3    anyone else that thinks -- Number 76.  And I know we

 4    are talking to you, but do you think that you

 5    were -- you or your family member were treated

 6    unfairly?

 7              PROSPECTIVE JUROR 76:  Yeah.  With federal

 8    it's a point system.  And with a conspiracy, having

 9    the lesser to do with the conspiracy, he got more

10    time than anybody else because of the point system.

11    So, yes, I kind of --

12              MS. MARTIN:  You felt it was an unfair

13    result.

14              PROSPECTIVE JUROR 76:  Yes, ma'am.

15              MS. MARTIN:  Anyone else?

16              Judge Boyle will instruct you on the law

17    at the end of the trial.  And one thing that she

18    will tell you is that punishment is only decided by

19    the judge in federal court.  Some of you had some

20    state court experience, and I think maybe even one

21    of you said you just did the sentencing, didn't do

22    the guilt or innocence.  But in federal court, you

23    will only be asked to decide whether a person is

24    guilty or not guilty.

25              Is there anyone that thinks that if you
```

1    don't have control over what the ultimate sentence

2    would be, it would be hard for you to render a

3    verdict based on the evidence?  Anyone think, I

4    can't do it, I need to know, I need to have control

5    over what the punishment is in order to say whether

6    someone is guilty or not guilty?  Okay.

7               Is there anyone here who has attended or

8    knows anyone that attends the Richardson mosque?

9               PROSPECTIVE JUROR 1:  The Richardson

10   mosque is in my neighborhood.  And I have attended

11   events, services there, where that mosque did

12   community outreach for the people in the community.

13   And so I've been there several times for those

14   events.

15              MS. MARTIN:  Thank you.  Anyone else?

16              THE COURT:  What number?

17              COURT SECURITY OFFICER:  21.

18              PROSPECTIVE JUROR 21:  I work for a family

19   that is Muslim and attends that mosque.  And I work

20   with diversity and inclusion with a lot of Muslim

21   people who attend that and other mosques.

22              MS. MARTIN:  Thank you.

23              Anyone else, Richardson mosque.

24              PROSPECTIVE JUROR 46:  I don't live too

25   far away from it.  I do have -- he's not a

1    colleague, but he's a contractor that works at our

2    company, and I do know that he attends it.

3              MS. MARTIN:  Okay.  Thank you.  Anyone

4    else?

5              How about Duncanville mosque?  Anyone know

6    anybody that attends that mosque, or have you ever

7    attended it?  Okay.

8              And finally, the Mesquite mosque.  Anyone

9    attend the Mesquite mosque or know anyone who has

10   attended or attends the Mesquite mosque?

11             Your Honor, may I have a moment?

12             THE COURT:  Yes.

13             (Pause in the proceedings.)

14             MS. MARTIN:  If you remember, one of the

15   questions in the questionnaire also dealt with your

16   feelings of the religion Islam or people of that

17   faith, and there are a variety of answers.

18             But is there anyone here who cannot,

19   because of those beliefs -- and that was question

20   19.  Let me read the question to you:  "Do you have

21   any views about Muslims or the Islamic faith that

22   would affect your ability to be an impartial juror

23   in this case?"

24             Is there anyone here who could not follow

25   Judge Boyle's instructions that they must base

```
 1    whatever verdict they have on the evidence that's
 2    presented and not their feelings about that
 3    particular religion?  Is there anyone here who could
 4    not follow the judge's instructions?
 5              THE COURT:  Number -- what number is that?
 6    Number 29.
 7              MS. MARTIN:  I would ask that we be able
 8    to talk to these jurors individually.
 9              THE COURT:  Yes.  Everybody raise your
10    hand again.  That's 29 -- 15.  Is that 15?
11              COURT SECURITY OFFICER:  15.
12              THE COURT:  15.
13              COURT SECURITY OFFICER:  29.
14              THE COURT:  Wait, wait, wait.  15.  What's
15    the other one?
16              COURT SECURITY OFFICER:  29.
17              THE COURT:  29.
18              COURT SECURITY OFFICER:  34.
19              THE COURT:  No, no, no.  Hold on.  Okay.
20    Go ahead.  34.
21              COURT SECURITY OFFICER:  46.
22              THE COURT:  46.  All right.
23              COURT SECURITY OFFICER:  61.
24              THE COURT:  61.  61.  61.  Okay.
25              COURT SECURITY OFFICER:  73.
```

```
 1              THE COURT:  73.
 2              COURT SECURITY OFFICER:  76.
 3              THE COURT:  76.
 4              COURT SECURITY OFFICER:  83.
 5              THE COURT:  83.  Okay.  Thank you.
 6              Thank you, Ms. Martin.
 7              MS. MARTIN:  Yes.  Thank you, Your Honor.
 8    Thank you for your attention.
 9              THE COURT:  You're very welcome.
10              Mr. Whalen.
11              MR. WHALEN:  May it please the Court?
12              THE COURT:  Yes.
13              MR. WHALEN:  Counsel.  Good morning,
14    Ladies and Gentlemen.  You're thrilled, you get to
15    hear from another lawyer.  This is a very important
16    part of this system, because this system does not
17    work if we don't get 12 fair and impartial people to
18    hear the facts of this case.  And we come into this
19    room with different life experiences, and it's
20    because of those life experiences that we may have
21    certain prejudices or biases.  And that's what they
22    say we have to find out in the law when we do this
23    part is to find out if you have a prejudice or a
24    bias or a leaning one way or another that we need to
25    know about.  And you have to have the ability to set
```

79

1    it aside and judge the facts in this case, in this
2    case alone.  Because if you can't do that and you're
3    seated as a juror and something comes up in the
4    middle of the trial, it is too late, and the system
5    does not work.
6              And so as we sit here today, that's what
7    we're trying to do.  And so when you hear the word
8    "terrorism," and you represent a person whose last
9    name is "Rahim," who is a Muslim, who is from the
10   Middle East, a United States citizen who has a
11   beard, I am scared.  I'm scared that we're not going
12   to know what's in your heart.  Because that's what
13   this process is about.  And we've had terrorist
14   attacks.  It has affected us all, and it is
15   emotional.
16             So as you sit here, does anybody from an
17   emotional standpoint say to themselves, "I can't do
18   it.  I don't want to do it," because I'm afraid I'm
19   not going to ask the right question and we will
20   never know.
21             So with that being said, on the first row,
22   is there anybody on the first row who says to
23   themselves, "When I hear those words 'terrorism,'
24   you can tell me about the law, you can say whatever
25   you want, I'm not sure I can do it."

1          Does anybody on the first row feel that

2    way?

3          COURT SECURITY OFFICER:  Number 8.

4          PROSPECTIVE JUROR 8:  I just want to say

5    that when I saw what happened with nine-one-one,

6    that really shook me.  It scared me.  For me and my

7    family and everybody in this country.

8          MR. WHALEN:  Okay.  Now, Juror Number 8, I

9    agree.  I think that's what happened.  But because

10   you have those feelings, can you set those aside and

11   judge the case on the facts that you hear from the

12   witness stand and the law that's given to you by

13   Judge Boyle?

14         PROSPECTIVE JUROR 8:  I think I could.

15         MR. WHALEN:  Sorry?

16         PROSPECTIVE JUROR 8:  I think I could.

17         MR. WHALEN:  Okay.  Thank you.

18         That brings me to another thing I want to

19   mention.  In voir dire, when I hear on my side, "I

20   think I can," "I might," that causes me concern,

21   because if you think you can, there's a chance you

22   couldn't.  And I'm not criticizing you, Juror Number

23   8, but I appreciate your honesty.  So we need to

24   know whether you can or you cannot.  And if all you

25   can say is, "I think I can," that's fine, too.

81

```
 1              Anybody on the second row?  Third row?
 2              THE COURT:  29.
 3              PROSPECTIVE JUROR 29:  I cannot.
 4              MR. WHALEN:  Okay.  Thank you.
 5              THE COURT:  You cannot.  Okay.
 6              MR. WHALEN:  Juror 34.
 7              THE COURT:  What number is she?
 8              COURT SECURITY OFFICER:  34.
 9              PROSPECTIVE JUROR:  34.  I don't believe I
10    could be impartial.  Terrorism is a very heavy
11    subject and something to deal with.  I know we were
12    all emotional about nine-one-one and other various
13    terrorist attacks and threats and other things that
14    have happened to our country.  I have family in the
15    military and have been directly affected by that, so
16    I don't believe I could be impartial.
17              THE COURT:  Okay.  Thank you.
18              MR. WHALEN:  Okay.  How many feel the same
19    way as Juror Number 34?
20              THE COURT:  37.
21              MR. WHALEN:  Your Honor, do you want to
22    just note them and have them come up individually?
23              THE COURT:  Yes, that would be good.
24    Let's note them.  37.
25              COURT SECURITY OFFICER:  38.
```

```
1                THE COURT:  38.

2                COURT SECURITY OFFICER:  44.

3                THE COURT:  Hold on a second.  44.

4                COURT SECURITY OFFICER:  46.

5                THE COURT:  46.

6                COURT SECURITY OFFICER:  50.

7                THE COURT:  50.

8                COURT SECURITY OFFICER:  51.

9                THE COURT:  51.

10               COURT SECURITY OFFICER:  61.

11               THE COURT:  61.

12               COURT SECURITY OFFICER:  68.

13               THE COURT:  68.

14               COURT SECURITY OFFICER:  73.

15               THE COURT:  73.  All right.

16               COURT SECURITY OFFICER:  76.

17               THE COURT:  76.  Is that it?

18               COURT SECURITY OFFICER:  79.

19               THE COURT:  79.  Is that it?

20               COURT SECURITY OFFICER:  80.

21               THE COURT:  80.

22               COURT SECURITY OFFICER:  83.  84.

23               THE COURT:  All right.  Thank you.

24               MR. WHALEN:  Okay.  Thank you very much.

25      Next I want to talk to you about -- and I know the
```

 1    judge has spoken to you and some of you answered.
 2    And if you have already stated your views about
 3    presumption of innocence and beyond a reasonable
 4    doubt, we have those noted.  But there are a lot of
 5    you who didn't say anything.  What I would like to
 6    do is read to you what I anticipate the law will be,
 7    and then see if there's any follow-up with that.
 8            "The indictment or formal charge against
 9    the defendant is not evidence of guilty.  Indeed, a
10    defendant is presumed by the law to be innocent.
11    The law does not require a defendant to prove his
12    innocence or produce any evidence at all, and no
13    inference whatever may be drawn from the election of
14    a defendant not to testify.  The government has the
15    burden of proving a defendant guilty beyond a
16    reasonable doubt, and if it failed to do so, you
17    must acquit the defendant.  A reasonable doubt is a
18    doubt upon -- based upon reason and common sense
19    after careful and impartial consideration of all the
20    evidence in the case.  Proof beyond a reasonable
21    doubt, therefore, is proof of such a convincing
22    character that you would be willing to rely and act
23    upon it without hesitation in the most important of
24    your own affairs."
25            So having heard that, is there anyone who

1  says -- who hasn't said what their feelings or

2  thoughts are about the presumption of innocence?

3          Juror Number 1, what are your thoughts

4  about the presumption of innocence, the burden of

5  proof, and a person's right not to testify at their

6  trial?

7          PROSPECTIVE JUROR 1:  Gosh, I didn't want

8  to be number one for a lot of reasons.  I think the

9  onus is upon the government if they have indicted

10  someone to prove what they said and not necessarily

11  on that person that was -- that was accused.  They

12  are the ones that said somebody did something wrong.

13  And if their case is good, I could be convinced, the

14  facts.

15          Did I answer your question?

16          MR. WHALEN:  You did.  You did.  Thank

17  you.

18          Juror Number 3, you're awfully quiet.  So

19  tell me what your thoughts are.  What do you think?

20  When you hear those concepts and things, what comes

21  to mind for you?

22          PROSPECTIVE JUROR 3:  I feel like that's

23  part of our justice system.  The prosecution has to

24  prove their case.  And if we believe what they

25  present to us, then we would convict.

```
 1              MR. WHALEN:  Okay.  And if you don't
 2    believe it or are not sure, what would your verdict
 3    be?
 4              PROSPECTIVE JUROR 3:  Then you would --
 5              THE COURT:  Acquit.
 6              PROSPECTIVE JUROR 3 -- show him not
 7    guilty.
 8              MR. WHALEN:  All right.  Thank you.
 9              Juror Number 4, what are your thoughts?
10              PROSPECTIVE JUROR 4:  My thoughts are that
11    he can just sit there and not say a word.  They have
12    to tell me and show me physical evidence to prove
13    that he did what he did.  He can just sit there
14    for -- you know, in my belief.
15              MR. WHALEN:  Okay.  Thank you.
16              Juror Number 5, what are your thoughts?
17              PROSPECTIVE JUROR 5:  I essentially would
18    follow the law.
19              MR. WHALEN:  Okay.  Does anybody feel
20    that -- you know, our natural inclination is we want
21    to hear both sides of the story, you know.  I mean,
22    it's natural, you know.  Anybody have children?
23    Anybody have children?  All right.  Anybody have two
24    children?  Okay.  They get in trouble.  I mean, you
25    grab one of them, "Tell me your side of it," and
```

```
 1    grab the other one and "Tell me your side of it."
 2    That's what we do in normal life.  We don't have
 3    that luxury in a criminal case.  And so is anybody,
 4    as we said, going to have a problem with that
 5    concept?  As we said, I know we naturally want to
 6    hear both sides of the story.  Has anybody who
 7    hasn't already said so say, Look, if I don't hear
 8    from him, I'm going to have a problem with it
 9    despite what the judge's instructions are?
10            Does anybody feel that way?  Number 54 --
11            COURT SECURITY OFFICER:  38.
12            PROSPECTIVE JUROR 38:  Well, I put a lot
13    of stock in our FBI and these.  So if this gentleman
14    did not stand up and at least say something on his
15    behalf, I would have to wonder.  I would think that
16    he would do that if he was innocent.
17            MR. WHALEN:  All right.  We will visit
18    with you.
19            THE COURT:  What number was that?
20            MR. WHALEN:  38, Your Honor.
21            THE COURT:  38.  Okay.  All right.
22            COURT SECURITY OFFICER:  54.
23            PROSPECTIVE JUROR 54:  In the interest of
24    transparency, like myself, I wonder, why wouldn't
25    you want to defend yourself?  But at the same time,
```

```
 1   I would need like proof of something before I could
 2   convict anybody.
 3            MR. WHALEN:  Okay.  Anybody else feel that
 4   way?
 5            Juror Number 60?
 6            PROSPECTIVE JUROR 60:  In the event that
 7   we don't hear from him, would we still hear from his
 8   representatives?
 9            MR. WHALEN:  Absolutely.  I can guarantee
10   you that.  Okay.
11            THE COURT:  Yes, you will hear from them.
12            MR. WHALEN:  Anybody else as relates to
13   that?  Okay.
14            COURT SECURITY OFFICER:  One more over
15   here.
16            MR. WHALEN:  Okay.
17            THE COURT:  What number?
18            COURT SECURITY OFFICER:  27.
19            THE COURT:  All right.
20            PROSPECTIVE JUROR 27:  So when you say he
21   will not say anything, that means somebody, the
22   lawyer or somebody is going to speak on his behalf
23   over the evidence that will be provided to us?  Not
24   necessarily him talking, but somebody will say
25   something on his side?
```

```
 1              MR. WHALEN:  Well, he has a right to
 2   testify or not testify, and that's a decision he
 3   gets to make.  But during a trial, you know,
 4   there's -- a witness may be subject to direct
 5   examination.  But then a lawyer, like myself, will
 6   get to do cross-examination.  And so we can ask
 7   questions through cross-examination, which is then
 8   our way to potentially get our side of the story
 9   out.
10              Does that make sense?
11              PROSPECTIVE JUROR 27:  Yes.
12              MR. WHALEN:  Which I will ask this
13   question:  How many -- does everybody know what the
14   greatest number one fear is or one of the top fears
15   is?  Public speaking?  Is anybody familiar with
16   that?
17              Can anybody just -- I will take anybody --
18   why somebody would not want to get up and speak on
19   their own behalf, other than, Well, he must have
20   something to hide?  Can anybody think of something
21   off the top of their head?
22              PROSPECTIVE JUROR:  You may misspeak or
23   say something wrong or, I guess in this circumstance
24   maybe someone gets you caught up in a question and
25   you don't know how to react and you may appear
```

```
 1   guilty just because you didn't know how to answer
 2   the question.
 3           MR. WHALEN:  Thank you.  Okay.  Anybody
 4   else?
 5           THE COURT:  79.  64.  26.
 6           PROSPECTIVE JUROR 26:  You said that he
 7   was born in another country.  So his language skills
 8   may not be up to par, so he may misunderstand
 9   questions depending on his proficiency in the
10   language.
11           MR. WHALEN:  I didn't misspeak, but I said
12   it wrong.  He was born in the United States.
13           PROSPECTIVE JUROR 26:  I thought you said
14   he was a naturalized citizen.
15           MR. WHALEN:  No.
16           PROSPECTIVE JUROR 26:  Okay.  Sorry.
17           PROSPECTIVE JUROR 60:  I feel like he may
18   not want to take the stand because you are not
19   academically well enough to withstand
20   cross-examination from a professional.
21           MR. WHALEN:  That's fair.  I'm not sure I
22   would be able to, either.
23           Anybody else?  Anybody else?  64.
24           PROSPECTIVE JUROR 64:  That's what I was
25   going to say.  I would say I would assume he
```

```
 1    wouldn't want to get cross-examined.
 2               MR. WHALEN:  Okay.  All right.  Anybody
 3    else?  Anybody else sitting here now, having heard
 4    those explanations, who hasn't already spoken up
 5    saying, If I haven't heard from him, I'm still going
 6    on to have an issue with it?
 7               Let's follow -- okay.  Number 61.
 8               PROSPECTIVE JUROR 61:  Yes, I would still
 9    have a problem with it.  If you can't defend
10    yourself, what did you do?
11               THE COURT:  Thank you.
12               PROSPECTIVE JUROR 61:  That's just in my
13    mind.
14               MR. WHALEN:  I understand.  Thank you very
15    much.
16               Okay.  Let's talk a little bit about -- we
17    talked about conspiracy -- Ms. Martin talked about
18    conspiracy.  And it is a very, in my opinion, nuance
19    topic.  But I want to talk to you about one
20    instruction you might get as it relates to
21    conspiracy, so I just want to try to maybe have some
22    discussion about that.
23               One of the instructions you may get as it
24    relates to conspiracy is the following:  "Mere
25    presence at the scene of an event, even with
```

91

1    knowledge that a crime is being committed or the

2    mere fact that certain persons may have associated

3    with each other and may have assembled together and

4    discussed common aims and interests, does not

5    necessarily establish proof of the existence of a

6    conspiracy.  Also, a person who has no knowledge of

7    conspiracy but who happens to act in a way which

8    advances some purpose of a conspiracy does not

9    thereby become a conspirator."

10          So Juror Number 1, in hearing that

11   language, what comes to mind for you, if anything?

12          PROSPECTIVE JUROR 1:  What comes to mind

13   is I'm cold and hungry.

14          I think those are some real hard things to

15   sort out.  And I think it will take a lot of

16   instruction from the officials in the courtroom to

17   make everyone clear on those topics.

18          MR. WHALEN:  Okay.  You know, I agree with

19   you.  You can put together examples, and it's hard

20   to do until you are actually put into practice, but

21   I appreciate your response.  Thank you.

22          Does anybody, upon hearing that, have

23   anything additional -- we talked about conspiracy,

24   and I thought you had good insights into it.  Now,

25   having heard that, is there anything else from

```
 1    somebody who hasn't said anything, that has comments
 2    or questions about anything as relates to that?
 3    Okay.
 4             Now, the other issue that we have in the
 5    case, if you haven't figured it out by now, is he's
 6    also charged with making a false statement.  For
 7    lack of a better word, it's lying.  You told a lie
 8    to a federal agent.  In this case, it would be the
 9    FBI.
10             There's several parts to that.  But the
11    one part I want to focus on is, there's an element
12    of it, it's called the statement has to be material.
13    And material is defined:  "A statement is material
14    if it has a natural tendency to influence or is
15    capable of influencing a decision of the federal
16    agency."  Of course in this case, it would be the
17    Federal Bureau of Investigation.
18             So does everybody understand or see that
19    if you tell a lie, it has to be material?  Does that
20    make sense to everybody?  Does anybody have any
21    questions about that or confusion about that?  I
22    think this is another one where, until you get it in
23    practice with the facts, is going to be hard to
24    understand.  Does everybody understand just by
25    telling a lie in and of itself may not be a crime?
```

1  Everybody understand that?  Anybody have any

2  question about that?

3          Let me ask you this question.  I'm not

4  going to pin anybody down specifically.  But has

5  anybody ever been in a situation, like at a

6  convenience store and the clerk's making small talk

7  with you and you are in a hurry?  You say what you

8  need to say to hurry up and get on out of there.  It

9  may not be true.  "Are you having a good day?"

10 You're having the worst day.  "Yeah, I'm having a

11 great day."  Come on, hurry up.  Hustle up, because

12 it's going to be a worse day because I'm late.  You

13 lied, but it's not material, so it doesn't matter.

14 The lie has to matter when you get charged with this

15 type of crime.  Does that make sense to everybody?

16         All right.  The next thing we want to do

17 is, I've got some follow-up questions based on your

18 questionnaire, so -- and it's really going to be

19 centered around the free speech -- the speech

20 question primarily, and the other question is going

21 to be around the question about ISIS.

22         So first I want to start with Juror Number

23 1.

24         THE COURT:  Poor Juror Number 1.

25         MR. WHALEN:  The stack is big, so there

```
 1   will be equal opportunity here.
 2              Juror Number 1, it's going to be Question
 3   32.  The previous question is:  Have you heard of
 4   ISIS, and you said -- it's on page 5.
 5              PROSPECTIVE JUROR 1:  I'm there.
 6              MR. WHALEN:  And you had circled "C," as
 7   it related to ISIS, not very familiar.  And then 32,
 8   the follow-up question, you left blank.
 9              PROSPECTIVE JUROR 1:  Because I was not
10   familiar with the group.
11              MR. WHALEN:  Okay.  And so you don't have
12   any leaning -- since you're not familiar, have any
13   leaning one way or the other.  I wanted to make sure
14   I knew why you left it blank.
15              PROSPECTIVE JUROR 1:  Well, since I really
16   don't read the news and the TV is off, I just kind
17   of insulate myself from a lot of this stuff because
18   that's just what I have done.  I think I am pretty
19   ignorant about a lot of those things.
20              MR. WHALEN:  Okay.
21              PROSPECTIVE JUROR 1:  So I don't think I
22   know enough to have an opinion.
23              MR. WHALEN:  Okay.  Thank you.  Okay.
24   We're not done yet.
25              PROSPECTIVE JUROR 1:  Good.
```

```
 1              MR. WHALEN:  If you can go to page 6,
 2     which is Question 41.
 3              PROSPECTIVE JUROR 1:  Oh, what speech, if
 4     any, should be limited?
 5              MR. WHALEN:  Yes, correct.
 6              PROSPECTIVE JUROR 1:  Oh, I think there's
 7     a lot of things that just don't need to be said.
 8              MR. WHALEN:  Okay.
 9              PROSPECTIVE JUROR 1:  But I think more of
10     it is my own personal values.  And maybe I am too
11     prudish or think people should think more highly of
12     themselves in how they do things and what they say.
13              MR. WHALEN:  Okay.
14              PROSPECTIVE JUROR 1:  And I'm not going to
15     win that battle.
16              MR. WHALEN:  I get that.  So from a
17     personal standpoint, you think people should have
18     some self-regulation.
19              PROSPECTIVE JUROR 1:  Oh, well, yeah.  And
20     it's in a lot of things that we see and hear and
21     that are exposed to that are just trash.
22              MR. WHALEN:  Okay.
23              PROSPECTIVE JUROR 1:  So there's a lot of
24     policing that's not done.
25              MR. WHALEN:  Okay.  And then my question
```

96

1    becomes, though, when you put that with, we do have

2    this right to free speech, would --

3          PROSPECTIVE JUROR 1:  You have a right to

4    free speech.  I should be able to say what I need to

5    say, but I should be able to say it respectfully and

6    in a language that does not involve a lot of

7    unnecessary -- the language I use should not carry

8    the emotion of what I'm thinking.

9          MR. WHALEN:  Okay.

10         PROSPECTIVE JUROR 1:  In other words,

11   clean up your language.

12         MR. WHALEN:  Okay.

13         PROSPECTIVE JUROR 1:  There's -- I'm

14   thinking of music.  There's a lot of good music that

15   we can choose from that you don't have to listen to

16   trash music.  But if you choose to listen to that

17   music, go into your own car and turn it up and put

18   your speakers on and, you know, that's your private

19   space.  But don't force that over on to me.

20         MR. WHALEN:  Okay.  All right.  Thank you.

21         Juror Number 3.  On page 6, Question 41,

22   you indicated, as it relates to the question of what

23   speech, if any, should be limited, you put, "Not

24   sure."  What did you mean by that, "Not sure"?

25         PROSPECTIVE JUROR 3:  I don't think I

1  really understood the question.

2          MR. WHALEN:  Well, I know it's put with

3  the social media question.  I guess the question is

4  what speech -- do you think there's any forums or

5  types of speech that should be limited by the

6  government or anybody else in general?  I guess it

7  kind of goes to that free speech First Amendment

8  concept.  Do you think personally there should be

9  types of speech that are limited, is kind of what

10 the question was getting at.

11         So what are your thoughts on that?

12         PROSPECTIVE JUROR 3:  I'm not sure I have

13 a good answer for that.

14         MR. WHALEN:  Okay.

15         PROSPECTIVE JUROR 3:  I don't.

16         MR. WHALEN:  There's no wrong answer.  So

17 whatever you feel or think is fine.

18         PROSPECTIVE JUROR 3:  So what I don't like

19 is offensive speech.  I don't know where you draw

20 the line on free speech, where the law draws that

21 line.  I don't know where that's at.  I don't like

22 offensive speech.  I don't like, as was mentioned

23 earlier, bullying or putting people down.  I don't

24 do any of those things, so I don't think that's

25 appropriate.

