THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

UNITED STATES OF AMERICA, )
                          )
          Plaintiff,      )
                          )
vs.                       )  3:17-CR-00169-B
                          )
SAID AZZAM MOHAMAD RAHIM, )
                          )
          Defendant.      )

TRANSCRIPT OF PROCEEDINGS
SENTENCING HEARING
BEFORE THE HONORABLE JANE J. BOYLE
UNITED STATES DISTRICT JUDGE
DECEMBER 11, 2019

A P P E A R A N C E S

For the Government:

     UNITED STATES ATTORNEY'S OFFICE
     1100 Commerce Street - 3rd Floor
     Dallas, TX  75242
     214/659-8600
     BY:  ERRIN MARTIN
          BRIAN PORTUGAL


For the Defendant:

     WHALEN LAW OFFICE
     9300 John Hickman Parkway - Suite 501
     Frisco, TX  75035
     214/368-2560
     BY:  JAMES P. WHALEN

COURT REPORTER:   SHAWNIE ARCHULETA, TX CCR No. 7533
                  1100 Commerce Street
                  Dallas, Texas 75242

proceedings reported by mechanical stenography,
transcript produced by computer.

SHAWNIE ARCHULETA, CSR/CRR
FEDERAL COURT REPORTER - 214.753.2747

```
 1              (In open court at 1:35 p.m.)
 2              THE COURT:  Now we're going to do Rahim,
 3    3:17-CR-169.
 4              Who is here for the defense?
 5              MR. WHALEN:  James Whalen for Mr. Rahim,
 6    Your Honor.
 7              THE COURT:  For the government.
 8              MS. MARTIN:  Errin Martin and Brian
 9    Portugal from the government and Agent Dwayne
10    Golomb.
11              THE COURT:  What is the name?
12              MALE SPEAKER:  Golomb, G-O-L-O-M-B.
13              THE COURT:  You are the agent.  Yes, I
14    remember.
15              (Defendant enters the courtroom.)
16              THE COURT:  Okay.  Mr. Rahim.
17              THE DEFENDANT:  Yes, Your Honor.
18              THE COURT:  Good afternoon.
19              THE DEFENDANT:  Good afternoon, how are
20    you?
21              THE COURT:  You know you are here -- thank
22    you very much.  I'm fine.  Hope you are good, too.
23              We are here for your sentencing in your
24    case today.
25              THE DEFENDANT:  Yes, Your Honor.
```

1          THE COURT:  And I want to ask you several

2     questions.  And I'm sure we're going to be covering

3     a lot of things, so I would like to place you under

4     oath before we do anything else.

5          So raise your right hand, please.

6          (The Defendant was sworn.)

7          THE DEFENDANT:  I do.

8          THE COURT:  Okay.  Have you read

9     thoroughly through the presentence report paragraph

10    by paragraph, word by word with Mr. Whalen before

11    today?

12         THE DEFENDANT:  Yes, I did.

13         THE COURT:  Okay.  Do you have any

14    questions about it?

15         THE DEFENDANT:  No, I don't.

16         THE COURT:  Okay.  The government filed a

17    statement regarding -- excuse me -- regarding the

18    presentence report, accepting the PSR.  Are you

19    familiar with that?  That's Document 145.

20         THE DEFENDANT:  Yes, I do.

21         THE COURT:  Document 146 -- whoops.

22    Document 144 are your objections to the PSR, and

23    they are filed by Mr. Whalen on your behalf.

24         Have you read through those with him?

25         THE DEFENDANT:  Yes, I have.

```
 1              THE COURT:  Do you have any questions
 2    about them?
 3              THE DEFENDANT:  No, I don't.
 4              THE COURT:  Okay.  Then the government
 5    responded to your statement about the objections in
 6    Document 146.  And have you read through that with
 7    Mr. Whalen?
 8              THE DEFENDANT:  Yes, I did.
 9              THE COURT:  Any questions about it?
10              THE DEFENDANT:  No, I don't.
11              THE COURT:  Okay.  Then I have an
12    addendum, which was filed by probation, which
13    responded to the objections and decided what to do
14    about them.
15              Have you read through that with
16    Mr. Whalen?
17              THE DEFENDANT:  Yes, I did.
18              THE COURT:  Okay.  Have you read through
19    the addendum?
20              THE DEFENDANT:  Yes, ma'am.
21              THE COURT:  Do you have any questions
22    about the addendum?
23              THE DEFENDANT:  No, Your Honor.
24              THE COURT:  Okay.  Hold on a second.
25              (Pause in the proceedings.)
```

```
 1              THE COURT:  Then I have Rahim's sentencing
 2    memorandum.  It's very lengthy, and it has all sorts
 3    of letters that I have read through, and it's
 4    Document 148.
 5              Have you read through that with
 6    Mr. Whalen?
 7              THE DEFENDANT:  Yes, I did.
 8              THE COURT:  Do you have any questions
 9    about it?
10              THE DEFENDANT:  No, I don't Your Honor.
11              THE COURT:  Then I have a supplemental
12    response to the defendant's objections to the PSR
13    that mentions the new case by the government,
14    Document 151.
15              Have you read through that?
16              THE DEFENDANT:  Yes, I did.
17              THE COURT:  That is all I have.  Lots of
18    letters from you, including a letter from the jail
19    counselor at Seagoville -- I think it was
20    Seagoville.
21              THE DEFENDANT:  Yes, ma'am.
22              THE COURT:  I have read through all of
23    those.
24              Now, is there anything else that you have
25    to say, because I want to go through the objections.
```

```
 1              THE DEFENDANT:  No, Your Honor.
 2              THE COURT:  Anything from the government
 3    before we start?
 4              MS. MARTIN:  Nothing, Your Honor.
 5              THE COURT:  Okay.  Mr. Whalen, let's go
 6    ahead with your objections.
 7              MR. WHALEN:  Yes, Your Honor.
 8              First of all, just out of an abundance of
 9    caution -- always concerned about the 5th Circuit --
10    is we filed in our objections that we continue to
11    renew our Rule 29 Motion so as not to waive that.
12              THE COURT:  Yes.  And your motion is
13    denied.  Thank you.
14              MR. WHALEN:  So the next objection relates
15    to the 12-level enhancement that was set forth in
16    paragraphs 45, 46 and 58.  The objection as stated
17    in a written objection talks about whether or not it
18    is a federal crime of terrorism, and there's two
19    prongs to be met.  And one is whether or not it
20    influences or affects the conduct of the government
21    by intimidation, coercion, or retaliation against
22    government conduct.
23              And so we believe that there's -- first of
24    all, there's no specific intent through the evidence
25    that was presented at trial to support that.  And so
```

1    for those reasons, we believe that the 12-level

2    enhancement should not be imposed.

3            And secondly, the cases that I found

4    indicate that there would be this specific intent

5    requirement in order to find that prong that we

6    discussed.  And so looking at the jury charge that

7    was filed, the only mental state in the written jury

8    charge was about knowingly.  There was not any

9    reference to any type of specific intent.

10           THE COURT:  Did you ask for it?

11           MR. WHALEN:  I didn't, because it wasn't

12   an element of the crimes charged.  The mental state

13   for the multiple material support counts was

14   knowingly.  And so in the false statements, it was

15   knowingly and willfully.  So as far as it related to

16   the terrorism counts, it was simply knowingly.  So

17   that was the only definition they received.

18           And so therefore, because this is

19   indicating it requires a specific intent

20   requirement, it is our view that -- while I know

21   it's not -- like it's not fits neatly into a

22   statutory minimum or a statutory mandatory minimum

23   or anything like that, because the statute is zero

24   to 20.

25           THE COURT:  Okay, Mr. Whalen.  Why don't

1    you sit down, Mr. Rahim, over there, because we have

2    quite a few of objections to go through.  All right?

3              THE DEFENDANT:  Yes, Your Honor.

4              THE COURT:  Go ahead.

5              MR. WHALEN:  That it is -- so therefore,

6    since that element -- the enhancement requires the

7    Court, the way I read the case law, to make this

8    finding of specific intent.  So for the Court to be

9    allowed to make that finding of a mental state, that

10   becomes an extrajudicial fact-finding on the Court's

11   part, and therefore that violates his 6th Amendment

12   right to a jury trial.  This should have -- could

13   have been, in my mind, like a special issue as far

14   as it goes to whether or not it's a drug quantity

15   amount.  And so therefore, because, in effect, this

16   enhancement is now enhancing his sentence.

17             And when I look at the -- when you look at

18   the guidelines as it relates to this -- as it

19   relates to the offense, I believe it's -- let me

20   find it.  The base offense level is 26 under 2M5.3.

21   So then if you have the 12-level enhancement, that

22   immediately gets you to a level 38.  Okay?

23             THE COURT:  Okay.

24             MR. WHALEN:  And so assuming a scenario at

25   a level 38 with no criminal history, like we do in

1    this case, you are now at 235 to 293 would be the

2    guideline range just for that offense.  And so I

3    believe, even though it's not a stacked mandatory

4    minimum, you now have an instance where this

5    enhancement in and of itself has created a statutory

6    maximum.  It causes the Court to default to the

7    maximum range of punishment, which would be 20

8    years.

9            Congress decided that the range should be

10   zero to 20.  And so -- so to not have a jury make a

11   finding about specific intent, was it his specific

12   intent to make -- to influence another government,

13   he's now being subjected to potential punishment

14   greater, at the higher end of it, and so that's --

15   that is causing him to suffer greater -- potentially

16   greater punishment, and that would violate his Sixth

17   Amendment right.  And it should have been a jury

18   issue and not for a Court finding in the presentence

19   report.

20           THE COURT:  Under this particular offense

21   18 U.S.C. -- whatever it is -- 2332b(G)(F), b(g)(5),

22   is that what we are talking about?  2332b(g)(5).

23           MR. WHALEN:  That's the -- that's the

24   definition of what a federal crime of terrorism is.