```
 1              MR. WHALEN:  And from a personal
 2    standpoint, but the law may allow it, you may not
 3    agree with it.
 4              PROSPECTIVE JUROR 3:  Right.
 5              MR. WHALEN:  So I guess the question
 6    becomes, if the law allows it, would you hold it
 7    against somebody who did say things that are allowed
 8    by law that were offensive to you but they had a
 9    right to say it?  How would you come down on that?
10              PROSPECTIVE JUROR 3:  Again, that's where
11    you have to draw at your own line and monitor
12    yourself, have the capacity to turn that off.
13              MR. WHALEN:  Okay.
14              PROSPECTIVE JUROR 3:  Yeah.  But where --
15    you know, adults should be able to do that it,
16    children may not type of thing.
17              MR. WHALEN:  That's fair.  Thank you.
18    That's it.
19              Juror Number 4.  Page 5.  Question 32.  I
20    just want to make sure.  You said you are not
21    familiar and that -- 32 asks, "If you are familiar
22    with this group, can you put aside anything that you
23    have read or seen on any media outlets," and you
24    indicated yes.  So I just want to make sure --
25    sometimes I read the question different ways, so
```

99

```
 1   what did you mean when you said yes, you could put
 2   what you read aside?
 3              PROSPECTIVE JUROR 4:  Yes.  Like I said,
 4   there's a lot of trash on TV, a lot of bending the
 5   truth and all of that.  So I try to stay away from
 6   it.  That's why I really -- pretty much news-wise, I
 7   try to kind of -- if I am interested in it, research
 8   it a little bit, but, if not, just kind of stay away
 9   from it.  So regarding this, yes, I would just
10   solely focus on evidence provided to me.
11              MR. WHALEN:  Okay.
12              THE COURT:  Is that Juror Number 5?
13              MR. WHALEN:  Juror Number 4, Your Honor.
14              THE COURT:  Four, okay.
15              MR. WHALEN:  And if you can turn to page
16   6, 41, bottom of the page.  The question about what
17   speech should be limited, and you put -- your answer
18   was "N/A."  So I just want to understand what you
19   meant by that.
20              PROSPECTIVE JUROR 4:  Yes, it's kind of
21   like a broad question for me.  I do believe
22   cyberbullying -- like I say, some people said, "Just
23   get off."  But there are people nowadays that can
24   find information about you, so -- and they can tell
25   where you live, take stuff out of your bank account.
```

```
 1    So that's kind of where you start drawing the line
 2    or where -- do you start drawing before.  I think
 3    social media has told us a lot of straight up lies.
 4    There is trash and bending the truth, and then
 5    there's just people lying.
 6              MR. WHALEN:  Okay.
 7              PROSPECTIVE JUROR 4:  I don't think it
 8    should be limited, because getting all these
 9    different opinions and everything, you kind of
10    gather your own information and make your own
11    thoughts about it, and like I said, just research.
12              MR. WHALEN:  Okay.  Thank you.
13              Juror Number 7.
14              On page 6, Question 41 at the bottom.
15              PROSPECTIVE JUROR 7:  I'm sorry which
16    number was it?
17              MR. WHALEN:  Number 41 is the question
18    regarding what speech, if any, should be limited,
19    and you left it blank.  So I want to know what your
20    thoughts or feelings are about that.
21              PROSPECTIVE JUROR 7:  Actually don't use
22    the media, so I don't even know what -- it should be
23    eliminated.
24              MR. WHALEN:  So you do use social media?
25              PROSPECTIVE JUROR 7:  No, I don't.
```

1          MR. WHALEN:  Okay.  So if we put social

2    media aside as it relates to speech, you know,

3    people get to hold public rallies and say things or

4    write things or say things.  What are your thoughts

5    about free speech and speech in general?  Do you

6    think it should be limited?  And, if so, in what

7    way?

8          PROSPECTIVE JUROR 7:  Maybe cyberbullying

9    or -- I think that's it.

10          MR. WHALEN:  Okay.  That's fine.  Thank

11    you.

12          And then Juror Number 8.  Page 6, which is

13    going to be Questions 41 and 42.

14          PROSPECTIVE JUROR 8:  Okay.

15          MR. WHALEN:  You indicated as far as

16    speech goes, should be limited, you said, "anything

17    too political."  What do you mean by anything too

18    political?

19          PROSPECTIVE JUROR 8:  Well, I agree a lot

20    with Juror Number 1, what she said.  I was totally

21    in line with what she was saying.  That's exactly

22    how I feel, too.  It's okay for people to say their

23    ideas, opinions, thoughts, whatever.  But when they

24    infringe on someone else, you know, we have our own

25    ideas, too.  So maybe that's what I meant about

 1   anything too political, I mean they cross the line a

 2   little bit too much for people who don't believe

 3   that way, whatever, you know, they are talking

 4   about.

 5          MR. WHALEN:  Okay.  And 42, do you believe

 6   a person should have unregulated speech on social

 7   media sites.  You said, "Not sure."

 8          PROSPECTIVE JUROR 8:  I guess I wasn't

 9   sure about unregulated speech.  What exactly does

10   that mean?

11          MR. WHALEN:  The way I look at it,

12   anything goes on social media.  Do you think there

13   should be a limit on what people can say or should

14   say on social media sites?

15          PROSPECTIVE JUROR 8:  Well, I guess people

16   should be able to say what they want, say what they

17   feel, because we have free speech in this country.

18   I think that sometimes makes me nervous because of

19   how far they go and what they say.

20          MR. WHALEN:  Okay.  Thank you.

21          Next on the list is Juror Number 14.

22          THE COURT:  You've got about ten minutes

23   left.

24          MR. WHALEN:  Okay.  Juror Number 14, on

25   page 6, 41, about what speech should be limited, I

```
 1   wasn't sure.  It looks like you started to answer
 2   and crossed it out and put "No."
 3           PROSPECTIVE JUROR 14:  I struggled with
 4   this question to be honest.  I do think that
 5   sometimes people get carried away in free speech.
 6   We all have that right.  But when it can inherently
 7   harm somebody else, I believe it needs to be ruled
 8   in a little bit.
 9           MR. WHALEN:  Okay.  Thank you.
10           PROSPECTIVE JUROR 14:  Is that the only
11   question?
12           MR. WHALEN:  That's it.  Just one for you.
13           Juror Number 15.  On Question 41, again,
14   on page 6, "What speech, if any, should be limited,"
15   and you put "N/A."  Do you have any additional
16   thoughts on that?
17           PROSPECTIVE JUROR 15:  When it causes harm
18   to somebody.  Because somebody can know maybe
19   another individual's self-esteem is low and then
20   they just really pile it on, and that can cause harm
21   to an individual that may not have high self-esteem
22   or be a stronger person than another individual.
23           MR. WHALEN:  Okay.  Juror 16.
24           On page 5, on Question 32, you wrote, "I
25   think so," about setting aside what you heard as
```

1  relates to ISIS and things.  What did you mean by,

2  "I think so"?

3          PROSPECTIVE JUROR 16:  I don't have

4  anything definitive to say against them or anything.

5  You know, I just know, I guess, what I've heard.

6  And I'd like to think that, you know, the evidence,

7  whatever it is, it shows, I'm good with that, and if

8  it shows something else, I'm good with that, too.

9          MR. WHALEN:  All right.  Thank you.  I

10  just wanted to clarify that.

11          Juror 17.

12          On question -- we'll come back to you.

13  You ended up on the list, and you probably shouldn't

14  have.

15          Juror 18.  On Question 41, page 6.

16          PROSPECTIVE JUROR 18:  Yes.

17          MR. WHALEN:  Can you read what you wrote?

18          PROSPECTIVE JUROR 18:  Sorry.  I wrote,

19  "Harsh and radical threats."

20          MR. WHALEN:  Can you explain what that

21  means to you when you say that?

22          PROSPECTIVE JUROR 18:  That should be

23  limited, because I am a personal victim of that.

24  When I was in middle school, I was severely bullied

25  for just different things, my appearance and just

1  the way I was.  And a group was made on FaceBook to
2  make fun of people, and pictures of me were posted
3  that were edited to be very graphic.  And I was
4  getting messages and comments saying that I should
5  just go kill myself because I was worthless.  And
6  even though I could have just turned it off, the
7  thoughts were still there, and the fact I read those
8  comments were in my memory.  So even though I could
9  have just turned my phone off, the thoughts were
10 still there.  And I actually attempted suicide in
11 the girls bathroom when I was in 7th grade, and
12 somebody found me and I had to be rushed to the
13 hospital.  So yes, that kind of speech should be
14 limited.
15             THE COURT:  What number are you?
16             PROSPECTIVE JUROR 18:  18.
17             THE COURT:  18.  Okay.
18             MR. WHALEN:  I'm sorry you have
19 experienced that.  Because this case may deal with
20 social media, is the mere fact that social media is
21 involved, do you think that will influence you in
22 any way based on your experience with social media
23 and how it affected you?
24             PROSPECTIVE JUROR 18:  No, sir.
25             MR. WHALEN:  Okay.  Thank you.

 1              Judge, how am I doing on time?

 2              THE COURT:  You've got about six minutes

 3       left.

 4              MR. WHALEN:  Six minutes, okay.

 5              Juror 20.

 6              On Question 32, page 5, you indicated your

 7       answer as it related to, "Can you set everything

 8       aside?"  And you said "Yes, I think so."  What

 9       concerns did you have or what hesitations did you

10       have about the ability to set what information you

11       may know about ISIS aside and just judge it on the

12       facts in this case?

13              PROSPECTIVE JUROR 20:  Well, just based on

14       what I hear in the news media and what I'm familiar

15       with about ISIS and its negative connotations, I

16       think I can set that aside, but I'm not sure that I

17       could.

18              MR. WHALEN:  Okay.  Thank you.

19              THE COURT:  What number are you?

20              PROSPECTIVE JUROR 20:  Number 20.

21              MR. WHALEN:  I have two more questions for

22       you.

23              On page 6, 41, as related to speech, you

24       said it was a very difficult question.  Free speech

25       is important.  What makes it difficult?  When you

1    say, "It's a very difficult question," what came up

2    for you?

3               PROSPECTIVE JUROR 20:  I think one thing

4    that makes America great is the fact that you do

5    have free speech and it is a right that should be

6    protected.  I think that it can be used in ways that

7    cross the line, and free speech can be used as a

8    weapon.  Very difficult, I would think, to be able

9    to regulate or control in any way a person's free

10   speech.

11              MR. WHALEN:  Okay.

12              PROSPECTIVE JUROR 20:  Because it's a

13   sacred right you should have.

14              MR. WHALEN:  Thank you.

15              Juror 25.

16              We'll go to page 6, Question 41 and 42.

17   Bottom of the page on page 6.

18              PROSPECTIVE JUROR 25:  Okay.  I don't see

19   how it could be regulated.  I believe in free

20   speech.  Most of what I see on social media, I don't

21   agree with.  I don't read what I don't agree with,

22   and a lot of it is profane to me.  But I don't see

23   how it could be regulated, really.

24              MR. WHALEN:  Okay.  All right.  Thank you.

25              Juror 26.

```
 1            Question 41, page 6, indicated about
 2   speech should be limited, and you indicated "hate
 3   speech unless it's in private."  What did you mean
 4   by that?
 5            PROSPECTIVE JUROR 26:  I mean private as
 6   in like you join groups, private chat between me and
 7   you.  If we decide we just hate somebody and we just
 8   want to kind of rag on them, that's kind of in our
 9   private area.  I don't think you need to be blasting
10   your hate speech, that you hate this group or this
11   person out in public where everybody can see it.
12            MR. WHALEN:  So you think if it was like a
13   private messaging group or a private channel or a
14   private message board of like-minded people, you
15   think that would be okay for people to say and talk
16   about like-minded things?
17            PROSPECTIVE JUROR 26:  Yeah.  I mean it's
18   no different than me joining say my bearded dragon
19   community.  We talk about common interests together.
20   It's our bearded dragon, and I have seen some ugly
21   stuff go on in those between people.  So you see it
22   in whatever group you're in.
23            MR. WHALEN:  Because that's private, and
24   people are asked to join the group or let into the
25   group, that's different than if it was broadcasted
```

```
 1   to the public.
 2             PROSPECTIVE JUROR 26:  Yeah.
 3             THE COURT:  Is that Number 25?
 4             PROSPECTIVE JUROR 26:  26.
 5             THE COURT:  26, okay.
 6             MR. WHALEN:  Thank you very much.
 7             Does anybody feel the same way as Juror
 8   Number 26 does, as far as it comes to if you are in
 9   a private chat group or private group versus a
10   public group, that that makes a difference?  is
11   there anybody who feels the same way?
12             PROSPECTIVE JUROR 11:  Can I talk?
13             MR. WHALEN:  Wait until you get the
14   microphone.
15             PROSPECTIVE JUROR 11:  Well, I'm pretty
16   loud.  We're talking about like in hate groups.  If
17   you're talking about like radicalizing young men to
18   be members of ISIS, I definitely draw a line on that
19   kind of thing on social media.  And we know that
20   that's how lots of people are being radicalized.
21   You know, they are getting in these hate groups.
22   They don't really have a group in life that they
23   identify with.  And so they find this group that
24   pulls them in, and they identify with that group and
25   then, you know, they become part of this on the
```

1  internet.  And maybe these three or four don't go

2  out and do any crimes, but maybe this one that this

3  group is influencing is going to go out and commit a

4  suicide bombing.  So, see, it's all such a vicious

5  cycle that I think all of that kind of thing on the

6  internet needs to be stopped.

7           THE COURT:  Thank you very much.

8           MR. WHALEN:  How many people feel the same

9  way as Juror Number 11?  Can you hold up your cards?

10  All right.  I will call them, and as I call out your

11  number, put them down.  1, 2, 3, 9 -- 8, 9, 10, 11,

12  12, 13, 15, 17, 18, 20, 22, 24, 25, 26, 27, 28, 29,

13  30, 31, 32 --

14           THE COURT:  Mr. Whalen, just a minute.

15  This doesn't mean we're going to talk to each of

16  these people.

17           MR. WHALEN:  No, just making a note.

18           THE COURT:  Okay.

19           MR. WHALEN:  No, no.  32, 33, 34, 35, 36,

20  38, 39, 40.  41, are you up or down?  42, 43, 44,

21  46, 47, 49, 50, 51, 52, 53, 54, 55, 56, 57, 58, 59,

22  60, 61, 62, 63, 64, 65, 66, 68, 69, 72, 73, 74, 76,

23  77, 78, 79, 80, 81, 83 and 84.  Thank you.

24           I'm going to sit down because I think I'm

25  out of time.  This is the last time you get to

```
 1  speak.  And you have heard a lot of different
 2  things, and now is the time to speak up and tell us
 3  what's in your heart.  You say, If I was to sit in
 4  Mr. Rahim's shoes, I would want these people to
 5  speak up, because I want to know what they think and
 6  they feel because I don't know if I can be sure or
 7  I'm not sure whether I can be fair in this type of
 8  case, and now is the time to do that.  Is there
 9  anything else before I sit down that you have
10  thought of that we need to know?
11          PROSPECTIVE JUROR 23:  So on that last
12  item, the reason -- Number 23.  The reason why I was
13  hesitating was the way you described it was very
14  specific.  They were doing an active recruiting
15  thing.  I think in a closed group to discuss policy
16  or approach that's in the world is different.
17  Right?  So that's why I hemmed and hawed on it.  It
18  really comes down to what did they really say?  Was
19  there an action behind it?  Did they do something
20  about it?  I wouldn't want the big government coming
21  around and saying, Hey, I just can't have a
22  discussion -- open true discussions with my
23  colleagues or friends.
24          MR. WHALEN:  All right.  Thank you.
25          THE COURT:  Thank you, Mr. Whalen.
```

```
 1              Mr. Whalen, you may sit down.
 2              MR. WHALEN:  All right.
 3              THE COURT:  Thank you very much.
 4              All right.  Ladies and Gentlemen, we are
 5   going to send you outside and talk to you one by
 6   one, not all of you.  I please remind you not to
 7   talk about the case.  Talk about anything but the
 8   case.  The Stars -- well, not the Mavericks.  You
 9   know, the baseball game, just anything but the case.
10              All right.  All rise for the jury
11              (Jury panel exits courtroom.)
12              THE COURT:  Okay.  You can bring the
13   chairs around, please.  And if somebody will turn
14   the lecturn around.
15              MR. WHALEN:  I'm not touching it.
16              THE COURT:  Me neither.
17              MR. WHALEN:  I might break it.
18              THE COURT:  I don't know that we need to
19   talk to her, but Juror Number 1.
20              Do you want to talk to her?
21              MR. WHALEN:  No.
22              THE COURT:  She didn't have anything.
23              Ms. Martin, you didn't want to talk to
24   her, did you?
25              First one I have, then, is 8, Diane
```

1 Salazar.  Everyone agree to bring her in?

2          COURT SECURITY OFFICER:  I can't find her.

3 I think she's in the restroom.

4          THE COURT:  The next person I have is

5 Jeffrey Miles Smith, Number 16.

6          MS. MARTIN:  Your Honor, we also had 15.

7          THE COURT:  Yeah, she's pregnant, seven

8 weeks pregnant.  But what did you have her for?

9          MS. MARTIN:  I think she raised her hand

10 to a question on, despite your feelings of Islam --

11          COURT SECURITY OFFICER:  We found her,

12 Your Honor.

13          MS. MARTIN:  -- would you have a problem

14 following the law.

15          THE COURT:  Come on up, Ms. Salazar.  Up

16 to the microphone, please.

17          (Ms. Salazar enters the courtroom.)

18          THE COURT:  Ms. Salazar, you said -- you

19 know, you talked about 9-11, and you said you had

20 certain feelings about that that made you maybe not

21 be able to be fair.  Tell us about that.

22          PROSPECTIVE JUROR 8:  When I heard about

23 what happened, it just shook me to my core.  I cried

24 with my family, and it just did something to me.  It

25 scared me.

---

```
 1              THE COURT:  Is there something about the
 2    fact that this involves not terrorism, but terrorism
 3    financing, that will affect you in this case?
 4              PROSPECTIVE JUROR:  No, I don't think so.
 5    I really don't believe so.
 6              THE COURT:  So even though 9-11 really
 7    bothered you, you don't think that any of this will
 8    bother you in trying this case.
 9              PROSPECTIVE JUROR:  No, no.
10              THE COURT:  Ms. Martin?
11              MS. MARTIN:  Nothing else, Your Honor.
12              THE COURT:  Mr. Whalen?
13              MR. WHALEN:  No, Your Honor.
14              THE COURT:  You may step outside.
15              PROSPECTIVE JUROR 8:  Thank you.
16              THE COURT:  Let's get Number 15.
17              MS. MARTIN:  Your Honor, may I address the
18    Court before 15 comes in?
19              (Ms. Salazar exits the courtroom.)
20              MS. MARTIN:  Your Honor, we don't have any
21    evidence of financing in this case.  It is the
22    material support --
23              THE COURT:  Oh, yeah, yeah, material
24    support, yes.
25              MS. MARTIN:  Yes, Your Honor, thank you.
```

1          THE COURT:  No financing.  Sorry, I was
2     thinking of financing.
3          COURT SECURITY OFFICER:  Are you ready for
4     16?
5          THE COURT:  No, 15.  15.  15, I'm sorry.
6          COURT SECURITY OFFICER:  One, five.
7          THE COURT:  Yeah, one, five.  They brought
8     it up.
9          Come on up, up to the microphone, please,
10    just right over there.
11         (Ms. McKenzie enters the courtroom.)
12         THE COURT:  You said at some point you
13    couldn't be fair.
14         Ms. Martin, what was it?
15         MS. MARTIN:  Yes, Your Honor.  I believe
16    it was, despite your feelings about Islam or that
17    faith, could you follow the law in this case and
18    base it on the evidence presented?
19         THE COURT:  Could you?
20         PROSPECTIVE JUROR 15:  No.
21         THE COURT:  Why?
22         PROSPECTIVE JUROR 15:  Because of my
23    strong Christianity faith.
24         THE COURT:  Because of what?
25         PROSPECTIVE JUROR 15:  Because of my own

```
1    Christian belief.
2              THE COURT:  And what does that mean?  That
3    means that you would not have the government bear
4    their burden?
5              PROSPECTIVE JUROR 15:  I know I could
6    listen, but I still feel that based upon my
7    beliefs --
8              THE COURT:  You would be biased in favor
9    of the government?  In favor of the government?  Or
10   in favor of the defendant?
11             PROSPECTIVE JUROR 15:  Of the government.
12             THE COURT:  Okay.  Any questions,
13   Ms. Martin?
14             MS. MARTIN:  No, Your Honor.
15             THE COURT:  Any questions, Mr. Whalen?
16             MR. WHALEN:  No, Your Honor.
17             THE COURT:  Thank you very much.
18             (Ms. McKenzie exits the courtroom.)
19             THE COURT:  Number 16.  Why do we have 16?
20   Do you have 16?  Yes, Mr. Sandel, come on up.
21             MR. SANDEL:  Yes, Your Honor.  He
22   previously worked for the FBI in a locksmith
23   capacity, and you mentioned you wanted to follow up
24   on that.
25             THE COURT:  Yes, okay.  Just over here to
```

1    the microphone, please.

2                (Mr. Smith enters the courtroom.)

3                THE COURT:  You worked with the FBI in a

4    bunch of search warrants and locksmith-type stuff.

5                Tell us about that.

6                PROSPECTIVE JUROR 16:  Well, I actually

7    was at -- part of the John Wiley Price

8    investigation.  Started off at the assistant's house

9    and gained access into that house, and then gained

10   access into some other stuff at Mr. Price's house as

11   well.  I've been on a couple down in Cockrell Hill.

12   Did a big embezzlement case in Corsicana with the --

13   I believe it was College Street Bakery.

14               THE COURT:  Yeah, I remember that.  Okay.

15               PROSPECTIVE JUROR 16:  So I have been

16   involved in several.

17               THE COURT:  Can you be fair in this case?

18               PROSPECTIVE JUROR 16:  I think I can.

19               THE COURT:  Can you put aside your

20   feelings for the FBI and be fair and impartial to

21   both sides?

22               PROSPECTIVE JUROR 16:  Yes.

23               THE COURT:  You're absolutely sure about

24   that.

25               PROSPECTIVE JUROR 16:  I --

```
 1              THE COURT:  You've got to be sure.  You've
 2    got to be sure.
 3              PROSPECTIVE JUROR 16:  Considering I just
 4    worked with them and I didn't, you know, develop
 5    any -- what I would consider any friendships or
 6    anything like that, I don't think it would be a
 7    problem.
 8              THE COURT:  You don't think it would be
 9    problem, but you don't if it would be a problem.
10    You've got to tell us for sure.
11              PROSPECTIVE JUROR 16:  Well . . . I would
12    have to see the evidence.  I will base my decision
13    on the evidence, and I know can do that.
14              THE COURT:  You can base your decision on
15    the evidence.
16              PROSPECTIVE JUROR 16:  Yes.
17              THE COURT:  And you will make the
18    government bear their full burden of proof.
19              PROSPECTIVE JUROR 16:  Yes.
20              THE COURT:  And you will follow the law
21    completely, correct?
22              PROSPECTIVE JUROR 16:  Yes.
23              THE COURT:  Ms. Martin?
24              MS. MARTIN:  No questions, Your Honor.
25              THE COURT:  Mr. Whalen?
```

```
 1              MR. WHALEN:  Just a few, Your Honor.

 2              Do you want me to stand?

 3              THE COURT:  Yes.

 4              MR. WHALEN:  Mr. Smith, Juror 16, how long

 5   did you partner or work with the FBI?  How many

 6   years was that?

 7              PROSPECTIVE JUROR 16:  Actually, I worked

 8   as a locksmith over eight years, and it was periodic

 9   over the eight years.

10              MR. WHALEN:  And during the eight years,

11   can you put a dollar figure on how much you were

12   paid to work during that time frame for your

13   services during that time?

14              PROSPECTIVE JUROR 16:  Overall, from all

15   of the -- probably a couple of thousand dollars.