25           THE COURT:  Okay.  Let's find a specific

```
 1  statutory provision that this relies upon.
 2          MR. WHALEN:  Your Honor, it's 2339B,
 3  18 U.S.C. Section 2339B.
 4          THE COURT:  Now, if I look at 2339B,
 5  what's going to be the maximum thing you can get for
 6  that, maximum punishment?
 7          MR. WHALEN:  Twenty years, Your Honor.
 8          THE COURT:  Okay.  Okay.  Twenty years,
 9  but we did a 12-month -- 12-year -- 12
10  enhancement --
11          MR. WHALEN:  Yeah, a 12-level enhancement
12  that really bumps you up against the maximum.  And
13  if you had a criminal history more than that, then
14  the guideline range would then exceed -- always
15  exceed the statutory maximum.  And so because now
16  the Court is in a position that you have to make a
17  finding that he had that specific intent, then I
18  think that falls into that -- that denies him his
19  right of having a jury decide this issue because it
20  does affect his punishment because they are not
21  making a finding about his specific intent because
22  it wasn't part of the underlying offense.
23          THE COURT:  Okay.  Okay.  And is there any
24  other, you know, causes of action that caused this
25  to go above 20?  Any other causes of action that
```

```
 1    we've got here?
 2              MR. WHALEN:  No.  And what's happening,
 3    though, is they then have -- you have the false
 4    statement counts.  And so now, as a result of them
 5    pleading the false statement counts, you can then
 6    run them consecutively.  And so now it's allowing --
 7    the way they charged it has allowed the Court now to
 8    assess a punishment greater than 20 years.
 9              THE COURT:  Okay.  Okay.  For that reason
10    only, but not because of the 12-level enhancement.
11              MR. WHALEN:  Correct.  Correct, Your
12    Honor.
13              THE COURT:  Okay.
14              MR. WHALEN:  All right.  So that's our
15    objection as it relates to the 12-level enhancement.
16              THE COURT:  Let me hear -- if you would
17    step aside, I would like to hear from the government
18    on this.
19              MR. WHALEN:  Sure.
20              THE COURT:  Go ahead.  Let me just find
21    this in the statute.  2339.  Okay.
22              MS. MARTIN:  Yes, Your Honor.
23              The defendant, Said Rahim, was actually
24    charged with one count of conspiracy to commit
25    material support of terrorism, one count of
```

12

```
1   attempted material support of terrorism, and six
2   counts of false statements with a terrorism
3   enhancement for --
4              THE COURT:  Okay.  Conspiracy, and then
5   attempt to do the thing.
6              MS. MARTIN:  Yes.
7              THE COURT:  And all of those are 20-year
8   offenses.
9              MS. MARTIN:  Right.  So we are at 40 stat
10  max.
11             THE COURT:  And then the false statements.
12             MS. MARTIN:  Are each -- there are six of
13  them, and they are each -- the statutory maximum is
14  eight years.  So total of 48 with those.  So if you
15  combine it with all, the statutory max is 88 years.
16             THE COURT:  Okay.
17             MS. MARTIN:  I believe what Mr. Whalen is
18  making is an Apprendi argument and saying that it is
19  something that should have been found by the jury.
20             THE COURT:  Yeah, partly I think he is.
21             MS. MARTIN:  And that's actually not
22  accurate in.  U.S. v. Hinojosa, 749 F.3d 407, 412 to
23  413.  It's a 5th Circuit case from 2014.
24             THE COURT:  Where what was charged?
25             MS. MARTIN:  I don't believe it was a
```

13

1    terrorism charge, Your Honor, but it said that

2    Apprendi does not apply to the guidelines because

3    Booker made the guidelines advisory only.  So the

4    Court is not bound by the guidelines.

5              THE COURT:  Okay.

6              MS. MARTIN:  Nothing about this 12-level

7    enhancement has increased the statutory maximum or

8    the statutory minimum, so it does not have to be

9    found by a jury beyond a reasonable doubt.

10             THE COURT:  Well, if he's looking at --

11   okay, I'm just -- because I'm -- I'm the last person

12   involved in this, but I'm looking at -- he's looking

13   at 360 to 1,056 months.  And how is that -- because

14   you said 88 months.  How is it increased up 360?

15             MS. MARTIN:  I'm sorry, 88 years.

16             THE COURT:  Oh, 88 years.  Okay.  I'm

17   sorry.

18             MS. MARTIN:  So he's looking at zero to 88

19   years.

20             THE COURT:  Okay.  Okay.

21             MS. MARTIN:  I apologize if I said months.

22             THE COURT:  Well, I think you did, but I

23   don't know.

24             MS. MARTIN:  So nothing about the

25   sentencing guidelines has increased that.  That's

14

```
 1   what it was when he walked into court on the first
 2   day of trial.
 3             THE COURT:  Okay.  Okay.
 4             MS. MARTIN:  So nothing about the
 5   guidelines -- guideline range being 360 to life has
 6   increased his statutory minimum or statutory
 7   maximum.
 8             THE COURT:  Okay.  I think he also is --
 9   well, Mr. Whalen, are you also complaining about the
10   offense conduct and the calculated to -- you know,
11   do the whatever?
12             MR. WHALEN:  Yes.  And I haven't really --
13   I think that's part of -- we will kind of progress
14   through that.  But that is the underlying argument,
15   is that because if you were to not have the 12-level
16   enhancement, then his guideline range and how they
17   are grouped together would be significantly lower,
18   which I put in my objections.  And so you're looking
19   at a guideline range of --
20             THE COURT:  I'm sorry.
21             MR. WHALEN:  What I had in my objections
22   is you're looking at -- without the 12-level
23   enhancement, you're looking at a guideline range of
24   78 to 97 months and so -- for those counts, and they
25   are grouped together.  So I think it is significant.
```

15

```
 1    And so now you have this huge disparity as far as
 2    what the guideline range is with that finding versus
 3    not.  And so that's part of it.
 4              THE COURT:  Okay.  Okay.  And you say --
 5    but the finding has to underlie offense conduct and
 6    calculate it, too, right?
 7              MR. WHALEN:  Correct, yeah.
 8              THE COURT:  Okay.  So do you think there's
 9    a problem with that?
10              MR. WHALEN:  Ask me that again.
11              THE COURT:  Well, do you think there's a
12    problem with -- you know, you said that you --
13    you -- you sort of made up a statement about the
14    guidelines and -- you know, all of that.  But are
15    you also saying the offense conduct and calculated
16    to do something is not in this -- not enough?  You
17    know --
18              MR. WHALEN:  The underlying offense
19    conduct doesn't support the enhancement?
20              THE COURT:  Uh-huh.
21              MR. WHALEN:  That's part and parcel of the
22    objection is that there wasn't enough evidence to --
23    one, there's this specific intent argument.
24              THE COURT:  Right, I've got your specific
25    intent argument.
```

1         MR. WHALEN:  But also there was no -- and
2    I think I tried to say that -- that there was no
3    evidence to support that finding, that it was
4    conclusory and there wasn't sufficient evidence to
5    do that.
6         THE COURT:  I think you did, too, but I
7    wanted to make sure you said it today.
8         MR. WHALEN:  Yes, that's correct, Your
9    Honor.
10         THE COURT:  Ms. Martin, go ahead.  I would
11   like to hear you talk about that.
12         MS. MARTIN:  Yes, Your Honor.  The
13   government has provided the Court and defense with a
14   binder of exhibits.
15         THE COURT:  Okay.
16         MS. MARTIN:  I'm also prepared to put the
17   agent on if the Court would prefer, but essentially
18   he would be testifying to the contents of the
19   exhibits.
20         THE COURT:  Okay.  Well, tell me what the
21   exhibits say, and I'll see what I want to do.
22         MS. MARTIN:  Yes, Your Honor.
23         The first exhibit is Government's
24   Sentencing Exhibit 1.  That is the transcript of the
25   testimony of the government's expert, Lorenzo

```
 1   Vidino.

 2               THE COURT:  Okay.

 3               MS. MARTIN:  At this time the government

 4   would move to admit it for sentencing.

 5               THE COURT:  How about -- you want to ask

 6   for all these exhibits to be admitted for

 7   sentencing?  What is it, 1 through what?

 8               MS. MARTIN:  Your Honor, the other

 9   exhibits that I can call out for the Court all

10   maintain their trial exhibit numbers, and they were

11   all admitted at trial.

12               THE COURT:  Let's say, A, B, C, D --

13               MS. MARTIN:  Your Honor, those are all

14   contained within Government Sentencing Exhibit 1.

15   Those are just to direct everyone to the specific

16   portions of the transcript.

17               THE COURT:  Okay.  And then the other

18   exhibits are trial exhibits.

19               MS. MARTIN:  Yes, Your Honor.

20               THE COURT:  They are in evidence, like

21   53 -- go ahead and number those.

22               MS. MARTIN:  Your Honor, it's Trial

23   Exhibit 53, 85, 170, 176, 178, 180, 182, 190.  And

24   then 192 and 194 were also trial exhibits that go to

25   another objection.
```

```
1              THE COURT:  Any objection?
2              MR. WHALEN:  Your Honor, just out of an
3   abundance of caution, I'm not sure what objections
4   we may have lodged at trial to these exhibits and to
5   the testimony of the experts.  So we -- to the
6   extent I don't want to waive those, I think for the
7   limited purposes of sentencing I don't have an
8   objection, but to the extent I objected to them at
9   the trial, I do reurge them.
10             THE COURT:  I overrule your objections for
11  purposes of sentencing, and all of those exhibits,
12  Exhibit A through I of 1 and all those others that
13  you just mentioned, Ms. Martin, are in.
14             MS. MARTIN:  Thank you, Your Honor.
15             Your Honor, with respect to Exhibit 1,
16  which is the testimony of --
17             THE COURT:  I would rather have you put
18  the agent on.  I really would.  Go ahead.
19             MS. MARTIN:  Your Honor, the government
20  calls Special Agent Dwayne Golomb.
21             THE COURT:  Come on up here, Agent.
22             COURT SECURITY OFFICER:  Raise your right
23  hand.
24             (Witness sworn.)
25             THE WITNESS:  I do.
```

```
1              COURT SECURITY OFFICER:  Please state and
2    spell your name for the record.
3              THE WITNESS:  Special Agent Dwayne,
4    D-W-A-Y-N-E, Golomb, G-O-L-O-M-B.
5              THE COURT:  Okay.  Please speak into the
6    microphone and go ahead.
7                SPECIAL AGENT DWAYNE GOLOMB,
8    having been first duly sworn, testified as follows:
9                    DIRECT EXAMINATION
10   BY MS. MARTIN:
11   Q.   Special Agent Golomb, you are the case agent in
12   the case of United States versus Said Rahim; is that
13   correct?
14   A.   That is correct.
15   Q.   And is it your understanding that the first
16   prong of the definition of a Federal Crime of
17   Terrorism is that it is calculated to influence or
18   to affect the conduct of government by intimidation
19   or coercion or to retaliate against government
20   conduct?
21   A.   Yes, it is.
22   Q.   And if you could take a look at the -- at your
23   binder, Exhibit 53 --
24              THE COURT:  Okay.  You think that's the
25   first prong, calculated to?
```

```
 1              MS. MARTIN:  Yes, Your Honor.

 2              THE COURT:  Okay.

 3              MS. MARTIN:  And the second prong, Your

 4  Honor, is just that's it's one of the listed

 5  offenses.

 6              THE COURT:  Yeah, I thought it was

 7  opposite, but yes, I've got it.

 8  Q.   (By Ms. Martin)  Special Agent Golomb, what is

 9  Government's Exhibit 53?

10  A.   Exhibit 53 is the State Department notice, the

11  designation for the Islamic State as a terrorist

12  organization.

13  Q.   And that is ISIS or ISIL?

14  A.   ISIS or ISIL, correct.

15  Q.   And so the United States Government recognizes

16  ISIS or ISIL as a foreign terrorist organization.

17  A.   Yes, ma'am.

18  Q.   And were you present for the entirety of the

19  trial in this matter?

20  A.   Yes, I was.

21  Q.   So you heard the testimony of Lorenzo Vidino?

22  A.   I did.

23  Q.   And have you reviewed the transcript of his

24  testimony?

25  A.   Yes, I have.
```

1   Q.   And at Government Sentencing Exhibit 1, which

2   is in your binder, if you will take a look at page

3   29 -- and that's behind Tab A, Your Honor --

4   beginning with line 3, and the question is:

5        "Okay.   And what about -- what about ISIS

6   wanting attacks in infidel countries?  Can you

7   explain that?"