16              MR. WHALEN:  Okay.  Now, this is my

17   impression, and I could be wrong.  Seems when you

18   are answering the question about whether you could

19   be setting it aside, you seem to be hesitating and

20   moving your head, like, yeah, I'm kind of sure; yes,

21   maybe.  And my concern is this, is that you said you

22   think so, you would have to hear the evidence.  My

23   concern is, then, once you start hearing the

24   evidence, if it comports with what you have

25   witnessed or not, that then it's going to affect
```

1   your opinion and you really haven't set it aside.

2   That's my concern.  So what can you do to assure us

3   that you're not going to let that happen?

4           PROSPECTIVE JUROR 16:  Thinking more about

5   it, I think it may be more difficult than I

6   originally envisioned.

7           THE COURT:  Thank you very much.  You can

8   step outside.  Thank you very much.

9           (Mr. Smith exits the courtroom.)

10          THE COURT:  Do you have a motion?

11          MR. WHALEN:  Your Honor, yes, a motion for

12  Mr. Smith.

13          THE COURT:  Ms. Martin?

14          MS. MARTIN:  No objection.

15          THE COURT:  Yeah, I grant it.

16          Let's see.  Next one I have is Rachel

17  Raelynne Petty.

18          MR. WHALEN:  Your Honor, do you want us to

19  make motions as you go?

20          THE COURT:  Make motions as you go.

21          MR. WHALEN:  Just to back up, I would make

22  a motion for 15.

23          THE COURT:  15 and 16 are granted.

24          MS. MARTIN:  No objection.

25          THE COURT:  Okay.  Then we have 18.  Do

```
 1    you have 18?  Do you-all have 18?  Do you have 18?
 2    If you don't, we don't.
 3              MS. MARTIN:  No, Your Honor.
 4              THE COURT:  You don't.  She tried to
 5    commit suicide, I thought that was interesting, but
 6    she didn't say anything else.
 7              MR. WHALEN:  No, she didn't.
 8              THE COURT:  Okay.  Then we have Leila
 9    Northcott Dennis.  I put question marks next to some
10    of their names that I wasn't sure.
11              MR. WHALEN:  Yes, Your Honor.
12              THE COURT:  All right.  Do you have her,
13    too, Ms. Martin?
14              MS. MARTIN:  Yeah, we have her noted on
15    one of Mr. Whalen's questions.
16              THE COURT:  Okay.  20.
17              (Ms. Dennis enters the courtroom.)
18              THE COURT:  Ms. Dennis, come on up here,
19    please.  Come up here to the microphone.
20              PROSPECTIVE JUROR 20:  This is the second
21    time -- I lied -- I've been in the courtroom.
22              THE COURT:  It's okay.  Take your time.
23    What did you have trouble with?  You had trouble
24    being fair for what purpose?
25              PROSPECTIVE JUROR 20:  I think that I have
```

```
 1    a resentment, anger, toward just the word "ISIS" and
 2    anything related to it.
 3              THE COURT:  Uh-huh.
 4              PROSPECTIVE JUROR 20:  And I'm afraid that
 5    might affect me being impartial.
 6              THE COURT:  So if you hear "ISIS" all
 7    through here and hear "ISIS" all through the radio
 8    and the transmissions, you will be biased towards
 9    the government.
10              PROSPECTIVE JUROR 20:  Yes.
11              THE COURT:  I mean biased towards the
12    defendant.
13              PROSPECTIVE JUROR 20:  No, no.  Biased
14    toward the defendant.  I would be thinking more
15    negatively than perhaps I should.
16              THE COURT:  Ms. Martin?
17              MS. MARTIN:  Yes, Your Honor.
18              And it's Ms. Dennis?
19              PROSPECTIVE JUROR 20:  Dennis.
20              MS. MARTIN:  ISIS is a terrorist
21    organization, and is that the reason for your bias?
22              PROSPECTIVE JUROR 20:  Yes, I think it is.
23              MS. MARTIN:  Would you require the
24    government to prove the defendant's connection with
25    that organization though?
```

```
 1              PROSPECTIVE JUROR 20:  In order for it to
 2   affect my decision as far as my resentment toward
 3   ISIS, you would have to prove that he had a
 4   relationship with ISIS.
 5              MS. MARTIN:  So just because "ISIS" is
 6   used, you would still require the government to
 7   prove that this defendant committed material support
 8   or attempted to commit material support for that.
 9              PROSPECTIVE JUROR 20:  I think so, yes.
10              MS. MARTIN:  Thank you, Your Honor.
11              THE COURT:  Mr. Whalen?
12              MR. WHALEN:  Yes, Your Honor.
13              Ms. Dennis, even if they -- if they show
14   the relationship, would you immediately, then,
15   believe he's guilty of the offense if they show a
16   relationship, even if they didn't prove other
17   elements of the offense?
18              PROSPECTIVE JUROR 20:  Possibly.
19              MR. WHALEN:  Possibly, okay.  And because
20   you have the resentment that you do, you can't
21   guarantee us that you would be able to set that
22   aside and listen to the facts in this case.
23              PROSPECTIVE JUROR 20:  I would do the best
24   I could.
25              MR. WHALEN:  But you're not sure.
```

1          PROSPECTIVE JUROR 20:  I'm not sure, only

2    because I think, you know, he is due a fair trial.

3    And I was concerned with my feeling toward the group

4    ISIS, that perhaps it might affect fairness of the

5    trial.

6          THE COURT:  That's what we need to hear.

7    We really need to hear that.  Thank you very much,

8    Ms. Dennis.

9          PROSPECTIVE JUROR 20:  Is that it?

10          THE COURT:  Yes.

11          PROSPECTIVE JUROR 20:  Okay.

12          (Ms. Dennis exits the courtroom.)

13          THE COURT:  Mr. Whalen?

14          MR. WHALEN:  We would move for cause, Your

15    Honor.

16          THE COURT:  Ms. Martin?

17          MS. MARTIN:  The government would object.

18    She said she would hold the government to its

19    burden.

20          THE COURT:  Yeah, I don't know what she

21    was talking about, but she did say she couldn't be

22    fair at some point.  And I think there was more of

23    that than the other, and I'm going to dismiss her

24    for not being fair.

25          So the next one I have is Ernest Charles

1    Strickland.  Do you have that person?

2            MS. MARTIN:  Your Honor, with respect to

3    21, Mika Earthspirit, she was observed asleep during

4    the voir dire.  I don't know if the Court wants to

5    inquire about that.

6            THE COURT:  No.

7            Anyone else?

8            Let's bring in Ernest Strickland.

9            We'll make sure they don't fall asleep in

10   the trial.

11           (Mr. Strickland enters the courtroom.)

12           THE COURT:  Hello, how are you?

13           Come on up, Mr. Strickland.

14           Tell us about this rotator cuff.  Come on

15   over here.

16           PROSPECTIVE JUROR 22:  Well, do you want

17   to hear how it happened?

18           THE COURT:  No, no, don't want to hear how

19   it happened.

20           PROSPECTIVE JUROR 22:  It's kind of

21   interesting.  I caught somebody breaking into my

22   vehicle and I caught them, and when I caught them I

23   fell.

24           THE COURT:  Wow.

25           PROSPECTIVE JUROR 22:  But the thing about

1    it is, that's twice in three days that my truck was

2    broken into, and I caught them the second time, then

3    I couldn't keep ahold of them.

4            THE COURT:  So what happened, then, to

5    your arm?

6            PROSPECTIVE JUROR 22:  Right now we don't

7    know if it's tore.  We don't know what the -- I was

8    supposed to have an MRI yesterday.  And I'm working

9    in Houston, so I had to drive all the way up here,

10   so I couldn't go back to get my MRI yesterday.  They

11   told me of course if I got out early, and I said,

12   no, it's in Dallas, and I can't drive all the way

13   back to Houston for the MRI.  So once I get back

14   down there, or if I have to reschedule it up here

15   because I will have to go to another doctor here --

16   I live in Hunt County.  So I have to reschedule with

17   another doctor to get it okayed through the

18   insurance again to get another doctor's office.

19           THE COURT:  What about -- let's just say

20   you are on the trial.  Can you listen to the

21   evidence and all of that with the rotator cuff?

22           PROSPECTIVE JUROR 22:  I can listen.  I

23   get fidgety.  Right now the pills are at home, and

24   I'm in a little bit of pain.  But I will have to get

25   up and I will pop it or whatever, it just seems

```
 1   like -- it's nerving.
 2            THE COURT:  Ms. Martin?
 3            MS. MARTIN:  No questions, Your Honor.
 4            THE COURT:  Mr. Whalen?
 5            MR. WHALEN:  Your Honor, if it's okay, I
 6   just have one question about an answer on his
 7   questionnaire.
 8            THE COURT:  Go ahead.
 9            MR. WHALEN:  Mr. Strickland, you are 22.
10   You did mention in Question 19, "I do believe
11   Muslim's are here to take over."
12            What did you mean by that?
13            PROSPECTIVE JUROR 22:  Being with what I
14   believe -- I'm not a news person, I'm not a -- I
15   think the news just gets their -- whatever they want
16   to get across, they get across.  I just believe that
17   the Muslim faith is what is -- they are wanting to
18   take over.  They don't like -- most don't like us,
19   don't like our freedoms, and they want to destroy
20   it.
21            MR. WHALEN:  Okay.  And because you feel
22   that way, would you be able to set that aside and
23   judge the facts in this case?
24            PROSPECTIVE JUROR 22:  Yeah.  I judge a
25   book by its cover.  I don't hold anything against
```

```
 1    people until I hear what they are about.

 2              THE COURT:  Okay.  Thank you.

 3              (Mr. Strickland exits the courtroom.)

 4              THE COURT:  Do you have a motion,

 5    Mr. Whalen?

 6              MR. WHALEN:  Your Honor, we would make a

 7    motion for that juror, Mr. Strickland, 22.

 8              THE COURT:  Denied.  Okay.

 9              Let's move to 25.  Is that right?  Do

10    you-all have 25?

11              MR. WHALEN:  Yes, Your Honor.

12              MS. MARTIN:  Your Honor, Number 23, I

13    think towards the very end of Mr. Whalen's voir

14    dire, said something to the effect of the big

15    government shouldn't be able to come in, and I

16    wonder if we could ask him some questions.

17              THE COURT:  All right.  All right.  23.

18              Number 23?

19              MS. MARTIN:  Yes, Your Honor.

20              THE COURT:  Brian Quinn Bergfield?

21              MS. MARTIN:  Yes, Your Honor.

22              (Mr. Bergfield enters the courtroom.)

23              THE COURT:  Come on up here.

24              How are you?

25              PROSPECTIVE JUROR 23:  Okay.
```

 1          THE COURT:  Okay.  Ms. Martin, you want to
 2   ask him?
 3          MS. MARTIN:  Yes.  You mentioned towards
 4   the end of Mr. Whalen's voir dire that you would
 5   have a problem with the big government coming into a
 6   private chat room.  What did you mean by that?
 7          PROSPECTIVE JUROR 23:  It goes back to the
 8   freedom of speech.  So if we're talking about
 9   international policy or whatever, I don't know that
10   that necessarily -- you know, that that should be
11   restricted.  I know the way -- and I'm sorry, I
12   can't remember your name.
13          MR. WHALEN:  Whalen.  Mr. Whalen.
14          PROSPECTIVE JUROR 23:  The way Mr. Whalen
15   described the premise at the beginning, I didn't
16   have an issue.  But then when the lady stood up and
17   gave very specific, like this is actionable, they're
18   recruiting to actually do some, you know, illegal
19   things, that that definitely crosses the line,
20   right?  So, you know.  But I think it is different
21   when you're in a private group.  You should be able
22   to have discourse and feel free amongst your friends
23   to discuss policy openly.
24          THE COURT:  But what about enticing --
25   like even a private discussion, talking about Jihad

```
 1   and all of that.  Would you think that would be
 2   okay?
 3             PROSPECTIVE JUROR 23:  Jihad means holy
 4   war, right?  So that's -- like it or not, that's
 5   another word for war.
 6             THE COURT:  Private discussion of one
 7   individual encouraging other people to commit acts
 8   of violence.
 9             PROSPECTIVE JUROR 23:  Yeah.  Okay, Your
10   Honor, I tried to stipulate by being very clear.  I
11   think in the content of what was discussed, if there
12   is actionable things, that's maybe where things are
13   different, yeah.
14             THE COURT:  Okay.
15             PROSPECTIVE JUROR 23:  Did I answer your
16   question?
17             MS. MARTIN:  Yes.  But you could follow
18   the Court's instructions.
19             PROSPECTIVE JUROR 23:  Of course.
20             THE COURT:  Mr. Whalen?
21             MR. WHALEN:  I have no questions.
22             THE COURT:  Thank you very much,
23   Mr. Bergfield.
24             (Mr. Bergfield exits the courtroom.)
25             THE COURT:  Do you-all have Laura Roberds
```

```
 1    Chapman?  Do you have her?

 2              MR. WHALEN:  Yes, Your Honor.

 3              THE COURT:  Yes.  Okay.  Let's have her

 4    come in.  She's Juror Number 25.

 5              And what did she say?

 6              MR. WHALEN:  I think she had a husband or

 7    somebody that was FBI, DEA, ATF that we wanted to

 8    talk about.

 9              THE COURT:  Yes, okay.

10              (Ms. Chapman enters the courtroom.)

11              THE COURT:  How are you?  Just right up

12    here to the microphone.

13              You said you had a family member who was

14    FBI, DEA and ATF.  Tell us about that.

15              PROSPECTIVE JUROR 25:  It's my brother.

16    And he was with the FBI, like he was there during --

17    not the 9-11 time.  And then he worked for the ATF,

18    and he currently is with the DEA.

19              THE COURT:  Is there anything about that

20    that would affect your ability to be fair and

21    impartial in this case?

22              PROSPECTIVE JUROR 25:  I believe there

23    would be in that I do believe a government law

24    agency or any law agency holds a weight.

25              THE COURT:  Okay.  Ms. Martin?
```

1          MS. MARTIN:  Even though your family

2    member is -- would you weigh each witness for their

3    testimony and their credibility as they testify here

4    in court?

5          PROSPECTIVE JUROR 25:  I definitely would

6    do my best.  Just . . .

7          MS. MARTIN:  Okay.  Thank you.

8          THE COURT:  Mr. Whalen?

9          MR. WHALEN:  I have no additional

10   questions.

11         THE COURT:  You may be excused.  Thank you

12   very much.

13         (Ms. Chapman exits the courtroom.)

14         THE COURT:  Okay.  Mr. Whalen?

15         MR. WHALEN:  Your Honor, we would submit

16   her for cause, Your Honor.

17         THE COURT:  Ms. Martin?

18         MS. MARTIN:  No objection.

19         THE COURT:  Okay.  32.  And let's see, I

20   have Robert Sean Byars.  Do you really want him?

21   Can we agree to release him, or do you want to talk

22   to him?  Robert Sean Byars.

23         MR. WHALEN:  Number 29?

24         THE COURT:  Yes.

25         MR. WHALEN:  No, I would submit him for

1    cause based on all of his answers.

2            THE COURT:  Yeah.

3            MS. MARTIN:  Okay.

4            THE COURT:  All right.  33.  And then I

5    have Gloria Jean White.

6            MR. WHALEN:  Yes, Your Honor.

7            THE COURT:  Let's bring her in.  She's

8    Number 30.

9            (Ms. White enters the courtroom.)

10           THE COURT:  Hi Ms. White.  How are you?

11   Just right up here to the microphone.

12           You said you couldn't be fair.  Tell us

13   about that.

14           PROSPECTIVE JUROR 30:  Fair with the

15   sentencings?

16           THE COURT:  Yeah.  I mean, what is it you

17   can't be fair about?

18           PROSPECTIVE JUROR 30:  Oh, the law -- I

19   think it works, it works most of the time.  I was

20   referring to the sentencings that is administrated,

21   you know, after everything is said and done.

22           THE COURT:  Let's talk about the guilt or

23   innocence, because that would be all you are

24   involved in in this case.  Would you have any

25   problem with either the government or the defense as

1    far as looking at this case fairly?

2             PROSPECTIVE JUROR 30:  No.  No.  It

3    depends.  It just depends on the evidence, if it's

4    presented well and accurate and true.

5             THE COURT:  Okay.  And you have a problem

6    with punishment for what reason?

7             PROSPECTIVE JUROR 30:  Well, you know, a

8    couple of family members -- and I've been in the

9    system also, you know.  And it's just -- to me, it

10   just seemed like it wasn't fair, the administration

11   of the sentence.

12            THE COURT:  But you can be fair and

13   impartial throughout your dealings in this case with

14   the guilt or innocence phase.

15            PROSPECTIVE JUROR 30:  Depending on the

16   level of the involvement.  But just either -- just

17   saying yes or no, I kind of more or less will go

18   basically on what was -- actually what was -- what

19   was the position in the whole conspiracy.

20            THE COURT:  I'm just asking you, will you

21   listen to the evidence and render a verdict based on

22   the law but not based on any personal feelings?

23            PROSPECTIVE JUROR 30:  Yes.  Yes.

24            THE COURT:  Ms. Martin?

25            PROSPECTIVE JUROR 30:  Yes.

1         MS. MARTIN:  I may have misheard you.  Did

2  you say that you also had been in the system?

3         PROSPECTIVE JUROR 30:  Yes, I've

4  experienced some accusations, but the justice system

5  did its job on that.

6         MS. MARTIN:  So you didn't feel the

7  justice system treated you unfairly.

8         PROSPECTIVE JUROR 30:  On my situation, it

9  was fair.  In all the other situations with family

10  members and friends, I think it was fair, but it was

11  more severe than for the -- for the type of thing

12  that was done.

13         MS. MARTIN:  Okay.  Thank you.

14         PROSPECTIVE JUROR 30:  Okay.

15         THE COURT:  Mr. Whalen?

16         MR. WHALEN:  Just real quick, ma'am.

17         You did indicate that you had views about

18  Muslims or the Islamic faith that would affect your

19  ability to be impartial, and you put "Not sure."

20  What did you mean by that?

21         PROSPECTIVE JUROR 30:  I'm not familiar

22  with that at all, except for a few things I have

23  heard in the media, but I don't know.  I'm not for

24  sure.

25         MR. WHALEN:  Thank you.

 1              THE COURT:  Thank you very much,
 2    Ms. White.  You may step outside.
 3              (Ms. White exits the courtroom).
 4              THE COURT:  I have a question mark next to
 5    Doreen Ekwerike.  Do you have a question mark next
 6    to her?
 7              MR. WHALEN:  Which number, Your Honor?
 8              THE COURT:  27, going back up.
 9              MR. WHALEN:  Yes.  About testifying, Your
10    Honor.
11              THE COURT:  Let's ask her to come in, 27.
12    We're going back up.
13              On the last one are you moving for
14    anything?
15              MS. MARTIN:  No.
16              MR. WHALEN:  No.
17              (Ms. Ekwerike enters the courtroom.)
18              THE COURT:  Come on up, just up there to
19    the microphone, please.  Watch out for that little
20    step there.  Right over there.
21              Ms. Martin, do you have a question?
22              MS. MARTIN:  Yes.  You, I think, in
23    response to one of Mr. Whalen's questions and maybe
24    the judge's, you indicated that perhaps you would
25    think that the defendant would need to take the

 1  stand if you were a juror in this case.  If the law

 2  says the defendant does not have to take the --

 3  testify in his defense, take the stand, you cannot

 4  hold it against him.  Would you be able to follow

 5  the law?

 6              PROSPECTIVE JUROR 27:  My concern about

 7  that was, I was just thinking out like how

 8  somebody -- let me just bring it down -- how

 9  somebody will come and say I did something, and you

10  prove everything that you want to prove that I did,

11  and I do not have the opportunity to say, "This is

12  not right.  I did not do this."  That's the way I'm

13  looking at it.  So I don't know if it's in that

14  context or not.

15              MS. MARTIN:  So is your concern that he

16  would -- that somehow he would be prohibited, that

17  he wouldn't be allowed?

18              PROSPECTIVE JUROR 27:  Yeah.  But I think

19  that question was clear later on when they -- when

20  the lawyer -- I don't know who is who, but when he

21  said -- when somebody said, so if he's not going to

22  talk, will his lawyer speak for him, and they said

23  yes.  Then I ask again, so when the government

24  provide the evidence of what he did, somebody is

25  going to be able on his side to say something about

1   the evidence provided, and so that answered my

2   question.

3            THE COURT:  Okay.  Does that clear up your

4   confusion?

5            PROSPECTIVE JUROR 27:  Yes.

6            THE COURT:  You could be fair and

7   impartial to him if he didn't testify?

8            PROSPECTIVE JUROR 27:  Yes, that cleared

9   it out.

10           THE COURT:  Mr. Whalen?

11           MR. WHALEN:  No, I don't have additional

12  questions.

13           THE COURT:  Thank you very much.  You may

14  step outside.

15           PROSPECTIVE JUROR 27:  Thank you.

16           (Ms. Ekwerike exits the courtroom.)

17           THE COURT:  I've got 31 next, but I'm

18  going to ask you-all if you can reach an agreement,

19  because I think this guy is far gone.

20           Ms. Martin?

21           MS. MARTIN:  The government agrees, Your

22  Honor.

23           THE COURT:  Mr. Whalen?

24           MR. WHALEN:  We agree, Your Honor.

25           THE COURT:  All right.  Let's just take

```
 1   him off, and we are at 34.  Let me see how many
 2   we've got.
 3           MS. MARTIN:  Your Honor, I believe 34 is
 4   one we agreed to this morning.
 5           THE COURT:  34 is one you agreed to.  Yes,
 6   you did.  Oh, 34 is one you have agreed to.  Okay.
 7   All right.  Let me just count out.  One, two, three,
 8   four, five, six, seven -- seven -- we're looking to
 9   go to 36, and then on the others we will get to
10   those.  So we have 37 -- is that right?  37?  Is
11   that right?
12           MS. MARTIN:  Yes, Your Honor.
13           THE COURT:  All right.  Let's bring 37 in.
14           (Ms. Reed enters the courtroom.)
15           THE COURT:  Yes, ma'am.  Come up to the
16   microphone, please.  How are you?
17           Ms. Reed, you had a lot of things going
18   on.  Why don't you start by telling me how you feel
19   about this case.
20           PROSPECTIVE JUROR 37:  I think, like you
21   said earlier, it's going to definitely be an
22   interesting case.  It's kind of hard to answer a lot
23   of the questions without a little context behind it.
24   I know you can't really do that.  But I think it's
25   going to be a definite challenge to draw a line in
```

```
 1    some of these issues.
 2              THE COURT:  Well, can you be fair and
 3    impartial to both sides?
 4              PROSPECTIVE JUROR 37:  I think I can.  As
 5    I've mentioned -- I know I was standing a lot --
 6    there are a couple of issues.  I would do my best to
 7    try to keep that separate and, you know, try to be
 8    as fair as possible.  But I think I would have a
 9    little bit of an unconscious bias in favor of, you
10    know, law enforcement, specifically with my familial
11    relations.
12              THE COURT:  Okay.  Ms. Martin?
13              MS. MARTIN:  No questions, Your Honor.
14              THE COURT:  Mr. Whalen?
15              MR. WHALEN:  No questions, Your Honor.
16              THE COURT:  Thank you very much.  You may
17    step outside.
18              PROSPECTIVE JUROR 37:  Thank you.
19              (Ms. Reed exits the courtroom.)
20              THE COURT:  What number was she?
21              MS. MARTIN:  37.
22              MR. WHALEN:  37.
23              Make a motion for cause, Your Honor.
24              THE COURT:  Ms. Martin?
25              MS. MARTIN:  No objection.
```

1             THE COURT:  She's stricken.  So let's see
2    where we are.  I've got to count.  We're up to 37,
3    but we've got the alternates, which will be 38, 39
4    and 40, right?  Right?  38, 39 and 40?
5             (Pause in the proceedings.)
6             THE COURT:  So we have our 30?
7             MS. WILSON:  No, we are 3 and 39.
8             THE COURT:  Yes, Sally Susan Morrow.  I
9    think that's all we need to talk to, Sally Susan
10   Morrow, Number 38.  Unless you want to agree to
11   strike her, we will move on.
12            (Ms. Morrow enters the courtroom.)
13            THE COURT:  Just right over here.
14            How are you?
15            PROSPECTIVE JUROR 38:  I'm good.  Thank
16   you for asking.
17            THE COURT:  Tell us, you have -- let's
18   see, you had a brother that was murdered 30 years
19   ago.
20            PROSPECTIVE JUROR 38:  Yes, ma'am.
21            THE COURT:  Yes.  And tell us about how
22   you might be affected in this case.
23            PROSPECTIVE JUROR 38:  I think I just did
24   not realize until today that I've never been in the
25   courtroom since then.  I think that part of that

```
 1   just -- you know, keeping my train of thought, where
 2   I needed to be, rather than remembering that time.
 3            THE COURT:  And you think that remembering
 4   that time is going to affect you in this case?
 5            PROSPECTIVE JUROR 38:  I think the part of
 6   it is that I was just kind of amazed of bringing
 7   back the memories and the slides and all we had to
 8   go through in there.  I just had a hard time kind of
 9   concentrating in here today as well.
10            THE COURT:  Okay.  Ms. Martin?
11            MS. MARTIN:  No questions, Your Honor.
12            THE COURT:  Mr. Whalen?
13            MR. WHALEN:  No questions, Your Honor.
14            THE COURT:  That's all.  Thank you.
15            (Ms. Morrow exits the courtroom.)
16            THE COURT:  Okay.  Have a motion?
17            MR. WHALEN:  Your Honor, we would move for
18   cause, Your Honor.
19            MS. MARTIN:  No objection.
20            THE COURT:  So let's see that we've got
21   this right.  I want 29, because it's 6, 10 and 13,
22   and that's nine -- yeah, 29.  So 1, 2, 3, 4, 5, 6,
23   7, 8, 9, 10, 11, 12, 13, 14, 15, 16, 17, 18, 19, 20,
24   21, 22, 23, 24, 25, 26, 27, 28 and 29.  I have 29,
25   stopping at 36.  And then the next three are
```

1    Mr. Klucsarits and Walls and Mom, and none of them

2    had anything.  Right?  Do you agree with that?

3              MS. MARTIN:  Yes, Your Honor.

4              THE COURT:  36 is where you stop for

5    the -- no.

6              (Pause in the proceedings.)

7              THE COURT:  So we've got Rodriguez,

8    Mr. Klucsarits and Walls as the three.  It's up to

9    35 on the main panel, and then the other three are

10   Klucsarits, Walls, and Rodriguez.  Right?

11             MS. MARTIN:  Yes, Your Honor.

12             MR. WHALEN:  Your Honor, can we go through

13   the causes again, because my math is not adding up.

14             THE COURT:  Okay.

15             MR. WHALEN:  How do you want to -- I will

16   go through what I have stricken out for cause.

17             THE COURT:  Yes.

18             MR. WHALEN:  I have 15.

19             THE COURT:  15.

20             MR. WHALEN:  16, 20.

21             THE COURT:  Uh-huh.

22             MR. WHALEN:  25.

23             THE COURT:  23 -- oh yeah, 25, yeah.  29.

24             MR. WHALEN:  29, 31, and 34.

25             THE COURT:  Yeah.

 1            MR. WHALEN:  Okay.  And then 37, 38.

 2            THE COURT:  And that's it.

 3            MR. WHALEN:  And that's it.  So then if I

 4  have ten strikes, she has six.

 5            THE COURT:  13 -- plus 13 is 29.

 6            MR. WHALEN:  So what I'm thinking is if we

 7  do the first 12, we would get the first --

 8            THE COURT:  Right, 28.  I keep forgetting

 9  that.  It's 28, 28.

10            MR. WHALEN:  So that would get us through

11  Juror Number 35 for the first --

12            THE COURT:  Yeah, that's right.

13            MR. WHALEN:  -- 28.  And so then the

14  alternates are coming from 36, 39 and 40.

15            THE COURT:  That's right.  Okay.

16            MR. WHALEN:  Okay.

17            THE COURT:  Okay.  All right.  You-all

18  can -- David, you can tell them to go out, and they

19  will have about 15 minutes to go wander around, but

20  be back here by then, and we will give you 15 or 20

21  minutes to strike your list.  And the government can

22  go in the jury room if you want.  All right.

23            (Recess taken.)

24            THE COURT:  Please be seated.  When I call

25  your name, come up, bring your belongings, and