8        And what was Dr. Vidino's answer?

9   A.   To summarize he said:  Yes.  ISIS, as always,

10  encouraged attacks against the West, but the message

11  has become particularly strong after September 2014.

12  September 2014 is when the U.S.-led international

13  coalition started bombing and attacking ISIS.  Their

14  reaction from ISIS was of course military on the

15  ground, but also calling for attacks, mobilizing its

16  global network of supporters to carry out attacks in

17  the countries that were attacking ISIS.  The message

18  was, they attack us here, we attack them back home.

19  Q.   And the question at line 17:  "What is the

20  reasoning for that?"

21       And what did Dr. Vidino testify?

22  A.   The reason for that is different strategic

23  purposes for ISIS.  One is, of course, weakening the

24  willingness of the coalition.  So they estimated

25  that if we attack, let's say, Spain, with terrorist

22

1   attacks, Spanish people will basically -- and the
2   government will then pull out of the coalition, the
3   coalition will become weaker, and that's obviously
4   good for ISIS.
5        There's also the second argument of a second
6   strategic objective, which is the idea of polarizing
7   that country's society, creating that polarization
8   in western societies; the idea of creating a divide
9   between Muslims and non-Muslims; and that perception
10  of mainstream society that all Muslims want to carry
11  out attacks, which creates depolarization in society
12  which serves ultimately ISIS purpose.
13            And finally, the last point is simply of
14  revenge.  If you attack us here, we will go and we
15  will kill you there.  So all of this is a series of
16  attacks we've seen in the West for the last five
17  years -- now, seven or eight years -- is basically a
18  response to those dynamics.
19  Q.   And so that testimony by Dr. Vidino was
20  specifically about ISIS's goals; is that correct?
21  A.   Yes, that's correct.
22  Q.   And going to that first prong, calculated to
23  influence or affect the conduct of government by
24  intimidation or coercion.  Was Dr. Vidino testifying
25  that the terrorist attacks are to influence the

```
 1   governments that are part of the coalition forces to
 2   back away and leave ISIS alone?
 3   A.   Yes, that's correct.
 4   Q.   Then, at the very end, when he gave the third
 5   strategic reason, did he say specifically it was for
 6   revenge or to retaliate against those countries?
 7   A.   Yes, that's correct.
 8   Q.   And then if you will take a look at that same
 9   exhibit, Government's Sentencing Exhibit 1, and
10   behind Tab B is page 36.  And if you will look at
11   lines 10 to 23.
12        And the question is:  "Have you had the
13   opportunity to review the transcripts of the
14   defendant's statements on that Zello channel in this
15   case?"
16        And Dr. Vidino says:  "I have."
17        And the question is:  "And what were your
18   initial reactions to those transcripts?"
19        Can you read Dr. Vidino's answer?
20   A.   Dr. Vidino wrote and replied -- well, his first
21   reaction was the size of -- quantitatively, a lot of
22   information, a lot of activity taking place on that
23   platform, referencing Zello.  I would say
24   specifically when it comes to the defendant, it was
25   pretty clear he was somebody with fairly deep
```

```
 1   knowledge and understanding of ISIS, of its jargon,
 2   of its strategy, of its priorities, of its
 3   operations.
 4   Q.   And so the first portion of that transcript was
 5   ISIS in general.  And that was portion of the
 6   transcript was directed specifically to Dr. Vidino's
 7   opinions by Said Rahim; is that correct?
 8   A.   That is correct.
 9   Q.   And he believed him to have a deep knowledge
10   and understanding based on the transcripts of ISIS's
11   strategies.
12   A.   That is correct, yes.
13   Q.   And those strategies that we just discussed.
14   A.   Yes.
15   Q.   That match up with prong one.
16   A.   Yes.
17   Q.   And if we could take a look at Government's
18   Exhibit 176 in your binder.
19        And page 1 beginning at line 6, the defendant
20   Said Rahim says:  "Yeah.  Now, the brothers in
21   Syria, I mean those that are now present in Turkey,
22   God willing, now they must...that's it, pledge
23   allegiance to the Islamic State and be lone wolves
24   and attack the Turkish government, its individuals,
25   its constituents, its police, its quarters, its
```

1   banks, its tourist sites, its vessels, its

2   nightclubs, and everything.  Let everything that

3   pertains to Turkey become a target for you."

4       What is a lone wolf?

5   A.   Lone wolf refers to ISIS supporters in the West

6   that are unable to travel into Syria Iraq and carry

7   out attacks on behalf of ISIS.

8   Q.   Does Said Rahim specifically mention the

9   Turkish government?

10  A.   Yes, he does.

11  Q.   If you will take a look at the same exhibit,

12  176, page 2, beginning at line 10:  "So, I mean, I

13  know there's a large number of the brothers present,

14  I mean in the Syrian land."

15      And when he says "brothers," is he referring to

16  other ISIS members?

17  A.   Yes, he is.

18  Q.   And continuing on line 12:  "In Turkey, I don't

19  know, maybe there is a million, a few million.

20  Let's say there is a 100,000, 100,000.  I mean, if

21  about 20- or 30,000 of those were lone wolves -- and

22  by the way, I am being modest with numbers -- if

23  there were 30,000 lone wolves, oh, man, that is it.

24  It will be raised.  The call to prayer will be at --

25  at -- at the forbearing mosques, and over there the

```
 1    Caliphate banner will be raised.  Attack them."
 2         Continuing on line 24:  "Take this matter
 3    seriously and I mean not jokingly.  That's it, the
 4    Emir of the Believers the Islamic State official
 5    spokesman, Abu Hasan al-Muhajir, may God protect
 6    him, said to target Turkey.  That's it.  This came
 7    based on -- on a fatwa and a study of the facts."
 8         And that statement is Said Rahim, again,
 9    speaking about attacks on a specific government.
10    A.   He's speaking and calling out for attacks on
11    that government, yes.
12    Q.   What government was that?
13    A.   The Turkish government.
14    Q.   Did Dr. Vidino specifically address that
15    transcript of the defendant's in his testimony?
16    A.   Yes, he did.
17    Q.   And if you will turn to Tab C in your binder,
18    which is government's sentencing Exhibit 1, page 85,
19    beginning at line one, Dr. Vidino stated:  "He's
20    basically saying that there is a large presence of
21    ISIS supporters in Turkey. When he talks about
22    brothers, that means ISIS supporters.  He
23    guesstimates the numbers, but it's an imaginative
24    20- to 30,000 lone wolves, so individuals that carry
25    out attacks independently, were to do so, were to
```

```
 1    carry out attacks. So imagine what kind of upheaval
 2    that would cause in Turkey, and the banner of the
 3    Caliphate would be raised.  So basically Turkey
 4    would be defeated, would be conquered and would
 5    become part of the Caliphate."
 6         Is Dr. Vidino talking there about one of the
 7    goals of ISIS?
 8    A.   Yes, he is.
 9    Q.   And what goal was that?
10    A.   To continue to expand its territory to take
11    over other nations bordering where they are at.
12    Q.   If we can look at Government's Exhibit 194 in
13    your binder.  It's the last exhibit.  And beginning
14    at the very bottom of page 1, line 28, and this is
15    Said Rahim speaking.  He says: "So when will you
16    rise up?  When will you rise up?  I mean attack the
17    er, policemen with -- with shoes, slippers and
18    stones.  Do anything but do not stand idle doing
19    nothing.  I mean you are being consumed; for here
20    came the Magi, I mean they expropriated your homes…
21    er, lands.  So rise up, rise up!  I mean there are
22    many millions in -- in Turkey, so rise up.  I mean
23    what are you waiting for?  Here, we appeal to-to-to
24    the brothers in al Sham land that are er, present
25    currently in Turkey; we are appeal to them to attack
```

1  the -- the false leaders members, government

2  establishments airline companies, police stations,

3  government centers, movie theaters and tourism

4  places attack them.  Set fire to Turkey.  Damn

5  Erdogan.  Damn the infidel."

6       Who is the Erdogan?

7  A.   Erdogan is the President of Turkey.

8  Q.   And do you see in this transcript the

9  defendant, Said Rahim, specifically mentioning

10 attacking a government?

11 A.   Yes, he is.  He is calling for attacks on that

12 government.

13 Q.   And did Dr. Vidino also address that specific

14 transcript during his testimony?

15 A.   Yes.

16 Q.   And if we can take a look at Tab D to

17 Government Sentencing Exhibit 1, that would be page

18 98.  And beginning at line 7.  Dr. Vidino explained:

19 "He is making repeated appeals to mostly Arabs, ISIS

20 supporters living in Turkey, to carry out attacks to

21 rise up against Turkey, particularly trying to

22 mobilize the Syrian refugee community, which is very

23 large, that exists in neighboring Turkey, to rise up

24 against the government and carry out attacks and so

25 on."

```
 1        In that portion, was Dr. Vidino explaining that
 2   the defendant is calling for attacks on the Turkish
 3   government?
 4   A.   Yes, he was.
 5   Q.   And this defendant in the transcripts that you
 6   read, the many transcripts, he hates Turkey, is that
 7   correct?
 8   A.   That is correct.
 9   Q.   And then if we could take a look at Tab G, and
10   I understand that's a little bit out of order.  But
11   that's still Government's Sentencing Exhibit 1, Tab
12   G, and that begins on page 131.
13        And Dr. Vidino explains:  "It's pretty open, as
14   open as it gets; basically saying that Turkey needs
15   to be punished.  But this is -- what's striking is
16   that he clearly identifies with ISIS as 'our
17   terrorism,' that basically Turkey, by virtue of its
18   foreign policy, its positions, is a target, and he
19   keeps praising the attack as 'our terrorism.'"
20        That's referring to a different transcript.
21   But do you recall that portion of the testimony?
22   A.   Yes, ma'am.
23   Q.   And do you remember that attack to be an attack
24   on a nightclub in Turkey?
25   A.   Correct, the Reina Nightclub, yes.
```

```
 1    Q.   And if we could take a look at Government's
 2    Exhibit 182 in your binder.
 3         Beginning on page 3.  Starting at line 7.  And
 4    this is again Said Rahim speaking:  "This message is
 5    to France, I mean er, the aircraft carrier or these
 6    military groups Charles De Gaulle or Charl-Charl De
 7    Gaulle that are I mean heading now er, towards the
 8    uh Arab region, the Islamic region to our countries
 9    er of course think and go back go back because it is
10    going to be destroyed this er this Charles De Gaulle
11    is going to be destroyed and er I mean you do not
12    learn a lesson; Hollande 75 of your people were
13    wasted like dogs and like animals, when you were the
14    president.  They died and were killed, good
15    riddance.  Think about your people man, think about
16    your people and leave the Muslims alone."
17         What is he referring to there with the 75
18    people in France that were wasted like dogs and
19    animals?
20    A.   He's referring to the lone wolf attack that
21    happened in Nice, France, on Bastille Day on July
22    14th of 2016.
23    Q.   And if you continue in that same transcript on
24    page 5, line 1, Said Rahim says:  "Here you are,
25    opposing the Muslims and this will happen to you, O
```

```
1   Frenchmen, you want ... you oppose Islam and this is
2   what will happen to you; you get trampled by trucks.
3   Tomorrow a er, suicidal er, martyrdom operation, or
4   a suicide operation tomorrow that might be carried
5   out by one of the Frenchmen, I mean other than
6   Muslims, er, just like that."
7        In this portion of the transcript, Said Rahim
8   is saying, if you mess with the Muslims, we're going
9   to attack you; is that correct?
10  A.    That is correct.
11  Q.    Does that fit the definition of a federal crime
12  of terrorism with respect to revenge?
13            MR. WHALEN:  Your Honor, I'm going to --
14  A.    Yes, ma'am.
15            THE COURT:  I'm sorry?
16            MR. WHALEN:  I'm going to object to him
17  making a legal conclusion.  I think it's out of his
18  scope of expertise.
19            THE COURT:  Overruled.  Go ahead.
20            MS. MARTIN:  Yes, Your Honor.
21  Q.    (By Ms. Martin)  And then if we could turn to
22  page 11 of the same exhibit.  Beginning at line 23,
23  said Rahim says:  "Okay.  The time of punishment is
24  here, what -- what time to settle the account, time
25  to settle the account, I mean the time to settle the
```

```
 1    account is here, er, that is brought to you by the
 2    monotheists, er, so here they are taking revenge on
 3    you O terrorist, you who terrorized the peaceful
 4    people and killed them.  I advise you to think and
 5    pull your army er, pull your army er from the region
 6    of the Muslims and that is it and you pay the
 7    jizyah, I mean as I said, which is the best solution
 8    for there is no other choice, there is no other
 9    choice, there is no other choice, nobody is going to
10    negotiate with you, nobody is going to negotiate
11    with you.  The State of the Caliphate is not going
12    to send anyone to negotiate with you.  No, no, no,
13    there won't be."
14            THE COURT:  And I think I've got the gist
15    of what you are trying to do, Ms. Martin.  You've
16    got Government's Exhibit -- I'm looking through your
17    response, 176, 178, 194, 182, 185, right?
18            MS. MARTIN:  Yes, Your Honor.
19            THE COURT:  Okay.  There's no reason to go
20    through those anymore.  Do you have anything else?
21    I would like to talk to you about how you want to
22    answer the specific intent argument.  I think you
23    have answered that, but I want to hear you say.  Do
24    you need him up here anymore?
25            MS. MARTIN:  No, Your Honor.
```

1          THE COURT:  I want to give Mr. Whalen a

2   chance to cross-examine him.

3          And I have all your exhibits.  They are in

4   evidence, all right, and your response.

                    **CROSS-EXAMINATION**

6   **BY MR. WHALEN:**

7   Q.   Agent, good afternoon.  How are you?

8   A.   Good, sir.  Thank you.

9   Q.   Just a couple of points as it relates to -- I

10  think you testified to this at trial, and I just

11  want to see whether or not it's the same, is that

12  there's no specific incident, identifiable terrorism

13  incident that relates to anything that Mr. Rahim

14  said on Zello, correct?

15  A.   Nothing that was presented in court, no.

16  Q.   Okay.  And would you agree with me that as

17  related to the Pulse Nightclub and the Nice, France

18  incident, he was speaking about those after the

19  fact, correct?

20  A.   That is correct.

21  Q.   And would you agree with me that -- let me see

22  how to phrase this.  You would agree with me that

23  Mr. Rahim, his role was to -- simply is talking on

24  this channel, correct?

25  A.   I disagree.

```
 1   Q.    Okay.  But he didn't take any steps, himself.
 2   He did not commit -- he didn't try to bomb anybody
 3   or kill anybody or do anything like that; you agree
 4   with that?
 5   A.    Did he commit an act of violence himself?
 6   Q.    Correct.
 7   A.    Not in regards to the channel, no.
 8   Q.    Okay.
 9              THE COURT:  Mr. Whalen.
10              MR. WHALEN:  I'm just thinking.
11              I will pass the witness at this point.
12              THE COURT:  Ms. Martin.
13              MS. MARTIN:  Nothing further.
14              THE COURT:  I would like you to address
15   his specific intent argument.  I think you have in a
16   way, but I would like to hear from you.
17              MS. MARTIN:  Yes, Your Honor.  And what I
18   was trying to demonstrate through the transcripts is
19   that we have the testimony of Dr. Vidino of what
20   ISIS's goal is.  This defendant was convicted of
21   material support for that terrorist organization,
22   ISIS.  But beyond just he was part of ISIS and these
23   are ISIS's goals, he demonstrated and fit within
24   this federal crime of terrorism.  He is trying to
25   influence countries by recruiting lone wolves to
```

1    attack in these countries in order to conquer them

2    for ISIS and in order to exact revenge on them for

3    their involvement in Syria and in the area of the

4    Levant.  So I think that fits squarely within the

5    definition of a federal crime of terrorism.  And I

6    really can't imagine a fact pattern that fits more

7    within that definition.

8             THE COURT:  What about specific intent?

9    Exactly -- you know, that's his argument.  So what

10   do you say about that?

11            MS. MARTIN:  Your Honor, I don't believe

12   that that's the law, but -- but I don't think you

13   have to make that determination because there's so

14   much specific intent demonstrated here.

15            THE COURT:  Okay.

16            MS. MARTIN:  But I do believe that

17   knowingly is all that needs to be demonstrated.  But

18   I don't believe that -- you have to get to that,

19   because I think specific intent is demonstrated

20   here.

21            THE COURT:  Okay.  That's what I wanted to

22   hear.

23            Okay.  Mr. Whalen, what else on this

24   objection?

25            MR. WHALEN:  I don't have anything

1    additional to add to that objection.

2              THE COURT:  On this objection, then -- is

3    there anything else that goes through this objection

4    that we need to keep -- I need to save ruling on it

5    for?

6              MR. WHALEN:  Yes, Your Honor.  There is

7    one more thing.  I know that the government has

8    presented that supplemental brief as related to Khan

9    about double counting that --

10             THE COURT:  Oh, yes, yes, I've got that.

11             MR. WHALEN:  I understand what the case

12   says, but I'm still going to reurge it is

13   consistent -- it is double counting.  Because the

14   basic offense is you're providing -- you're charged

15   with an offense of providing material support to a

16   terrorist organization, which is contemplated in the

17   statute.  And so, therefore, you're then going to

18   add an enhancement because it involved this crime of

19   terror.  So it -- to me, it is double counting.  And

20   I will reurge that objection.  I understand what the

21   5th Circuit has said, but I'm going to reurge it.

22             THE COURT:  Okay.  You do agree that the

23   5th Circuit has said that that's not true.

24             MR. WHALEN:  I do agree with that, that is

25   the case law, but I'm still going to reurge the

```
 1   objection, Your Honor.
 2              THE COURT:  Okay.  Okay.  All right.
 3              MR. WHALEN:  Your Honor, so that would
 4   conclude as it relates to the 12-point enhancement.
 5              THE COURT:  Okay.  Anything else,
 6   Ms. Martin, as to --
 7              MS. MARTIN:  No, Your Honor.
 8              THE COURT:  I do think, Mr. Whalen, you
 9   make the best argument you could possibly make, that
10   anyone else would make for this, not counting this.
11   But I don't think the guidelines are susceptible to
12   that Apprendi argument.  And I also think that she's
13   shown -- aside from that, within the guidelines,
14   she's shown specific intent, and she's also shown
15   knowingly.  But she's shown specific intent over and
16   over again.  So I think she has shown it, it's an
17   enumerated offense, and it's -- it is calculated to
18   influence or affect the conduct of government by
19   intimidation or coercion or retaliation against
20   government conduct.
21              So I will keep the 12-point enhancement.
22              MR. WHALEN:  Okay.
23              THE COURT:  Go ahead.
24              MR. WHALEN:  Your Honor, our next
25   objection relates to the two-level enhancement for
```