```
1    Mr. Travis will show you where to sit.
2              Juror Number 1 is Carolyn Sue McEwan.
3              Juror Number 2 is Patricia Ann Maki.
4              Juror Number 3 is Joe Anthony Aguilar.
5              Juror Number 4 is Maria Inez Muniz.
6              Juror Number 5 is Jana Louise Renfro.
7              Juror Number 6 is Steven Brian Walman.
8              Juror Number 7 is Rachel Raelynne Petty.
9              Juror Number 8 is Raymond Patrick Demuth.
10             Juror Number 9 is Tomi Michelle Perry;
11   Tomi Michelle Perry.
12             Juror Number 10 is Doreen Ekwerike.
13   Excuse me for pronouncing that so horribly.  Doreen,
14   E-K-W-E-R-I-K-E.
15             Juror Number 11 is Gloria Jean White.
16             Juror Number 12 is Long-Cheng Liang.
17             Juror Number 13 is Michael Edward Walls.
18             Okay.  If you-all will just rise and raise
19   your right hands as soon as he gets up here.  Okay.
20             Raise your right hands.  Jenelle will
21   swear you in.
22             (Jury Sworn.)
23             THE COURT:  Please be seated.
24             Ladies and Gentlemen, we are going to
25   release you.  You may return to the jury room and
```

```
 1   turn your juror badges in, and you are free to go.
 2              All rise for the jury panel.
 3              (Jury panel exits courtroom.)
 4              THE COURT:  Please be seated.
 5              I'm going to give you some general
 6   instructions now.  Most of this you have heard,
 7   general instructions for you being on the jury, and
 8   I will excuse you for lunch for an hour and 15
 9   minutes, and then we will start the testimony and
10   opening statements.
11              So, Members of the Jury:  Now that you
12   have been sworn, I will give you some preliminary
13   instructions to guide you in your participation of
14   this trial.
15              Duty of the jurors:  It will be your duty
16   to find from the evidence what the facts are.  You
17   and you alone are the judges of the facts.  You will
18   then have to apply those facts to the law as the
19   Court gives them to you.  You must follow the law,
20   whether you agree with it or not.  Nothing the Court
21   may say or do there in the course of trial is
22   intended to indicate by you or taken by you as any
23   indication of what the verdict should be.
24              Evidence:  The testimony from the evidence
25   of which you will find the facts is testimony of
```

1  witnesses, documents, and other items received in

2  evidence, received in the record as exhibits, and

3  any facts that the lawyers may agree to or stipulate

4  to or that the Court may instruct you to find.

5  Certain things are not evidence and must not be

6  considered by you as evidence.  I will list them for

7  you now:  Statements, arguments, and questions by

8  the lawyers are not evidence.

9           Objections to questions are not evidence.

10  Lawyers have an obligation to their clients to make

11  objections when they believe evidence being offered

12  is improper under the Rules of Evidence.  You should

13  not be influenced by the objections of lawyers.  If

14  the objection is sustained, ignore the question.  If

15  it is overruled, treat the answer like any other.

16  If you are instructed that some item of evidence is

17  received for a limited purpose, you are to consider

18  it only for that purpose.

19           Three:  Testimony that the Court has

20  excluded or told you to disregard is not evidence

21  and must not be considered.

22           Fourth:  Anything you may have seen or

23  heard or read outside the courtroom is not evidence

24  and must be disregarded.

25           You are to decide the case solely, solely

1    on the evidence presented in this courtroom.

2            There are two kinds of evidence, direct

3    and circumstantial.  Direct evidence is proof of a

4    fact, such as testimony of an eyewitness.

5    Circumstantial evidence, which is just as strong

6    as -- as -- or weak as direct, is evidence that

7    proof of facts from which you may infer or conclude

8    that other facts exist.  I will give you further

9    instructions on these, as well as other matters at

10   the end of the case, but keep in mind you may

11   consider both kinds of evidence.

12           It will be up to you to decide which

13   witnesses to believe, which witnesses not to

14   believe, and how much of any witness' testimony to

15   accept or reject.  I will give you some guidelines

16   for determining the credibility of the witnesses at

17   the end of the case, but it is up to you to decide

18   their credibility.

19           Rules for Criminal Cases:  As you know,

20   this is a criminal case.  There are three basic

21   rules about a criminal case that you must keep in

22   mind:

23           First:  The defendant is presumed innocent

24   until proven guilty.  The indictment brought by the

25   government against the defendant is only an

1   accusation, nothing more.  It is not proof of guilt

2   or anything else.  The defendant therefore starts

3   out with a clean slate.

4          Second:  The burden of proof is fully on

5   the government until the very end of the case.  The

6   defendant has no burden to prove his or her

7   innocence or to present any evidence or even

8   testify.  Since the defendant has the right to

9   remain silent, the law prohibits you from arriving

10  at your verdict by considering that the defendant

11  may not have testified.

12         Third:  The government must prove the

13  defendant's guilt beyond a reasonable doubt.  I will

14  give you further instructions on this point later.

15  But bear in mind, in this respect, a criminal case

16  is different from a civil case, because a civil case

17  is preponderance of the evidence and a criminal case

18  is beyond a reasonable doubt.

19         You are -- the applicable law I will give

20  to you at the end of the case.  Bear in mind, this

21  is terrorism support -- is it terrorism support? --

22  two counts, and six counts of lying to the FBI.  We

23  will get into more detail on that later.

24         Conduct of the Jury:  This is so

25  important.  Just remember this.  During the course

1   of the trial, do not speak with any witness or with

2   the defendant or with any of the lawyers in the

3   case.  I will not talk to you either.  Please do not

4   talk with them about any subject at all.  You may be

5   unaware of the identity of everyone connected to the

6   case.  Therefore, in order to avoid even the

7   appearance of impropriety, do not engage in any

8   conversation with anyone in or about the courtroom

9   or courthouse.  It is best that you remain in the

10  jury room during breaks in the trial and do not

11  linger outside in the hallway.  In addition, during

12  the course of the trial, do not talk about the case

13  with anyone else, anyone else, not your family, not

14  your friends, not the people with whom you work.

15  Also, do not discuss the case among yourselves.

16  That's important to note.  You can't discuss the

17  case among yourselves until I have instructed you on

18  the law and you have gone to the jury room to

19  deliberate at the end of the case.  Otherwise,

20  without realizing it, you may start forming opinions

21  before the trial is over.  It is important that you

22  wait until all of the evidence is received and until

23  you have heard my instructions on the rules of law

24  before you deliberate among yourselves.  Let me add:

25  During the course of trial, you will receive all the

1    evidence you may properly consider to decide the

2    case.  Please do not try to find out any information

3    from any source outside the confines of this

4    courtroom.  Do not seek or receive outside

5    information on your own of what you think might be

6    helpful.  Do not engage in any outside reading about

7    this case.  Don't Google definitions.  Do not

8    attempt to visit any place mentioned in the case,

9    whether in person or via maps or online research,

10   such as Google Earth.  You must not read about it in

11   any publications or watch or listen to television or

12   radio reports of what is happening here, and I don't

13   know that there will be any of those, but there

14   might be.  Do not use the Internet or any other form

15   of electronic communication to obtain or provide

16   information to another, whether on a phone, a

17   computer or other device.  This includes but is not

18   limited to the use of websites and search engines

19   such as Google or Yahoo! or other online resources

20   or publications for the use of sending or receiving

21   information on the case.  Do not attempt to learn

22   about the parties or witnesses, the lawyers or the

23   judge.  Do not send or receive emails or text

24   messages relating to the case or your involvement.

25   Do not read or post any information on FaceBook or

1    any other blog or social networking site, such as

2    Twitter or MySpace.

3              The reason for these rules, I'm certain

4    you understand, is your decision in this case must

5    be made solely on the presentation of evidence in

6    the case, and that's how we are fair; that is how we

7    preserve the fairness of the trial and really the

8    sacred dignity of the case.  So remember that.

9              We will have an opening statement after

10   lunch by the government and by the defense.  The

11   government always goes first, because they have the

12   burden of proof.  After all the evidence is in, the

13   attorneys will give you their closing statements,

14   and then you will deliberate.

15             Ladies and Gentlemen, go back to the jury

16   room, and I will give you an hour and 15 minutes for

17   lunch.  That means you are to be back here by 2:15.

18   You're going to call people, I know, and tell them

19   where you are and what you are doing and that you

20   are on a trial.  I think this will be a two-week

21   trial, no more.  You can't tell them about the

22   trial, you can just tell them you are on a trial.

23             We will go from nine to five every day; 15

24   minutes in the morning, 15 minutes in the afternoon

25   and an hour and 15 minutes for lunch basically.  I

1    may go a little longer than five some days, but I

2    don't think much, but maybe.

3              You can have bottled water in the

4    courtroom and the snack room back there has a

5    refrigerator and snacks and all that type of thing.

6    If you want any more snacks, just let us know.  And

7    also you can go across the street and other places

8    to eat.  Mr. Travis can tell you about that.  But in

9    the meantime, I'll see you back here at 2:15 and we

10   will get started with the case

11             (Jury exits courtroom.)

12             THE COURT:  Do we have anything before we

13   adjourn?

14             MS. MARTIN:  No Your Honor.

15             MR. WHALEN:  No, Your Honor.

16             THE COURT:  See you back here at 2:10.

17   All right.  Be in recess.

18             (Recess taken.)

19             THE COURT:  We are going to start with the

20   government arraigning the defendant, please.

21             Please stand.  Mr. Rahim, will you please

22   stand?

23

24

25

1            MS. MARTIN:  Thank you, Your Honor.

2                 The Grand Jury Charges:

3            Foreign Terrorist Organization

4            On or about October 15th, 2004, the United

5    States Secretary of State designated Al Qaeda in

6    Iraq, then known as Jam 'at al Tawid wa' al Jahid,

7    as a Foreign Terrorist Organization or FTO under

8    Section 219 of the Immigration and Nationality Act

9    and as a Specially Designated Global Terrorist

10   entity under Section 1(b) of Executive Order 13224.

11           On or about May 15th, 2014, the Secretary

12   of State amended the designation of AQI as an FTO

13   under Section 219 of the Immigration and Nationality

14   Act and as a Specially Designated Global Terrorist

15   Entity under Section 1(b) of Executive Order 13224

16   to add the alias, Islamic State of Iraq and the

17   Levant (ISIL) as its primary name.

18           The Secretary of State also added the

19   following aliases to the FTO listing:  The Islamic

20   State of Iraq and al-Sham ("ISIS" - which is how the

21   FTO will be referenced herein), the Islamic State of

22   Iraq and Syria ad-Dawla al-Islamiyya fi al-Iraq

23   wa-sh-Sham, Daesh, Dawla al Islamiya, and Al Furquan

24   Establishment for Media Production.

25           On September 21, 2015, the Secretary added

1    the following aliases to the FTO listing:  Islamic

2    State, ISIL, and ISIS.  To date, ISIS remains a

3    designated FTO.

4              From in or about August 2014 to

5    August 30th of 2016, Abu Mohammad Al-Adnani

6    (Al-Adnani) was ISIS's official spokesman and a

7    senior leader under ISIS leader Abu Bakr

8    al-Baghdadi.  Al-Adnani was listed as a Specially

9    Designated Global Terrorist by the United States

10   government in August of 2014.  Al-Adnani was killed

11   on or about August 30th, 2016.  Since as early as in

12   or about 2014, Al-Adnani began publicly calling for

13   the murder of non-Muslims in Western Countries on

14   behalf of ISIS.  For instance, on or about

15   September 21st, 2014, ISIS released a speech by

16   Al-Adnani entitled, "Indeed Your lord is Forever

17   Watchful," which provided official instruction to

18   ISIS supporters to kill non-Muslims in Western

19   Countries.  Among other things, Al-Adnani said, "If

20   you can kill a disbelieving American or European ...

21   including the citizens of the countries that entered

22   into a coalition against the Islamic State, then

23   rely upon Allah, and kill him in any manner or way,

24   however it may be.  Smash his head with a rock or

25   slaughter him with a knife or run over him with your

1   car or throw him down from a high place, or choke

2   him, or poison him," and "rise and defend your state

3   from your place where you may be."

4          In addition, in an audio statement

5   distributed on or about May 21st, 2016, Al-Adnani

6   called for Ramadan (which corresponded to June and

7   July 2016) to be "a month of ruin for the

8   nonbelievers" and urged "soldiers of the Caliphate

9   and Europe and America" to carry out attacks and to

10  target civilians, for "there are no so-called

11  innocents."  Al-Adnani's speeches and calls for

12  violence have been widely distributed on Social

13  Media by ISIS supporters.

14                     Count One:

15     Conspiracy to Provide Material Support to a

16      Designated Foreign Terrorist Organization

17   (Violation of 18 United States Code, Section 2339B)

18          Paragraphs 1 through 6 of this indictment

19  are incorporated by reference as if set forth fully

20  herein.

21          Beginning in or around October 2014 and

22  continuing through March 2017 in the Northern

23  District of Texas and elsewhere, the defendant, Said

24  Azzam Mohamad Rahim conspired with Coconspirator 1

25  and other persons known and unknown to the United

1   States Grand Jury to provide material support or

2   resources, including services and personnel, to a

3   foreign terrorist organization, namely ISIS, knowing

4   that ISIS is a designated terrorist organization and

5   ISIS has engaged, and engages in, terrorist activity

6   and terrorism.

7          In violation of 18 United States Code,

8   Section 2339B.

9                      Count Two:

10      Attempting to Provide Material Support to a

11       Designated Foreign Terrorist Organization,

12   (Violation of 18 United States Code, Section 2339B)

13          Again, Paragraphs 1 through 6 are

14   incorporated by reference.

15          Beginning in or around October 2014 and

16   continuing through March 2017, in the Northern

17   District of Texas and elsewhere, the defendant, Said

18   Azzam Mohamad Rahim, did knowingly attempt to

19   provide material support or resources, including

20   services and personnel, to a Foreign Terrorist

21   Organization, namely ISIS, knowing that ISIS is a

22   designated terrorist organization and that ISIS has

23   engaged and engages in terrorist activity and

24   terrorism.

25          In violation of 18 United States Code,

1    Section 2339B.

2                          Count Three:

3            False Statement to a Federal Agency,

4     (Violation of 18 United States Code, Section 1001)

5                  Again, Paragraphs 1 through 6 are

6     realleged.

7                  On or about March 5th, 2017, in the

8     Northern District of Texas, the defendant, Said

9     Azzam Mohamad Rahim, did knowingly and willfully

10    make a materially false, fictitious and fraudulent

11    statement and representation in a matter within the

12    jurisdiction of the Federal Bureau of Investigation

13    and involving international terrorism; that is,

14    during an interview conducted as part of a terrorism

15    investigation, a federal law enforcement officer

16    asked Rahim, "Okay.  Have you ever discussed with

17    anyone travel for the purpose of jihad."  Rahim

18    responded, "No."  That statement was false, as Rahim

19    then and there well knew that he had discussed with

20    other individuals travel for the purpose of jihad.

21                  In violation of 18 United States Code,

22    Section 1001.

23                          Count Four:

24            False Statement to a Federal Agency,

25     (Violation of 18 United States Code, Section 1001)

```
 1          Again, Paragraphs 1 through 6 are
 2    realleged.
 3          On or about March 5th, 2017, in the
 4    Northern District of Texas, the defendant, Said
 5    Azzam Mohamad Rahim, did knowingly and willfully
 6    make a materially false, fictitious, and fraudulent
 7    statement and representation in a matter within the
 8    jurisdiction of the Federal Bureau of Investigation
 9    and involving international terrorism; that is,
10    during an interview conducted as part of a terrorism
11    investigation, a federal law enforcement officer
12    asked Rahim, "Have you ever been a supporter of the
13    Islamic State, ISIL, ISIS, Daesh?"  Rahim responded,
14    "No."  That statement was false in that Rahim then
15    and there well knew he has been and was a supporter
16    of ISIS, (a/k/a the Islamic State, ISIL or Daesh.)
17          In violation of 18 United States Code,
18    Section 1001.
19                    Count Five:
20         False Statement to a Federal Agency
21    (Violation of 18 United States Code, Section 1001)
22          Again, the introduction is realleged.
23          On or about March 5th, 2017, in the
24    Northern District of Texas, the defendant, Said
25    Azzam Mohamad Rahim, did knowingly and willfully
```

**SHAWNIE ARCHULETA, CSR/CRR**
**FEDERAL COURT REPORTER – 214.753.2747**

 1   make a materially false, fictitious, and fraudulent

 2   statement in a matter within the jurisdiction of the

 3   Federal Bureau of Investigation and involving

 4   international terrorism; that is, during an

 5   interview conducted as part of a terrorism

 6   investigation, a federal law enforcement officer

 7   asked Rahim, "Have you ever promoted violence on

 8   behalf of the Islamic State, ISIS, ISIL?"  Rahim

 9   responded, "No."  That statement was false, as Rahim

10   then and there well knew that he had promoted

11   violence on behalf of ISIS, also known as the

12   Islamic State or ISIL.

13            In violation of 18 United States Code,

14   Section 1001.

15                      Count Six:

16         False Statements to a Federal Agency

17    (Violation of 18 United States Code, Section 1001)

18            Paragraphs 1 through 6 are realleged.

19            On or about March 5th, 2017, in the

20   Northern District of Texas, the defendant, Said

21   Azzam Mohamad Rahim, did knowingly and willfully

22   make a materially false, fictitious, and fraudulent

23   statement and representation in a matter within the

24   jurisdiction of the Federal Bureau of Investigation

25   involving international terrorism; that is, during

1    an interview conducted as part of a terrorism

2    investigation, a federal law enforcement officer

3    asked Rahim, "Okay.  Have you, yourself, ever

4    encouraged anyone to follow the guidance of Abu

5    Mohammed Al-Adnani, including his instruction to

6    kill infidels without consultation or permission?"

7    And Rahim responded, "No, no."  That statement was

8    false in that Rahim then and there well knew that he

9    had encouraged people to follow the guidance of Abu

10   Mohammed Al-Adnani, including Al-Adnani's

11   instructions to kill.

12            In violation of 18 United States Code,

13   Section 1001.

14                      Count Seven:

15        False Statement to a Federal Agency

16    (Violation of 18 United States Code, Section 1001)

17            Paragraphs 1 through 6 are realleged.

18            On or about March 5th, 2017, in the

19   Northern District of Texas, the defendant, Said

20   Azzam Mohamad Rahim, did knowingly and willfully

21   make a materially false, fictitious and fraudulent

22   statement and representation in a matter within the

23   jurisdiction of the Federal Bureau of Investigation

24   and involving international terrorism; that is,

25   during an interview conducted as part of a terrorism

1    investigation, a federal law enforcement officer

2    asked Rahim the following question:  "Have you ever

3    promoted an act of terrorism?"  Rahim responded,

4    "No.  I've been coming here since 1995.  I'm clean."

5    That statement was false in that Rahim then and

6    there knew that he had promoted an act of terrorism.

7             In violation of 18 United States Code

8    Section 1001.

9                        Count Eight:

10        False Statement to a Federal Agency

11             (Violation of 18 United States Code,

12   Section 1001)

13             Paragraphs 1 through 6 are again

14   realleged.

15             On or about March 5th, 2017, in the

16   Northern District of Texas, the defendant, Said

17   Azzam Mohamad Rahim, did knowingly and willfully

18   make a materially false, fictitious and fraudulent

19   statement and representation in a matter within the

20   jurisdiction of the Federal Bureau of Investigation

21   and involving international terrorism; that is,

22   during an interview conducted as part of a terrorism

23   investigation, a federal law enforcement officer

24   asked Rahim the following question:  "Do you ever,

25   okay, have you ever praised an act of terrorism?"

1    Rahim responded, "No."  That statement was false in

2    that Rahim then and there knew that he had praised

3    an act of terrorism, including the June 12th, 2016,

4    terrorist attack in Orlando, Florida, the July 14th,

5    2016, terrorist attack in Nice, France, and the

6    December 31st, 2016, terrorist attack in Istanbul,

7    Turkey.

8              In violation of 18 United States Code,

9    Section 1001.

10             Signed by the foreperson.

11             THE COURT:  To which your client pleads

12   how, Mr. Whalen?

13             MR. WHALEN:  Not guilty, Your Honor.

14             THE COURT:  Thank you very much.

15             Please be seated.

16             Ms. Martin, opening?

17             MS. MARTIN:  Yes, Your Honor.

18             THE COURT:  Ms. Meeks?

19             MS. MEEKS:  Thank you, Your Honor.

20             "ISIS will chop your head off, you

21   disbeliever.  ISIS coming to your land, we are gonna

22   occupy your land, and we are gonna chop your head

23   off, we gonna kill you.  We gonna slaughter you like

24   a sheep."

25             That's what the defendant said in an

1   online global platform that supports the Islamic

2   State of Iraq and al-Sham, also known as ISIS or

3   ISIL.  It is a violent terrorist organization that

4   is built around an extremist view of Islam.  It's

5   responsible for terrorist attacks worldwide that has

6   caused terrible deaths abroad and here in the United

7   States.

8           Over the next few days, you're going to

9   hear a lot about ISIS and how the defendant, Said

10  Azzam Mohamad Rahim, spent years attempting to

11  support and recruit for the terror group.  Here in

12  Dallas, the defendant controlled and facilitated an

13  online platform.  It's used to communicate with ISIS

14  members and potential recruits.  And the site is on

15  a social media platform called Zello.

16          You will learn a lot about how Zello

17  works.  It's a push-to-talk application.  So it

18  works a little bit like a walkie-talkie or a radio.

19  It runs like a two-way radio, and with the tap of a

20  cell phone, you can send your voice all around the

21  world.  You can send that voice with that message to

22  anyone who is on the other end.

23          The defendant was a leader in the global

24  group on Zello called The State of the Islamic

25  Caliphate.  This had upwards of 10,000 members.