38

```
 1   providing material support that would result in a
 2   violent attack.  There's two bases for the
 3   objection.  The way I read it, and my objection is,
 4   this implies that material support was actually
 5   provided.  He was charged with conspiracy, so that
 6   was simply just an agreement to do it.  And then the
 7   other part is the attempt to provide material
 8   support.  And so I don't think there would -- even
 9   with the attempt, it wasn't actually provided to a
10   terrorist organization.  So since there was never
11   any evidence that actual support was ever provided,
12   then I don't think the enhancement should apply.
13          Additionally, I do think that the words
14   "violent terror activity" is not defined in the
15   guidelines and it is vague.  I understand that
16   there's case law that says it's -- you can't make a
17   vagueness argument, but I'm going to make it anyway
18   because I do think it is vague.  So I do think it
19   makes it difficult for the Court to then figure out
20   how to apply it, as well as for Mr. Rahim to argue
21   against it.
22          THE COURT:  Okay.
23          MR. WHALEN:  Because I would, you know,
24   add the point -- the way the case law is set up as
25   far as, you know, if you have an objection to any
```

```
 1    type of factual finding -- you know, the burden is
 2    on the defendant to give some contrary evidence.
 3    And so because it is vague, how do you give contrary
 4    evidence.  I don't think there's any evidence that
 5    there was a violent terror activity.  So how do you
 6    give some contrary evidence that there wasn't
 7    material support provided.  They haven't proven
 8    that, and they never charged him with that.  So I
 9    think that, in and of itself, shows the two-level
10    enhancement shouldn't apply.
11              THE COURT:  Okay.  Thank you.
12              Ms. Martin?  Number 3.
13              MS. MARTIN:  Yes, Your Honor.
14              Your Honor, first of all, I believe that
15    the guideline says in (b)(1)(E).
16              THE COURT:  In what?
17              MS. MARTIN:  I'm sorry, in Sentencing
18    Guideline Section 2M5.3(b)(1)(E).
19              THE COURT:  Yes, I thought that's what you
20    were talking about.
21              MS. MARTIN:  The specific language is
22    actually commission of a violent act, and not a --
23    what language Mr. Whalen was using, I believe he
24    said a violent terrorist act.  Is that correct?
25              MR. WHALEN:  I said "violent terror
```

```
 1  activity."
 2            MS. MARTIN:  Violent terror activity.
 3            THE COURT:  And it says -- let's see.
 4  Provision of funds or other materials support or
 5  resources with the intent, knowledge, or reason to
 6  believe they are to be used to assist or commit a
 7  violent act or something like that.
 8            MS. MARTIN:  Yes, Your Honor.
 9            So that's the first point I would make.
10  But the guidelines do not require that the violent
11  act be completed.  So the conspiracy and the attempt
12  falls squarely within this offense characteristic.
13            THE COURT:  And what cases do you have on
14  that?
15            MS. MARTIN:  Your Honor, I don't believe I
16  cited any cases on that.  I believe that's just
17  argument.
18            THE COURT:  Okay.
19            MS. MARTIN:  But I believe even the
20  language contemplates that when it says, "with the
21  intent, knowledge, or reason to believe they are to
22  be used."
23            THE COURT:  Um-hum.
24            MS. MARTIN:  So it doesn't even
25  contemplate a completed act, just with the intent
```

```
 1   that it's going to be used for a violent act.
 2               THE COURT:  Okay.
 3               MS. MARTIN:  And in this case, the
 4   evidence was that this defendant provided material
 5   support and resources, recruiting himself, and
 6   certainly there was evidence that that was for
 7   violence.
 8               THE COURT:  Government's Exhibit 190?
 9               MS. MARTIN:  Yes.  Government's Exhibits
10   190 and 192, Your Honor, which you have already
11   admitted.  And so unless the Court would like for me
12   to read those, I won't.
13               But the first one is, again, Said Rahim.
14   And he's talking specifically to an individual --
15   I'm sorry.  No, that's not correct.  This is one
16   where he is -- he's telling a young child -- he is
17   talking to an individual.
18               THE COURT:  Okay.  He's talking to an
19   individual here.
20               MS. MARTIN:  Yes.  And he is telling that
21   child to commit an act of violence.
22               THE COURT:  Um-hum.
23               MS. MARTIN:  And it starts out at line --
24               THE COURT:  "Do not look at your age."
25               MS. MARTIN:  Yes, line 10:  "We do not
```

```
 1    look at your age, may God bless you, whether you are
 2    eight years old so ... or f-or four years or ten
 3    years; it does not matter, rather what your creed
 4    down deep in your heart is, the creed of al-Wala'
 5    wal Bara'.  Meaning, may God bless you, you can now,
 6    I mean according to the area, to attack, I mean, as
 7    the Emirs of the Islamic State and the official
 8    spokesman of the Islamic State said, 'Be a lone
 9    wolf,' if you are able to do something in Turkey so
10    I mean attack the infidels and the apostates the
11    Turks, the Turkish police.  If you are able to kill
12    them then do so."
13            It goes on and on, but he's advocated to a
14    specific person for an act of violence.
15            Again, Exhibit 192.
16            THE COURT:  Who is he talking to?
17            MS. MARTIN:  In Exhibit 192, Your Honor,
18    he is talking on the channel to an unknown male.
19            THE COURT:  Um-hum.
20            MS. MARTIN:  And I think the Court will
21    probably remember this one from trial, the attack on
22    the Turkish nightclub happens.  And there had been a
23    previous statement by him about two weeks earlier to
24    attack the nightclubs -- we just went over that
25    transcript -- to attack the police, attack the
```

1 nightclubs.

2          And then after the attack -- and it was a

3 New Year's Eve into New Year's Day party, two days

4 later on the 3rd of January, 2017, Exhibit 192, page

5 2, line 11 he says: "Also, if you recall, before

6 from...I mean less than a month -- less than a

7 month, I called upon the brothers, I mean, to target

8 Turkey.  But I...who am I to be heard, but I mean,

9 praise be to God, the Lord of the Worlds.  I ask God

10 to grant me reward for it, for inciting brothers to

11 perform jihad for the cause of God, for inciting

12 brothers to perform jihad for the cause of God and

13 to fight the enemies of Almighty God, God willing."

14          So whether the government can present

15 evidence that he is specifically -- you know, that

16 that act can be attributed to him.  He certainly

17 believes the act is attributed to him, and he should

18 receive a reward from God for advocating and

19 inciting the act.  And so in that earlier

20 transcript, that's exactly what he was doing.  He

21 was calling -- he was recruiting for violence and

22 believes he was able to accomplish that goal.

23          THE COURT:  Why is this not double

24 counting?

25          MS. MARTIN:  Why is this one not double

44

```
 1  counting?
 2          THE COURT:  Did you argue this,
 3  Mr. Whalen?
 4          MR. WHALEN:  That goes to the 12-point,
 5  but I will take it.
 6          THE COURT:  All right.  Sorry about that.
 7          MS. MARTIN:  And, Your Honor, that's
 8  the -- that's the only argument the government has
 9  on that, is just that he is advocating to specific
10  people in some circumstances -- and sometimes it's
11  just the channel at large -- for violence, specific
12  violent acts, general violent acts and then takes
13  credit and expects rewards in heaven for those
14  violent acts.
15          THE COURT:  Okay.  Mr. Whalen.
16          MR. WHALEN:  Your Honor, I don't really
17  have anything additional to add.  I mean, you have
18  the -- what it says when it talks about the
19  characteristics.  You can read that.  And I still
20  don't think it applies, because I don't think
21  there's any evidence to support it.
22          THE COURT:  Thank you very much.
23          We're going to take a 10-minute break.  I
24  don't think my court reporter has had a break yet.
25  we're going to take a 10-minute break.
```