```
 1            The evidence will show you that from right
 2   here in Dallas, the defendant spent years trying to
 3   recruit more ISIS members all around the world and
 4   had influence over massive amounts of people.  He
 5   was a leader on the site, and, as such, he
 6   controlled the content, meaning he decided which
 7   people spoke and which people didn't.  He spent
 8   hours each day, as you will hear, sometimes
 9   seemingly all day, running and recruiting The State
10   of the Islamic Caliphate platform.
11            In Count 1, the defendant is charged with
12   conspiracy to provide material support to a Foreign
13   Terrorist Organization, ISIS.  The defendant acted
14   to conspire with other ISIS members to try and
15   achieve acts of terrorism.
16            The evidence will show you that the
17   defendant and his coconspirators found the State of
18   the Islamic Caliphate site, and that he was one of
19   the most influential members, acting as an
20   administrator, as a moderator, and as an avid
21   contributor.
22            The defendant could designate certain
23   users as trusted.  You're going to learn what that
24   means.  That means that when they were designated as
25   trusted, they could participate, too.  They could
```

1  contribute and they could ask questions and they

2  could talk.  He could also silence users who

3  disagreed with him.

4          And the evidence will show how he promoted

5  people who agreed with him and tried to push them to

6  talk more.  The State of the Islamic Caliphate

7  channel had designated committees, which were

8  organized by leaders of the group.  The defendant

9  was assigned to various committees.  He was on the

10 Coordination Committee, the Media Committee, the

11 Dialogue Committee.  That allowed him even more

12 control over the content of the site.

13         In Count 2, he's also charged with

14 attempting to provide material support to a Foreign

15 Terrorist Organization, ISIS.  You will hear over

16 the next few days how the defendant tried to recruit

17 people around the world to commit horrendous acts of

18 violence in their homelands from bombings, to

19 shootings, to stabbings.  The defendant told his

20 followers over and over again to attack the

21 so-called infidels or nonbelievers, giving a

22 mandate -- and this is the defendant's words -- that

23 "All Christians are legal targets."

24         He recruited them to further ISIS's

25 mission of destabilizing Western democracies and in

1    retaliation for U.S. and coalition forces overseas
2    in the Middle East.
3            You will learn about the ISIS mission and
4    how the defendant's actions fit squarely within it.
5    In one instance, the defendant attempted to recruit
6    someone to commit an attack in their homeland -- and
7    this is the defendant's words -- "Kill and do not
8    consult anyone, and do no ask for a legal opinion.
9    Kill him by any means, smash his head on the wall,
10   spit in his face. . .I mean anything, anything;
11   poison, anything; praise be to God."
12           In another instance, he instructed a
13   person to "kill nonbelievers by ordering them to
14   kill them and do not have any mercy or compassion
15   towards them."
16           And yet another time, the defendant
17   bragged about how many people in the channel had
18   been mobilized for jihad; meaning had gone to fight
19   for ISIS.  Saying, "Yes, this is the one who was
20   among us, and with us on this channel, but he
21   mobilized.  He mobilized the Caliphate lands.
22   Praise be to God, the Lord of the worlds.  He is
23   sharp-tongued with forceful statement and argument,
24   and also now he is on the battlefields."
25           In Counts Three through Eight, the

1    defendant is charged with multiple false statements

2    made to federal law enforcement when they questioned

3    him about his support to ISIS.  The evidence will

4    show how he lied to the FBI on March 5th, 2017, at

5    the Dallas/Fort Worth airport.

6             The defendant was about to board a flight

7    from DFW to Ahmad, Jordan.  He had upwards of nearly

8    $6,000 in U.S. cash on him.  He had his birth

9    certificate.  He had SIM cards tucked away inside

10   his luggage.  He had two cell phones cleared of all

11   social media.  And when FBI questioned him about his

12   support for the terrorist groups and the terrorist

13   attacks, the defendant lied over and over again.

14            Over the next few days, you will hear

15   about the investigation and how it goes back to

16   2016, when the FBI learned of a Texas-based ISIS

17   supporter who was born in the U.S., living in

18   Richardson, Texas.  That person turned out to be

19   Said Rahim, also working in South Dallas.

20            So you will hear testimony from FBI agents

21   and law enforcement personnel who have been working

22   this case for years, including FBI Special Agent

23   Dwayne Golomb, who is the lead case agent.  He will

24   talk to you about the roles and members of the ISIS

25   platform, and he will walk you through the records

1    collected in this case.  He will talk to you about

2    the committees and the leadership and the

3    defendant's role in that channel.  And you will hear

4    the explicit and violent words spoken by the

5    defendant while trying to recruit more people.

6            You will also hear how the defendant

7    became what's called tradecraft savvy or conscious

8    of operational security, meaning he went to great

9    lengths to protect his identity.

10            The evidence will show when the FBI

11   interviewed the defendant as he was trying to leave

12   the country, he lied repeatedly about his support

13   for ISIS.

14            You will also hear from FBI linguist, Ayda

15   Hussein.  She's a native Arabic speaker and an FBI

16   employee.  The defendant speaks Arabic and English,

17   but nearly all the recordings you will hear are in

18   Arabic.  So Ms. Hussein spent hundreds of hours

19   translating the recordings from Arabic into English.

20   She will identify the defendant as "The Speaker."

21   She will also describe to you key terms in Arabic

22   and what they mean in the context of what the

23   defendant has said.

24            You will hear from other witnesses, such

25   as Alexey Gavrilov, who is the Chief Technology

 1   Officer of that platform, Zello.  So he will discuss

 2   how that platform works in detail; you will get

 3   familiar with it.  He will talk to you about how it

 4   has an incredibly broad communications capacity, so

 5   up to 6,000 people can be listening on one channel

 6   at any one time.  You will hear that Zello is low

 7   bandwidth, meaning it's easy to communicate in

 8   places that don't have good connectivity; so places

 9   such as Syria.

10          The evidence will show that the

11   investigation spanned the globe.  And it led FBI to

12   one of the defendant's coconspirators in Italy.  The

13   FBI and Italian law enforcement worked together to

14   break apart that conspiracy.  So you will hear from

15   Marshal Major Cristiano Napoletano.  He's a member

16   of the Italian Carbianari.  That's their federal law

17   enforcement.

18          He will talk about the related

19   investigation and to a person named Monour el Aoual.

20   Monour el Aoual is a Moroccan citizen who was living

21   illegally in Italy.  He was a coconspirator in this

22   case, as well.  He was known online as user

23   Ibn Dawla, and he had close communication with the

24   defendant.  He, too, was an administrator and a

25   moderator of that Zello, site, The State of the

1    Islamic Caliphate.  So the defendant and el Aoual

2    worked together with other members, trying to

3    recruit people for ISIS.

4          El Aoual was specifically sought out by

5    members, as the evidence will show, for his

6    bomb-making abilities; one time telling a channel

7    member, "Brother, this is the easiest of bombs.

8    It's called the booby trap explosive," and

9    explaining, "I will enter your country with a

10   suicide belt and a bomb, and this is the Islamic

11   State."

12         Major Napoletano explained that el Aoual

13   agreed to develop what he called a lone wolf manual,

14   which would include bomb-making instructions.  And

15   you will hear how he specifically advised other

16   users how to pledge allegiance to ISIS.

17         In addition, you will hear from expert

18   witnesses.  You will hear from Dr. Lorenzo Vidino,

19   who is the founder and director of the program on

20   extremism at the George Washington University and

21   the Director of Radicalization and International

22   Terrorism Program in Milan, Italy.  Dr. Vidino has

23   an extensive background and education in terrorism

24   matters, particularly related to ISIS.  So he's

25   going to talk in detail about how ISIS operates, its

1  history, its goals, what exactly is this Islamic

2  Caliphate that the defendant talks so much about.

3        He will talk about how ISIS has changed

4  through the years.  It's adapted its mission.  Its

5  adapted its efforts -- recruitment efforts to stay

6  relevant and powerful.

7        He will talk to you about certain ISIS

8  leaderships.  So you will hear names such as

9  Abu-Bakr al-Baghdadi.  And this is the leader of

10  ISIS.  You will also hear Abu Mohammed al-'Adnani,

11  and he was the spokesperson of ISIS.  You will hear

12  these names a lot through the trial, because the

13  defendant uses them repeatedly when he commands

14  people to travel to ISIS territory or commit violent

15  acts.

16        Dr. Vidino will explain the commonly used

17  extremist terminology.  You're going to hear a lot

18  of words you may not be familiar with.  Words such

19  as "Caliphate," which is the land under ISIS

20  control; "Shari'a law," Islamic doctrine that

21  governs the Caliphate; "Fatwa," an Islamic religious

22  order; "Jihad," the struggle to please God or in

23  this case, to fight for God; "Jizyah," to immigrate

24  to the Islamic State; "Mobilize," to travel to Iraq

25  or Syria to fight with ISIS; "Sheikh," a word of

1    respect used for people with religious wisdom;

2    "Mujahidin," a person who, again, fights for jihad;

3    "a foreign fighter," people around the world who

4    travel to ISIS territory to fight; "a lone wolf,"

5    someone who acts on behalf of ISIS; "a martyr," to

6    die in the course of battle for jihad.

7            You will learn that when the defendant

8    says, "How many brothers on this channel are

9    martyrs?  They were here, and they mobilized to the

10   Caliphate country and became the best soldiers to

11   the best state."

12           The "brothers" in this context means

13   like-minded ISIS supporters; that "martyr" means to

14   die in battle for ISIS; "mobilize" means to travel

15   to Syria to join ISIS; and "state" means The Islamic

16   Caliphate State.

17           The evidence will show you through audio

18   recordings made by the defendant that he told

19   channel members that jihad is mandatory and that

20   they must mobilize, that this isn't just talk, this

21   is conspiring and trying to recruit for ISIS.  It's

22   these types of members, these types of foreign

23   fighters that the defendant was trying to recruit

24   that the U.S. and its allies have been fighting in

25   the Middle East for years.

```
 1              You will learn that the defendant had
 2    multiple online entities.  He went by various names
 3    or IDs or monikers you can call them.  You will
 4    learn how the FBI connected the defendant to each
 5    and every one of these.  At various times he went by
 6    the names Dr. sa7wat, hola isis, safer-alshahadah,
 7    all way isis, angousha@ and trip W amojahed.
 8              You will also learn the significance of
 9    those names and what they mean in extremist
10    communities.  But regardless of the alias that he
11    used, the defendant made the same constant call to
12    his global audience:  "Where are you, men?...So
13    where are you men of the Quran?!...God gives you
14    this chance that may or may not present itself again
15    any other time to mobilize and wage jihad for the
16    cause of God...Some of the brothers mobilized from
17    this channel, they were amongst us.  They mobilized
18    for jihad for the cause of God and now we
19    communicate with them."
20              Sometimes the defendant would spend
21    seemingly all day on the Islamic Caliphate worldwide
22    platform talking to other members, other potential
23    recruits.  Again, this is the defendant, as the
24    evidence will show you, saying:  "We ask God,
25    glorified and exalted be he, to open your hearts,
```

1   and that you mobilize to the land of the Islamic

2   State, or, if you are in infidel countries that you

3   become a lone wolf, a real lion in the area you live

4   in.  As our sheikh, Al-Adnani said:  'Kill and do

5   not consult anyone and do not seek anyone's fatwa.'"

6   Importantly adding that "Everyone on this channel is

7   a Mujahidin project."

8              As part of recruiting more violent acts he

9   praised the ones that were occurring elsewhere,

10  including inciting others to commit similar acts of

11  violence.  On January 1st, 2017, an ISIS gunman shot

12  and killed 39 people and wounded 79 others at Reina

13  Nightclub in Istanbul, Turkey, where hundreds had

14  been celebrating the new year.  Of this the

15  defendant said:  "This is our terrorism, it

16  extends -- our terrorism extends and the State is

17  strong, by the grace of God, glorified and exalted

18  be he.  This is terror:  Terrorism reaches Turkey.

19  Yes, our terrorism as decreed by God, glorified and

20  exalted be he, it is to terrorize you, to kill you,

21  and to spill your blood, seeking closeness to God,

22  glorified and exalted be he."

23             The defendant literally takes credit for

24  this attack as you will here, saying that less than

25  a month before he had put out a global request on

1    the Caliphate site calling upon brothers to target

2    Turkey.  And then he asked God to reward him,

3    saying, "I ask God to grant me reward for it for

4    inciting brothers to perform jihad for the cause of

5    God -- for inciting brothers to perform Jihad for

6    the cause of God and to fight the enemies of

7    Almighty God."  The defendant said this as a leader

8    in this platform.

9         And July 14th, 2016, an ISIS member drove

10   a 19-ton cargo truck into crowds of people in Nice,

11   France, resulting in 86 deaths and 400 people

12   injured.  About this attack the defendant said:

13   "The effect that it would have on the West is that

14   the nonbeliever will turn, he will turn to the

15   right, he will turn to the right and to the left in

16   fear, and this is what is happening.  Oh, man, now

17   the French and all the Europeans are in extreme

18   states of terror.  Everyone is living in fear.  Are

19   they going to prevent everyone from driving trucks?

20   Then go ahead and stop, stop them from driving

21   trucks.  Praise be to God, the Lord of the worlds, I

22   really was happy for this act.  I was happy for this

23   act, those dogs..."

24        And in Orlando, Florida, or June 12th,

25   2016, an ISIS member gunned down 49 people and

1  wounded 53 others inside the Pulse Nightclub.  And

2  the defendant, talking about how easy it is to

3  commit these attacks in the United States said, "It

4  is easy to get a weapon.  To acquire a weapon is

5  very, very, very easy.  Just about any person can

6  have a weapon.  I mean, almost everyone is armed,

7  everyone is armed; I mean, they would have weapons.

8  I mean, it is not hard to get a weapon.  You can

9  be...go anywhere carrying a weapon; you can go to

10  the airport carrying weapons, because, for example,

11  no one inspects or anything."

12        He said these words to members who were

13  all around the world:  members who said that they

14  were in Syria; members who said they were in Turkey;

15  in the United Kingdom; in other parts of Europe.

16  They would seek out the defendant for guidance.

17  They would seek him out for guidance about

18  immigration or traveling to the Islamic Caliphate.

19  Or they would seek out advice about committing

20  homeland attacks.

21        Now, the defendant, from right here in

22  Dallas, responded over and over to his vast audience

23  of eager and willing recruits with the same

24  directive, "Travel for jihad...or stay and kill."

25        Then, on March 5th, 2017, the defendant

```
 1   was arrested for attempting to board a plane out of
 2   Dallas/Fort Worth airport to Amman Jordan.  When the
 3   FBI questioned him, Said Rahim lied repeatedly.  The
 4   agents asked him if he supported ISIS, and he said
 5   no.  The agents asked him if he had ever praised an
 6   act of terrorism, and he said no.  They asked him if
 7   he had ever talked with anyone about travel for
 8   jihad, and he said no.  They asked him if he had
 9   ever promoted an act of terrorism, and he said no;
10   if he had ever praised an act of terrorism, and he
11   said no.  And again, the agents asked him if he had
12   ever encouraged anyone to follow the guidance of
13   Al-Adnani, including his instruction to kill
14   infidels, and again, the defendant said no.
15          So over the next several days, you will
16   hear from a lot of different witnesses as I
17   mentioned earlier, the ones I mentioned and there
18   will be others as well.  Some of them will talk
19   about different parts of the crime.  Here in
20   opening, I have talked to you about it as a
21   narrative, but they will talk about different
22   aspects to this whole case.  And as you listen to
23   their testimony, bear in mind that the events are
24   really very simple.  The defendant conspired and
25   attempted to provide material support to ISIS from
```

1   right here in Dallas, and he tried to recruit people

2   to travel to Syria or commit acts of violence for

3   ISIS.  And then, when asked by federal agents about

4   his activities, he lied over and over again.

5           At the close of this trial, the government

6   will return and ask you to find him guilty of all

7   charges.

8           THE COURT:  Thank you very much,

9   Ms. Meeks.

10          Mr. Whalen.

11          MR. WHALEN:  May it please the Court.

12          THE COURT:  Mr. Whalen.

13          MR. WHALEN:  Counsel.

14          Good afternoon, Ladies and Gentlemen.

15          Mr. Rahim said some very offensive things

16   in that chat room, and we don't expect you to find

17   them otherwise.  He said them.  They were offensive.

18   But they don't give rise to the level that he

19   conspired with anyone to provide material support to

20   a terrorist organization.  They don't give rise to

21   the level that he attempted to provide material

22   support to a terrorist organization.  They were

23   simply words.  Words that are offensive, outrageous,

24   however you want to put it, but they are just words.

25          And we believe the evidence is going to

 1    show that's all they were, were simply words.  And
 2    that's the thing we want you to focus on is, how
 3    were those words used if at all, because we don't
 4    think they were.
 5             And what you also have to look at, too, is
 6    this can be a very emotional-type case and the facts
 7    you hear.  But we ask you to listen to the evidence,
 8    not only what you hear, but what you don't hear.
 9    And I think that will be very important to focus on
10    in this case.
11             And when we talk about the false
12    statements that were made, did he make some false
13    statements?  I believe he did.  But the question is
14    going to become, were they material?  Did they
15    matter?  And I think when you hear the evidence in
16    this case and hear the cross-examination in this
17    case, you will realize that many of the statements
18    he made weren't material in any way, shape, or form.
19    And for them -- for those statements to be a crime,
20    they have to be material, they have to matter.  We
21    don't believe the evidence is going to show that
22    they were material.
23             And they want to tell you that he was
24    trying to board a plane to Jordan.  But what we
25    believe the evidence is going to show is that he was

1    trying to get to a plane in Jordan, get on that

2    plane to go to Jordan, and he was going to see his

3    daughter.  That's why he was leaving the country, to

4    go to Jordan to see his daughter.  I don't think

5    anyone will dispute that.  That's why he was leaving

6    the country on that particular day.

7            And I think also the evidence will show

8    that when he was approached by the FBI, he was

9    having trouble getting his boarding pass, and they

10   asked him, "Mr. Rahim, we can help you."  And when

11   they helped him and said they could help him get a

12   boarding pass, I think the evidence will show that

13   that was a lie.  Mr. Rahim was never going to get on

14   that plane, and they never told him about that.

15           And so it's important, because when you

16   look at the nature of the investigation, the

17   magnitude of the investigation, I think those things

18   are going to be important for you to look at and to

19   consider.  But we ask you to hold the government to

20   their burden.  And when you get the jury charge and

21   look at the evidence and the law that you have to

22   apply in this case, that you swore an oath to take,

23   the government will fall short.  You will have

24   reasonable doubts in this case.  And while

25   Mr. Rahim's statements were offensive, they were not

 1   criminal, and we're going to ask you to find him not

 2   guilty.

 3            THE COURT:  Thank you, Mr. Whalen.  Will

 4   you-all -- somebody turn the lecturn around and let

 5   me ask the government to call their first witness.

 6            MS. MARTIN:  Yes, Your Honor.

 7            The government calls Special Agent Dwayne

 8   Golomb.

 9            THE COURT:  Agent.

10            COURT SECURITY OFFICER:  Raise your right

11   hand.

12            (Witness sworn.)

13            THE WITNESS:  I do.

14            COURT SECURITY OFFICER:  Have a seat and

15   state your first and last name and spell your last

16   name for the record.

17            THE COURT:  Do you invoke the Rule, either

18   side?

19            MR. WHALEN:  We invoke the Rule, Your

20   Honor.

21            THE COURT:  Any witnesses in the

22   courtroom?  No?  All right.  Go ahead.

23            THE WITNESS:  Dwayne Golomb, G-O-L-O-M-B.

24            MS. MARTIN:  Thank you, Your Honor.

25

1            **SPECIAL AGENT DWAYNE GOLOMB,**

2    **having been first duly sworn, testified as follows:**

3                     **DIRECT EXAMINATION**

4    **BY MS. MARTIN:**

5    Q.   Special Agent Golomb, how long have you worked

6    for the FBI?

7    A.   Approximately 15-and-a-half years.

8    Q.   Where all have you worked?

9    A.   I spent the first 12 years in the FBI Chicago

10   Field Office and the remaining years here in Dallas.

11   Q.   And what type of cases have you worked for the

12   FBI in the last 15 years?

13   A.   Majority of that time I have worked

14   counterterrorism investigations.

15   Q.   When you say, "terrorism investigations," what

16   do you mean by that?

17   A.   I mean we are looking to protect the American

18   people from acts of terrorism, here and abroad.

19   Q.   Do you have a specialty within -- I mean

20   terrorism, I think, involves a lot of different

21   things.  Do you have a specialty?

22   A.   I specialize in international terrorism, yes.

23   Q.   What specific threat group are you assigned

24   with investigating here in Dallas?

25   A.   Here in Dallas, I am assigned to investigate

184

1    ISIS.

2    Q.   And in 2016, did you become involved in a

3    investigation of Said Azzam Mohamad Rahim?

4    A.   Yes, I was.

5    Q.   How did you become involved in that

6    investigation?

7    A.   In early April, late March of 2016, we were

8    informed by another field office of their concern of

9    an Islamic State chat room channel and some of those

10   participants on that channel who could be located

11   here in Dallas.

12   Q.   When you say "channel," what are you talking

13   about?

14   A.   Talking about a -- what we call like an online

15   channel of users across the globe using a social

16   media application called Zello, to communicate with

17   each other, to mobilize, to recruit, to spread

18   propaganda for ISIS.

19   Q.   And you used the term "Zello."  What is Zello?

20   A.   Zello is a mobile application.  I would call it

21   three parts:  It's part social media app; part

22   phone; part two-way radio.

23        In this case, you would download it to your

24   phone like you would if you were using your iPhone,

25   you went to the app store and downloaded an

```
 1   application.  In this case it would be Zello.  Once
 2   you load the application on your phone and sign in
 3   and create an account, you can then, by the push of
 4   your thumb on the phone, begin to communicate with
 5   others, either person-to-person or we call over the
 6   channel, about 6,000 people at a time.  Very similar
 7   to using -- if I were standing here with a two-way
 8   radio and push the button on the two-way radio, it
 9   would broadcast out to whoever else had that channel
10   on the radio.
11   Q.   And you said you could go into the app store on
12   your iPhone.  Is this application only available in
13   an iPhone or on an iPhone?
14   A.   No.  The application can be downloaded to an
15   iPhone, any type of android device, iPads.  Even
16   your PC, you can download an application to download
17   it on your PC desktop.
18   Q.   Was there any website affiliated with the
19   channel?
20   A.   Yes.  I say social media app on your phone.
21   But a lot of these apps, like FaceBook, for example,
22   you have an app on your phone, but you can also log
23   into it through the internet and go to the web page.
24   In this case, Zello does maintain a web page for
25   individual owners or participants and the channel
```

1   itself.

2   Q.   But if you wanted to do the push-to-talk

3   function, how would you do that?  Is that solely

4   through the phone?

5   A.   That's solely for the app you need; yeah,

6   through the phone.

7   Q.   You're saying "channel."  Can you describe for

8   the jury what a channel is?

9   A.   So a channel would be considered something of a

10  large -- like I said, a large internet audience.  So

11  I could use a device to communicate

12  person-to-person.  Or I, as an individual, can

13  create my own channel.  Or I could log into the

14  application and search for channels that are already

15  existing, already built by other individuals.

16       In this case, The State of the Islamic

17  Caliphate channel already existed, and you could log

18  into that channel -- or connect to that channel

19  based on if you were allowed to, if there were

20  passwords set up or no passwords set up.

21  Q.   Now, were the channels private channels, or

22  were they public channels?  Could anyone go into

23  them?  How did it work?

24  A.   Yeah.  Ultimately, the channels can be set by

25  the owner.  I can determine who can get into the

1  channel.  So I can set it for very high security,

2  put a password on it.  Or I can allow it just to be

3  open, so anyone can just click on the channel and

4  start to listen to what's happening on the channel.

5  Q.   And are there different settings to control

6  whether or not you are just listening or you're

7  participating?

8  A.   Correct.  Kind of midrange of the channel, you

9  can get to a point where anyone can listen.  But if

10 you want to speak on the channel, if you want to

11 give your opinion or talk to the administrators or

12 moderators, you have to become possibly a trusted

13 member of the channel.  And once you are given that

14 status, then you are allowed to participate more

15 freely rather than just listening.

16 Q.   Now, you've talked about this push-to-talk

17 function and how it's actually an audio or

18 verbal-type social media application.  What happens

19 to that audio once someone is talking on this

20 channel?

21 A.   What makes Zello unique, it operates very much

22 like a two-way radio.  So if I'm on the channel at

23 the time someone is talking, I can hear what they

24 are saying, but it doesn't record those

25 conversations; Zello doesn't record those

188

1    conversations.

2        The only difference there is if I'm in the

3    channel and I am listening to you and I think, wow,

4    this is something really important, I want other

5    people to hear it if they are not here right now,

6    you could then post that conversation, that

7    particular conversation you are a part of, you could

8    post that to the channel room or the website.  So

9    others could come in later, members of the channel

10   or just the public in general, and listen to those

11   audio clips.

12   Q.   So if one is posted to the website, are those

13   preserved in any way?

14   A.   Yes.  Zello does preserve only those that are

15   posted by channel room participants.  If I post it,

16   then Zello saves it so other listeners can listen to

17   that content.

18   Q.   Once you became involved in this investigation,

19   did you obtain any evidence from Zello?

20   A.   We did.  Once we were aware of the channel, and

21   particularly users in Dallas on the channel, we

22   began to collect lawful records from Zello.

23   Q.   Did you ultimately obtain a search warrant from

24   Zello?

25   A.   We did.

1   Q.   And did that search warrant, the return, did

2   that contain any audio?

3   A.   It did.  The search warrant we served on Zello

4   provided us with all of the audio sessions that

5   participants of the channel had posted over time.

6           MS. MARTIN:  Your Honor, may I approach

7   the witness?

8           THE COURT:  Yes.

9   Q.   (By Ms. Martin)  Special Agent Golomb, I have

10  handed you what's been marked as Government's

11  Exhibit 109.  Do you see that?

12  A.   I do.

13  Q.   What is that?

14  A.   This is a DVD of the information we received

15  back from Zello from the search warrant of all the

16  audio that was posted on the website.

17  Q.   Was there anything in addition to the audio?

18  A.   In addition to the audio, Zello also collected

19  basic records on channel participants, actions that

20  were taken on the channel, like who was made a

21  moderator, trusted users added, IP logs, those

22  actions; kind of just server maintenance of the

23  room, who's doing what and when.

24  Q.   And when you collect evidence such as those

25  DVDs in Exhibit 109, what does the FBI do with it

```
 1   once you've gotten the evidence?
 2   A.    So in the case like this search warrant, Zello
 3   would create these DVDs and then FedEx them directly
 4   to our office.  We would receive them and
 5   immediately make a working copy of these records and
 6   then file these records into our 1-A evidence.
 7   Q.    Have you maintained the custody and control of
 8   those DVDs or Exhibit 109?
 9   A.    Yes.
10   Q.    And have they been altered in any way?
11   A.    No, they have not.
12   Q.    In addition to these search warrants, did you
13   also collect -- or conduct some other types of
14   investigation that -- open-source?
15   A.    We did.  As part of our investigative
16   techniques, we would do open-source searches on
17   identifying information on individuals as well.
18   Q.    And what does open-source mean?
19   A.    For example, we can just do an open-source
20   search on whether or not someone may have a WhatsApp
21   account or a Twitter account or FaceBook, things of
22   that nature.
23   Q.    Did you do that in this case?
24   A.    We did, yes.
25   Q.    And once you had obtained what you believed to
```

1  be Said Rahim's phone number, did you attempt to

2  determine whether a WhatsApp account was associated

3  with it?

4  A.   I did.

5  Q.   Were you able to do that?

6  A.   I did, and there was an account associated with

7  his phone number, yes.

8  Q.   How did you determine that?

9  A.   There's a website in open-source to everybody

10  called checkwa.com.  If you plug a phone number in

11  there and some identifiers in there, it will tell

12  you that that number is reserved; yes, there's an

13  active account for that number.

14  Q.   Have you done that in the past for phone

15  numbers you know have a WhatsApp account?

16  A.   Yes, I have.

17  Q.   So you have been able to verify the lookup?

18  A.   Yes.

19  Q.   Were you able to do that for Said Rahim's phone

20  number?

21  A.   Yes, I did.

22  Q.   What did you find?

23  A.   I found that he had an active account, and I

24  took a screenshot of that web page.

25  Q.   What was contained in the web page?

1    A.    It basically just provides the phone number and

2    then a profile picture of what the -- the user is.

3    Q.    And you said you printed that out?

4    A.    I did.

5    Q.    And if you will take a look at Government's

6    Exhibit 305.

7    A.    Yes.

8    Q.    Is that the printout you did?

9    A.    It is.

10   Q.    Has it been changed or altered in any way?

11   A.    No, it has not.

12   Q.    Does it accurately reflect the website on the

13   day that you took that screenshot?

14   A.    Yes, it does.

15          MS. MARTIN:  Your Honor, at this time the

16   government would move to admit Exhibit 305.

17          THE COURT:  What about 109?

18          MS. MARTIN:  Your Honor, we will move to

19   admit that with a subsequent witness.

20          THE COURT:  305, Mr. Whalen?

21          MR. WHALEN:  No objection, Your Honor.

22          THE COURT:  All right.  Government's

23   Exhibit 305 is admitted.

24          MS. MARTIN:  Your Honor, may we publish

25   that exhibit?