45

```
 1              (Recess taken.)
 2              THE COURT:  Let's go to the next
 3   objection -- no, no, we haven't finished that one.
 4              Anything else on that one?
 5              MR. WHALEN:  No, Your Honor.
 6              THE COURT:  Okay.  Now, I'm just trying to
 7   make sure I understand this.  Ms. Martin, are you
 8   saying that he attempted to do this but it's okay to
 9   use this guideline?  Come on up.  I mean, he
10   attempted to do this, right?
11              MS. MARTIN:  Yes, Your Honor, the charges
12   in the indictment were conspiracy and attempt.
13              THE COURT:  Okay.  And I'm looking at --
14   and this is reading from a case out of California.
15   I hate to cite a case out of California.  But it's
16   741 Fed.Appx. 676, 2017, and it says:  "Unless
17   another guideline section expressly covers an
18   attempted offense, the appropriate base offense
19   level for an attempt is the generic attempt
20   guideline found in 2X1.1."
21              And then it says:  "Here the District
22   Court used 2M5 --" you know, this one, 2M5.3, and it
23   said it was erroneous.  And so I just want to make
24   sure that you can respond to that somehow, because
25   it looks like it's the wrong guideline.
```

```
 1            MS. MARTIN:  Your Honor, so I don't
 2    have -- I have not read that case.  But I mean, I'm
 3    just looking at 2X1.1., and it's for the substantive
 4    offense.  It says in (a), 2X1.1(a), base offense
 5    level, "The base offense level --" oh, and you're
 6    saying that the specific characteristics in an
 7    attempt to increase by three and conspiracy to
 8    increase by three --
 9            THE COURT:  Well, I don't know what I'm
10    saying.  I just know that they say that it should be
11    2x that you're applying here and not 2M, I think.
12    If you want to look at the case, you're welcome to.
13            MS. MARTIN:  Your Honor, I think one thing
14    in 2239B, the attempt and conspiracy is actually
15    written into the statute.  So it is 2339B and
16    just --
17            THE COURT:  It says:  "There is no express
18    provision in the guidelines, in the application
19    notes or commentary to the guidelines that directs
20    the sentencing court to apply 2M5.3 to an attempted
21    offense under 2339B."
22            Mr. Whalen, do you have anything to say
23    about this?  Do you want to look at my case?
24            MR. WHALEN:  Yes.
25            THE COURT:  I will pass it down, and
```

```
1    Ms. Martin you can look at this.  I just found this.
2    My computer is running very slow or I would have
3    found some more.
4              (Pause in the proceedings.)
5              THE COURT:  Mr. Portugal, are you going to
6    address this?
7              Let Mr. Whalen finish so he can listen to
8    you first.  I will let him finish reading it.
9              (Pause in the proceedings.)
10             THE COURT:  I realize it says it's
11   harmless error, but we're not talking about that.
12             (Pause in the proceedings.)
13             THE COURT:  Okay.
14             MR. PORTUGAL:  Your Honor, I think the
15   case is distinguishable on the following basis.
16             THE COURT:  Go ahead.
17             MR. PORTUGAL:  That case is dealing with
18   setting a base offense level.  And I think for
19   purposes of the guidelines, the way you distinguish
20   that is, in determining the base offense level, the
21   Commission obviously is concerned with whether the
22   base offense level should be treated for attempt and
23   conspiracy as severely as it is for a completed
24   crime.
25             And here in 2339B, attempt and conspiracy
```

```
 1    are within the same statute.  So the base offense
 2    level is obviously the same.  And unlike the case
 3    that the Court has provided, here we're talking
 4    about an offense level increase.  So that's the
 5    basis in which I would distinguish it.
 6              THE COURT:  Okay.  Mr. Whalen, go ahead.
 7              MR. WHALEN:  Here's my initial reaction.
 8    Reading the case, it's talking about a 15-year
 9    statutory maximum.  Now, the statute that we were
10    charged under is a 20-year maximum.  So without
11    having to be able to do more looking, I wonder
12    whether or not this case it applicable because the
13    statute changed to increase the mandatory minimum.
14              I do kind of agree with the fact that
15    since "attempt" is written in the statute, that
16    makes sense that guideline would apply.  I think
17    where you have an attempt and it's not in the
18    statute, my understanding is you go to 2x, but I
19    could stand corrected.
20              THE COURT:  It sounds like it would be two
21    points either way, right?
22              MR. WHALEN:  Right.
23              THE COURT:  Ms. Martin, anything else?
24              MS. MARTIN:  Nothing additional, Your
25    Honor.
```

```
 1              THE COURT:  All right.  Right now, we've
 2     just looked at this case, and I'm going to go ahead
 3     and accept it because it would be two points anyway.
 4     Right?  Right?
 5              MS. MARTIN:  You mean the decrease would
 6     be two points?
 7              THE COURT:  Yes.
 8              MS. MARTIN:  Yes, it would be two points,
 9     Your Honor.
10              THE COURT:  Okay.  Let me just . . . oh,
11     no, it's -- it's a two-level enhancement.  Yeah.
12     And Mr. Whalen makes the argument that it's not,
13     it's attempt; it's not the actual offense, it's
14     attempt.
15              MR. WHALEN:  Well, I don't think -- Your
16     Honor, just to clarify, I think what my point -- if
17     that works, I will go with it.  But I think what I
18     was trying to say was, because they charged him with
19     an attempt, he didn't provide -- you know, the way I
20     read it, he provided and connected to that.  And so
21     because he attempted it, he never actually provided
22     it.  So that's kind of my rationale of why I focused
23     on the word "attempt."
24              THE COURT:  Since he attempted it,
25     shouldn't it be the 2X attempt provision that
```

```
 1   applies?
 2             MR. WHALEN:  I don't think -- I don't
 3   think so.
 4             THE COURT:  Okay.
 5             MR. WHALEN:  Because it is written in the
 6   statute as a way to commit the offense.
 7             THE COURT:  If you're going to say that, I
 8   think we're fine.
 9             MS. MARTIN:  Yes, Your Honor.
10             THE COURT:  I will accept that and
11   overrule your objection to number 3.  First of all I
12   will say I don't think it's vague.  And I think the
13   attempt, we've already talked about that.  I'm fine
14   with it the way it is, so I overrule that objection.
15             Go ahead.
16             MR. WHALEN:  Your Honor, just for
17   clarification, I know you overruled objection as it
18   relates to the 12-level enhancement.  I just want to
19   make sure, because the 12-level enhancement applies,
20   it makes his criminal history a VI instead of a I.
21   So I just want to make sure the objection is
22   complete, that we are objecting to the 12-level
23   enhancement and the increase in the criminal history
24   to a VI.  And I think that was covered by the
25   objection, but I just want to make sure it's clear.
```

```
 1              THE COURT:  Ms. Martin, anything to say
 2    about that?
 3              MS. MARTIN:  No, Your Honor.  I agree that
 4    objection covered both.
 5              THE COURT:  It does increase the criminal
 6    history category, right?
 7              MR. WHALEN:  Yes.
 8              THE COURT:  All right.
 9              MR. WHALEN:  And Your Honor, the next two
10    objections, 4 and 5, do not affect guideline
11    calculations.
12              Objection 4 relates to paragraph 70 and 71
13    as -- as they have listed two offenses that were
14    dismissed.  We're asking that they not be included
15    in the PSR.
16              THE COURT:  I'm going to include them.  I
17    think they are includable.
18              MR. WHALEN:  I understand.
19              THE COURT:  They are not counted for
20    anything.
21              MR. WHALEN:  Right.  And the next
22    objection relates to paragraphs 85, 86 and 87.  And
23    we are objecting to that because it relates to
24    alleged criminal history associated with his family
25    members.  And my concern with it is, one, I think
```

```
 1   it's unusual to see that in a presentence report.
 2   In all the ones I've done, I've never seen that
 3   specifically.  And my concern is that then there's
 4   this spillover effect that therefore it affects --
 5   because potentially his family members may have a
 6   criminal history, therefore that should affect how
 7   you sentence him.  So I would object to the
 8   inconclusion of that.
 9              It doesn't affect the guideline range, and
10   I understand the Bureau of Prisons' issue, but I
11   don't knowing it was necessary to be included in the
12   presentence report.
13              THE COURT:  Ms. Martin.
14              MS. MARTIN:  Your Honor, the government
15   believes that the information is accurate.
16              THE COURT:  You can speak into the
17   microphone, please.
18              MS. MARTIN:  Yes.  The information is
19   accurate.  And based on the addendum that says the
20   information was included to give a complete picture
21   and inform the Bureau of Prisons, the government
22   believes it's appropriately included in the PSR but
23   doesn't believe it should affect the sentence.
24              THE COURT:  No, it won't affect the
25   sentence at all.  But I think it needs to
```

```
 1    appropriately be included in there because of a lot
 2    of reasons, one because this is a terrorism case,
 3    and a lot of what they are talking about is
 4    terrorism, at least violent related.  And I think
 5    they need to know about that for visitors and all of
 6    that type of thing at the Bureau of Prisons.  So I'm
 7    going to leave it.  It doesn't mean -- and I will
 8    not consider any of it when I'm sentencing him.  So
 9    that's 4 and 5 are overruled.
10            What's 6?
11            MR. WHALEN:  And then 6, Your Honor,
12    related to the paragraph 108, objecting to the
13    calculated guideline range; in order to preserve our
14    other objections, we object to paragraph 108.
15            THE COURT:  Ms. Martin, come up here,
16    please.  It's best if you come up here.
17            MS. MARTIN:  Yes, Your Honor.  I believe
18    that the Court's rulings on the two previous
19    objections take care of that final objection, and so
20    we believe the calculation is accurate.
21            THE COURT:  Okay.  Anything else?
22            MR. WHALEN:  No, Your Honor, as to
23    objections.
24            THE COURT:  Overruled.  That takes care of
25    all of your objections?
```

```
 1              MR. WHALEN:  Yes.
 2              THE COURT:  Mr. Rahim, you can come up
 3    here now.  Let's go ahead and hear from you on
 4    sentencing.
 5              MR. WHALEN:  Yes, Your Honor.  First, for
 6    the record, I wanted to let the Court know that
 7    Mr. Rahim knows he has the right to allocute at his
 8    sentencing, and we have discussed his right to
 9    allocute at his sentencing.  However, based on my
10    advice and the fact that he did go to trial, I think
11    it is in his best interest not to allocute in order
12    to potentially not waive any objections he made at
13    trial and be consistent in his plea of not guilty.
14              THE COURT:  Mr. Rahim, do you agree with
15    that?  Yes or no.
16              THE DEFENDANT:  Yes, I do.
17              MR. WHALEN:  Your Honor, you have in front
18    of you our sentencing memorandum.  And I do think --
19    I think it's fairly laid out, so I don't want to go
20    over it.
21              THE COURT:  Go ahead, I want you to --
22              MR. WHALEN:  I will go over most of it.
23              When you look at the facts in the case,
24    you know, as the way the guidelines are calculated
25    and the range that you have, I think there's serious
```

55

1    issues that the Court should look at in fashioning a

2    reasonable sentence.  I think when you look at the

3    character letters that you have from his family --

4    and his family is here present in the courtroom.

5              THE COURT:  And could they stand up

6    please?

7              MR. WHALEN:  Sure.

8              THE COURT:  Thank you all very much for

9    coming down.  I really appreciate it.  Thank you.

10             MR. WHALEN:  And they supported him 33

11   months ago -- that's how long he's been in

12   custody -- and they support him today.  And so I

13   think he does have a strong family, but I also think

14   when you look at Mr. Rahim's background, he has

15   suffered some tragedies in his life, specifically as

16   related to the death of his father.

17             THE COURT:  Yeah, and that was from the

18   Palestinians, correct?

19             MR. WHALEN:  That is correct.  The

20   Palestinian authority tortured him and killed him.

21   And you know, he suffers from that loss.  He also,

22   unfortunately, was in a tragic accident where he

23   struck a child on his bicycle and resulted in his

24   death.  He suffered from that.

25             Also, he -- you know, he was going to

```
1    Jordan to see his daughter.  And I think -- you
2    know, I will continue to believe, and even though I
3    respect the jury's verdict, I think he was going to
4    Jordan to see his daughter.  I think that was very
5    clear and the evidence supported that.  So that's
6    why he was traveling to Jordan.  So you have -- and
7    he was separated from his daughter.  So he's now not
8    in a position to see her because he's been in
9    custody and was arrested that day at the airport.
10           And so I do think from his background that
11   he does have, you know, those things the Court
12   should consider.  He also, you know, has no scorable
13   criminal history.  The cases that he had were
14   dismissed.  So he stands before in his 40s with no
15   criminal history.
16           I think it's also important, too, to look
17   at, you know, obviously the seriousness of the crime
18   and we -- I'm not trying to diminish the seriousness
19   of it.  I do believe that the Court has to make a
20   sentencing determination that's fair and just, and I
21   do not think that what the guidelines calculate in
22   this case are fair and just.  I don't think they
23   support that.  And I think what's interesting -- and
24   I may jump around, because that's how my brain is
25   working.
```

```
 1            THE COURT:  That's all right.

 2            MR. WHALEN:  -- is that they are grouped.

 3   All these counts are grouped.  And so both the

 4   terrorism counts and the false statement counts are

 5   grouped together.  And one of the notes as it

 6   relates to grouping -- I think this is

 7   appropriate -- is:  "In order to limit the

 8   significance of the formal charging decision and to

 9   prevent multiple punishments for substantially

10   identical offense conduct, this part provides rules

11   for grouping offenses together," and these are

12   grouped together.  So really it's looking at it as

13   one particular -- it's one offense and not the

14   separate offenses.

15            And so the first point -- the reason to

16   make that point is, I do think there shouldn't be

17   any sentences run consecutively.  I think they

18   should be run concurrently that you impose in this

19   case.  And I think that goes back to my argument

20   that in order -- they have chose to charge all these

21   multiple false statement accounts.  And I kind of --

22   when thinking about how do I argue this to the

23   Court, it's kind of akin in my mind of doing a lot

24   of drug cases -- or bank robbery cases they had a

25   bunch of 924(c)s and that increased the range of
```

58

1    punishment.

2            But in this particular case, we're talking

3    about false statements in this case.  And really

4    when you look at the conspiracy to commit material

5    support, as well the attempted, to me they are one

6    and the same.  Yes, they have different elements and

7    they charge them differently and they are allowed to

8    do that.  But when you look at it, it's identically

9    the same conduct that we are talking about and

10   should be punished together, not consecutively.

11           I think it's also important, too, that the

12   Court recalls the evidence that, you know, they had

13   a pole camera up outside of his shop and his house

14   for over a year and watched him significantly for

15   over a year and there was no criminal conduct

16   occurring during that year of time.

17           I do think because of his age that his

18   likelihood to recidivate is low.  I do think it's

19   rare to get a letter from a jail counselor to say

20   that he's performing well and doing his job.  And I

21   think it was also important he's able to perform

22   work with minimal supervision.  And so I think you

23   have the character of him outlined for that.

24           So I think the other thing, too, is -- the

25   other one that I do want to focus on is the

1  sentencing disparities.  I think that's very

2  important for the Court to look at.

3           THE COURT:  Yeah, and I think you have

4  those attached to something.

5           MR. WHALEN:  Yes, I do, Your Honor.  I did

6  attach to the sentencing memo, different cases

7  that --

8           THE COURT:  Yes.

9           MR. WHALEN:  -- that have come up,

10  sentences that have been imposed as it relates to

11  different offenses.  And I think it's, you know,

12  illustrative of the different types of sentences

13  that have been handed out.  But I think the reason

14  why I highlighted some of these is that you have a

15  person getting a 40-year sentence where he planned

16  to detonate bombs in New York City and Times Square

17  and the subway system.  So now we have a guideline

18  range that allows the Court to consider 360 to 88

19  years.  So I think when you look at his conduct, you

20  know, I want the Court to weigh that and look at

21  that in its totality.