```
 1            THE COURT:  Yes.
 2   Q.   (By Ms. Martin)  Special Agent Golomb, is this
 3   the printout of the page that you saw on the
 4   WhatsApp app?
 5   A.   Yes, it is.
 6   Q.   Is this the profile picture right here in the
 7   center?
 8   A.   Yes, it is.
 9   Q.   All right.  Thank you.
10        Were you able to determine other social media
11   accounts that you believed were associated with the
12   defendant, Said Rahim?
13   A.   Yes, I was.
14   Q.   Was Twitter one of those?
15   A.   It was.
16   Q.   What did you do once you learned -- or believed
17   he had a Twitter account?
18   A.   When we believed he had a Twitter account,
19   again, we just conducted an open-source search on
20   the Twitter ID and took a screenshot of Twitter
21   pertaining to that specific ID.
22   Q.   And did you again print that out?
23   A.   I did.  I took a screenshot of the computer
24   when I looked up the Twitter address, yes.
25   Q.   If you will take a look at Government's Exhibit
```

1    306.

2    A.    Yes.

3    Q.    What is that?

4    A.    That is the picture of the screenshot I took of

5    the Twitter account.

6    Q.    And has it been changed or altered in any way?

7    A.    No, it has not.

8    Q.    And does it accurately reflect the screenshot

9    when you took it?

10   A.    Yes, it does.

11        MS. MARTIN:  Your Honor the government

12   moves to admit Government's Exhibit 306.

13        THE COURT:  Mr. Whalen?

14        MR. WHALEN:  No objection, Your Honor.

15        THE COURT:  306 is admitted.

16        MS. MARTIN:  May we publish that?

17        THE COURT:  You may.

18   Q.    (By Ms. Martin)  Special Agent Golomb, what is

19   this?

20   A.    This is a screenshot of the Twitter account for

21   Motasaher.

22   Q.    And that's the one you believe to be associated

23   with Said Rahim?

24   A.    Yes.

25   Q.    What is the big picture?

1    A.    The bigger picture is a picture of a salad.

2    Q.    Okay.   What about the smaller one?

3    A.    The smaller picture appears similar to what is

4    in the WhatsApp profile, and I was giving that to my

5    translators because I do not understand Arabic.

6    Q.    So you believe that to be Arabic?

7    A.    That's correct, yes.

8          MS. MARTIN:   Okay.   Thank you.

9    Q.    (By Ms. Martin)   And you just mentioned

10   translators.

11   A.    Yes.

12   Q.    When you collected the audio in this case, what

13   language was it in?

14   A.    The majority of the audio was in Arabic.

15   Q.    Do you speak Arabic?

16   A.    I do not.

17   Q.    So how are you able to understand what the

18   Arabic audio said?

19   A.    The process we go through when we receive

20   either audio or written information in another

21   language, we will take that information, package it

22   and submit it to our Language Services Department.

23   And then they will assign a qualified linguist to

24   then, in that particular language, review that and

25   provide the translation.

1    Q.    They did that in this case?

2    A.    Yes.

3    Q.    You said "particular linguist."  Is one

4    particular linguist assigned to be a lead linguist

5    in a particular investigation?

6    A.    Yes, in this case it was.

7    Q.    And who was that?

8    A.    Her name is Ayda Hussein.

9    Q.    What did you do with the recordings?

10   A.    With the recordings, once we had them from

11   Zello, we made our working copy.  We then provided

12   that working copy to the linguist to work off of.

13   Q.    And were translations from Arabic to English

14   made?

15   A.    Yes, they were.

16   Q.    And have you reviewed those translations in

17   this case?

18   A.    I have.

19          MS. MARTIN:  Your Honor, I will pass the

20   witness.

21          THE COURT:  All right.  Cross-examination,

22   Mr. Whalen.

23                    **CROSS-EXAMINATION**

24   **BY MR. WHALEN:**

25   Q.    Agent Golomb, just so I'm clear, when did you

1    first start the investigation?

2    A.   I want to say start of April 2016.

3    Q.   Okay.  And that was based on a referral from a

4    different office?

5    A.   It was.

6    Q.   And until the time you -- I'm just trying to

7    get a timeline here.  You said you started doing

8    some open-source-type investigations.  When did you

9    do the WhatsApp?  When did you exactly do that?

10   A.   The WhatsApp and the social media open-sources

11   were done pretty immediately, I would say within the

12   first few weeks.

13   Q.   And in the beginning, did you -- were you just

14   told that there may be people in Dallas, or did you

15   specifically have a name?

16   A.   We specifically had monikers associated with an

17   individual that we believed to be in Dallas.

18   Monikers, and I should say IP addresses, as well.

19   Q.   So you had IP addresses and monikers in April

20   of 2016, correct?

21   A.   Correct.

22   Q.   And then you said you got a search warrant for

23   Zello.

24   A.   That came later.  Originally we would do

25   subpoenas, and we received subscriber information.

```
 1   Q.    Okay.  So when did you issue the subpoenas for
 2   the subscriber information to Zello?
 3   A.    Some were issued out of the other field office,
 4   and some were issued out of Dallas.
 5   Q.    What date and what time did you do that?
 6   A.    I don't have them in front of me, but there
 7   were several over the course of April, May, June,
 8   July.
 9   Q.    When you say "several," are we talking one,
10   two, five, ten?  How many?
11   A.    Probably upwards of 20, 25.
12   Q.    Okay.  So approximately 20, 25 subpoenas were
13   issued in the beginning of April to June of 2016?
14   A.    Correct.
15   Q.    And out of those subpoenas, were you just
16   getting subscriber information and IP addresses?
17   A.    Correct, yes.
18   Q.    And were they all directed to Zello?
19   A.    They were not all directed to Zello, no.
20   Q.    Okay.  What other subpoenas did you use, and
21   what companies did you send them to?
22   A.    We also subpoenaed Google for email accounts.
23   As we learned more and more information, we
24   subpoenaed AT&T or Cricket Wireless for phone
25   records, subscriber records, Time Warner Cable.  I'm
```

1  trying to think.  I believe there were Twitter we

2  subpoenaed, maybe some FaceBook accounts; possibly a

3  few more.

4  Q.   Okay.  And then as it relates to Zello, you

5  said you got a search warrant for Zello?

6  A.   We did.

7  Q.   And when did you get the search warrant for

8  Zello?

9  A.   If I remember correctly, the search warrant was

10  served in late December of 2016.

11  Q.   Okay.  And you said you then -- they were able

12  to provide recordings; is that correct?

13  A.   That is correct.

14  Q.   Okay.  And as far as the recordings go, you

15  stated Zello maintained them on their server?

16  A.   They maintained them on a controlled server.  I

17  think the servers are actually owned by Amazon, but

18  Zello maintains ownership of those servers.

19  Q.   Okay.  So they are maintained on a space on an

20  Amazon server?

21  A.   Yeah, I believe so.  Alexey will be able to

22  describe that in more detail.

23  Q.   And so the chats that may occur on there, they

24  don't -- they don't keep a hard copy of all the

25  chats and discussions on there, do they?

1  A.   They don't -- as far as I know, they don't
2  record ongoing conversations on the mobile app, no.
3  Q.   Did there come a time that you then began to
4  monitor the chats?
5  A.   We effectively executed lawful legal orders
6  from the Court during the investigation, yes.
7  Q.   Okay.  When did you begin monitoring the chats
8  live?
9          MS. MARTIN:  Objection, relevance.
10         THE COURT:  Overruled.
11         MS. MARTIN:  Your Honor, may we approach?
12         THE COURT:  Yes.
13         (Bench Conference:)
14         THE COURT:  What was the question?
15         MR. WHALEN:  When did you begin monitoring
16 the chats live, like in realtime?
17         MS. MARTIN:  Your Honor, the government
18 objects under CIPA Section 8.  This begins to go
19 into questions that we were outside the issue.
20         THE COURT:  Okay.  I'm going to sustain
21 it.
22         (Bench conference concluded.)
23         THE COURT:  Sustain the objection.
24 Q.   (By Mr. Whalen)  And as far as what was saved
25 to the web by Zello, how many hours of chats were

SHAWNIE ARCHULETA, CSR/CRR
FEDERAL COURT REPORTER - 214.753.2747

1    there?

2    A.   Probably hundreds of hours.

3    Q.   Okay.  Okay.  And would you agree that only --

4    whoever saved them only saved a portion of the chat,

5    correct?

6    A.   Yes.  I mean chats can go for 12 straight

7    hours.  So usually what you're saving -- when I push

8    the button and then I let go, those are sessions.

9    Every time I push a button and let go, I think it

10   saves that data.  So each user has a separate audio

11   as other people click in.  You can save one, two,

12   three, four, however many, to string together a

13   conversation, I believe.

14   Q.   And so you would agree with me that whoever is

15   saving, it's their choice on what they save and what

16   they don't save, correct?

17   A.   Correct.

18   Q.   And you agree with me that you may not be

19   getting the full context of the entire chat, because

20   they are only saving a portion of it.  Would you

21   agree with that?

22   A.   I would.

23   Q.   And then when did you exactly hand over these

24   recordings to Ms. Hussein to then start translating

25   them?

1  A.   The linguist started translating material from

2  the onset of the investigation.

3  Q.   Okay.  And just so we are clear, when you said

4  "hundreds of hours," are we talking a hundred hours,

5  200 hours, a thousand hours?  How many hundreds of

6  hours are we talking about?

7  A.   I would say probably 150 to 200 hours; yeah,

8  it's a lot.

9  Q.   And that 200 hours is only a snippet or a

10  portion of the entire activity of these chats,

11  correct?

12  A.   I would assume so.  I wasn't in the chat, but I

13  would assume that if it went on every day for at

14  least a year, that would be a portion of it.

15  Q.   Okay.  And as far as the chat room is set up,

16  at some point you would have to get permission to

17  join the chat, correct?

18  A.   Not to join.  You would get permission to

19  speak.  Anyone could listen into the chat room.

20  Q.   Okay.  But in order to speak, you would have to

21  get approved, correct?

22  A.   You would have to become a trusted member of

23  the room, yes.

24        MR. WHALEN:  I will pass the witness at

25  this time.

```
 1              THE COURT:  All right.  Redirect?

 2              MS. MARTIN:  No more questions, Your

 3     Honor.

 4              THE COURT:  Agent, you may step down.

 5              Call your next witness.

 6              MS. MEEKS:  Government calls Alexey

 7     Gavrilov.

 8              THE COURT:  All right.  Come right up

 9     here, sir.

10              COURT SECURITY OFFICER:  Raise your right

11     hand.

12              (Witness sworn.)

13              THE WITNESS:  I swear.

14              COURT SECURITY OFFICER:  Have a seat.

15     State your first and last name and spell your last

16     name for the record.

17              THE WITNESS:  My name is Alexey --

18              THE COURT:  Speak into the microphone a

19     little bit.  Thank you.

20              THE WITNESS:  Alexey Gavrilov.  Last name

21     is G-A-V-R-I-L-O-V.

22                   ALEXEY GAVRILOF,

23     having been first duly sworn, testified as follows:

24

25
```

1                    **DIRECT EXAMINATION**

2    **BY MS. MEEKS:**

3    Q.   Thank you, Mr. Gavrilov.

4         Can you give us an idea of your educational and

5    professional background?

6              THE COURT:  Can you pull that closer to

7    your mouth?

8              MS. MEEKS:  Yes, ma'am.

9    Q.   (By Ms. Meeks)  Can we get your educational and

10   professional background?

11   A.   Yes.  I have a Master's Degree in Applied Math

12   and Physics.  And I've been working software

13   development for about 22 years.

14   Q.   And you said that's software development?

15   A.   Software development.

16   Q.   Where do you currently work?

17   A.   I'm currently a chief technology officer at

18   company called Zello.

19   Q.   A chief technology officer.  And how long have

20   you been doing that job?

21   A.   Full time since 2012.

22   Q.   Okay.  And you are responding to a subpoena to

23   be here today?

24   A.   Yes.

25   Q.   Tell us a little bit about Zello.  What is it

1    exactly?

2    A.    Yes.  Zello is a communications service, which

3    allows you to use your phone or computer or to talk

4    to people in walkie-talkie style.  You can talk to

5    one person or you can talk to a group of people,

6    essentially just push a button and speak.  And one

7    person or many people can hear you talking in

8    realtime as you talk.

9    Q.    And is this a worldwide application?

10   A.    Yes.

11   Q.    When was it established?

12   A.    Well, the company was created in 2012.  I've

13   been working on it part time since 2007.

14   Q.    And what makes this unique than other social

15   media platforms?

16   A.    There are a few key differentiators in Zello.

17   First, it supports voice communication at large

18   scale.  So we allow channels that's like groups in

19   Zello with up to 6,000 people connected at the same

20   time.  It is also a live voice.  It works even if

21   your phone is like locked and in your pocket.  So

22   you don't need to interact with the app to hear

23   messages on Zello.

24   Q.    So you can have 6,000 people all live in the

25   same group at the same time?

1   A.    Yes.

2   Q.    And does the application look the same on an

3   iPhone or on an android?

4   A.    The user interface is slightly different, but

5   essentially it works the same.

6   Q.    What are the navigation sections?

7   A.    The main addition of the screens are recents,

8   which show recent calls you had with channels or --

9            THE COURT REPORTER:  I'm sorry, what?

10            THE WITNESS:  Recents.

11   A.    And the second is contacts, which shows just

12   the list of people who you have as contacts of Zello

13   who you can communicate with.

14        And the last one is channels, which is a list

15   of channels you subscribe or channels you

16   participate in.

17   Q.    (By Ms. Meeks)  Okay.  So if you want to go to

18   a new channel, how would you do that?

19   A.    So if you want to subscribe for a channel, you

20   go through "channels" screen.  You select "plus" or

21   "add" button.  And you have options of scanning a KR

22   code or you can search for the channel.  You just

23   type in channel name, and you select one of channels

24   and connect.

25   Q.    How many people -- you said 6,000 people can be

1  on a channel at any one time.  But how many people

2  can speak, and how does it work?  Are they talking

3  at the same time, or is there a way to regulate

4  that?

5  A.    Only one person can talk at a time.  So it's

6  more like radio-style communication.  So if you try

7  to talk while somebody else is speaking, you can't.

8  Q.    And people can use this around the world.  Do

9  you have to be on the internet, or can you get it on

10  cellular service as well?

11  A.    You can use any type of internet connection.

12  You can use WiFi.  You can use mobile data.  You can

13  use 2G, 3G, 4G.  You can use really any type of

14  internet connection.

15  Q.    And where is Zello used around the world?

16  A.    So Zello is used in more than 100 countries.

17  The top countries are United States, about

18  12 percent of users are in the United States;

19  brazil, Mexico, Thailand, many countries.

20  Q.    How many user accounts does Zello have total?

21  A.    We have about 130 million user accounts.

22  Q.    170 million?

23  A.    130 million.

24  Q.    130 million.

25  A.    Yes.

```
 1   Q.    130 million user accounts.
 2         How many monthly active users?
 3   A.    About three million monthly active users.
 4   Q.    Three million monthly active users.
 5   A.    Yes.
 6   Q.    Zello, is it considered low bandwidth?
 7   A.    Yes.  As I mentioned, you can use it with any
 8   type of internet connection.  You can use it with
 9   2G, which is the lowest bandwidth you can typically
10   get.
11   Q.    And tell us a little bit about the settings
12   about it being a public or how to make it private.
13   A.    Yes.  So we support different channel types
14   with the idea to let -- people who create channels
15   have control over who can connect and participate in
16   channels.  And the easiest is just the public
17   channel, which is a default option, so really create
18   the public channel, anyone can join and talk on such
19   channel.
20         And the other extreme is password protected
21   channel.  And in this case, you just set channel
22   password.  And to connect to the channel, the person
23   needs to enter the password.
24         And there are options in between.  You can have
25   a channel, we call it elect channel.  And such
```

1  channel needs moderator approval for users to
2  participate or listen to the channel.
3  Q.   Does elect channel -- and that's in between --
4  what you are saying is an in between --
5  A.   Yeah.  I mean the functionally -- functionally
6  it's somewhere in between like totally private,
7  password protected channel and totally open.
8  Q.   Okay.  What is a channel owner?
9  A.   A channel owner is a person who created the
10 channel, and they have complete control over the
11 channel.  They can modify channel description.  They
12 can set channel password.  They can remove the
13 channel.  They can also assign different roles of
14 the channel, such as like administrators,
15 moderators, or trusted users.
16 Q.   Okay.  So you've got the channel owner, and
17 they can assign the administrator, the moderator and
18 the trusted users.
19 A.   Yes.
20 Q.   What is an administrator?
21 A.   Administrator is the second level in this for
22 managing the channel.  And they have all of the same
23 functions as channel owner, except they cannot
24 remove the channel and they cannot set channel
25 password.  And also they cannot assign other

1  administrators.

2  Q.   All right.  Can they assign moderators?

3  A.   They can, yes.

4  Q.   What is a moderator?

5  A.   Moderator is kind of a little lower.  They can

6  just manage the users, switch music.  And trusted

7  users, add them to trusted list; they can remove

8  them from this list.  They can block users.  And

9  when user is blocked, he cannot access the channel

10 anymore.  They can mute users.  And when channel is

11 muted, he cannot talk, but he can stay on the

12 channel and can continue listening.

13 Q.   Okay.  So the moderator has several functions

14 to moderate the channel.

15 A.   Right, yes.

16 Q.   Okay.  What's a trusted user?

17 A.   So trusted user is somebody who connected to

18 the channel and later was approved by one of

19 moderators of the channel or channel administrators.

20 This person was added to the trusted list.  And they

21 have additional -- they have additional privileges.

22 They can talk on the channel.  And if it's -- a plus

23 channel is more restrictive, they can only actually

24 hear the trusted user.

25 Q.   So there are a lot of ranges.

1    A.    Yes.  It's designed to be flexible to let --

2    well, people have control over who and how can

3    access those channels.

4    Q.    And is there any limit to the number of trusted

5    users that can be on a channel?

6    A.    No.

7    Q.    And the trusted users, can that be revoked by

8    moderators?

9    A.    They can be, yes.  One of the functions of the

10   moderators is to be able to also remove the trusted

11   status.

12   Q.    You also mentioned something called "mute."

13   What does that mean in this channel?

14   A.    So it's another function that's available to

15   moderators.  They can mute a user, and then this

16   person just cannot talk on the channel.  The

17   essentially talk button is no longer available and

18   the -- similarly, moderators can mute users.  They

19   can mute or unmute.

20   Q.    Can a muted user be subject to a finite amount

21   of time or an indefinite amount of time?

22   A.    It's up to the moderator.  They can just

23   personally mute a user, or they can set a time limit

24   and the user will be muted automatically after this

25   time expires.

1    Q.    Okay.

2             MS. MEEKS:  Your Honor, permission to

3    publish a demonstrative aid?

4             THE COURT:  Is it in evidence?  Is it

5    marked?

6             MS. MEEKS:  It's just a demonstrative aid,

7    Your Honor.

8             THE COURT:  Has the other side seen it?

9             MR. WHALEN:  Yes, Your Honor, we have.  No

10   objection.

11            THE COURT:  Fine.

12   Q.    (By Ms. Meeks)  Okay.  Mr. Gavrilov, do you

13   recognize this?

14   A.    Yes.  It's a screenshot from Zello Android

15   application.

16   Q.    Can you tell us what we are looking at from

17   sort of the top section there, that says next to the

18   "Z."

19   A.    So, yeah.  So "Z" is the Zello logo followed by

20   a user name of the user who signed into the

21   application right now.  Then you have a search icon,

22   menu icon.  And at the bottom, we have tab

23   controller was three in the navigation section.  So

24   the app that I mentioned at the beginning, kind of

25   looking at channels.

 1       And in this case, this person has two channels

 2  listed.  And each channel shows a number of

 3  connected users right now.

 4       And this blue icon on the right lets you

 5  connect and disconnect from the channel.

 6       And at the bottom we have this action button to

 7  add a new channel.

 8  Q.   Okay.  And this is just an example of what the

 9  platform looks like.

10  A.   Right.

11  Q.   And is this what -- so this is something that

12  you had created; is that correct?

13  A.   Yes.

14  Q.   Okay.  So we're just on an example here.

15       Can you do the next one?

16       Walk us through what's on this slide right

17  here.

18  A.   Yeah.  So this is a screen that shows up when

19  you tap the round "add" button on the previous

20  screen.  And it shows all the options you can use to

21  add a channel.  This is the "search" you can find

22  channel by name.

23       Second is (inaudible) channels.  This option is

24  no longer available on Zello, but used to be

25  available that shows the most popular channels, most

214

1    active channels in your language.  And then again,
2    scan code for the channel to add it or you can
3    create your own channel.
4    Q.    And how about this slide?
5    A.    Yeah.  So this is the main screen that people
6    interact with when using Zello.  And so you can see
7    it's dominated by this big round "Talk" button.  So
8    to use button to talk on Zello, you touch and hold
9    it, and then you speak after the signal.  And to
10   stop talking, you just release the button.
11         And so at the top it also shows you those
12   navigation icons.  Blue means like an active screen,
13   talk screen.
14         The second is a list of users in the channel.
15   For example, if you are moderator, you can use this
16   screen to see who is connected to the channel right
17   now and you can like trust them or untrust them.
18         The last is "Voice History."  Shows you a list
19   of messages you sent or received from your phone.
20   Q.    Okay.  We have one more.  Could you describe
21   this?  What are we looking at here?
22   A.    Yeah.  So this is the "History" screen.  It
23   just shows a list of messages or actions, like
24   moderator actions being performed through this
25   channel.  So this screenshot only has one line,

1  means that you, as the moderator, made this user

2  trusted.

3  Q.   All right.  So when a moderator makes a trusted

4  user, it would be reflected there.

5  A.   Yeah, it would be reflected there.  It's

6  history for the users who are connected to the

7  channel at this time.  And if you send messages or

8  retrieve messages, it will show or at least they can

9  play them.

10 Q.   Okay.  Talk to us about how you use it as a

11 user.  Do you log into the channel affirmatively, or

12 does it keep you logged in?

13 A.   Well, so to use the application, you need an

14 account.  So you just install the app.  The first

15 thing you're going to see is the welcome screen and

16 the options, sign up or sign in.  And so if you

17 already have an account, you will select "sign in".

18 You're going to type in your user name and password,

19 which is going to sign you in.

20     If you don't have an account, you will select

21 "sign up" or "create a new account," and then it

22 signs you in.  Once you signed in, it keeps you

23 signed in on this device.  So once you sign out,

24 it's going to be connected to your account and all

25 the channels you added later.