22           I think it's also important, too, that we

23  did provide to you the data from their expert

24  witness, Mr. Vidino, about the average sentence for

25  these type of offenses.  And according to his data,

60

1    the average sentence is 13.6 years.  I think that is
2    significant.
3            So when you look at the characteristics of
4    him, his age, the fact he's been incarcerated for
5    the length of time that he has, and the nature of
6    the offense in that it was him on a chat room, I
7    don't think that he was going to Jordan to commit a
8    terrorist act or join ISIS, he was going to see his
9    daughter.  And I think it's his involvement in a
10   chat room is what he has been found guilty of.  And
11   so I think the Court needs to avoid the
12   sentencing -- consider sentencing disparities as it
13   relates to that, and I think that's one of the
14   things that's important.
15           Obviously he doesn't have a significant
16   criminal history prior to this.  So as the Court has
17   to consider protecting him from further crimes, I
18   think that is a factor you have to consider but not
19   a significant one due to his criminal history as
20   well as his age.
21           And I think as far as vocational training
22   and those matters, I think he has vocational
23   training, he can be employed and was employed prior
24   to his arrest in this offense.
25           So I think when you look at the totality

```
 1    of Mr. Rahim, his character, his family, his
 2    background, the nature of this offense, as well as
 3    other offenses, to fashion a reasonable sentence, I
 4    do think a reasonable sentence below the guidelines
 5    recommended is appropriate.  I do not think that the
 6    Court should run any counts consecutively.  I think
 7    the maximum that he should be exposed to is 20
 8    years.  I think that is what Congress intended for
 9    this offense.  I mean, when you look at it and their
10    intent was zero to 20 years, that's what they meant.
11    I mean, that's what they felt was appropriate, was
12    within that range.  So when you look at that range
13    of from zero to 20, 20 is intended for the most
14    serious offense, the most -- the active act of
15    committing a terrorist act and somewhere in between.
16            And so I think when you look at that, as
17    far as what Congress intended as far as the range of
18    punishment, 20 is the worst, zero is down at the
19    bottom, it fits somewhere in the middle.  And I
20    think the false statement counts, I think you can
21    consider that, but I think they should be
22    concurrently, together, in fashioning a reasonable
23    sentence.  So we would ask the Court to do that.
24    And I don't think it should be any sentence greater
25    than what the statutory maximum is for the material
```

```
 1    support count.  But I do think it should be
 2    significantly lower when you look at that range of
 3    punishment, and I think that would be appropriate,
 4    Your Honor.
 5              THE COURT:  Okay, Mr. Whalen, thank you
 6    very much.  Is there anything else that you have?
 7              MR. WHALEN:  No, Your Honor.
 8              THE COURT:  And I want to make sure,
 9    Mr. Rahim, I'm going to give you another chance.  Do
10    you want to talk -- you're not going to tell me
11    later your attorney told you you couldn't talk.  You
12    don't want to talk, right?
13              THE DEFENDANT:  I don't.
14              THE COURT:  Step aside, and Ms. Martin
15    come on up here.
16              MS. MARTIN:  Yes, Your Honor.
17              The government does not believe a variance
18    or departure of any kind is appropriate in this case
19    and would request a guideline sentence.
20              I first want to address Mr. Whalen's
21    argument about the need to avoid the sentencing
22    disparities.  If you look at his chart, I mean,
23    charts are great, but they don't necessarily tell
24    the story of these sentences.
25              Many of these sentences were the result of
```

```
 1    guilty plea negotiations and guilty pleas.  For
 2    example, on the first page, the 20-year sentence for
 3    Ciccolo was a guilty plea; the Amer Sinan Alaggagi,
 4    guilty plea; Adam Raishani, guilty plea; Zakaryia
 5    Abdin, guilty plea; Ikaika Erik Kang, the gentleman
 6    in Hawaii was 11(c)(1)(C), guilty plea; and Asher
 7    Abida Khan pled guilty.  And Judge Hughes in Houston
 8    sentenced him, and that's on appeal by the
 9    government at this point.  So I don't know that that
10    is one to consider.
11            Ones that didn't make Mr. Whalen's list,
12    and understandably, were U.S. v. Medina in the
13    Southern District of Florida.  And I don't have the
14    case number, Your Honor, but --
15            THE COURT:  How much did he get?
16            MS. MARTIN:  He got 30 years.  It was
17    actually a weapons of mass destruction charge that
18    he pled to, and that was a guilty plea.
19            THE COURT:  How much is that in months, 30
20    years?
21            MS. MARTIN:  360 months, Your Honor.
22            THE COURT:  Okay.
23            MS. MARTIN:  Guilty plea on that one.
24    Christopher Lee Cornell, that was a 2339B case and
25    guilty plea, 30 years.
```

64

1          And then in the Fort Worth Division of the

2    Northern District of Texas in September, Michael

3    Sewell, an 18-year-old, pled guilty to one count of

4    2339B prior to any complex discovery litigation,

5    which as the Court well knows, that's a big

6    incentive for plea negotiations.  He pled guilty to

7    one count, sentenced to 20 years.

8          And those are guilty pleas.  As is

9    Mr. Rahim's right, he went to trial.  But inherent

10   in that is the refusal to accept responsibility and

11   put the government to its burden, and we accepted it

12   and we met our burden.  But he doesn't get credit

13   for that now and get some kind of variance or

14   departure when the examples given largely were the

15   results of plea negotiations with the government.

16   And we also don't have any information on whether

17   those involved downward departure motions or

18   anything of that sort.

19          And the facts in this case, the government

20   does not believe, warrant any kind of variance.  The

21   nature and circumstances of the offense and the

22   history and characteristics of the defendant, I

23   think the Court will recall that there wasn't a lot

24   of English in the case, but there was one English

25   recording.  And the tone of the defendant's voice

1    when he said, "ISIS will chop your head off, you

2    disbeliever.  ISIS come into your land, we gonna

3    occupy your land, we gonna chop your head off, we

4    gonna kill you, we gonna slaughter you like sheep."

5    That wasn't directed at U.S. citizens, but it was

6    directed at people he hated based on his affiliation

7    with ISIS.

8            And then in Government's Exhibit 122, I

9    believe the Court will recall that the defendant

10   said and the translation was:  "In any area where

11   Christians exist, they are legal targets or a Jew or

12   atheist or crusader or where a Christian missionary

13   preacher is, all those are legal targets of the

14   Islamic Caliphate State."

15           The nature and circumstances and

16   characteristics of this defendant don't warrant a

17   variance.  He was laughing about victims of violent

18   crimes, which included children in those terrorist

19   attacks.  The characteristics of this defendant

20   don't warrant a variance.

21           He praised the murder of Dallas Police

22   officers on that chat room.

23           THE COURT:  Yeah, yeah.

24           MS. MARTIN:  The characteristics of this

25   defendant do not warrant a variance.

```
 1              And he was an admitted member of more than
 2   just ISIS.  He admitted to being a member of other
 3   foreign terrorist organizations previously.  This
 4   just doesn't warrant a variance in this defendant.
 5              Additionally, the Court considers under
 6   18 U.S.C. Section 3553(a), a sentence that will
 7   reflect the seriousness of the offense to promote
 8   respect for the law and to provide just punishment
 9   for the offense.
10              Mr. Whalen, in trial -- and I certainly
11   understand his argument, but I think the evidence is
12   different.  He was traveling.  He talked about how
13   he was compelled to travel and he was a hypocrite if
14   he didn't commit jihad, and it wasn't just talk.
15   Just before he traveled, he had been on that
16   application nonstop for years, and he went dark.  He
17   was off the application, he was -- he had been
18   driving erratically.  He was kind of a bad driver
19   and surveillance caught him; no more erratic
20   driving.  He was very within the traffic laws right
21   before he left.  He bought a ticket to Jordan in the
22   Levant that bordered Syria.  He shaved his beard and
23   went to the airport; he had $6,000 in cash; he wiped
24   his phones of all social media; he had three foreign
25   SIM cards, one of which was password-protected and
```

```
 1   secreted in a jewelry box in his luggage, and he
 2   took his birth certificate.  And then he lied to
 3   these agents over and over and over about what he
 4   had been doing.  If it was just talk, why did he
 5   lie?  He was traveling; he was going to join ISIS,
 6   an organization he loved, he recruited for, he
 7   provided material support for.
 8            I think in order to afford adequate
 9   deterrence to criminal conduct and to protect the
10   public from further crimes of this defendant, as are
11   the factors in 3553(a), a variance is not warranted,
12   a guideline sentence is warranted.
13            The government believes in this case with
14   this defendant and what he did and what he was
15   trying to do and what he said and the way he
16   recruited passionately for ISIS and instructed
17   others to kill and commit attacks in their
18   homelands, we believe a guideline sentence is
19   appropriate in this case.
20            THE COURT:  Thank you, Ms. Martin.  I
21   would like a few minutes.
22            Sarah, would you come back with me?  We're
23   going to take about a five-minute break, ten-minute
24   break.
25            (Recess taken.)
```

68

1          THE COURT:  Anything else, Mr. Whalen?

2          MR. WHALEN:  No, Your Honor.

3          THE COURT:  Anything else from the

4  government?

5          MS. MARTIN:  Your Honor, just one thing

6  with respect --

7          THE COURT:  Step aside, please, and let's

8  have her come up here.

9          MR. WHALEN:  Okay.

10          MS. MARTIN:  Your Honor, just one thing.

11  Mr. Whalen and I visited over the break.  With

12  respect to supervised release, under

13  18 U.S.C. Section 3583(j), I believe supervised

14  release in this type of offense can be any term of

15  years or life.  So it can -- it's not limited to the

16  three years, it can be any term of years.  I just

17  wanted to raise that.

18          THE COURT:  Is it minimum three years?  I

19  thought it was minimum like two years or something.

20          MS. MARTIN:  I don't -- I apologize, Your

21  Honor.  I think it's not more than three years for

22  the false statements; is that correct?

23          USPO:  I believe so.

24          MS. MARTIN:  And then one to three years.

25          THE COURT:  Okay.  Okay.

```
 1           MS. MARTIN:  We just wanted to let the
 2    Court know that we believe it can be any term of
 3    years up to life.
 4           THE COURT:  Thank you.  Come on up.
 5           Mr. Rahim, we don't see many cases like
 6    this here.  We might do maybe one case a year for
 7    the various courts that have this come up, and --
 8    and, you know, you didn't plead guilty, which I
 9    think does affect you a little bit -- well, more
10    than a little bit for the sentencing.  But, you
11    know, I think if I'm looking at what you did -- hold
12    on a second, I want to find it.
13           Okay.  You know, there is -- on the one
14    hand it seems like it's just phone calls -- not
15    phone calls, but just being on the website, and then
16    you're going to see your daughter as far as
17    Mr. Whalen is concerned.  But on the other hand,
18    there's a lot of stuff that hurts you.
19           I mean, just going over some of the things
20    in the presentence report, you know, you -- you said
21    on January 18th of 2016: "... to join them, God
22    willing.  Amen O Lord.  By God, I have something in
23    mind, and since I'm going anyway, I will do this
24    something.  May the Lord of two worlds wills.  I
25    have some act in my mind.  May God facilitate
```

70

1  matters."