```
 1    Q.   All right.  So if you are still signed in, you
 2    haven't signed out, how does the app function and
 3    how do you interface with it?
 4    A.   Yes.  So the app normally just runs in the
 5    background.  And when somebody calls you, you just
 6    hear the voice coming from your phone right away.
 7    And it works the same for private messages or
 8    channel messages.
 9    Q.   The voice will come through your phone even if
10    it's set aside.
11    A.   Yes.  Yeah.  If you -- which is one of the key
12    functions of Zello, being able to receive those
13    messages and hear them right away even when you
14    don't interact with the app.
15    Q.   Can the app be silenced?
16    A.   Yes.  You can set your status to be "Z," for
17    example, and that would prevent you from hearing
18    those messages in realtime.  However, they are still
19    going to be received and reflected in your local
20    history on the device, so you can replay them later.
21    Or you can change your status to offline, and this
22    will actually stop messages from receiving; you're
23    only going to be getting push notifications.
24    Q.   Push notifications?
25    A.   Yes.
```

```
 1   Q.    What does that mean?
 2   A.    Push notification is just going to show you a
 3   notification later that you received the message.
 4   There are many settings that can affect how it
 5   works, but -- and it's slightly different between
 6   iPhones and Androids, but -- so essentially the best
 7   option for you to completely silence the app is to
 8   set your status to busy.
 9   Q.    So you can be signed in and not using it and
10   still receive audio?
11   A.    Yes.
12   Q.    All right.  Okay.  And if you silenced it, will
13   the audio still be there when you come back to the
14   phone?
15   A.    Yes.
16   Q.    And if you are busy or you had to sign out, the
17   audio files will still be there when you come back
18   to the phone?
19   A.    Yes.
20   Q.    What about private messages, is that an option?
21   A.    Yes.  If you want to send private messages to
22   any Zello user, you first need to find them.  You
23   need to know their Zello user name or the phone
24   number or email address.  Then you use the
25   application to find them and send them contact
```

```
 1   request.  So before you can communicate, they need
 2   to see the contact request in the app and accept it.
 3   And once accepted, you can send one-on-one messages
 4   back and forth.
 5   Q.   Can those messages also be unloaded to the
 6   website?
 7   A.   So normally Zello doesn't store user messages.
 8   But if you -- say if you want to share some of
 9   those, you can go through the voice history in your
10   application.  You can select the messages you want
11   to share, and just click share button, and this
12   uploads those messages to Zello website and gives
13   you a unique link, which you can then use.  And the
14   same with private messages or general messages.
15   Q.   And that unique link, can that be sent in other
16   applications, as well?
17   A.   Yeah, it's like social media.  You can email
18   it, you can text it, and that's going to give
19   anybody who has this link access to those messages.
20   Q.   Can that link be shared indefinitely?
21   A.   Yes.
22   Q.   So many people could have access to the same
23   link?
24   A.   Yes.
25   Q.   On this application, can people send photos or
```

1    files?  What are the constraints?

2    A.    So in Zello, the primary function is voice;

3    however, you can send images.  You can send images

4    from camera or you can send images from your phone,

5    from your app on the phone.  You can also send text

6    messages; those messages could include links.  You

7    can send your location, which is gonna just use a

8    GPS on your phone to capture your location and send

9    to another person.

10   Q.    And can the channel owner or administrators

11   change the settings to allow for a certain file

12   sharing or not?

13   A.    Yes.  They actually have complete control over

14   what you can share on the channels.  So you can --

15   if you channel owner or channel administrator, you

16   can enable or disable text messages or you can

17   enable or disable images.

18   Q.    Can a person, a user, can they have multiple

19   IDs or multiple monikers or profiles?

20   A.    Yes.

21   Q.    Does Zello have subscriber agreements?

22   A.    We do.

23   Q.    And what does that mean?

24   A.    It means on our website we have terms of

25   service and privacy policy that governs the use of

1    the app.

2    Q.    A terms of service?

3    A.    Yes.

4    Q.    And is a user, if they elect to use Zello, then

5    bound by Zello terms of service?

6    A.    Right.

7    Q.    Does Zello -- how does Zello know what's on its

8    application?

9    A.    Well, we don't.

10   Q.    And if someone is reported for violating the

11   terms of service?

12   A.    So when we receive reports -- and you can do

13   this from the app or you can email support.  In

14   those cases, we investigate those reports, and we

15   take actions, like blocking over user accounts or

16   channels.

17   Q.    So Zello can block a user or block an account?

18   A.    Yes, sir.

19   Q.    Do those account users come back as different

20   people or different accounts?

21   A.    It does happen.

22   Q.    Can Zello link the same phone to a -- by device

23   ID?

24   A.    Yes.  So we build this function mainly to --

25   for user application.  So when a user is using phone

1  to create multiple identities, we are able to

2  connect to those just using device AG.

3  Q.   Are you familiar with the Zello channel called

4  The State of the Islamic Caliphate?

5  A.   Yes.

6  Q.   How are you familiar with it?

7  A.   Well, we received subpoenas and search warrants

8  related to this channel.

9  Q.   You responded to a federal request for records

10  about this channel?

11  A.   Right.

12  Q.   And did you produce those records?

13  A.   Yes.

14       MS. MEEKS:  Your Honor, permission to show

15  the witness Government's Exhibits 7 through 30.

16       THE COURT:  Sure.

17       MS. MEEKS:  May I approach the witness,

18  Your Honor?

19       THE COURT:  You may.

20  Q.   (By Ms. Meeks)  Mr. Gavrilov, those are

21  Government's Exhibits 7 through 30.  Can you take a

22  look at them?

23  A.   Okay.

24       (Witness complied.)

25       Okay.

1   Q.    Thank you.  Do you recognize those?

2   A.    I do.

3   Q.    What are they?

4   A.    So those are various records of printouts.  And

5   this we produced in the response to those subpoenas

6   and search warrant.

7   Q.    Okay.  Do you have personal knowledge of what's

8   contained on the disks and in the physical logs?

9   A.    Yes.

10  Q.    All right.  And did you verify them and also

11  initial on the disks that you had verified them?

12  A.    Yes.

13  Q.    Do they contain IP logs and user information?

14  A.    Yeah, they do.

15  Q.    Do they contain server and subscriber

16  information?

17  A.    Yes.

18  Q.    And that's from the State of the Islamic

19  Caliphate channel, right?

20  A.    Yes.

21  Q.    And how many different iterations of the

22  channel are reflected in that?

23  A.    Four different channels.  I mean from Zello's

24  standpoint, they are all different channels because

25  they have slightly different names, but I understand

1  they're somehow connected.  I'm not sure.

2  Q.   Were these records that are marked before you,

3  were they kept in the regular course of business?

4  A.   Yes.

5  Q.   And were the records made at or near the time

6  of the event that it records?

7  A.   Yes.

8  Q.   Do they accurately reflect the records which

9  were provided by Zello to the government in response

10 to the request?

11 A.   Yes.

12          MS. MEEKS:  At this time, Your Honor, the

13 government moves to admit Government's Exhibits 7

14 through 30.

15          THE COURT:  Any objection?

16          MR. WHALEN:  Your Honor, can I approach

17 the witness so I can look at those exhibits quickly?

18          THE COURT:  Yes.  Yes, yes, yes.

19          (Pause in the proceedings.)

20          MR. WHALEN:  No objection.

21          THE COURT:  All right.  Government's

22 Exhibits 7, 8, 9, 10, 11, 12, 13, 14, 15, 16, 17,

23 18, 19, 20, 21, 22, 23, 24, 25, 26, 27, 28, 29 and

24 30 are in.

25          We're going to take a 15-minute break,

 1    Ladies and Gentlemen.  Please remember not to talk

 2    about the case.

 3              (Jury exits courtroom.)

 4              THE COURT:  Anybody need to see me for any

 5    reason?

 6              MS. MARTIN:  No.

 7              MR. WHALEN:  I do, Your Honor.

 8              THE COURT:  Okay.  Have a seat.

 9              Mr. Whalen.

10              MR. WHALEN:  I can do it from the podium.

11              THE COURT:  Well, it's best you did it

12    from the podium.

13              MR. WHALEN:  Your Honor, I just want it

14    clear for the record we had our sidebar conference,

15    and you sustained the objection.  And I just want to

16    make sure I object and preserve that we object to

17    the ability to answer that question.

18              THE COURT:  And I sustained the objection.

19    Anything else you want to say about that?  You want

20    to make a record or anything?

21              MR. WHALEN:  No.  I think the question I

22    was going to ask is on the record.  I think any

23    additional information I would prefer -- I would

24    like to make a record ex parte, because of trial

25    strategy, and I would like to be able to make a

 1    record ex parte, because I don't want to make the

 2    objection --

 3                THE COURT:  Just remind me about that.

 4                MR. WHALEN:  All right.

 5                THE COURT:  Anything else?

 6                MR. WHALEN:  No, Your Honor.

 7                (Recess taken.)

 8                THE COURT:  We will go to 5:00, Ladies and

 9    Gentlemen.  Go ahead.

10                MS. MEEKS:  Thank you, Your Honor.

11                Your Honor, permission to approach the

12    witness with Government's Exhibit 109?

13                THE COURT:  Okay.  All right.  Be sure

14    they are up here when we are finished.  They are all

15    up here?

16                MS. MEEKS:  Yes, Your Honor.

17    Q.   (By Ms. Meeks)  Mr. Gavrilov, do you recognize

18    Government's Exhibit 109?

19    A.   Yes.

20                THE COURT:  Number 9?

21                MS. MEEKS:  109, Your Honor.

22    A.   So those are two disks with information I

23    produced for Zello channels.

24    Q.   (By Ms. Meeks)  And was this information

25    produced by you in response to a records request?

```
 1   A.   Yes.
 2   Q.   Was this information that's contained on the
 3   disk, was it kept in the regular course of business?
 4   A.   Yes.
 5   Q.   And was it made at or near the time of events
 6   that it records?
 7   A.   Yes.
 8   Q.   And do these records on that disk accurately
 9   reflect what was provided by you to the government?
10   A.   Yes.
11   Q.   And did you also have an opportunity to initial
12   that disk once verifying it?
13   A.   Yes.
14           MS. MEEKS:  Your Honor, at this time
15   government moves to admit Government's Exhibit 109
16   and also 110, Your Honor.
17           THE COURT:  Mr. Whalen -- well, 109,
18   Mr. Whalen, what is your position on that?
19           MR. WHALEN:  No objection, Your Honor.
20           THE COURT:  No objection.  109 is
21   admitted.
22           What about 110?
23           MS. MEEKS:  Also 110, to the extent in our
24   pretrial hearing that it wasn't admitted, the
25   government would move to finally admit it now.
```

1          THE COURT:  Mr. Whalen, do you know what

2    110 is?

3          MR. WHALEN:  May we approach real quick,

4    Your Honor?

5          THE COURT:  Yes.

6          (Bench conference:)

7          THE COURT:  Speak into that.

8          MR. WHALEN:  Your Honor, this is

9    Exhibit 110, with the affidavit from Agent Fine,

10   where we had the pretrial hearing of Agent Fine.  So

11   I'm going to renew my objection to the disk.  I'm

12   not objecting to the affidavit, but I want to make

13   sure I have preserved my objection to the questions

14   I couldn't ask of Agent Fine, so I don't want to

15   waive those by --

16         THE COURT:  And the exhibit is not

17   anything other than -- it's not like it's FISA

18   stuff.  It's just you wanted to ask him that stuff.

19         MR. WHALEN:  I did as far as it went to

20   the authenticity of it, and I wasn't able to do

21   that.  So I want to renew my objection to that.

22         THE COURT:  Objection is overruled.  110

23   is admitted.

24         (Bench conference concluded.)

25         MS. MEEKS:  One moment, Your Honor.

1    Q.    (By Ms. Meeks)   Mr. Gavrilov, I'm pulling up

2    Government's Exhibit 13.

3        Can you tell us what we are looking at here?

4    A.    Yes.   This is one of the records that we

5    produced.   It is information about one of the

6    channels.   So it shows ChannelLink, a link to the

7    channel page at zello.com website; date the channel

8    was created; names of the server, actual files

9    related to this channel we also provided.   And note

10   that the channel was blocked by Zello on June 5th,

11   channel owner, list of channel admins.   Those are

12   Zello user names of users who are admins for this

13   channel and followed by at least moderators for this

14   channel.

15   Q.   So let me just back up just a little bit so we

16   can be clear what we are all looking at here.   I'm

17   going to highlight on the screen here so you will be

18   able to see.   So this right here, this highlighted

19   section shows that the channel was the creation

20   date; is that correct?

21   A.    Yes.

22   Q.    And this also shows us that it was shut down

23   for violation of -- is that TOS, Terms of Service?

24   A.    Right.

25   Q.    -- by a Zello moderator; is that right?

1    A.    Yes.

2    Q.    This would be the channel name; is that

3    correct?

4    A.    Yes.

5    Q.    And then these would be the administrators that

6    are reflected on this detail log; is that correct?

7    A.    Right.

8    Q.    And would these, that section there, be the

9    moderators?

10   A.    Yes.

11   Q.    Now, is the detail log that we're looking at

12   here, is it a snapshot in time when you took that --

13   when you took the records from that detail log?

14   A.    Yes, exactly.  This is just a reflection of

15   information at the time of when the record was

16   produced.

17   Q.    So would there be more information contained in

18   the server logs?

19   A.    Yes.  So this log would include all of the

20   history of the actions on this channel, including

21   when somebody was made administrator or moderator or

22   somebody joined the channel, but that also

23   potentially could include more information.

24   Q.    Okay.  So not every administrator is reflected

25   on this detail log?

1    A.    Well, current administrators at the time of

2    producing this record are, but historical -- some of

3    the historical moderators or administrators may not

4    be reflected here.

5    Q.    Okay.  So just to recap, all of the -- when

6    this log was created, the administrators and

7    moderators at the time you created are reflected,

8    but there may be more detail in the server logs.

9    A.    Right.

10   Q.    Let's turn to Government's Exhibit 21.

11         Tell us what we are looking at here.

12   A.    So this is a similar page for different

13   channel.

14         THE COURT:  Government's -- 21, yes, yes,

15   it is in, yes.  Go ahead.

16   A.    So this is just exactly the same format of

17   information as we just looked at for a different

18   channel.

19   Q.    (By Ms. Meeks)  Okay.  And highlighting --

20   again, what is that highlighted section there?

21   A.    This is the date the channel was created.

22   Q.    And what is this highlighted section here?

23   A.    This is the channel name.

24   Q.    Okay.  I'm going to direct you forward to

25   page 3 of Exhibit 21.  I'm going to highlight this

1   section here.

2        What does that reflect?

3   A.   This is like a list of the top users.  So in

4   the app, we have a setting that let's channel

5   administrator enable voting in the channel.  And

6   when they do, users of the channel can vote up or

7   down on any messages sent in the channel.

8        And this list reflects the users with the most

9   up-votes.  So the top would be the person who

10  received the most up-votes versus down-votes.  And

11  this is arranged in the order of the decreasing

12  support from people who participated in the channel.

13            THE COURT:  What exhibit is this again,

14  please?

15            MS. MEEKS:  21, Your Honor.

16            THE COURT:  Okay.

17  Q.   (By Ms. Meeks)  So under the top users column,

18  they are ranked in order of their popularity.  Is

19  that fair to say?

20  A.   Yeah.  Popularity is measured by votes of the

21  active participants on this channel.

22  Q.   Okay.  And the third user down, can you say

23  that third user name down?  Can you read that?

24  A.   Safer-alshahadah.

25  Q.   I would now go to Government's Exhibit 14.

```
 1        And what are we looking at in Government's
 2   Exhibit 14?
 3   A.    So this is the complete list of the subscribers
 4   for this channel.
 5   Q.    So all of the subscribers to this particular
 6   channel would be reflected in this log.
 7   A.    Yes.
 8   Q.    Can I turn your attention to page 199 of
 9   Government's Exhibit 14?
10        Once again, I'll highlight that name there.  If
11   you can read it or pronounce it as best you can?
12   A.    I see two highlighted, but the top one is
13   Q-A-L-B --
14   Q.    The one below that.
15   A.    Q-O-Q-A-Z-I-
16   Q.    Okay.  Can I now turn to page 546.
17        And Mr. Gavrilov, what I did highlight there?
18        Can you read that?
19   A.    "All way ISIS."
20   Q.    Can we turn to Government's, same exhibit, 14,
21   to page 226.
22             MS. MEEKS:  One moment, Your Honor.
23   Q.    (By Ms. Meeks)  Can I turn you to page 825?
24        And Mr. Gavrilov, can you see what I
25   highlighted there?
```

```
 1    A.    Yes.   "Hola isis."
 2    Q.    Can we turn to page 586?
 3          Mr. Gavrilov, what did I highlight there?
 4    A.    Angousha@.
 5    Q.    And page 1273.
 6          That one, as well, Mr. Gavrilov.
 7    A.    Okay.   Trip W amojahed.
 8    Q.    Okay.   Can I now turn to Government's Exhibit
 9    18, page 1?
10          What is it that we are looking at here?
11    A.    This appears to be the log of list of
12    subscribers for the second channel.
13    Q.    All right.   The subscriber list for the second
14    channel.
15    A.    Right.
16    Q.    Reference -- refer to page 12.
17          What did I highlight there?
18    A.    Dr. sa7wat.
19    Q.    Okay.   Can I turn to Government's Exhibit 15.
20          All right.   What is this?
21    A.    So this is a channel actions log which just
22    reflects essentially everything that happened in a
23    particular channel.
24    Q.    So this server log would reflect any actions
25    taken on the channel; is that right?
```

1    A.    Yes, exactly.

2    Q.    Okay.  And take us just through the first line,

3    if you can, and let us, if you can, describe how to

4    read this document for us.

5    A.    Yes.  So it starts from the name of the log

6    file where this record is coming from, followed by a

7    time stamp.  So it's like 1404168836 is the time

8    stamp, representing the exact time when the action

9    happened.  And this is followed by the channel name,

10   this long text in Arabic.

11        And then the next is the user name that was the

12   subject of this action, and then the action itself.

13   And we can jump to the second line.  In this case,

14   it is a channel subscribed.  Again, somebody

15   subscribed for the channel, they used the app to add

16   to this channel to the list.

17        And the next one is listed as the first one in

18   this case because the person did it themselves.

19   Q.    Okay.  So I will just highlight for

20   clarification for the jury.  So this portion here,

21   does that represent the channel ID?

22   A.    No.  This represents the name of the log file.

23   Q.    I'm sorry.  Thank you.  And -- of the log file.

24   And what about that other section I just

25   highlighted.  Is that the time date stamp?

1    A.    Yes.

2    Q.    This portion here, is that the name of the

3    channel?

4    A.    Yes.

5    Q.    In Arabic.  And then this section here, is that

6    the user who took the action?

7    A.    So this is the user of the subject of the

8    action.

9    Q.    The subject of the action.  So the person on

10   the receiving end of the action.

11   A.    Yes.

12   Q.    And right below it, when it says, "Channel

13   Subscribe," what does that mean?

14   A.    It means somebody joins the channel, they added

15   the channel in Zello app.

16   Q.    And then the final Arabic script would

17   represent the user taking the action; is that right?

18   A.    Yes.

19   Q.    And in this case, it just happens to be the one

20   I'm highlighting is the same user to do both; is

21   that right?

22   A.    Yes.  Because user joins the channel, and as a

23   result he joins the channel.

24   Q.    All right.  Can I turn to page 4,924 of

25   Government's Exhibit 15?

1        I'm going to refer to the bottom part of the

2    page.  And can you again walk us through what these

3    two lines mean?

4    A.   Yes.  So it starts the same.  So the first part

5    is the name of the log file.

6    Q.   Oh, it got much bigger for us.

7    A.   So, yeah, starts from the name of the work file

8    followed by a time stamp of this action, followed by

9    a channel name, words in Arabic, and then the user

10   name.  The subject of this action in this case, it's

11   salejnn.  And channel block was the action

12   performed.  And this action was performed by the

13   user name hola isis.  And the last is the IP

14   address.  So in this case, what we see is user, hola

15   isis, blocked using salejjn from this channel.

16   Q.   Okay.  Can we turn to page 5,748?

17              THE COURT:  What exhibit?

18              MS. MEEKS:  Exhibit 15, Government's

19   Exhibit 15.

20              One moment, Your Honor.  Okay.  Thank you,

21   apologize.

22   Q.   (By Ms. Meeks)  I'm going to refer you to this

23   line here, Mr. Gavrilov.  Can you describe that for

24   us, please?

25   A.   Yes.  So in this case, it's the same channel.

1   And we see that user all way isis was added as a

2   moderator in this channel by another user who is --

3   whose name is Abu Ab Dawla.

4   Q.   Okay.  And can I refer you to page 64 of

5   Government's Exhibit 15?  I'm going to highlight a

6   section for you, Mr. Gavrilov, again.  And can you

7   tell us what is reflected in that highlighted

8   section?

9   A.   Yes.  So in this case, user -- so Zello user

10  was using name inasr155@gmail.com was made trusted

11  by moderator or administrator with user name

12  angousha@.

13  Q.   Okay.  So in order to add a person as trusted,

14  in order for the user name, inasr155@gmail.com to be

15  added as trusted, it must be made by an

16  administrator or moderator.

17  A.   Or channel owner.

18  Q.   Or channel owner.

19       Your Honor, turn to Government's Exhibit 27.

20       Mr. Gavrilov, what are we looking at here?

21  A.   So this is singular actions, like channel

22  actions log from different channel.

23  Q.   Okay.  And so, again, it's a server log; is

24  that correct?

25  A.   Yes.

1    Q.    From another iteration of the channel?

2    A.    I couldn't tell from -- I mean -- I know from a

3    different channel, because it's a different file.

4    The channel names look the same to me.

5    Q.    You don't read Arabic, though.

6    A.    No.

7    Q.    Can I refer to page 139 of Government's Exhibit

8    27?

9          And I'm going to highlight a section here again

10   for you.  Can you read -- explain what's happening

11   in that section, please?

12   A.    Yes.  So we see a record of user Dr. sa7wat

13   added as moderator in this channel by somebody with

14   user name khaled-khateeb1.

15   Q.    So in that instance, the Dr. sa7wat ID was

16   added as a moderator; is that correct?

17   A.    Yes.

18   Q.    Turn to page 143.

19         Right there I'm going to refer you to this

20   highlighted section, Mr. Gavrilov.  Can you explain

21   what's happening there?

22   A.    Yes.  So here user fgtdx was made trusted in

23   this channel by moderator administrator

24   safer-alshahadah.

25   Q.    All right.  And now can I turn your attention

```
 1   to page 255.  And I'm going to refer you to this
 2   highlighted section here one more time,
 3   Mr. Gavrilov.  Can you explain what that is?
 4   A.    Yes.  So in this case, user trip W amojahed was
 5   made trusted by user Dr. sa7wat.
 6             MS. MEEKS:  Thank you, Your Honor.  I have
 7   no further questions.
 8             THE COURT:  Thank you.
 9             Cross-examination, Mr. Whalen.
10                  CROSS-EXAMINATION
11   BY MR. WHALEN:
12   Q.    Mr. Gavrilov, I'm not a technology guy, so bear
13   with me.  So if I understand this correctly,
14   somebody downloads the app, and then they can talk
15   to whoever subscribes to their channel, correct?
16   A.    Well, that's part of the action that Zello
17   provides.
18   Q.    Is that like the main function that it
19   provides?
20   A.    Not necessarily.  I mean, you can talk to
21   individuals; different people use it differently.
22   Q.    And Zello is headquartered down in Austin,
23   correct?
24   A.    Yes.
25   Q.    And do you have servers in Austin to capture
```

```
1    all this data?

2    A.    No, we don't have servers in Austin.

3    Q.    Do you have servers at all to capture data?

4    A.    Say it again?

5    Q.    If I'm in a channel, if I'm communicating back

6    and forth with somebody in a certain channel, is

7    that data preserved on a Zello server?

8    A.    Yes.

9    Q.    Okay.  So the conversations are preserved on

10   Zello?

11   A.    Not normally.

12   Q.    Okay.  Which ones -- how are they preserved on

13   the server?

14   A.    So there are two cases when Zello conversation

15   could be saved by Zello on Zello servers.  One is,

16   when you send a message to somebody personally.  And

17   this person right now is connected to Zello.  So in

18   this case, we're going to store this message until

19   it is delivered or like for, I believe, 60 days.

20   And so when you sign in next time, you get your

21   message and you remove it, or if you don't sign in

22   within 60 days, then it removes the message.

23        And the second case with the stored messages,

24   somebody use share function in the app.  So you,

25   like from your -- what's listed on your device, you
```

```
 1   delivered some messages and you decided to share
 2   them.  And in this case, those messages are provided
 3   to the Zello servers and stored.
 4   Q.   Okay.  And just so I understand correctly, if I
 5   send a message to somebody, like a text message, you
 6   will store that on the server until it's received by
 7   the other person, correct?
 8   A.   Yes.
 9   Q.   And then if it's on the server for 60 days,
10   then it gets purged off the server.
11   A.   Yes.
12   Q.   So then the other way is if I share with
13   somebody, that gets stored on the server?
14   A.   Yeah, just share -- it is stored until --
15   until -- you can remove it, but otherwise it is
16   stored just forever.
17   Q.   Okay.  Now, if I create a channel, a private
18   channel on Zello, can I make it private where, if
19   you did a search, nobody can find it unless they
20   know exactly where to look for it?  I mean, how does
21   that work?
22   A.   So your best option for making it private is to
23   search channel password.  And people can find it,
24   but they cannot join until you tell them the
25   password.
```

```
 1   Q.   Okay.  So I guess just to clarify what I am

 2   trying to getting to, if I create a channel, if they

 3   know the right words, they can search for it.

 4   A.   Yes.

 5   Q.   But if it's private, they can't log into it.

 6   A.   Yes.

 7   Q.   Okay.  Now, you were talking about Exhibit 14,

 8   Government's Exhibit 14, and looking at various user

 9   names on that, they were highlighting those for you,

10   correct, Exhibit 14?

11   A.   There were many.  I don't remember.

12   Q.   I'll try to make it simple so we don't have to

13   go through all of that.

14        On each page, it appeared to me approximately

15   40 to 50 different user names per page, correct,

16   when you look at the number of users subscribed to a

17   channel?

18   A.   It would help if I can look at what you are

19   referring to.

20             MR. WHALEN:  Can you pull up Exhibit 14,

21   page 199?

22   Q.   (By Mr. Whalen)  Okay.  You were shown this

23   page, correct?  Do you see this?