2        And then February 11th of 2016, you said:

3  "... my religion is on trial because I have not

4  mobilized to jihad yet and the brothers are crying

5  out.  But by the will of God, the Lord of two

6  worlds, I swear by God that the intention exists ...

7  the intention exists but there are obstacles.  May

8  Almighty God facilitate it and we will mobilize to

9  jihad in the Caliphate Islamic State."

10       And then it goes on, and I'm skipping over

11 a few things.

12       On June the 12th, there was a mass

13 shooting at the Pulse Nightclub in Orlando, Florida,

14 which killed 49 people and injured 53.  And you

15 addressed the attack on the Zello channel.  Among

16 other things, you made fun of the Friday prayers

17 where those that were killed in Orlando would be

18 eulogized.  You were laughing about the attack and

19 asked listeners to laugh.  You called the attacker a

20 lion, one of ISIS's main symbols.  And you thanked

21 God for the attack and the success of the attack

22 because God is almighty.

23       Then on July the 12th, you were talking

24 about the state of things.  And you talked about --

25 there was a July 14th, 2016, attack by a -- an

71

 1  attacker that drove a 19-ton cargo truck in front of

 2  a large crowd of people in France, and it resulted

 3  in the death of 86 people and injured 434.  ISIS

 4  publicly claimed responsibility for the attack and

 5  you spoke about the attack on Zello, and you said:

 6  "I know if you are Islam's enemies, this is what

 7  happens, a truck will go over you."

 8          And you said:  "A grand killing done by a

 9  lion of God against the infidel French."

10          "May the immigrants in France carry a

11  knife and kill a Frenchman.  If you are truthful,

12  kill the French, kill them, for God said Jews and

13  Christians will not like you until you follow their

14  faith," and it goes on.

15          And then 35 you said:  "Many mobilize to

16  jihad because of a word on this channel."  That

17  meant that you took credit for a lot of what

18  happened by mobilizing to jihad because of the word

19  on this channel.

20          And then you talked about the killing of

21  non-Muslims in England was permissible, and you said

22  something like this:  "Okay.  May God bless you.  I

23  was going to grab the microphone so I would tell

24  him, the one in Manchester, okay, and do not consult

25  anyone or seek the opinion of others.  Kill them and

1    do not show them mercy or compassion, for neither

2    the civilian clothes protect them nor the military

3    uniform sanctions the shedding of their blood," and

4    it goes on.

5            And then in 37, you praise the mission,

6    and that was after the December 31 attack on the

7    nightclub in Istanbul where 39 people were killed

8    and people were of 14 countries.  And you gave --

9    ISIS claimed responsibility for the attack, and you

10   spoke on the Zello channel referring to the Turkish

11   nightclub bombing as a continuation of ISIS work.

12   You praised the mission and said that the way the

13   Caliphate celebrates is by exploding their pure

14   bodies, the suicide bombers, in your victim's filthy

15   pernicious bodies."  It goes on and on.

16           There's so much hate out there, so much

17   hate, and laughter at incredible harm.  I mean 45

18   people, 80 people getting murdered, and you thought

19   it was funny.  And I don't think that's just talking

20   on a radio station.  I think that it's a lot more

21   than that.

22           And because -- I mean, I don't know if it

23   was true or not, but December the 16th of -- I don't

24   know what year it was -- I think it was -- I can't

25   remember -- you mentioned the killing of people in

```
 1   nightclubs.  And then December 31st, there was an
 2   attack at a nightclub in I think it was Istanbul.
 3   And I don't think you took credit for it, I don't
 4   know what you did.  But it's -- it's curious,
 5   anyway.
 6            So all of these facts, this hate, this
 7   mobilization towards the Islamic State, we just
 8   can't tolerate that in this country.  This country
 9   has to stand up firm against terrorism and all of
10   its factors.  And you didn't plead guilty.  You went
11   to trial as you are allowed to.  But you made the
12   government go to their proof, and they put on a
13   great case and your attorney did a great job for
14   you, but the government had a very good case.  But
15   we had all sorts of things that went into this case,
16   all sorts of things that the government had to do,
17   but they did it, and the end result was that you
18   were convicted.
19            So I think, Mr. Rahim, the appropriate
20   sentence in this case is -- is going to be 360
21   months, that's probably not as much as the
22   government wanted, but it's not as little as your
23   attorney wanted.  It is 30 years, and I think it
24   will go as follows:  Pursuant to the Sentencing
25   Reform Act of 1984, it is the judgment of the Court
```

74

```
1   that the defendant, Said Azzam Mohamad Rahim, is
2   committed to the Bureau of Prisons for a period of
3   360 months.  This sentence consists of 240 months on
4   Count 1 and 240 months on Count 2.  The sentence
5   imposed on Count 2 shall run consecutively to those
6   on Count 1, but only to the extent that it produces
7   a combined sentence equal to the 360-month term.
8            A sentence of 96 months per count is
9   imposed on each of Counts 3, 4, 5, 6, 7 and 8.  The
10  sentences on each of Counts 3, 4, 5, 6, 7 and 8
11  shall run concurrently with each other and to Counts
12  1 and 2, to produce an aggregate sentence of 360
13  months or 30 years.  There is no restitution
14  applicable in the case, and I did not order a fine,
15  because I don't think you have the financial
16  resources to pay it.
17           You have a 100-dollar mandatory special
18  assessment on each count for a total of $800.  You
19  must pay $800.  And I think you shall be placed on
20  supervised release for a period of two years, and
21  that's going to be 30 years from now.
22           How old are you now?
23           THE DEFENDANT:  I will be like 80 if I
24  make it.  I'm 43 now.
25           THE COURT:  So it will be a long time; so
```

75

```
 1    a two-year term of supervised release.  During that
 2    time, you cannot commit another federal, state or
 3    local crime.  You must not unlawfully possess a
 4    controlled substance.  You must cooperate in the
 5    collection of DNA as directed by probation.
 6              There will be no mandatory drug testing
 7    condition based on the Court's determination that
 8    you pose a low risk of future substance abuse.
 9              The defendant shall participate and comply
10    with the requirements of the Computer Internet
11    Monitoring program, contributing to the costs of
12    monitoring in an amount not to exceed $40 per month.
13              The defendant shall consent to the
14    probation officer conducting the ongoing monitoring
15    of his computers.  The monitoring may include
16    conducting ongoing monitor of computer equipment.
17    So the government -- so the monitoring may include
18    the installation of hardware and software systems
19    that allow the evaluation of computer use.
20              The defendant shall not remove, tamper,
21    reverse engineer, or circumvent the software in any
22    way.
23              The defendant shall only use authorized
24    computer systems that are compatible on the software
25    and/or hardware used on the computer and the
```

1    internet monitoring program.

2          The defendant shall permit the probation

3    officer to conduct a preliminary computer search

4    prior to the installation of software.  At the

5    discretion of probation, the monitoring software may

6    be disabled or removed at any time during the term

7    of supervision.

8          The defendant shall submit to periodic

9    unannounced examinations of his computer and

10   computer program storage media and/or other

11   electronic or internet capable devices performed by

12   a probation officer at reasonable times and in a

13   reasonable manner or on reasonable suspicion of

14   contraband evidence or of a violation of

15   supervision.  This may include retrieval and copying

16   of any prohibited data and the removal of such

17   system for the purposes of conducting a more

18   thorough inspection.  The defendant shall provide

19   written authorization for the release of information

20   and from the defendant's internet service provider.

21         The defendant shall not use any computer

22   other than the one defendant is authorized to use

23   without prior approval by probation.

24         The defendant shall not use any software

25   program or device designed to hide, alter, delete

1    records or logs of the defendant's computer in

2    activities or files shared on the defendant's

3    computer.

4           The defendant shall not install new

5    hardware, perform upgrades or effect repairs on the

6    computer system without prior permission of

7    probation.

8           The defendant shall not access any service

9    or use any software that allows a direct

10   peer-to-peer contact which may include chat rooms,

11   file sharing or other similar activity without

12   permission from probation.

13          The defendant shall not access any

14   internet service provider account or provide -- or

15   other online service using someone else's account,

16   name or designation.

17          Mr. Rahim, you can appeal this sentence,

18   I'm sure you will; I'm just going to assume you will

19   right now.  If you want to appeal, you have two

20   weeks from the date of my judgment.  My judgment may

21   be tomorrow, it may be next week, but you have two

22   weeks thereafter to file a notice of appeal.

23   Mr. Whalen can do that for you.  Mr. Whalen will do

24   that for you.  If he will check with you and,

25   Mr. Whalen, will you check with him and see if he

78

```
 1   wants to appeal and file the notice?

 2           MR. WHALEN:  We will file the notice, Your

 3   Honor.

 4           THE COURT:  Okay.  All right.  Is there

 5   anything else that you want?

 6           MR. WHALEN:  No, Your Honor.  We would

 7   recommend a facility in the Dallas/Fort Worth area.

 8   We know that's up to the Bureau of Prisons.

 9           THE COURT:  I will recommend that.  I

10   don't know if it will be in this case, but yes.

11           MR. WHALEN:  And finally, Your Honor, just

12   for the record, we would object to the sentence

13   imposed both procedurally and substantively as being

14   unreasonable as to both prongs.

15           THE COURT:  Okay.  Overruled.

16           Ms. Martin, anything from you?

17           MS. MARTIN:  Your Honor, there was a

18   superseding indictment and an original indictment.

19   We would just ask that those be dismissed now that

20   he's been convicted and sentenced to the second

21   superseding indictment.

22           THE COURT:  Okay.  He's on the second

23   superseding indictment, the first indictment and the

24   first superseding indictment are dismissed.  Okay.

25           Anything else?
```

```
 1                    MR. WHALEN:  No, Your Honor.

 2                    MS. MARTIN:  No, Your Honor.

 3                    THE COURT:  Okay.  Mr. Rahim, is remanded

 4    to federal custody, and we're in recess.  Thank you.

 5                    (Court in recess at 4:21 p.m.)

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

80

1                 C E R T I F I C A T E

2           I, Shawnie Archuleta, CCR/CRR, certify

3    that the foregoing is a transcript from the record

4    of the proceedings in the foregoing entitled matter.

5           I further certify that the transcript fees

6    format comply with those prescribed by the Court and

7    the Judicial Conference of the United States.

8           This 21st day of March 2020.

9

10

11                      s/Shawnie Archuleta
                        Shawnie Archuleta CCR No. 7533
12                      Official Court Reporter
                        The Northern District of Texas
13                      Dallas Division

14

15

16   My CSR license expires:  December 31, 2020

17   Business address:  1100 Commerce Street
                        Dallas, TX  75242
18   Telephone Number:  214.753.2747

19

20

21

22

23

24

25

**SHAWNIE ARCHULETA, CSR/CRR**
**FEDERAL COURT REPORTER - 214.753.2747**