24   A.   Yeah, I recognize this page.

25   Q.   Okay.  And those are all different user names,
```

1   correct?

2   A.   Yes.

3   Q.   Okay.  And so that -- so those are a number of

4   user names that have subscribed to the channel over

5   time; is that correct?

6   A.   Yes.

7   Q.   And is that during the history of the channel?

8   A.   Yes.

9   Q.   And so of these total pages, would you -- if I

10  told you that there's 1,400 pages in Exhibit 14,

11  does that mean there's 1,400 pages of these user

12  names?

13  A.   Yes.

14  Q.   And are you able to -- and so let me ask you

15  this question -- you can take it down, please -- if

16  I subscribe to a channel and I subscribe to a

17  channel and I never log into it or do anything with

18  it, will I show up on that list of subscribers or

19  users.

20  A.   Yes.  So if you subscribe to the channel, then

21  you will show up.

22  Q.   Even if I don't even log into it or use it or

23  get into the channel at any time.

24  A.   Well, so there's like no logging to the

25  channel.  When you add a channel to your list,

 1    that's when you are going to reflect on this list.

 2    And when you do, if it's a public channel, then you

 3    don't need to do anything else, you're just going to

 4    start receiving messages from this channel.

 5         Now, if the channel is like password protected,

 6    then you're not going to show up here.  If it's a

 7    different channel, you need to be trusted user, for

 8    example, to share messages.  So yeah, you might

 9    never get any message from the sharer, but you will

10    still show up on this list.

11    Q.   Okay.  And if I subscribe to like ten different

12    channels, how do I -- somebody -- if someone reaches

13    out to me in one of those channels, am I going to

14    get a message simultaneously from ten different

15    channels if all are activated at the same time?

16    A.   No.  You're going to have those messages cued

17    on your phone, so they are going to just play in

18    order of occurrence.

19    Q.   Okay.  So I can't be on more than one channel

20    at one time.

21    A.   You can, yeah.

22    Q.   I can't?

23    A.   You can, yes.

24    Q.   But can I talk on it on several different

25    channels at more than one time?

1  A.   You can do it in like PC app.  You cannot do it

2  in like android or iPhone app.

3           MR. WHALEN:  I'll pass the witness, Your

4  Honor.

5           THE COURT:  Redirect?

6           MS. MEEKS:  Yes, Your Honor, thank you.

7                 **REDIRECT EXAMINATION**

8  **BY MS. MEEKS:**

9  Q.   Mr. Gavrilov, I just wanted to go back to the

10 spectrums of a public versus a private channel.  A

11 channel can be public, is this right, and can be

12 searched for, or a channel can be private and we

13 would have to know the name; is that right?

14 A.   No, you can search for any channel.

15 Q.   Okay.  So when you come into the public

16 channel, there are ranges of availability of

17 participation; is that right?

18 A.   Yes.

19 Q.   Okay.  And the same could be said for the

20 private channel?

21 A.   Yes.  I mean, you don't have this like private

22 channel as a concept.  It's just the password

23 protected channels, we can call them private

24 channels, but it's really just the channel with a

25 password.

1   Q.   Okay.  It would have to be password protected

2   to be a private channel.

3   A.   Yes.

4   Q.   And when we were looking at one of the

5   exhibits, it was -- was it a server log?  Was that

6   what you called it?

7   A.   What exhibit are you referring to?

8   Q.   Okay.  Let's pull up Government Exhibit 27.

9        Is this a server log?

10  A.   Yes.

11  Q.   Okay.  And does this reflect actions that have

12  been affirmatively taken in the channel?

13  A.   Yes.

14  Q.   So in order to be reflected in this, would it

15  have to be an affirmative action by a user?

16  A.   Yeah.  I mean, well, all actions here are taken

17  by a user.

18  Q.   And do you recall how many thousands of pages

19  long were the server logs produced by Zello in this

20  case?

21  A.   They are big, I know, thousands of pages.

22  Q.   Thousands of pages?

23  A.   Yeah.  It was different for different channels.

24  But for channels that existed for longer time, it

25  was, yes, thousands of pages.

1  Q.   And those would be reflecting those thousands

2  of pages affirmative actions taken throughout the

3  time of the channel?

4  A.   Yes.

5  Q.   So we only looked at a very small fraction here

6  in court?

7  A.   Yes.

8          MS. MEEKS:  No additional questions, Your

9  Honor.  Thank you.

10          THE COURT:  Anything else?

11          MR. WHALEN:  No, Your Honor.

12          THE COURT:  You may step down.

13          Do both sides agree to excuse this

14  witness?

15          MS. MEEKS:  Yes, Your Honor.

16          MR. WHALEN:  Yes, Your Honor.

17          THE COURT:  Okay.  Wait, look at me.  You

18  can go back to your normal job.  Just remember not

19  to talk about the case until it's over.

20          THE WITNESS:  Okay.

21          THE COURT:  Call your next witness.

22          MS. MARTIN:  Yes, Your Honor.  The

23  government calls Ayda Hussein.

24          THE COURT:  Okay.  Yes, ma'am, come on up

25  here.

```
 1              COURT SECURITY OFFICER:  Raise your right
 2   hand.
 3              (Witness sworn.)
 4              THE WITNESS:  I do.
 5              COURT SECURITY OFFICER:  Have a seat here.
 6   State your first and last name and spell your last
 7   name.
 8              THE WITNESS:  Ayda Hussein.
 9              THE COURT:  Please make sure you speak up.
10   Go ahead.
11              THE WITNESS:  Ayda Hussein.  Last name
12   H-U-S-S-E-I-N.  First name Ayda, A-Y-D-A.
13              MS. MARTIN:  Thank you.
14                        AYDA HUSSEIN,
15   having been first duly sworn, testified as follows:
16                    DIRECT EXAMINATION
17   BY MS. MARTIN:
18   Q.   Thank you.
19        Ms. Hussein, where do you work?
20   A.   I work for the FBI.
21   Q.   What do you do for the FBI?
22   A.   I'm a language analyst.
23   Q.   You're a language analyst?
24   A.   Yes, ma'am.
25   Q.   How long have you been a language analyst?
```

1    A.    With the FBI, for about 12 years.

2    Q.    And do you have any other experience as a

3    language analyst?

4    A.    I have about 12 years with the Department of

5    Defense.

6    Q.    In your 12 years at the FBI, is that all here

7    in Dallas?

8    A.    Yes, ma'am.

9    Q.    How do you become a linguist with the FBI?

10   A.    I went through a battery of tests, and I was

11   qualified.

12   Q.    When you qualify, what are you qualified for?

13   A.    You qualify for the language that you are being

14   tested with.

15   Q.    And as a result of the qualification testing,

16   do you hold any licenses?

17   A.    Yes, we do.

18   Q.    What do you hold?

19   A.    I hold a licensing and certification in the

20   MSA, which is Standard Modern Arabic.  And I also

21   have certification for being a quality control

22   reviewer.  And I am also certified in different

23   dialects.

24   Q.    So you're the Modern Standard Arabic you are

25   certified for, and the dialects are those subsets of

```
 1  the Modern Standard Arabic?
 2  A.    Yes.
 3  Q.    What subsets are you qualified and certified
 4  in?
 5  A.    I'm certified in Yemeni and Iraqi and
 6  Levantine.
 7            THE COURT:  What was the first one?  The
 8  what.
 9            THE WITNESS:  Yemeni dialect, Iraqi
10  dialect and Levantine, which includes the Syrian,
11  Jordanian, Palestinian and Lebanese.
12            THE COURT:  Okay.  Thank you.
13  Q.    (By Ms. Martin)  You said -- I'm going to focus
14  on the Levantine that you said you are certified in.
15        One of those dialects was Palestinian.  Is that
16  correct?
17  A.    Correct.
18  Q.    Are you of Palestinian descent yourself?
19  A.    I am.
20  Q.    So that's your first language.
21  A.    Yes, it's my mother tongue language.
22  Q.    In that specific dialect in fact.
23  A.    Yes, ma'am.
24  Q.    When you took this testing to be qualified with
25  the FBI, were you automatically, upon testing,
```

1    qualified for these?

2    A.    Yes, I was.

3    Q.    Do they only test you in Arabic?

4    A.    They test us in English and in Arabic.

5    Q.    And why is that?

6    A.    To test our ability of translation from and to

7    the source languages to the target languages.

8    Q.    And you took that initial test 12 years ago.

9    Do you have to do anything to stay certified with

10   the FBI?

11   A.    Yes.  There is a process of recertification for

12   different tests every once in a while.

13   Q.    About how often?

14   A.    For the dialect, it's about five years, every

15   five years.

16   Q.    Now, are you or have you been assigned to the

17   case of the United States of America versus Said

18   Rahim?

19   A.    I was.

20   Q.    And how long have you been assigned to that

21   case?

22   A.    Since the inception; about 2016, in the

23   springtime.

24   Q.    And have you listened to audio recordings as a

25   result of that assignment?

1   A.    Yes, I have.

2   Q.    Can you give a rough estimate of how many hours

3   of audio you have listened to?

4   A.    A great number of hours; probably between 500

5   and 600 hours.

6   Q.    And when you say that, does that mean you've

7   listened to that much audio throughout the course of

8   the investigation?

9   A.    Yes.

10  Q.    Did you know him only by his name, Said Rahim?

11  A.    No.  The subject had different monikers that he

12  went by.

13  Q.    Were you the only linguist assigned to listen

14  to all of the audio in this case?

15  A.    No, a team of linguists were assigned

16  collectively.

17  Q.    And do you have a specific role in that team of

18  linguists?

19  A.    I was the lead linguist.

20  Q.    And do you personally listen to a subset of

21  that 5- to 600 hours of audio?

22  A.    No; personally I listened to about 500 hours.

23  Q.    And when you say you listened to that many

24  hours, does that include all of the hours you've

25  spent on the case or just the number of hours of

```
 1   audio?
 2   A.   This is not the whole number.  There were also
 3   times where I had to listen to the audios to make
 4   some summaries and the verbatim throughout the
 5   process of the investigation.
 6   Q.   That's what I wanted to ask you about.  When
 7   you are making a verbatim translation from Arabic to
 8   English, let's say one minute of Arabic audio, how
 9   long would it take you to translate one minute of
10   Arabic audio to English?
11   A.   It takes about one hour.  The standards of the
12   translation concerning Arabic, when it comes to
13   Arabic, is one hour for one minute.
14   Q.   So an hour of Arabic audio would take you 60
15   hours approximately?
16   A.   That's correct.
17   Q.   And what about a verbatim -- when you say you
18   make a verbatim translation, what does that mean?
19   A.   It means conveying the meaning for the meaning;
20   what is being said versus what's meant.
21   Q.   And what is your religion?
22   A.   I'm a Muslim.
23   Q.   So was that particularly helpful for you in
24   this case?
25   A.   Yeah.  The terminology I'm aware of made it
```

```
 1   very much easier and facilitated understanding
 2   everything that was being said.
 3   Q.   Now, on March 5th, 2017, do you recall an
 4   interview of Said Rahim that occurred at the
 5   Dallas/Fort Worth International Airport?
 6   A.   Yes, I do.
 7   Q.   Were you at the airport that day?
 8   A.   I was at the airport.
 9   Q.   Why were you at the airport?
10   A.   I was part of the team in case they needed any
11   interpretation to be done in case the subject
12   chooses to utilize a translator.
13   Q.   Were you able to listen to that interview in
14   realtime or as it was occurring?
15   A.   Yes, I was.
16   Q.   Were you in the room with Said Rahim?
17   A.   Not in the same room of the interview, no.
18   Q.   The audio was being sent to you in another
19   room.
20   A.   Correct.
21   Q.   Was it necessary for you to go do any
22   translations?
23   A.   On that particular interview, no.
24   Q.   So that interview happened in English?
25   A.   I'm sorry, say that again.
```

1   Q.   I think I mumbled.  So that interview happened

2   in English?

3   A.   Yes, it happened in English, all of it.

4   Q.   And have you watched the video of that?

5   A.   Yes.

6   Q.   Were you able to see the person being

7   interviewed?

8   A.   Yes, I was.

9   Q.   Do you recognize the person in the courtroom

10  today?

11  A.   Yes, I do.

12  Q.   Can you point to him and indicate an article of

13  clothing -- well --

14  A.   It's the defendant, Mr. Said Rahim.

15  Q.   And is he standing?  Is he standing?

16  A.   Yes, he's standing, I'm sorry.

17        MS. MARTIN:  Your Honor, may the record

18  reflect the witness has identified the defendant,

19  Mr. Rahim.

20        THE COURT:  It will so reflect.

21  Q.   (By Ms. Martin)  Now, you listened to that

22  audio and you've heard it realtime.

23  A.   Correct.

24  Q.   Were you able to tell whether that was the same

25  voice that you were hearing on the audio from the

1   investigation?

2   A.   Yes, it was.

3   Q.   Even though he was speaking English on the

4   interview and most of the audio was in Arabic?

5   A.   That's correct.

6   Q.   How is that?

7   A.   Well, my ears are trained to understand the

8   foreigner speaking the English language.  And I have

9   heard his voice so many times over hearing different

10   recordings.

11   Q.   Have you also listened to recordings of

12   Mr. Said Rahim talking to his family?

13   A.   Yes, I did.

14   Q.   Now, did Mr. Rahim speak English in any of the

15   audio recordings in this case?

16   A.   Very rarely, but here and there.  In one of

17   them it was probably a sentence all in all.

18   Q.   Were there other reasons that he was easier for

19   you to identify during the course of the

20   investigation?

21   A.   Well, because he speaks the same dialect that I

22   speak, he also speaks the terminology that I'm very

23   familiar with.

24   Q.   What types of dialects did you hear on the

25   audio?

1  A.   There were many users on the channel where his

2  voice was up.  There were different dialects of

3  North African, like Moroccan, Libyan, plenty of

4  Syrians and also some Saudi Arabians.

5  Q.   What was the dialect that the defendant,

6  Mr. Rahim, was speaking?

7  A.   He was speaking Palestinian.

8  Q.   Was the voice that you heard on that audio

9  video and the voice on the audios that you

10  translated, was that the same person, Said Rahim?

11  A.   It was the same person.

12  Q.   And you testified earlier that you knew him by

13  certain monikers.

14  A.   Yes.

15  Q.   Were you able to connect those monikers by the

16  voice behind them?

17  A.   Yes.

18  Q.   And I'm going to go through the monikers.

19  A.   Okay.

20  Q.   One of those monikers was angousha@.  Do you

21  recall that moniker?

22  A.   Yes, I do.

23  Q.   Who do you associate that moniker with?

24  A.   With the subject.

25  Q.   What is the subject's name?

1   A.   Mr. Said Rahim.

2   Q.   Okay.  How about hola isis?

3   A.   That, too.

4   Q.   Who was hola isis?

5   A.   Mr. Said Rahim.

6   Q.   Do you know what "hola" means?

7   A.   Hola means "hi" in Spanish.

8   Q.   So "hello" or "hi ISIS."

9   A.   Yes.

10  Q.   What about Dr. sa7wat, and it's S-A-7-W-A-T.

11  How would you say that?

12  A.   This is Dr. sa7wat.

13  Q.   Who is that moniker associated with?

14  A.   The defendant.

15  Q.   And that's Said Rahim?

16  A.   Said Rahim.

17  Q.   Does the "7" in that name have any significance

18  to you?

19  A.   Yes.  The number "7" is the letter "H" in

20  Arabic.  And before inventing the Arabic keyboard,

21  or for those people who do not know how to type in

22  Arabic, they would use certain numbers that

23  resembled certain alphabetic, and the "7" stands for

24  the "H."

25  Q.   And so when you see the S-A-7-W-A-T, how would

1    you pronounce that?

2    A.    That forms the word sa7wat.

3    Q.    What does sa7wat mean?

4    A.    Sa7wat is the name referred to by ISIS to those

5    people that used to live in Al Anbar province in

6    Iraq.  The sa7wat formed a coalition in between

7    those Sunnis.  The sheikhs of those tribals formed a

8    coalition along with the former military service

9    that used to work for Saddam Hussein, the former

10   Saddam Hussein, and they were backed initially by

11   the United States.  But then later on, they were

12   never integrated into the new military service.

13   Q.    Ms. Hussein, can I stop you right there?  Are

14   you saying Sunni, S-U-N-N-I?

15   A.    Yes.  Sunni is a sect of Islam, one of the

16   sects of Islam and the most popular.

17   Q.    Now, he's saying, Dr. sa7wat -- I'm trying to

18   say that correctly.  Could you understand what he

19   meant by "Doctor," what significance that had?

20            MR. WHALEN:  Objection, calls for

21   speculation.

22            THE COURT:  Overruled.

23   A.    Well, the meaning of the word is associated

24   with him being able to vet those that come on the

25   channel and figuring out who is Sunni and who is

1    Shari'a.  It's his way of filtering those who
2    infiltrate the channel.
3    Q.   (By Ms. Martin)  What about the moniker
4    "safer-alshahadah."  How do you say that?
5    A.   Safer-alshahadah.
6    Q.   And who do you associate that moniker with?
7    A.   With Said Rahim, the subject.
8    Q.   What does "alshahada" mean?
9    A.   In this context, the way he used the moniker,
10   it means martyrdom; otherwise, it is -- another
11   meaning for it is Muslim declaration of faith.
12   Q.   So it has two meanings, it means martyrdom or
13   the Muslim declaration of faith?
14   A.   Correct.
15   Q.   And based on the context, which meaning do you
16   believe it had here?
17   A.   Martyrdom.
18   Q.   What about "safer," what does that mean?
19   A.   Ambassador.
20   Q.   What about the moniker "trip W amojahed"?
21   A.   It stands for taking a trip with amojahed.
22   Q.   What does "amojahed" mean?
23   A.   Jihadist, the one who wages jihad.
24          THE COURT:  And just to be clear, these
25   are all aliases or whatever of Mr. Rahim.

```
 1            MS. MARTIN:  Yes, Your Honor.
 2   Q.   (By Ms. Martin)  And by voice, who do you
 3   associate the moniker, "trip W amojahed," with?
 4   A.   The defendant, Said Rahim.
 5   Q.   How about "all way isis," who do you associate
 6   that moniker with?
 7   A.   Again, with the defendant Said Rahim.
 8   Q.   And do you recall a moniker, Q-O-Q-A-Z-I?
 9   A.   I do.
10   Q.   What does that mean?
11   A.   That stands for Caucasian.
12   Q.   Do you associate that moniker with anyone by
13   voice?
14   A.   Yes, I do; the defendant, Said Rahim.
15   Q.   And were there any other nicknames that you
16   heard him referred to by other users or did he refer
17   to himself in the audio you listened to?
18   A.   There were others, yes, one of them.
19   Q.   Go ahead.
20   A.   One of them is Abu al-Shahid in Shikari.
21   Q.   What does that mean?
22   A.   It's also a name or a user name that he used to
23   go by.  It means the cluster bomb in Shikari, and
24   Abu al-Shahid is the father of the one who was
25   martyred.
```

1    Q.   And all of those monikers we just went over,

2    were they the same person or was it -- was it

3    different people?

4    A.   It is the same person.

5    Q.   I'm going to ask you a couple of other Arabic

6    words and phrases if you could tell us what they

7    mean.

8    A.   Sure.

9    Q.   What about Allah?

10   A.   Allah is the Arabic name in Islam for God.

11   Q.   In the transcripts, is it sometimes referred to

12   as "Allah," but usually as "God"?

13   A.   Yes.

14   Q.   What about jizyah?

15          THE COURT:  Please spell that.

16          MS. MARTIN:  J-I-Z-Y-A-H.

17   A.   Jizyah is the tax that has to be paid by the

18   unbelievers to the State of Caliph or the Land of

19   Muslims if the unbelievers are residing in it.

20   Q.   So it's a tax if you are an unbeliever living

21   in the Land of the Caliphate?

22   A.   Correct.

23   Q.   What about Ba'yat?  B-A apostrophe Y-A-T.

24   A.   Ba'yat is the pledge of allegiance to a

25   terrorist leader.

1    Q.    Do you know what a Kunya, K-U-N-Y-A, is?

2    A.    Kunya is also a name, a nickname.

3    Q.    What about nafir, N-A-F-I-R?

4    A.    Nafir is a word used to mobilize, to wage

5    jihad.

6    Q.    And what about hijrah, H-I-J-R-A-H?

7    A.    Hijrah is immigration to mobilize for jihad in

8    the Caliphate state, in the Islamic state.

9    Q.    So nafir and hijrah seem similar.  Is there a

10   difference between the two?

11   A.    Well, hijrah, you have to be in the land of the

12   Caliphate itself.

13   Q.    So hijrah is going to the land of the

14   Caliphate.

15   A.    Yes.

16   Q.    What about nafir?

17   A.    Nafir is the wage of jihad, not having to be in

18   the land.

19   Q.    Wherever.

20   A.    Um-hum.

21   Q.    Now, Ms. Hussein, have you listened to the

22   audio exhibits in this case?

23   A.    I have.

24   Q.    And did you prepare or verify each of the

25   transcripts in this case?

1    A.    I have.

2    Q.    And when you were doing that, did you compare

3    the audio to each of the corresponding transcript of

4    exhibits?

5    A.    I did.

6    Q.    And did the transcripts accurately reflect the

7    conversation or statements contained in the audio?

8    A.    Correct, it did.

9    Q.    Did they contain accurate translations from

10   Arabic to English?

11   A.    It did contain accurate translations from

12   Arabic to English.

13   Q.    Some of those were from an investigation

14   separate from the FBI; is that correct?

15   A.    Correct.

16   Q.    But with respect to the FBI audio exhibits,

17   when you listened to them, were they broken out with

18   different audios broken out from -- separately from

19   the main exhibits?

20   A.    Correct.

21           MS. MARTIN:  And Your Honor, at this time

22   I'm going to list the audio exhibits.

23           THE COURT:  Okay.

24           MS. MARTIN:  The FBI audio exhibits are

25   113, 115, 117, 119, 121, 123, 125, 127, 129, 131,

```
1    133, 135, 137, 139, 141, 143, 145, 147, 149, 151,

2    153, 155, 157, 159, 161, 163, 165, 167, 169, 171,

3    173, 175, 177, 179, 181, 183, 185, 187, 189, 191,

4    193, 195, 197, 199, 201, 203, 205, 207, 209, 211,

5    213, 215, 217, 219, 221, 223, 223, 225, 229, 231,

6    233, 235, 237, 239, 241, 243, 245, 247, 249, 251,

7    253, 255, 257, 259, 261, 263, 265, 267, 269, 271,

8    273, 275, 277, 281, 283, 285, 287, 289, 291, 293,

9    295, 297, 299, 301, 303, 311.
```

10            And those are each of the audios that you

11   listened to and compared to the transcripts in this

12   case; is that correct?

13            THE WITNESS:  Yes.

14            MS. MARTIN:  Your Honor, at this time I'm

15   going to list the transcript numbers.

16            THE COURT:  Okay.  Maybe we are going to

17   stop for the day.  Okay.  There is -- the transcript

18   numbers are on the next page, so we will finish this

19   up tomorrow morning.

20            Ladies and Gentlemen, it's been a long

21   day, I know it's been a long day.  You probably did

22   not know that you would not only end up on a trial

23   but you would end up hearing some of the testimony,

24   and that's exactly what you have done.

25            Please remember just not to talk about the

```
 1    case at all.  Tell your relatives and friends and
 2    coworkers that you are on a trial and it will last
 3    two weeks, but that's all.  And remember, get
 4    yourself, you know, a little bit of extra time,
 5    because there's lots of construction downtown.  Be
 6    here by 9:00 -- 8:45 sharp is actually better, and
 7    we will get started on time.  Thank you very much.
 8              COURT SECURITY OFFICER:  All rise.
 9              (Jury exits courtroom.)
10              THE COURT:  I think this little
11    contraption over here is a little bit too close to
12    the jury.  So I'm going to ask you if you could
13    arrange that some other way so you are not so close
14    to the jury, like, you know, just see if you can
15    arrange it along there.  That would be better.  I
16    know it might not be as comfortable for you, but I'm
17    afraid it's too close to the jury otherwise.
18              MS. MARTIN:  Would you prefer that we put
19    that . . .
20              THE COURT:  I don't care.  It's too close
21    to the jury as he sits right now with him sitting
22    right there, so that's fine.
23              Ms. Martin, do you have anything?
24              MS. MARTIN:  No, Your Honor.
25              THE COURT:  Mr. Whalen, do you have
```

1    anything?

2            MR. WHALEN:  Yes, if we have time, I would

3    like to put what I asked to put on the record about

4    the expert.

5            THE COURT:  Go ahead and put it on the

6    record.

7            MR. WHALEN:  I would like to do it

8    ex parte, Your Honor.

9            THE COURT:  You can put it on the record.

10           MR. WHALEN:  Right, but I would like to do

11   it ex parte without the government present.

12           THE COURT:  Okay.  All right.  Be here by

13   8:30.  I want the lawyers here at 8:30.  And that

14   means you have to be here, too, Mr. Rahim, because

15   we have to have all critical phases with you, so I

16   want you here as well.

17           Yes.  Anything else?  And you can go, and

18   I will have him here for the ex parte recitation of

19   his objections.  All right?  All right.  Go ahead.

20           (Courtroom vacated except for Court staff

21   and Mr. Whalen and the defendant.)

22           (Following record sealed; filed

23   separately.)

24           (Court in recess at 5:00.)

25

**SHAWNIE ARCHULETA, CSR/CRR**
**FEDERAL COURT REPORTER - 214.753.2747**

1                 C E R T I F I C A T E

2            I, Shawnie Archuleta, CCR/CRR, certify

3    that the foregoing is a transcript from the record

4    of the proceedings in the foregoing entitled matter.

5            I further certify that the transcript fees

6    format comply with those prescribed by the Court and

7    the Judicial Conference of the United States.

8            This 21st day of March 2020.

9

10

11                     s/Shawnie Archuleta
                       Shawnie Archuleta CCR No. 7533
12                     Official Court Reporter
                       The Northern District of Texas
13                     Dallas Division

14

15

16   My CSR license expires:  December 31, 2020

17   Business address:  1100 Commerce Street
                        Dallas, TX  75242
18   Telephone Number:  214.753.2747

19

20

21

22

23

24

25

**SHAWNIE ARCHULETA, CSR/CRR**
**FEDERAL COURT REPORTER - 214.753.2747**